# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

## CAUSE NO.: 3:06-CV-2248-BH

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

---

**LICHO ESCAMILLA,**

**VS.**

**NATHANIEL QUARTERMAN,**
**Director of Texas Department of**
**Criminal Justice, Correctional**
**Institutions Division**

**POLUNSKY UNIT, LIVINGSTON, TX**

**TDC NO. 999432**

---

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

---

Petitioner was convicted and sentenced to death by a jury in the 203rd Judicial

District Court of Dallas County, Texas. The Texas Court of Criminal Appeals affirmed

Petitioner's conviction on direct appeal on June 30, 2004. *Escamilla v. State*, 143 S.W.3d 814

(Tex. Crim. App. 2004), *cert. denied*, 544 U.S. 950 (2005). The United States Supreme Court

denied certiorari on March 28, 2005.

Thereafter, on January 6, 2006, Petitioner filed an Article 11.071 state writ of habeas

corpus with the 203rd Judicial District Court. On March 20, 2007, the trial court recommended

denial of relief on all grounds. (Trial Court's Findings of Fact and Conclusions of Law, March

20, 2007).  On October 10, 2007, the Texas Court of Criminal Appeals denied habeas relief, adopting the trial court's findings and conclusions.  *Ex Parte Escamilla*, 2007 WL 2955561 (Tex. Crim. App. October 10, 2007) (per curium).

## II.    BACKGROUND FACTS

Petitioner was convicted of capital murder for causing the death of Officer Christopher James, a Dallas City Police Officer, after Petitioner's own counsel argued to the jury that they should find him guilty of murder.  Petitioner was indigent.  Counsel Wayne C. Huff and Brook Busbee were appointed by the 203rd Judicial District Court to represent Petitioner at trial. Despite evidence of a sordid criminal history in the Escamilla family, neither counsel investigated the criminal history of this family.  Counsel similarly failed to investigate the abusive and alcoholic proclivities of Petitioner's father – one of only two family members that testified on Petitioner's behalf.  Counsel also failed to timely investigate and evaluate Petitioner's educational, medical and social history that would have revealed an abusive past that affected Petitioner's educational failures, his disciplinary failures and his seeming inability to avoid altercations.

Counsel Wayne Huff maintained no file in this case.  His co-counsel, Ms. Busbee, maintained only 10 pages of handwritten and investigatory notes in her file.  There is absolutely no evidence of any investigation, beyond speaking with a few family members, that occurred during this case.  Despite the existing ABA Guidelines regarding investigation in capital cases, Petitioner's counsel failed to undertake any meaningful investigation into why Petitioner might involve himself in this sort of crime.  Two jury members indicated during state habeas proceedings that had they learned of the readily available mitigating evidence, they might have voted for a life sentence rather than death.

The City of Dallas has serious racial issues in relation to jury selection. Professors, journalists and even the United States Supreme Court has exposed these shortcomings. While *Batson v. Kentucky* intended to eradicate racial disparity in jury selection, the recent decision in *Miller-El* underscores the remnants of racial disparity prevalent in Dallas jury selection.

Petitioner, a Hispanic, was tried by a nearly all-white jury. His venire was wholly lacking in Hispanic representation. This under-representation existed throughout the entire year that Petitioner was tried. Evidence of this racial disparity was presented to, but ignored by, the state habeas court. This finding violates *Duren v. Missouri*, 439 U.S. 357 (1979).

The State of Texas currently uses a three-drug cocktail to execute individuals condemned to death. This three-drug cocktail is not administered by a physician or an individual with adequate medical training to administer the cocktail. This methodology results in severe undetectable pain and suffering to individuals and violates the Eighth Amendment's ban against cruel and unusual punishment. The United States Supreme Court's recent plurality in *Baze v. Rees* does not resolve this issue.

### III. EXHAUSTION OF CLAIMS

All claims presented herein were previously presented during the state 11.071 habeas corpus proceedings and/or during state direct appellate proceedings. Thus, all claims have been properly preserved and are capable of § 2254 review by this Court.

### IV. STANDARD OF REVIEW – AEDPA

This case and its review by this Court is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). 28 U.S.C. § 2254. *See also Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Because the Texas courts' determination of Petitioner's habeas claims resulted in a decision that was contrary to *and* involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, habeas corpus should issue and Petitioner's requested relief be granted. *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). Further, because the Texas courts' determination of Petitioner's habeas claims resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court, this Court should grant his requested relief in its entirety. *Id.*

## V.    CLAIMS FOR RELIEF

Petitioner presents fifteen (15) claims for review. The first claim, however, has two parts: the failure to investigate *and* the failure to present mitigating evidence.

**A.    CLAIM ONE:  INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL FOR FAILING TO INVESTIGATE *AND* PRESENT READILY AVAILABLE MITIGAITON EVIDENCE**

Petitioner Licho Escamilla received ineffective assistance of counsel at trial when trial counsel failed (1) to investigate, and, (2) to present readily available mitigation evidence during his punishment proceedings. These failings violate Petitioner's Sixth Amendment right to the effective assistance of counsel as set forth by the United States Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 396 (2000), *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005).

The Texas Court of Criminal Appeals committed error when it adopted the trial court's state habeas findings denying relief on these claims. In not finding that counsel was deficient for failing to investigate, the Texas state courts ignored the clear mandate of *Williams, Wiggins* and *Rompilla*. These failings permit this Court to overrule the state court findings and grant Petitioner his requested habeas relief. Accordingly, habeas corpus should issue on these claims and Petitioner should be granted an entirely new punishment proceeding at which time the readily available mitigation evidence can be properly presented.

In the alternative, Petitioner should be granted an evidentiary hearing at which time he can more fully be heard on the issues that were not properly developed during the state court proceedings.

**A.1    PETITIONER WAS DENIED HIS SIXTH AMENDMENT
RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL
WHEN HIS COUNSEL FAILED TO CONDUCT A MEANINGFUL
INVESTIGATION INTO POSSIBLE MITIGATING EVIDENCE**

*GUIDELINE 11.4.1 INVESTIGATION*

*A. Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously....*

*C. The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.*

*7. Expert Assistance:*

*Counsel should secure the assistance of experts where it is necessary or appropriate for:*

*C. rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of the trial;*

*D. presentation of mitigation. Experts assisting in investigation and other preparation of the defense should be independent and their work product should be confidential to the extent allowed by law. Counsel and support staff should use all available avenues including signed releases, subpoenas, and Freedom of Information Acts, to obtain all necessary information.*

*ABA Guidelines for the Appointment & Performance of Counsel (1989)

## 1. __Applicable Legal Standard__

Criminal defendants are guaranteed the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). This protection stems from the Sixth Amendment of the United States Constitution and has been incorporated to apply to the states via the Fourteenth Amendment. *See Gideon v. Wainwright*, 372 U.S. 335 (1963); *United States v. Cronic*, 466 U.S. 648 (1984). Courts considering ineffective assistance of counsel claims must evaluate whether counsel's deficient performance was significant enough to undermine confidence in the results of the proceeding. *Bell v. Cone*, 535 U.S. 685, 695 (2002).

The state court findings commence, specifically in findings Six and Seven, by highlighting counsel's qualifications and appear to fault Petitioner for not "acknowledging this expertise." There is a significant gap, however, between satisfaction of paper qualification standards and years of practice and actual effective assistance – the type of assistance guaranteed

by the Sixth Amendment. If it were not so, counsel would be immune from ineffective assistance challenges merely by obtaining licenses, attending training and satisfying paper qualification standards. Instead, "[t]he Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment." *Avery v. Alabama*, 308 U.S. 444, 446 (1940).

Petitioner vigorously challenges the state courts' findings regarding his counsels' effectiveness. Petitioner submits that the state habeas court erred by commencing its ineffective assistance evaluation through such a narrow lens because such myopic analysis looks not to actual efforts, proficiency and zealous representation but, instead, only to the inherent fact of being appointed pursuant to state minimal standards. This emphasis on paper qualifications, if permitted to stand, would virtually eliminate all ineffective assistance challenges in the State of Texas. And, as clearly federal law has established, such is not the proper consideration or emphasis when assessing the propriety of counsels' actions. *See United States v. Cronic*, 466 U.S. 648, 654-655 (1984); *Avery v. Alabama*, 308 U.S. 444, 446(1940). As the Court noted in *Cronic*, "To hold otherwise 'could convert the appointment of counsel into a sham and nothing more than formal compliance with the Constitution's requirement that an accused be given the assistance of counsel. The Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment." *Cronic*, 466 U.S. at 654-655.

> The substance of the Constitution's guarantee of the effective assistance of counsel is illuminated by reference to its underlying purpose. "[T]ruth," Lord Eldon said, "is best discovered by powerful statements on both sides of the question." This dictum describes the unique strength of our system of criminal justice. "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." Herring v. New York, 422 U.S. 853, 862 (1975). It is that "very premise" that underlies and gives meaning to the Sixth Amendment. It "is meant to assure fairness in the adversary criminal process." United States v. Morrison, 449 U.S. 361, 364 (1981). Unless the

accused receives the effective assistance of counsel, "a serious risk of injustice infects the trial itself." Cuyler v. Sullivan, 446 U.S. at 343.

Thus, the adversarial process protected by the Sixth Amendment requires that the accused have "counsel acting in the role of an advocate." Anders v. California, 386 U.S. 738, 743(1967). The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted - even if defense counsel may have made demonstrable errors - the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated. As Judge Wyzanski has written: "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." United States ex rel. Williams v. Twomey, 510 F.2d 634, 640 (CA7), cert. denied sub nom. Sielaff v. Williams, 423 U.S. 876 (1975).

*Id.* at 655-57.

The state courts improperly decided this issue, much like the appellate court in *Cronic* by placing undue emphasis on counsel's paper qualifications. Such emphasis is contrary to clearly established federal law as set forth by the United States Supreme Court in *Avery v. Alabama* and *United States v. Cronic.* Thus, this Court should be permitted to make an independent assessment of the actual performance of counsel in this case – with no deference given to their paper qualifications.

### 2.        Counsel's Failures Under the ABA Guidelines

The United States Supreme Court requires reviewing court to use the ABA Guidelines as a source for determining the "reasonable professional norms" evaluated under *Strickland.* Trial counsel's performance is legally deficient using these standards for numerous reasons. Petitioner's trial counsel failed to follow the governing ABA guidelines by:

a.        Failing to conduct a proper or thorough mitigation investigation;

b.  Failing to interview Petitioner's numerous relatives and friends – many of whom either resided with Petitioner (i.e., his sister Maria and his cousin Rachel) or within a six-block radius;

c.  Failing to perform a timely mitigation investigation, waiting until trial had begun to hire one of their purported mitigation experts. This "investigation" was neither immediately nor expeditiously conducted;

d.  Failing to perform a timely mitigation investigation, not having completed their penalty case strategy until sometime well into the trial and well after jury selection had begun;

e.  Failing to investigate the family's criminal history, despite awareness that both of Petitioner's brothers were in state custody preceding Petitioner's trial;

f.  Failing to hire a qualified mitigation expert that had experience with capital cases or appreciated, even on a rudimentary level, the legal concept of mitigation;

g.  Failing to resort to sources beyond Petitioner or Petitioner's two family members for accurate information about the family;

h.  Failing to perform any independent social history for Petitioner – one that considered sources beyond Petitioner and his family; and,

i.  Failing to investigate a mitigation defense that could rebut the prosecution's theory that Petitioner is the "black sheep" of his family.

### 3.  Application of Law to These Facts

The Escamilla family has a sordid and extensive criminal past. Even a cursory review by counsel would have revealed that Petitioner's immediate family has a pervasive, and continuing, history with guns, assaults, drugs and prison. Petitioner's father and uncle both have several

convictions. Likewise, both of Petitioner's brothers have served, and continue to serve, sentences for crimes of violence and drugs. This is the family wherein Petitioner was raised and learned how to respond to laws and rules and how to conform his conduct to that expected from others. Respect for the law appears to have been the exception for the Escamilla family, not the rule. Put more frankly, Petitioner was raised in a lawless environment that prevented him from fully appreciating the negative consequences of his behavior. Disrespect for the law was the norm.

Yet, Petitioner's counsel sat mute while the prosecution questioned Petitioner's father on where Petitioner could possibly have learned to misbehave in such dire fashion. When the prosecution posed this question, it was clear that Petitioner's counsel had no idea that Petitioner's aggressive behavior had been learned and refined at home. Because counsel failed to conduct any review of Petitioner's family history, they were truly ignorant that their star mitigation witness himself had a criminal past involving guns and assaults. Counsel was unaware that their star mitigation witness had frequently beat all of his children, using his bare fist, wooden planks, sticks, whips and belts. Counsel was ignorant to the fact that their star mitigation witness had repeatedly beat his wife, in the presence of his children, creating insecurity and a certain propensity for physical violence in all his children. Counsel was oblivious to the fact that their star mitigation witness was a raging alcoholic that would call his daughter a "whore" and his sons faggots and animals. Ironically, trial counsel's star mitigation witness was *the primary source* of Petitioner's violent and abusive upbringing. This witness was the most likely cause and precipitating force behind Petitioner's aggressiveness and lawlessness.

While trial counsel suggests that the jury found Petitioner's father to be a sympathetic figure, Petitioner would argue that any sympathy placed upon him is both misguided and

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 10**

misplaced.  Petitioner's father ruled over his wife and his children with an iron fist and

tyrannical outbursts.  Had anyone beyond Petitioner's father and his daughter by his former wife

been contacted, counsel would have learned that this "Normal Rockwall" family portrait was a

deceptive illusion.  The true nature of the family was revealed, and somehow ignored, during

state habeas proceedings.  Counsels' unfamiliarity with the true family dynamics in the

Escamilla household resulted in a defense strategy that was uninformed, unreliable and,

ultimately, unsuccessful.

      As is true in so many capital cases, counsels' inactivity and inertia prevented counsel –

and, more importantly, the jury -- from learning any of the reasons that hardened Petitioner

against issues of violence, drugs, alcohol and guns.  Petitioner is, tragically, a natural and

foreseeable product of his environment.

      In addition to the criminal episodes common to the family, physical abuse and alcohol

use was rampant during Petitioner's upbringing.  Petitioner's father was a physically abusive

individual that would regularly hit his children.  Petitioner's father would hit the children with

his closed fist, with boards, with sticks, with whips, and, with belts.  And, as Petitioner's sister

testifies, the children were hit every week, usually several times a week.  Maria Escamilla

Affidavit, 2008, supplementing November 2005 Affidavit.

      Petitioner's father would regularly push his children to their knees while he hit them on

their legs, butts and backs.  In this way, the children's bruises would not be obvious.  Petitioner's

father actually broke a four-by-four piece of wood over Petitioner's older brother's head.  On

another occasion, Petitioner's father broke a cow-whip on Petitioner and still refused to stop

hitting him.  Petitioner's father busted Petitioner's sister Maria's lip one time by punching her in

the face with his closed fist.  When Petitioner's younger brother Juan talked back to their father,

he told him to "take it outside. You want to act like a man, let's take it outside." This physical

violence was a regular part of Petitioner's childhood. Maria Escamilla Affidavit, 2008.

Maria, Petitioner's older sister, moved out of the family home at age 17 after her father

beat her so badly that the shirt she had been wearing was lined with blood stains. Maria recalls

her father laughing and bragging to his mother that he had "beat her ass." The next day, Maria

left and moved away. When Petitioner's family found Maria staying at their cousins' house

months later, Maria begged for her cousins to let her stay there. She was afraid to return to the

home. *Id.*

Petitioner's father would always cuss and talk down to the children. He would demean

and degrade the children in a verbally abusive way. He would call Petitioner a "fucken' fagget,"

called Petitioner's sister, Maria, a "whore" and would suggest that his sons were "animals." *Id.*

In addition, Petitioner's father would regularly hit his mother – often, in front of the children.

Maria testifies that their father would hit their mother and then send the children to their rooms.

While in their rooms, the children could hear their mother cry and scream. Petitioner's mother

often had bruises on her legs, back and arms – places where the bruises would not be easily seen.

*Id.*

Still, two friends of Petitioner's mother testified during the state habeas proceedings that

they both knew of Petitioner's mother's abuse. One friend, Luis Gonzales, testified that she

worked with Petitioner's mother for several years. Ms. Gonzales testified that:

> We would frequently have coffee in the morning prior to starting work and we
> would talk. Maria would tell me about problems she was having with her family.
> According to Maria, most of the family's and her personal problems were related
> to her husband. She talked about her husband drinking all the time. I observed
> on three or four occasions that Maria appeared to have been beaten and (sic) a
> black eye. . . .

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 12**

She also told me that her husband often carried a gun. He was aggressive and frequently getting into fights.

Luis Gonzales Affidavit, p. 1, dated October 30, 2005.

In addition, another friend of Petitioner's mother, Margaret Barajas, testified to the abuse

Petitioner's mother suffered at the hand of Petitioner's father. Ms. Barajas testified:

I knew the Escamilla family when they lived across the street in apartments in approximately 1981-1982. We became friends and [Petitioner's mother] would come over to talk. Maria talked about her husband, Jose, and said that he drank a lot. Maria told me her husband would hit her and I saw bruises.

Margaret Barajas Affidavit, p. 1, dated October 30, 2005.

The state habeas court was confronted with several witnesses that testified to the violent

tendencies of Petitioner's father. Yet, none of this information was uncovered during trial

counsel's perfunctory investigation. Despite the fact that Petitioner's three uncles, his

grandmother and numerous cousins all lived within a six-block radius preceding – and during –

Petitioner's trial, counsel made absolutely no effort to interview these valuable witnesses.

Petitioner's paternal uncle, Eliezar Escamilla, lived next door to Petitioner's

grandmother. Eliezar has one son, Carlos, and two daughters, Eloisa and Maria de Jesus.

During the time of Petitioner's trial, Eliezar was married to Maggie (also known as Margaret).

Trial counsel failed to interview or meet with any of these family members – despite their

proximity to Petitioner's family. Maria Escamilla Affidavit, 2008.

Petitioner's grandmother lived next door to Eliezar and just a few blocks from

Petitioner's family. She was never contacted by trial counsel or their investigator. *Id.*

Petitioner's paternal uncle, Benito Escamilla, lived approximately one street away from

Petitioner's family on Peoria. Benito Escamilla has four sons, Nataolo, Benito, Jr., Julio and

Jesse. In addition, Benito and his wife Julia have one daughter, Beatrice. For unknown reasons,

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 13**

trial counsel failed to interview or meet with any of these family members – despite their proximity to Petitioner's family.  *Id.*

Finally, Petitioner's paternal uncle, Juan Escamilla, lived approximately one street away from Petitioner's family – also on Peoria.  Juan Escamilla and his son have criminal histories that are noteworthy.  Juan has a son, Eliezar, and three daughters, Gloria, Maria and Cindy.  Juan was married to a woman the family knew as "Pancha."  Trial counsel failed to interview or meet with any of these family members – despite their proximity to Petitioner's family.  *Id.*

Had trial counsel met with these family members – any of these family members – they undoubtedly would have learned about the dynamics of the Escamilla family.  In addition to Petitioner's father's troubled past, criminal history and alcoholic issues, it is likely that trial counsel would have learned that Jose Sr. beat both his children and his wife, Maria.

This information was never sought.  Instead, despite the fact that numerous immediate family members lived in a six-block radius from the Escamilla household, none of these relatives were interviewed.  This lack of investigation ultimately precluded trial counsel from preparing an effective mitigation case on Petitioner's behalf.  Counsels' lackluster efforts are an affront to the Constitutional promise of effective assistance of counsel.

In addition to trial counsels' ignorance about Petitioner's upbringing and household circumstances, trial counsel also failed to investigate the family's criminal history.  Had counsel undertaken this assessment, trial counsel would have learned the following:

a.   Petitioner's Uncle Juan had two convictions--one for unlawful carrying of a weapon and one for prohibited weapon.  (Cases F-7804467, MA-9153353)

b.   Petitioner's Uncle Eliezar had a conviction for burglary of a habitat. (F-9775621)

c.   Petitioner's father, Jose, Sr., had two convictions--one conviction for unlawful carrying of a weapon and a second for unlawful carrying of a weapon – handgun. (Cases MA-8923384, MA-9140928)

d.   Petitioner's cousin, Eliezar (Juan's son), has a total of ten adult convictions:  four for assault, four for assault with a DV, one for aggravated assault with a deadly weapon and one for murder.  (Cases F-0454866, F-0454867, F-9746530, F9746550, M-0405601, M-0405559, M-0458028, M-0458029, M-0458032, and M-0458033)

e.   Petitioner's older brother, Jose, Jr., has eight adult convictions:  possession of a controlled substance, possession of a prohibited weapon, two thefts in excess of $1,500, DWI, driving while license suspended, unlawful carrying of a weapon – handgun, and assault.  (Cases F-0020647, F-9755456, F-9652623, MB0321102, MB0321103, MA0321107, MA0372081, and MB0136632).  Jose, Jr., is currently in federal custody serving a 15-18 year sentence.

f.   Petitioner's younger brother, Juan, has nine adult convictions:  two for aggravated assault with a deadly weapon, aggravated robbery with a deadly weapon, unauthorized possession of a firearm by a felon, possession of a controlled substance, evading arrest, unauthorized use of a motor vehicle, driving while license suspended and unlawful carrying of weapon – handgun.  (Cases F-0773346, F-0773174, F-0757125, F-0334671, F-0334670, F-0157490, F-0157491, M-0688446, and M-0235458).  Juan is currently in state custody on new charges.

In addition to this history, Petitioner's father's son from a previous marriage,  Alfredo Hinojosa, has an extensive criminal history in Hidalgo County, Texas.  Alfredo Hinojosa has six convictions:  2 DWIs, possession of marijuana, criminal mischief, aggravated assault with a deadly weapon and murder (Cases CR-113938-A, CR-106414-A, CR-61285-C, CR-59896-C, CR-543-83-C, and CR-105-87-C).  Thus, including Alfredo, all four of Petitioner's sons have extensive criminal histories -- two for murder.

Trial counsel had no appreciation of the vast familial issues Petitioner grappled with during his childhood.  His upbringing was chaotic and filled with abuse.  In addition, many of the males in his family had frequent run-ins with the law.  While the State of Texas cast

Petitioner as the "black-sheep" of his family, even a cursory investigation of the family dispels this notion. As indicated above, two of Petitioner's father's sons have murder convictions.

Unfortunately, trial counsel made no efforts to prepare for Petitioner's sentencing hearing prior to trial. Rather, they hired one of their two medical experts *during trial* and failed to provide him with a true picture of Petitioner's upbringing and familial circumstances.

This lack of awareness regarding Petitioner's family environment is a direct result of ineffective assistance of counsel. Counsel did practically nothing to prepare for the penalty phase of Petitioner's trial. There was no meaningful investigation. There was no assessment of the family environment despite the actual knowledge that counsel had at the time that Petitioner's brother was then currently in prison. Not only was there no follow-up to obvious leads, there was no initiation of an investigation *prior to trial*. Rather, counsel relied solely on two family members – Petitioner's father and his half-sister, both of whom were bent, obviously, on shielding counsel from the patently toxic nature of the family unit.

In this instance, counsel knew, or should have known, that Petitioner and the family members they spoke to were very poor sources of information. Counsel both indicate in their respective affidavits that Petitioner was of little help – often simply shrugging his shoulders when asked about trial strategy. Likewise, counsel both testified to the difficulty they had in arranging meetings with members of Petitioner's family. Ms. Busbee confirms that she interviewed only two members of Petitioner's family – his father and his half-sister. Neither counsel interviewed two of Petitioner's sisters *prior to* the punishment proceedings despite the fact that these young women could have discussed Petitioner's history. Both these young women attended the trial, both were available locally and both were available and willing to testify at trial. Further, despite the fact that Petitioner's one brother was in jail at the time of

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 16**

Petitioner's trial, no evidence was obtained about the family criminal history. Even a cursory review of this family would have revealed numerous arrests and convictions within the nuclear family for weapons, assaults and drug offenses. In fact, at least three members of Petitioner's immediate family have been incarcerated for murder – including two of Petitioner's father's sons (Petitioner and Jose's son from his former marriage, Alfredo Hinojosa). Yet, none of this evidence was unearthed during the investigation performed by trial counsel.

Further, counsel made no efforts to interview Petitioner's paternal grandmother who lived mere blocks away. Counsel likewise failed to interview any of Petitioner's paternal uncles, all three of whom were married at the time and living only blocks away from the family home. Counsel similarly failed to interview any of Petitioner's 11 paternal cousins, again, despite their proximity to the family home. These valuable sources of information were never assessed, never considered and, certainly, never presented.

The record clearly demonstrates that counsel did not independently obtain any records about Petitioner's life. Trial counsel did not even obtain signed release forms from Petitioner – which is precisely why trial counsel did not receive anything but redacted copies of Petitioner's records.

Counsel's failure to obtain any life history records or information was especially unreasonable. Counsel knew the family members they spoke to were not good sources of information about Petitioner's history – both counsel reflect in their state habeas affidavits that these individuals demonstrated reticence in meeting with counsel. Still, trial counsel pursued no other sources – familial or otherwise – that were capable of providing a social history for Petitioner. Texas lawyers know that adult and juvenile criminal records typically contain much life history and mental health information, but counsel here did not obtain these records.

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 17**

Counsel knew Petitioner had problems in school, but did not obtain records about his educational history.

Counsel knew Petitioner was drinking heavily and using drugs around the time of the crime and that a condition of his parole was to abstain from drugs and alcohol, but counsel did not seek background records about Petitioner's substance abuse problems. Petitioner had his probation revoked precisely because he tested positive for banned substances. Counsel knew Petitioner spent much of his life in custody (either via TYC detention or on probation), but did not obtain Petitioner's incarceration and full probation records.

Counsel did not have any information – though readily available – that drinking was common throughout this family, not only with Petitioner. Simple conversations with neighbors or family friends of Petitioner's mother would have revealed that this family was highly unusual, that the father was physically abusive to the children and toward Petitioner's mother, and that there were drinking and substance abuse problems throughout the family – particularly with Petitioner's father. Yet, none of this readily available mitigation evidence was sought or pursued – much less discovered.

Accordingly, none of this information could have been considered or otherwise utilized to create a trial strategy. Instead, counsel sat mute while the Prosecutor remarkably suggested that Petitioner was the bad apple in the family. Had counsel undertaken more than a superficial investigation, counsel would have learned that Petitioner is not just a bad apple but, perhaps, that he came from a bad apple tree. This knowledge would have prevented the Prosecutor's characterization of Petitioner as a rational actor making poor choices despite his noble upbringing. This knowledge would have permitted Petitioner's counsel to assess how one

presents an unstable family and abusive upbringing – the precise type of mitigating evidence that the Supreme Court relied upon in deciding *Williams, Wiggins* and *Rompilla*.

The *Wiggins* court confirmed that:

> The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)(emphasis added). Despite these well defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. Cf. *id.*, 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are *medical history*, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences)(emphasis added); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing . . . . Investigation is essential to fulfillment of these functions").

*Wiggins*, 539 U.S. at 524-25.

Much like the counsel deemed ineffective in *Williams, Wiggins* and *Rompilla*, Petitioner's trial counsel failed to pursue an adequate investigation. Few sources beyond Petitioner's father and his half-sister were consulted in an effort to learn about Petitioner's background and upbringing. Little information was obtained regarding the fact that all of Petitioner's sons have extensive criminal histories, including two sons that have convictions for murder. These failures, collectively, constitute ineffective assistance of counsel and, because Petitioner can demonstrate prejudice, merit federal habeas relief.

### 4.   Prejudice

Individuals challenging the effectiveness of counsel during punishment have the seemingly insurmountable burden of proving that had the evidence now uncovered, been

considered and evaluated by counsel, a different strategy would have been pursued and that there is a reasonable probability that at least one juror would have opted for life over death.   In the present case, two interviews were conducted in the fall of 2005 that suggest that Petitioner meets this seemingly insurmountable burden.

Juror number 7, Ms. Elizabeth Amis told Toni Knox that her own mother had been abused and that she understood the effect that had on her mother's life.   Thereafter, Ms. Amis told Ms. Knox that "[s]he would have considered some mitigation factors if proven and feels it may have swayed her to a life decision." *See Mitigation Partners, Exhibit 1 (Knox interview with Amis)*; Knox Affidavit, 2008.

Toni Knox testifies most recently as follows:

> Ms. Amis remembered all the previous incidents that were presented against Licho, including him stealing a car and trying to get away, the incident with the principal and other illegal activities.   She said they had quite a bit of information about his previous bad behavior.   I asked her if she might have been able to consider other mitigating factors if they had been presented.   For example, if it had been presented that someone had issues of abuse from childhood; would she have considered that to be mitigating?   She responded that her mother had been abused as a child and she had seen the effects on her mother's life.   She would have considered some mitigation factors if proven and feels it may have swayed her to a life decision.

Knox Affidavit, 2008, p. 2-3 (and attached notes).

In addition, Juror number 3, Mr. James Sutton, indicated that very little was presented about Petitioner's background and that "[h[e would have liked to have heard from others about specific details concerning [Petitioner's] life and more about what may have contributed to [Petitioner's] behavior."   The interview continues that "Mr. Sutton says if a thorough story with the specific contributing factors had been presented, he would have taken them into

consideration." *See Mitigation Partners, Exhibit 2 (Knox interview with Sutton)*; Knox

Affidavit, 2008; Sutton Affidavit, 2008.

Toni Knox testifies most recently as follows:

> Mr. Sutton stated that the defense presentation at the guilt phase seemed
> disjointed and he had hoped to have more details about Licho's life. He did not
> find the testimony by father and sister effective. He remembers the father telling
> the story about Licho not wanting his father to kill   the goat, but he said he
> thought that most children would have been opposed to killing an animal at that
> age. He would have liked to have heard from others about specific details
> concerning his life and more about what may have contributed to Licho (sic)
> behavior. Mr. Sutton says if a thorough story with the specific contributing
> factors had been presented, he would have taken them into consideration.

Knox Affidavit, 2008, p. 2 (and attached notes).

Petitioner's counsel was neither prepared nor able to present the details of Petitioner's

background desired by juror members because counsel failed to conduct any meaningful

investigation. Instead, due to the fact that counsel was wholly unaware of the abusive nature and

criminal history of Petitioner's family, counsel permitted – wrongfully – the prosecution to

characterize Petitioner as the black sheep of an upstanding family that taught him right from

wrong. Such characterization could not have been further from the truth. And, Juror number 3,

Mr. James Sutton, indicated that he "did not find the testimony by [Petitioner's] father and sister

effective." *See Mitigation Partners, Exhibit 2 (Knox interview with Sutton).* Knox Affidavit,

2008; Sutton Affidavit, 2008.

Ms. Knox further testifies that when she "reviewed the information that was presented in

Licho's trial for the punishment phase and the experts used, I was appalled by the lack of

mitigation investigation. I am often critical of the lack of thoroughness in a mitigation

investigation, but in Licho's case, there was basically no mitigation investigation. Knox

Affidavit, 2008, p. 3.

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 21**

The evidence gathered by state habeas counsel, including all the evidence obtained by Ms. Knox, confirms that Petitioner was raised in an environment where problems were solved with violence. Cruel punishments were issued capriciously, and frequently. Violence was not only tolerated, it was practiced with great regularity – both inside and outside the family. Likewise, drugs and alcohol were introduced to family members at a shockingly early age – an age when children do not appreciate the dangers of using and abusing alcohol. Petitioner was not regularly given the affection that all people need to feel safe and secure in the ordinary world – much less the world wherein he was raised. Maria Escamilla Affidavit, 2008.

The prosecution characterized Petitioner as a rational actor that had no past or family reasons for committing this crime. In fact, this crime was likely a natural progression of his physically abusive and lawless upbringing. The lack of family intervention or protection resulted in Petitioner's repeated aggressive and, unfortunately, criminal behavior. The jury was not provided any insight into Petitioner's actual upbringing. Instead, due solely to counsel's ignorance about the true facts of Petitioner's upbringing, the jury received a sterilized and inaccurate picture of Petitioner's family as a loving, law-abiding and stable family. The facts on the ground were much different.

Had counsel conducted even a cursory investigation into Petitioner's family history, they would have learned that the prosecution's characterization of Petitioner as the "black sheep" was both inaccurate and inconceivable. Petitioner, like most of us, is a product of his environment. But that environment was never presented to the jury. Instead, the jury was left with the clear impression that Petitioner knew right from wrong, knew that his actions were inappropriate and fully appreciated what he did was wrong, both on a legal and moral level. The jury was falsely led to believe that Petitioner's father, the source of Petitioner's abusive upbringing, had taught

Petitioner to make better choices.  Yet, Petitioner is the second of Jose Escamilla's four sons to be convicted of murder. The evidence accumulated by both state habeas and federal habeas counsel shed much needed light on this mis-perception.

Under *Strickland*, Petitioner must prove that had the jury been informed of this information at the time of trial, they would have rendered a different verdict.  This litigation reconstruction is nearly impossible as much time has passed, and there is no viable way to return to the time where the jury had just heard the evidence of guilt.  Accordingly, the Supreme Court has not required actual evidence that any single juror would have rescinded their verdict of death.  Rather, Petitioner must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. 668 (1984).

> In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.  An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like.  A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed.  The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.  It should not depend on the idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency.  Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.  Thus, evidence about the actual process of decision, if not part of the record of the proceeding under review, and evidence about, for example, a particular judge's sentencing practices, should not be considered in the prejudice determination.

> The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors.  When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt

respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer - including an appellate court, to the extent it independently reweighs the evidence - would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 694-697.

The commands of Strickland only mandate that Petitioner demonstrate a "reasonable probability." This is not an outcome-determinative test. This simply requires that Petitioner point out that had the undiscovered evidence been evaluated for consideration prior to the penalty phase, counsel's strategy probably would have reflected this information and that there is a reasonable probability that the jury would not have sentenced him to death.

Petitioner was undeniably vilified during the penalty phase of his trial as a black sheep that appreciated, if not relished, the unlawful nature of his actions. The state courts refused to consider the effect the lack of investigative information had on the jury's assessment of death. Were counsel to have been aware of the vast materials regarding Petitioner's family's past, they would have undoubtedly lodged vigorous objections to the prosecution's inaccurate characterization of Petitioner. Lacking this information, they sat inert, wholly ignorant that the prosecution's theory about the Escamilla family was factually wrong – terribly wrong.

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 24**

The prosecution's mischaracterization was only permitted to stand due to lack of knowledge and information held by trial counsel. For all they knew, Petitioner was the black sheep. Only, he was not . . . and is not.

Had the jury been fully apprised of Petitioner's physically abusive upbringing, his early introduction to drugs and alcohol by family members and his constant exposure to crimes of violence by other family members, the jury would have been confronted with a very different individual during sentencing. The difference between an incorrigible individual and an individual who has not been taught that guns, physical violence and alcohol are wrong is significant. In this case, that distinction – in all reasonable probability – meant the difference between a sentence of life and a sentence of death. And the interviews with two of the jury members demonstrate there is a reasonable probability that at least one of the jury members – perhaps two -- might have opted for life. Sutton Affidavit, 2008.

An accurate presentation of Petitioner's family history would have undermined the prosecution's entire punishment theory. But for counsel's unawareness of the fallibility of the prosecution's theory, Petitioner would have undoubtedly been presented as a product of his environment. Such presentation would have been much, much more sympathetic than the presentation of a hardened killer who had learned better at home.

Petitioner, when assessed with even a modicum of insight into his upbringing, is a sympathetic figure. The act of killing a police office standing alone is insufficient to warrant the death penalty. In Texas, the state must further prove that the mitigating factors regarding the individual – not the crime – do not merit any consideration of mercy. Yet, Petitioner's upbringing in this family undoubtedly merits some measure of mercy. Two members of the jury agreed. Knox Affidavit, 2008; Sutton Affidavit, 2008.

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 25**

The state courts erred in not considering the impact this evidence might have had on the outcome of Petitioner's trial. Two jurors have indicated in interviews that the presentation of some reason explaining Petitioner's behavior might have swayed their opinion. This meets Petitioner's burden of proof under *Strickland*. All that Petitioner must do is demonstrate by a preponderance of the evidence that there is a reasonable probability that the jury would have voted for life. This is a much lesser burden than clear and convincing evidence or beyond a reasonable doubt. Further, all that is required is evidence of a "reasonable probability" -- not evidence of any certainty or likelihood. Again, this standard is not as demanding as the state courts erroneously applied. And, the affidavits submitted by both Toni Knox and James Sutton meet this burden. Knox Affidavit, 2008 (confirming two jurors told her that they would have considered a lesser sentence had they been presented with information about Petitioner's background and abuse); Sutton Affidavit, 2008.

Had evidence of Petitioner's upbringing even been considered or fully evaluated by counsel, a much different portrait of Petitioner would have been presented to the jury. The entire tenor of the penalty phase would have been different. The jury would have been exposed to the criminal heritage of the Escamilla family. The jury would have learned that Petitioner was exposed to drugs and alcohol in the family in his pre-teen years. The jury would have learned that Petitioner was severely disciplined in often degrading and cruel fashion. The jury would have learned that Petitioner's father regularly beat Petitioner, his siblings and his mother. The jury would have been introduced to a very different individual than the one the prosecution presented.

Had the jury been introduced to the real Licho Escamilla, there is a reasonable probability that they would have spared his life. In light of Petitioner's sympathetic childhood,

the jury would have been given the opportunity to consider this crime in light of Petitioner's own experiences.

The charge in this case required the jury to consider under Special Issue No. 2:

Do you find, taking into consideration all of the evidence, including the circumstances of the offense, *the defendant's character and background*, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Petitioner's jury was never presented with accurate information about Petitioner's background. Such information was never evaluated because such information was never investigated or obtained. Hence, no strategy regarding Special Issue No. 2 could have effectively been prepared. Without an appreciation of the evidence qualifying for consideration under Special Issue No. 2, counsel could not possibly have been prepared to meet their burden of proving ample mitigation. Counsel simply allowed the prosecution to erroneously shape this issue and transmogrify the results of the penalty phase. To the jury, Petitioner was presented solely as a remorseless killer. But, this veneer – with minimal investigation – could have been easily pierced and rebutted by able counsel.

What at first glance appears to be an act of unbridled viciousness should have properly been presented as an extension of Petitioner's tumultuous upbringing. Considering Petitioner in context – which is precisely what Texas law and the charge submitted to the jury required – would have revealed Petitioner in a starkly different light than the dishonorable glow that was cast upon him without any effective, factually accurate, rebuttal. The prosecution's theory at the punishment phase was factually flawed. Petitioner is but a mere byproduct of his environment. Had the jury been accurately informed about Petitioner in context, considering his upbringing and family circumstances, there is a reasonable probability that at least one member of the jury

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 27**

would have voted to spare Petitioner's life. From the evidence presented to the state court, there was evidence that two jurors harbored such doubt and uncertainty beginning in 2005. That evidence suffices even under *Strickland*'s deferential test.

Accordingly, the state habeas decisions should be reversed as being contrary to clearly established federal law as set forth by the United States Supreme Court. Petitioner presented ample evidence to the state habeas courts that proved both deficiency and prejudice as required by *Strickland*. At a minimum, Petitioner should receive an evidentiary hearing to more fully flesh out the issues that were ignored or discounted by the state courts.

## 5. State Court Findings

Federal habeas relief is appropriate in this case because the state court findings both:

(a)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(b)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). These deficiencies occurred on both the failure to investigate mitigating evidence as well as the failure to present mitigating evidence. "It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams*, 529 U.S. at 396. Further, "the *Strickland* test "of necessity requires a case-by-case examination of the evidence." *Id.*

As set forth above and described immediately below herein, the state habeas courts resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as set forth in *Strickland*, *Cronic*, *Williams*, *Wiggins* and *Rompilla*. In addition, for the reasons set forth above and immediately below herein, the decision of the state

habeas courts also resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

### a.    Unreasonable Application of Federal Law

On page 3 of the State Findings, adopted by the Texas Court of Criminal Appeals, the trial court emphasizes trial counsels' respective paper qualifications.  In finding number six, the trial court states that "[Petitioner] attacks the performance of two highly qualified death-penalty defense counsel.  Pursuant to article 26.052 of the Texas Code of Criminal Procedure, the Court finds both of applicant's counsel have been qualified for first-chair appointment to death penalty cases. . . ."  In finding number seven, page eight, the trial court further "finds both of applicant's counsel are board certified in criminal law and have tried numerous felony cases. . . .The Court finds Mr. Huff and Ms. Busbee possessed the qualifications and experience necessary to represent [Petitioner]."  State Court Findings, Finding 7, p. 8.

In finding number eight, on pages eight and nine, the trial court states that "[w]ithout acknowledging this expertise, applicant attacks counsel's performance . . ."

The United States Supreme Court in *Avery v. Alabama* and *United States v. Cronic* clearly reminds that paper qualifications – standing alone -- are insufficient to satisfy the Sixth Amendment right to the effective assistance of counsel.  The undue emphasis that the state habeas courts placed on paper credentials does not have support in clearly established federal law.  Thus, this heavy reliance upon Mr. Huff's and Ms. Busbee's paper qualifications contravenes and is an unreasonable application of clearly established federal law.

In addition, the state habeas courts findings regarding failure to investigate are an unreasonable application of *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005).  Throughout the state

court findings, the state habeas court suggests that any deficiency regarding the failure to uncover the extensive criminal background of Petitioner's family or the pervasive level of physical and verbal abuse inflicted by Petitioner's father is the fault of family reticence to reveal the true character of the family.  Yet, in the very first paragraph of *Rompilla*, Justice Souter explains counsels' independent duty to investigate regardless of familial supports as follows:

> We hold that even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial.

*Rompilla v. Beard*, 545 U.S. 374, 376 (2005).  Much like the allegations of lack of cooperation lodged against Petitioner in the current case, "Rompilla's own contributions to any mitigation case were minimal.  Counsel found him uninterested in helping, as on their visit to his prison to go over a proposed mitigation strategy, when Rompilla told them he was 'bored being here listening' and returned to his cell." *Id.* "There were even times when Rompilla was even actively obstructive by sending counsel off on false leads." *Id.*

In finding defendant's efforts at obstructionism an insufficient reason for limited investigation, *Rompilla* demanded that counsel pursue readily available documents and leads where "plenty of 'red flags' pointed[ed] up a need to [investigate] further." *Id.* Counsels' asserted awareness that Petitioner's older brother was in prison at the time of their investigation and that his younger brother was detained in the county jail where Petitioner was confined during trial undoubtedly qualifies as a "red flag" meriting additional investigation.  Most families do not have all their male children in state custody for criminal behavior.  Rather, this would be one of the indicators that the *Williams*, *Wiggins*, and *Rompilla* line of cases mandates further evaluation.  For counsel to assert awareness of the brothers' criminal history – and then,

to disclaim that such awareness required additional investigation, belies any appreciation of the *Williams*, *Wiggins*, and *Rompilla* trilogy.  And, the state findings sanctioning counsels' failure to follow obvious leads is contrary to clearly established federal law as set forth by the United States Supreme Court.

Petitioner asserts that the state habeas court failed to properly apply *Strickland* in light of *Williams*, *Wiggins*, and *Rompilla*.  Each of these three cases underscores the importance of a thorough and diligent investigation.  Failure to conduct a reasonable investigation exempts subsequent reviewing courts from providing the usual level of deference reserved for tactical decisions.  In 2000, the Supreme Court reminded that capital defendants have an undisputed right – "indeed, a constitutionally protected right – to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." *Williams*, 529 U.S. at 396.

State court findings that defer to counsel's inertia based on Petitioner or his family's reluctance to share familial information are contrary to clearly established federal law.  These findings, accordingly, cannot survive AEDPA review in the current case.  Reasons transcending Petitioner's own purported recalcitrance must be proffered by trial counsel to justify their failure to investigate Petitioner's history of abuse, violence and criminal behavior. *Rompilla*, 545 U.S. 374 (2005).  Counsels' failure to investigate obvious leads, even without cooperation from Petitioner and his family, will be deemed deficient under the clearly established federal law of *Williams*, *Wiggins*, and *Rompilla*.

*Williams v. Taylor* was the first of three United States Supreme Court cases underscoring the importance of investigation in capital cases.  Thus, beginning in 2000, the Supreme Court signaled that cases alleging ineffective assistance of counsel based on failure to investigate or

failure to present mitigation evidence would be viewed favorably by the Court – even under the heightened AEPDA review. *See Williams*, 529 U.S. 362 (2000).

*Williams* emphasized that counsels' failure to investigate precluded the jury from appreciating the "circumstances . . . [that are] consistent with the view that in [Petitioner's] case his violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation. Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.* Notably, Williams involved Petitioner's confession of two murders. In addition, there was significant evidence of past violent, criminal behavior. In this way, Petitioner's crime and background are similar to that assessed in *Williams*. In fact, Williams had even been convicted of arson for "setting a fire in the jail while awaiting trial in this case. Two expert witnesses employed by the State testified that there was a 'high probability' that Williams would pose a serious continuing threat to society." *Id.*

Thus, the serious nature of Petitioner's crime and his purported behavior while awaiting trial or following the jury's verdict does not negate trial counsels' obligation to have fully investigated and presented available mitigation evidence. The Supreme Court quashed any suggestion that the heinous nature of the crime, or the misdeeds – both past and present -- of a criminal defendant somehow minimize the investigatory mandates of counsel in *Williams*.

A mere three years later, the Supreme Court again found that the right to the effective assistance of counsel encompasses a concomitant requirement of counsel to investigate readily available mitigating evidence. *See Wiggins v. Smith*, 539 U.S. 510 (2003). In an opinion authored by Justice O'Connor, the Court found that for "strategic decision[s] to be reasonable,

[they] must be 'based upon information the attorney has made after conducting a reasonable investigation.'" *Id.*

In describing the "proper application" of the *Strickland* standard in relation to investigation, Justice O'Connor wrote:

> Our opinion in *Williams v. Taylor* is illustrative of the proper application of these standards. In finding Williams' effectiveness claim meritorious, we applied *Strickland* and concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background. . . .
>
> In light of these standards, our principal concern in deciding whether [counsel] exercised "reasonable professional judgmen[t], it not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [a Petitioner's] background *was itself reasonable.* In assessing counsel's investigation, we must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," which include a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time."

*Id.* (emphasis in original)(internal citations omitted).

Justice O'Connor's opinion in *Wiggins* makes clear that any assessment of the prevailing professional norms must be made *in context.* Thus, as in the instant case, where counsel *was aware* that both of Petitioner's brothers had been, or were currently, incarcerated at the time of Petitioner's arrest and prosecution for capital murder, some investigation should have been conducted regarding the criminal issues in this family. It is highly unusual for all the male children in one family to have the vast criminal records the Escamilla men have. In the Escamilla family, crime is not an isolated occurrence – but something that has, sadly, affected all of Petitioner's father's sons.

Had counsel bothered to evaluate the criminal tendencies of this family, a clear pattern would have emerged. And, that pattern would have mandated additional investigation to discern why this family, and all of its male children, have such a difficult time abiding by the lawful dictates of society. This pattern merited review and evaluation so that defense counsel could have foreseen and, more importantly, countered the State's "black-sheep" theory. Counsel's failures, at a minimum, rise to the level of deficient performance. *Id.*

Much like the state court found in *Wiggins*:

> The court rejected the State's defense of counsel's "tactical" decision to 'retry guilt,' concluding that for a strategic decision to be reasonable, it must be "based upon information the attorney has made after conducting a reasonable investigation." The [state] court found that though counsel were aware of some aspects of [Petitioner's] background, that knowledge did not excuse them from their duty to make a "fully informed and deliberate decision" about whether to present a mitigation case. In fact, the [state] court concluded, their knowledge triggered an obligation to look further.

*Id.*

The facts and holding in *Wiggins* clearly apply to Petitioner's case. Here, counsel confesses a rudimentary appreciation that Petitioner's family had a criminal history and some embryonic understanding that Petitioner had substance abuse. This awareness "triggered an obligation to look further." Had sources beyond the family been consulted, the resulting investigation would have demonstrated that the household wherein Petitioner was raised was filled with capricious and harsh discipline – much like that viewed as powerful mitigation in the trilogy cases – serious drug and alcohol abuse and an extensive, pervasive criminal history. The limited knowledge trial counsel did possess was merely the tip of an iceberg. But, rather than proceed to assess what lie beneath the surface, counsel moved on without ever unearthing the obvious and more substantive mass of data just below.

Two years after *Wiggins*, the Supreme Court again took up the issue of counsel's duty to investigate all readily available mitigating evidence in compliance with the right to the effective assistance of counsel. For the third straight time, the Court struck down counsel's meager efforts as deficient – even in light of a particularly heinous crime. *See Rompilla v. Beard*, 545 U.S. 374 (2005). The *Rompilla* court spoke of the numerous "red flags" that popped up during counsel's limited investigation. *Id.* Again stressing the importance of ABA standards as guides to determining what level of conduct is reasonable, the Court found that counsel's failure to move beyond the immediate family's portrayal of Petitioner was deficient. *Id.*

In the instant case, the state habeas court placed undue emphasis on Petitioner and his family for limiting the scope of the investigation. But, in truth, it was not that any member of the Escamilla family affirmatively limited counsel's investigation – only that they proved to be what counsel should have already known, unreliable sources. This fact, however, does not relieve counsel of moving outside the family circle for confirmation or repudiation of the family's story. *Id.* In fact, even where a defendant is particularly obstreperous, counsel still has a duty to look to all readily available sources of information to assess the viability of mitigation. *Id.*

**b.       Unreasonable Application of the Facts**

The state court findings are further legally deficient, even under the heightened AEDPA standard of review, as the findings are both unreasonable and untenable. On many occasions, the state court findings permit speculative, inadmissible evidence provided by the state to overshadow Petitioner's direct evidence – such as affidavits based on personal knowledge. Likewise, the state court apparently demands that Petitioner provide direct documentary evidence of his father's abusive behavior – and ignores the voluminous direct evidence provided

by family members and neighbors.  Such requirement has no basis in law and is contrary to most

domestic violence scenarios.  Rare is the case where a family steeped in domestic violence seeks

medical help or outside intervention.  The reason domestic violence continues is, often, due to its

very private and hidden nature.

In addition, the state habeas court ignores the fact that Petitioner's evidence of his

father's alcoholism and lawless behavior are clearly documented in his arrest for possession of a

weapon at a Waffle House and his arrest for DUI where a gun was found on his lap.  Had trial

counsel conducted even a cursory review of Petitioner's father's background, there is ample

evidence of a tyrannical, abusive, alcoholic father with a criminal record.

### c.    Unreasonable Assessment of Counsels' "Investigation"

The first example of an unreasonable application of the facts surrounds the state habeas

court findings that trial counsel conducted anything beyond a cursory investigation.  The

extensive information collected and prepared by Petitioner for the state habeas court was

unreasonably ignored or otherwise marginated by the state habeas court in a zealous effort to

find that counsels' perfunctory investigation was constitutionally sufficient.  Yet, an objective

review of this so-called "investigation" reveals the careless preparation of counsel, the lack of

any reliable investigation and the complete failure of counsel to assess – or mount -- any

mitigation case.

The state habeas court unreasonably found that counsels' failure to employ a mitigation

specialist was rescued by other investigatory efforts. State Court Findings, Finding 77, page 23.

The findings never explain why trial counsels' failure to prepare any social or educational

history regarding Petitioner complies with the investigatory requirements of clearly established

federal law. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000), *Wiggins v. Smith*, 539 U.S. 510,

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 36**

521-23 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005).  In fact, it was these very deficiencies that prevented trial counsel from learning about Petitioner's oppressive upbringing at the hands of an overbearing, physically abusive and alcoholic father.  The findings do not explain how counsels' failure to contact a medical expert until jury selection satisfies the commands of *Williams*, *Wiggins* and *Rompilla*.  *See* Pearson Letter, dated November 29, 2002)(explaining that he had been hired "during jury selection" to first evaluate Petitioner).  This superficial one-hour evaluation – hastily arranged without providing the evaluator with any social history -- was much too delayed to ensure that counsel would inure any benefit during the critical stage of jury selection to properly prepare jurors for either the guilt/innocence or penalty phase of trial.  Bruce Anton Affidavit, 2008.

Toni Knox testifies to this very point by reminding that "it is recommended the mitigation theme(s) be well established prior to jury selection and trial so that this information can be used (sic) help screen for jurors and also to start front loading the mitigation theme(s).  When I interviewed Dr. Pearson in September 2005, he stated that he had received no direction from the attorney and he felt it had been a last minute effort by the attorney to cover all the bases."  Knox Affidavit, 2008, p. 3 (and attached notes).

*Williams*, *Wiggins* and *Rompilla* require that counsel have conducted a reasonable investigation so as to be prepared for both the guilt/innocence and punishment phases of trial.  However, failure to have properly assessed the status of their mitigation evidence or to have reviewed sufficient evidence to begin preparing jurors during jury selection prevented counsel from assessing the advisability of selecting jurors based on their mitigation "strategy."  For example, if counsel would have known of the extensive criminal background of the family and would have intended to utilize this during trial, this information was necessary to choose the best

possible jury panel.  Likewise, had counsel known of the physically abusive, violent and

unstructured home environment wherein Petitioner was raised, this would have enabled trial

counsel to begin educating potential jurors about these issues during voir dire.

However, no such assessment could be made by counsel during jury selection because at

this critical juncture, counsel still had not undertaken even a modicum amount of investigation

regarding their mitigation options.  Prior to trial, only two of Petitioner's family members were

contacted by counsel, or their investigator.  The state court findings accepting this

"investigation" as reasonable are, under clearly established federal law, unreasonable findings of

fact and should be ignored by this court.

Trial counsels' self-serving affidavits should not salvage an otherwise indefensible case

of ineffective assistance of counsel.  Mr. Huff's affidavits avers that "some of Escamilla's family

met with us at Ms. Busbee's office."  Huff Affidavit, p. 1, dated June 29, 2006.  However, there

is no recitation of which family members came to speak with him.  Further, when Mr. Huff

testifies that "[n]o one mentioned anything about abuse by Escamilla's father or anyone else," he

fails to explain that perhaps that was because Petitioner's father was present during the only

interview with counsel.  There is no evidence that the family met at any other time with Mr. Huff

than this lone example where the oppressive father was present.  Mr. Huff's statement that, "I

believe at one point during the meeting, we separated them and spoke with them individually" is

not credible at all since Petitioner's father does not relate to others in English.  Thus, the

reliability of this generic affidavit does not justify the wholesale reliance provided by the state

habeas court.

Likewise, Ms. Busbee's affidavit is lacking in specificity and reliability.  Ms. Busbee,

like Mr. Huff, speaks generically of Petitioner's family but only names four family members that

they attempted to contact:  Brenda Hinojosa, Jose Escamilla, Jose Escamilla, Jr. and Juan

Escamilla. Nothing at all is said regarding Petitioner's paternal grandmother, his three paternal

uncles and their wives and his numerous cousins – all living within a six-block radius of

Petitioner's family.  In providing specifics about the lone meeting with family members, Ms.

Busbee – unlike Mr. Huff – clearly indicates that only Brenda (Petitioner's sister) and Jose

Escamilla (Petitioner's father) were present during the meeting.  Thus, Ms. Busbee's own

testimony confirms that trial counsel only met with two family members before trial.  And,

notably, Ms. Busbee does not agree that these two individuals were separated at any time during

the interview – explaining very easily why no information about paternal abuse was

forthcoming.

  Ms. Busbee also admits that the earliest time at which she met with Petitioner's other

sister and Petitioner's niece was during the punishment phase (though Ms. Busbee does not even

explain who these individual's are or what their relation to Petitioner is).  There is no reasonable

explanation for waiting until after your client is convicted to contact the remaining members of

the family.  And, it is perhaps understandable that these two family members might be "off-

putting" and "overly dramatic" after their immediate relative has just been found guilty of capital

murder.  One can only surmise how these potential witnesses and sources of information might

have been perceived in a less threatening environment at a time when their insight could have

been used to help develop a mitigation strategy.

  These findings make a mockery of the burden imposed upon counsel following *Williams*,

*Wiggins* and *Rompilla*.  None of these three cases would have upheld a purported mitigation

"investigation" that relied upon information obtained for the first time from family members met

for the first time during the penalty phase of trial!  Rather, these cases underscore the importance of evaluating the mitigation case prior to trial and, one can only surmise, prior to jury selection.

The state trial court unreasonably gives credence to Ms. Busbee's statement that she met with and interviewed additional family members beyond Petitioner's half-sister Brenda and Petitioner's father.  State Court Findings, Finding 88, page 26.  The finding, unreasonably indicates that in her affidavit, "Ms. Busbee specifically identifies Maria Escamilla (applicant's sister) and another young woman *possibly* Rachel Hinojosa (applicant's niece), as two family members . . . that Mr. Jenkins met with during his pretrial investigation."  First, the information contained in Ms. Busbee's affidavit about what Mr. Jenkins purportedly did is not based on personal knowledge and does not suffice as proper evidence regarding the actual scope of the investigation.  In fact, even the phrasing of the affidavit and the state court findings speaks in tentative and speculative terms:  it might have been, possibly, Petitioner's niece – but, one cannot be sure because there is no direct or admissible evidence on this point.

In fact, Maria Escamilla's recent testimony contradicts Ms. Busbee's statements.  Maria avers that she never met with any attorney or investigator prior to meeting with Petitioner's state habeas investigator, Toni Knox.  Maria's testimony challenges the credibility and reliability of Ms. Busbee's state habeas affidavit.  In addition, there are no notes in either Mr. Huff's file or Ms. Busbee's file confirming that any interview with Maria ever occurred.  Maria Escamilla Affidavit, 2008.

Further, Ms. Busbee's self-serving testimony that she does not "remember looking for [Petitioner's] father's criminal history.  [But] Even had I found one, though, I doubt I would have used it," is unreliable, unrealistic and based upon pure speculation.  Busbee Affidavit, p. 4, dated June 28, 2006.  While Ms. Busbee might not have used Petitioner's father's criminal

history as evidence during mitigation, the teachings of *Williams*, *Wiggins* and *Rompilla*, explain that she failed in her duty to her client if she could have used this information to shape the mitigation strategy. Thus, the state habeas court findings regarding the sufficiency of investigation based on Ms. Busbee's affidavit are unreasonable in light of the evidence.

Under *Williams*, *Wiggins* and *Rompilla*, one cannot justify their mitigation strategy on incomplete information. The fact that Ms. Busbee might still believe now, as she did then, that her alleged "strategy" was effective does not suffice to counter Petitioner's challenge that Ms. Busbee and Mr. Huff constructed this "strategy" without a complete appreciation for the family history and for the true nature of Petitioner's father's abusive and alcoholic proclivities. Even a cursory investigation would have revealed that Petitioner – and his brothers – are who they are because of their abusive and violent upbringing. Further, the *Williams*, *Wiggins*, *Rompilla* trilogy of cases requires counsel to chase down leads that might shed light on potential mitigation strategies . . . such as the knowledge that all the male children in the family have criminal histories of shootings, drugs, assaults and crimes of violence.

The lessons of *Williams*, *Wiggins* and *Rompilla* suggest that counsels' awareness of a checkered criminal past for all the male children in the family required counsel to dig a little deeper and not place such blind reliance on the family's protestations of normalcy. Having every male child in a family incarcerated for crimes of violence implies that the familial environment was not as upstanding as counsel's affidavit would suggest. Further, had counsel sought actual information about the serious criminal history of Petitioner and his brothers – not to mention Petitioner's father, his father's son from a previous marriage, his uncles and cousins – it is doubtful that she could have credibly maintained that "the Escamillas were a fine family and

that Escamilla's father was a good man and father." Such conclusion could not rationally have been reached on the data available in the criminal records alone.

Finally, had counsel actually spoken to Maria, as she suggests, even as late as the penalty phase, counsel would have learned that Petitioner's father was physically and verbally abusive toward every member of the family. It is hard to imagine that trial counsel would have refused or ignored such important information.

Accordingly, because the state habeas court relied upon Ms. Busbee's affidavit to establish a key point in the Sixth Amendment assessment without requiring that Ms. Busbee have personal knowledge of the actual investigation conducted and without assessing the credibility of her testimony in light of the evidence presented during the state habeas proceedings, these findings are unreasonable and not deserving of AEDPA deference. Petitioner respectfully requests, at a minimum, that he be provided an evidentiary hearing on this issue to permit him to more fully develop the facts regarding the insufficiency of trial counsels' "investigation" and the credibility of trial counsels' respective affidavits.

### d.    Failure to Credit Any of Petitioner's Voluminous Evidence

The state habeas court improperly discounted Petitioner's evidence refuting that trial counsel performed a timely investigation. Maria Escamilla testifies that neither trial counsel nor their investigator met with her . . . ever. Maria Escamilla Affidavit, 2008. *See also* State Court Findings, Findings 89-91, pages 26-27. The state court found that Petitioner's evidence "does not foreclose the possibility that someone on the defense team interviewed Rachel and Juanita. Ms. Knox writes that Rachel told her applicant's attorneys did not speak to her until the end of trial, when they asked her to testify." State Court Findings, Finding 90, page 27.

But again, these findings are internally inconsistent as Ms. Busbee averred in her affidavit that she did not ask Rachel [or Maria] to testify, allegedly finding both Rachel – or the young woman she presumed to be Rachel -- and Maria as "off-putting" and "overly dramatic." Ms. Busbee's affidavit specifically avers that "I do not believe that [Maria and Rachel] would have made good defense witnesses because they would have shifted the jury's attention onto them and away from [Petitioner]." Busbee Affidavit, p. 3, dated June 28, 2006. And, importantly, Ms. Busbee is not even sure that she spoke to Rachel, testifying equivocally that "I remember speaking with Escamilla's other sister, Maria, and another young female member of the family, *possibly* Rachel Hinojosa, during the punishment phase of trial." *Id.*

What becomes clear from reviewing Ms. Busbee's affidavit is that she is not even sure that she ever spoke with Rachel. She has no notes in her file confirming such meeting or interview. And, similarly, there are no notes from her investigator confirming any interview with Rachel ever occurred. Instead, the state habeas court credited Ms. Busbee's affidavit in the most positive light that would uphold the sentencing verdict, without requiring that it be consistent with other evidence adduced during state habeas. These findings cannot be squared.

So, either the habeas court *agreed* with Ms. Knox that Rachel was asked to testify at the end of trial. *Or*, the habeas court *agreed* with Ms. Busbee that she did not ask Rachel to testify because, after sizing her up – again, at the end of the guilt/innocence phase – she found that Rachel would not make a good witness. It cannot be both ways – that Ms. Busbee did ask Rachel to testify . . . and that she did not. These findings are mutually exclusive. The main fact, however, that is consistent is that the earliest that Ms. Busbee could have met with Rachel – Petitioner's cousin that lived in the family home – was during the penalty phase.

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 43**

The fact that the state habeas court required Petitioner to foreclose all conceivable possibilities imposes an improper legal standard above and beyond preponderance of the evidence. For this reason, these findings contravene clearly established federal law. In addition, the fact that the habeas court acknowledges that many of Petitioner's family members were not contacted until or after trial, establishes the deficiencies of trial counsel's investigation. Because a trial strategy that is based on incomplete information is not deserving of deference, the state habeas findings that grant deference to trial counsels' investigation are an unreasonable application of the facts in this case in light of the evidence submitted.

In fact, if counsel failed to interview potential witnesses and failed to compile information regarding any possible penalty proceeding until *at* or *after* trial, clearly established federal law condemns such "investigation" as constitutionally deficient. *Williams*, *Wiggins*, *Rompilla*. The evidence presented during the state habeas proceedings confirms that prior to trial, Petitioner's trial counsel only met with Petitioner, his father and his half-sister. Thereafter, sometime during jury selection or the trial, counsel employed a medical expert to evaluate Petitioner. Still, later, Ms. Busbee testified that she met with Maria – something Maria denies – and another female family member, "possibly Rachel Hinojosa."

What becomes abundantly clear is that trial counsel entered voir dire without any firm mitigation or penalty phase strategy. And, even as the trial progressed, trial counsel still had no appreciation for what type of mitigation cases they might be able to present. Their "investigation" was still in its early stages even after the guilt/innocence phase of trial. Or, worse still, trial counsel abandoned their investigation without ever tapping into the countless family members living near-by and without utilizing a medical expert trained in mitigation.

Astonishingly, trial counsel only met with two members of this very large family prior to trial. The rest of the family, a grandmother, three uncles, three aunts and numerous cousins all lived within a six-block radius of Petitioner's family. No explanation is provided as to why these family members were ignored.

It is inconceivable how any attorneys would believe that they were equipped to prepare a mitigation strategy on such incomplete investigation as occurred in this case: a couple of meetings with your client and one meeting with two family members. Bruce Anton Affidavit, 2008. The situation is further exacerbated when one realizes that the two family members selected were uniquely situated to shield trial counsel from the true character of the home – a home filled with physical abuse, alcoholism and crime.

Petitioner adduced voluminous evidence during the state habeas proceedings that proved the inadequacy of trial counsels' purported investigation. *See* Toni Knox, Second Declaration. The investigation fails in timing – it was neither immediate nor expeditious. The investigation fails in scope – relying only on two family members and Petitioner before trial. The investigation fails in resources – relying on an unqualified medical expert to assist with mitigation . . . one that admits he is uninformed as to what qualifies as mitigation in the legal context. The investigation fails in strategy – one cannot possibly create a strategy unless they have conducted, and completed, a thorough mitigation investigation. The entire "investigation" was a failure.

The state court findings crediting this investigation as adequate are unreasonable in light of the evidence produced and should be overturned. At a minimum, this Court should provide Petitioner with an evidentiary hearing to permit him to further reveal the inadequacies of trial counsel's investigation and to cross-examine trial counsel on the scope of their investigatory

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 45**

activities.  Because the state court findings are unreasonable in light of the facts presented during

state habeas, these findings can be overturned consistent with the AEDPA or, in the alternative,

this Court can grant Petitioner an evidentiary hearing.

#### e.   Unreasonable Findings Regarding Defense Expert

In addition, the state habeas court findings that trial counsel adequately investigated

Petitioner's case because they had Dr. Glen T. Pearson, M.D., evaluate Petitioner to assist with

mitigation wholly ignores the last-minute employment of this individual – long after efforts

should have been invested, if not completed, in developing a mitigation strategy.  As Dr.

Pearson's November 29, 2002, letter indicates, Dr. Pearson examined Petitioner "on October 2,

2002, at the Frank Crowley Center, *during jury selection* for his trial on capital murder charges."

*See* Pearson Letter, dated November 29, 2002.  *See also* Pearson Affidavit, 2008.

Dr. Pearson's letter clearly relies upon trial counsel's files – mostly Dallas County

Juvenile Department and Texas Youth Commission records – and a brief, hour-long, interview

with Petitioner.  While Dr. Pearson stated that Petitioner's life "is a tragic story," his report and

evaluation rely on patently false information – information that trial counsel purportedly knew to

be false.  The third paragraph in the letter demonstrates the unreliability of this expert's findings

because they were premised upon factually inaccurate data.

Dr. Pearson found that:

> Licho grew up in a close-knit Latino family in West Dallas, one in which his
> father owned his own business and the parents were deeply concerned about the
> social development of their offspring.  ***None of Licho's siblings were involved
> with illegal activity***, and despite his own repeated arrests and incarcerations,
> beginning when he was 13, his family remained supportive and caring.

Pearson Letter, dated November 29, 2002 (emphasis added).  The highlighted statement that

"[n]one of Licho's siblings were involved with illegal activity" was a crucial misstatement – as

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 46**

both of Petitioner's brothers were incarcerated when Petitioner was being evaluated by Dr. Pearson. Trial counsel even testified to this fact, and admitted awareness of this fact, during the state habeas proceedings. *See* Busbee Affidavit, p. 4, dated June 28, 2006. Taking trial counsel at her word, she surely knew that this misunderstanding would have improperly influenced Dr. Pearson's evaluation. And, yet, no further record of communication between trial counsel and Dr. Pearson seeks to invalidate Petitioner's false statements made during this interview.

At a minimum, trial counsel had an obligation to ensure that Dr. Pearson knew that Licho's brothers both had significant criminal histories. In addition, trial counsel should have further informed Dr. Pearson that Licho's father, his father's son from a previous marriage, his uncles and male cousins had all been in trouble with the law. Of course, this presupposes that trial counsel were aware of this extensive criminal history – including the fact that Petitioner's father's son from a previous marriage had also committed murder.

Had trial counsel made any attempt to explain that Licho was raised in a physically abusive, alcoholic, violent and lawless household, it might have placed Petitioner's "pow-pow-pow" comments in a very different light. Had Dr. Pearson been aware that Petitioner was raised in an environment where every male family member had some conviction or arrest relating to guns, these comments would have undoubtedly taken on a very different meaning. But, without any effort by trial counsel to explain that Petitioner's entire family had experienced run-ins with the law for guns and crimes of violence, Dr. Pearson was unable to perform a proper evaluation.

The lack of any notes or other indicators in either of trial counsel's file(s) regarding Petitioner's brothers' extensive legal troubles, and his half-brother's conviction for murder, suggests that trial counsel had no awareness of depth of these issues. Had trial counsel actually known about the Escamillas' sordid past, some notes should have been contained in the file that

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 47**

was provided to Dr. Pearson for review or the files forwarded to state and federal habeas counsel. Reasonable professional norms at the time of Petitioner's trial mandated that any awareness by counsel of family members with similar criminal pasts as Petitioner's should have been timely communicated to any expert evaluating Petitioner. Only by timely conveying this information to their expert could that individual place Petitioner's otherwise irrational statements and behavior in a proper context.

The State Court Findings suggest that Dr. Pearson's testimony could not have helped Petitioner, but would only have "benefitted the State's future dangerousness case." These findings further suggest that "if counsel had called Dr. Pearson as a witness to explain why applicant became a murderer, the jury would also have heard just how disturbing Dr. Pearson found [Petitioner.]" State Court Findings, Finding 121, page 36.

Of course, this very finding begs the question of what type of assessment Dr. Pearson would have made had he been properly informed about the true nature of the Escamilla family – including the abusive upbringing, alcoholism and criminal histories – and what type of punishment recommendation he would have made. Had Dr. Pearson learned that all of the Escamilla males had been incarcerated for guns, drugs, assaults or killings, it is highly likely that he would have been able to place Petitioner's disturbing behavior in a different, legally mitigating, context. Rather, trial counsels' futile 11th hour employment of Dr. Pearson prevented this expert from obtaining an accurate picture of Petitioner and his background. Counsel failed to convey extremely probative information about Petitioner's upbringing that would have necessarily shed important light on the abusive, physically violent, chaotic and lawless nature of Petitioner's home life.

Such accurate information would also have undermined Petitioner's inaccurate statements that his father was a positive role model.  Had Dr. Pearson learned that Petitioner and his brothers, including his half-brother, all with criminal pasts, had been raised by a father twice arrested for crimes involving gun possession, it might have contextualized why "pow-pow-pow" was a product of Petitioner's environment.  Had Dr. Pearson been aware that Petitioner was raised in a neighborhood where gunshots rang out constantly, that Petitioner's own father used a gun to scare Petitioner's mother by shooting the gun in the air, or that Petitioner's older brother had shot someone for picking on Petitioner, and that the family had blamed Petitioner for his older brother's behavior, more context would have been provided for the "pow-pow-pow" comments  And, with a complete lack of supervision regarding alcohol, drugs and guns, Dr. Pearson would have learned – had counsel performed even a rudimentary investigation about the family dynamics – that Petitioner's behavior was a predictable response to his upbringing.

Federal habeas counsel spoke with Dr. Pearson, who, while still contending that his diagnosis of antisocial personality disorder would have remained intact, explained that he [Dr. Pearson] does not understand the legal concept of mitigation.  Dr. Pearson, trial counsel's *only* possible mitigation expert, is unfamiliar with the legal doctrine of mitigation because he has *never* testified in a capital murder trial and does not regularly work on capital cases.

Yet, amazingly, Dr. Pearson avers that he would never – under any facts or circumstances – testify that the death penalty is an appropriate penalty.  Pearson Affidaviat, 2008.  Dr. Pearson believes that every individual should be given a life sentence as an alternative to death.  When pressed as to why he did not testify, Dr. Pearson explained that his twenty-nine minute discussion with federal habeas counsel was more extensive than any conversation he had

with Ms. Busbee.  Dr. Pearson indicated that Ms. Busbee did not ask searching questions or seek to have him testify.

Rather, Dr. Pearson stated that he felt that Ms. Busbee's instructions indicated to him that she did not think Dr. Pearson would be of much help or that he would find anything.  As Toni Knox, the state habeas investigator, reported, Dr. Pearson told her that he thought his hiring in the case was a "last-minute effort to cover all the bases" by Ms. Busbee.  There is no indication when speaking with Dr. Pearson that he understood his task or the legal definition of mitigation.

Thus, the retention of an uninformed expert – one who was not even sure he was aware that this was a capital case – was predestined to yield nothing of value.  The effort was hollow and the results equally predictable.  This *pro forma* hiring of an expert is deserving of absolutely no deference.  In fact, Petitioner would urge this Court to conduct an evidentiary hearing at which time Dr. Pearson could be subpoenaed to explain (1) his lack of familiarity with death penalty cases; (2) his lack of appreciation for the legal concept of mitigation; and, (3) his feelings that he was hired simply as a "last minute effort to cover all the bases."

Further, the state habeas court findings regarding: (1) the usefulness of Dr. Pearson's evaluation without any accurate history of the family's criminal heritage; (2) the usefulness of Dr. Pearson's evaluation without any accurate presentation of the Petitioner's abusive home and chaotic upbringing; and, (3) the burden placed upon Petitioner to undermine Dr. Pearson's findings despite the fact that they clearly rest upon false and incomplete data, are all unreasonable in light of the evidence presented to the state habeas court.

As set forth above, Dr. Pearson did not even meet Petitioner until sometime during trial. His evaluation was only a single hour.  He did not have any background data to use in his assessment.  He did not – and, still, does not – understand the legal concept of mitigation.  Thus,

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 50**