he was unable to consider anything beyond his own medical diagnosis and personal feelings to assess the legal responsibility of Petitioner. His statements to federal habeas counsel underscore that he does not appreciate, even in an elementary fashion, the legal application of mitigation as embraced in Texas by Special Issue No. 2.

Dr. Pearson's unfamiliarity with the legal concept of mitigation should have foreclosed trial counsel's reliance on him as an expert capable of securing mitigation information. Dr. Pearson has never testified in a death penalty case. He does not usually perform "forensic" work. He does not usually work on capital cases. He did not have the requisite experience to serve in a mitigation capacity in this case. Making matters worse, he did not receive ample direction from trial counsel as to what he was looking for or how Texas courts evaluate the legal concept of mitigation. Shockingly, trial counsel delegated the task of compiling a possible mitigation defense to an individual that openly admits that he does not understand the legal concept of mitigation.

The state court found that Petitioner "claims he would have benefitted from the evidence he presents with his [state habeas] application if it had been presented to Dr. Pearson before his evaluation. The Court finds applicant has not presented this evidence to Dr. Pearson to determine if or how it would affect his pretrial opinion. Thus, he offers no proof of this claim." State Court Findings, Finding 120, page 36.

The patently unreasonable nature of this finding is hard to swallow. First, as set forth immediately above, Dr. Pearson was not, and is not, aware of what information qualifies as mitigation evidence. Thus, perhaps the first error in the state court's finding is that Dr. Pearson was not even qualified to serve as an expert witness in this case on the issue of mitigation. The main assumption underlying the state court's findings is that Dr. Pearson was a proper expert in

this case. In fact, his lack of appreciation of mitigation in a legal context precludes him from serving in the role he was cast.

Second, Dr. Pearson's findings were only as reliable as the instructions he received. If he was not instructed to provide legally mitigating information, then his failure to do so is a failing that lies with trial counsel, not the expert. Trial counsel told Dr. Pearson that she did not expect him to find anything of value. Accordingly, Dr. Pearson thought that trial counsel's efforts were just going through the motions to cover her bases.

Third, it is unreasonable to suggest that counsels' failure to provide their expert with accurate information about their client's violent, abusive family setting – and the family's criminal history -- would not have impacted a proper mitigation expert's analysis. Instead, as *Williams, Wiggins* and *Rompilla* all explain, childhood beatings, lack of structure or oversight at the home, alcoholism and drug abuse are all relevant mitigating factors. Dr. Pearson candidly admits he does not understand how these issues relate to criminal culpability. The state habeas court's speculation that the plethora of mitigating information did not affect Dr. Pearson's opinion ignores the obvious facts that: (1) Dr. Pearson, an individual that does not comprehend legal mitigation, is not remotely qualified to serve as a mitigation expert; (2) that Dr. Pearson did not receive proper instructions as to what he was supposed to be looking for; (3) that counsel's eleventh hour hiring of this expert was, at best, *pro forma*; and, (4) that his findings are not reliable in the mitigation context because he does not know what legal mitigation is.

Accordingly, the findings that either Dr. Pearson was a proper expert or that his findings are due any deference – since they were based on insufficient information and equally deficient instructions -- is unreasonable and does not withstand AEDPA analysis. Petitioner respectfully

requests an evidentiary hearing to permit this Court to learn the true circumstances of Dr.

Pearson's retention and lack of awareness regarding legal mitigation.

Further, the state habeas court found that "at most, [Petitioner's] evidence might have

provided the doctor with some explanation for [Petitioner's] behavior. It would not have

changed his conclusion that [Petitioner] has an antisocial personality." State Court Findings,

Finding 121, page 36. The unreasonable nature of this particular finding is apparent from its

own internal inconsistency. First, the court's finding unreasonably suggests that accurate

information would not have influenced a qualified mitigation expert's assessment. Yet, the very

exercise of legal mitigation is to provide some explanation and context for a capital defendant's

crime. Both Special Issue No. 2 and the legal concept of mitigation explains, very clearly, that

*the reasons explaining the behavior* are the precise type of mitigation evidence that Texas juries

must consider in capital sentencing. Had such explanation been discernable from accurate

information provided by counsel, his family or Petitioner, then, utilizing a properly qualified

mitigation expert, a proper mitigation evaluation could have been performed. The state court

findings that the true nature of Petitioner's background and abusive upbringing are not relevant

to mitigation are unreasonable in light of *Williams*, *Wiggins* and *Rompilla*.

It is one thing to have someone appear to be a heartless, remorseless killer. It is another

to learn that this façade is a direct result of being raised in an environment where that person was

continually beaten, verbally abused, and constantly exposed to crimes of violence and guns

without any admonition – tacitly or openly – that such behavior is inappropriate. The scientific

method of analysis requires accurate data to ensure valid test results. If the conclusion reached is

based upon inaccurate data, the conclusions are similarly flawed. Such basics of logic and

appreciation of the scientific method are notably absent in the state court's findings. As is any

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 53**

acknowledgment that Dr. Pearson was unqualified for the task he was assigned – to evaluate Petitioner for any potential mitigation evidence. Accordingly, these findings by the state habeas court are unreasonable and should not stand.

### f.  Unreasonable Findings Regarding Strategic Decisions

Many of the state court findings regarding trial counsels' mitigation "strategy" are internally inconsistent. The state habeas court finds, for instance, that Petitioner's "brothers' criminal past was no mystery to the defense." State Court Findings, Finding 96, page 28. Later, in Findings 114 and 115, the state habeas court surmises that even had trial counsel fully known about Petitioner's brothers' criminal history, "that, although the State could not have argued that applicant was the only criminal in the family, they could still have credibly argued that he was the most dangerous member of his family." State Court Findings, Finding 115, page 34. However, the state habeas court fails to explain how it was possible, if counsel truly knew about the family's criminal history, that such a significant issue was not conveyed to the medical expert evaluating Petitioner. Why would counsel withhold such imperative information from their expert – or fail to correct this information once they received the expert's report? These findings suggesting that the strategy was to allow Petitioner to be classified as a "black sheep" are difficult to reconcile.

The state court's findings regarding the criminal past of the Escamilla family are unreasonable in light of the fact that Petitioner's older brother was preparing to serve a significant federal sentence at the time of Petitioner's trial; that Petitioner's half-brother had a murder conviction; and, that Petitioner's younger brother was housed – at least some of the time during Petitioner's trial – in the very same Dallas jail as Petitioner. All of the readily available evidence indicated that the Escamilla family was one where violence was both tolerated and

regularly practiced. Any unbiased review of the family history would not permit a finding that somehow Petitioner was the blackest of the black sheep. Likewise, the state habeas court's finding that Petitioner's attempt to negate the characterization of Petitioner as the lone black sheep of an otherwise upstanding family "would not necessarily have benefitted his defense" is patently unreasonable. State Court Findings, Finding 114, page 34. How can permitting your client to be labeled a "black sheep" qualify as reasoned strategy when the underlying facts supporting this "strategy" are false?

The prosecution misleadingly portrayed Petitioner as a lawless individual from an upstanding family. In fact, the lawlessness that Petitioner modeled was the behavior that seeps from the entire family tree: murder, manslaughter, DWI, drug possession, assault with deadly weapon, theft, driving with suspended licenses and unauthorized use of motor vehicles. This is the true picture of Petitioner's upbringing. This reality-based presentation certainly could have helped by placing Petitioner's behavior in the larger context of his family. Petitioner's crime was not solely Petitioner's fault based on rational choice and righteous upbringing. To the contrary, Petitioner is merely a product of his environment – an environment that was never investigated and, therefore, never presented to the jury for their consideration.

Several jury members indicated that they wanted to know how someone from such a "proper" family could turn out like Petitioner. These jury members wanted to learn about Petitioner's background – a reasonable desire since an individual's background is assessed under Special Issue No. 2 in Texas. Yet, because trial counsel wholly failed to conduct a meaningful investigation BEFORE they proceeded to trial, they were ill-equipped to present readily available mitigating evidence regarding Petitioner's background.

The state habeas court's finding that "although the State could not have argued that [Petitioner] was the only criminal in the family, they could still have credibly argued that he was the most dangerous member of his family" is unreasonable in light of the evidence submitted to the state court. State Court Findings, Finding 115, page 34. Toni Knox, the state habeas investigator, submitted an affidavit listing the following criminal history of the Escamilla family:

<u>Licho and Family Criminal History</u>

Licho (Petitioner herein) and the Escamilla family have a long history of arrests and incarcerations. Licho's paternal Uncle Natalio was murdered by being shot at age seventeen in Florida. Licho's father [Jose Escamilla] was arrested in 1989 and 1991 for public intoxication and both times for carrying an unlawful weapon (gun). The Dallas, Irving and other local Police Departments have a long history with the Escamilla family.

Jose's oldest son with Rosa [his previous marriage], Santos Lugo Escamilla (goes by Lugo) was convicted of murder and incarcerated in the Minnesota prison system in 1995. He is currently incarcerated at the Minnesota Correctional facility in Moose Lake, Minnesota. His (sic) may be eligible for release by 2009, but his sentence does not expire until 2016.

Licho's brother Juan, was first arrested as an adult by the Dallas PD was (sic) on September 21, 2001 for unauthorized use of a vehicle and evading arrest. Juan was apparently on probation for four years for a previous juvenile offense and his probation was revoked. He was sentenced to 240 days in jail. Juan was incarcerated at Lew Sterrett during the same time that Licho was incarcerated there. Juan's second arrest was July 27, 2002 by the Irving PD for unlawful carrying of a weapon. He was incarcerated for 200 days. Juan's last arrest [at the time of Ms. Knox's declaration – he has since been arrested AGAIN] was on April 10, 2003 was for possession of a controlled substance (cocaine) and unlawful possession of a firearm by a felon. Juan was sentenced to two years and is currently completing that confinement at the TDCJ Clements Unit in Amarillo, Texas.

Licho's uncle, Juan (his father's brother, not Licho's younger brother), was arrested by the Dallas PD on April 5, 1969 for disorderly conduct and driving while under the influence of liquor and sentenced to 30 days. He was arrested again August 3, 1973 for driving while under the influence of liquor and sentenced to one year probation. He was arrested in 1978 for carrying a prohibited weapon and received three years probation.

Licho's cousin, Eliezar Escamilla, son of Jose's brother, Juan, was arrested February 12, 1997 and charged with aggravated assault with a deadly weapon (car), which was later changed to manslaughter. He was also charged with burglary of a habitation and received a sentence of six years. He is currently out on parole in Dallas. He had a series of misdemeanor arrests starting in 1994 and his last arrest was in September of 2004, but he was found not guilty. Another of Licho's paternal cousins, Julian Escamilla, also has a record of arrests by the Dallas PD.

Licho's older brother, Jose, was incarcerated at Texas Youth Commission as a juvenile in 1995 for shooting a man that had assaulted Licho. His first adult arrest was May 30, 2001 by the Irving Police Department for evading arrest and he was sentenced to 90 days in jail. His next arrest was by the DPD on May 19, 2003 and was originally for unlawfully carrying of a weapon (handgun), but the charge was later changed to DWI. Jose is currently incarcerated on federal drug related charges and is incarcerated in a federal prison near San Antonio.

Declaration of Toni Knox, Second Declaration, page 46-47.

This evidence indicates that Petitioner was raised in a family where gun possession, alcohol use and overuse, shootings and killings were not isolated incidents. It is a stretch – at best – to suggest that somehow Petitioner is the worst of this group. Instead, he is simply a product of his environment and began to act in similar ways to his father, his uncle, his brothers and his cousin. From all objective observations, Licho Escamilla learned to act the way he did at home.

Had counsel conducted a cursory review of the family past, they would not have permitted the prosecutor, Mr. Tokoly, to argue the following without objection – as his conclusions are contradicted by the evidence and are patently untrue:

> *This case isn't about events in his life; it's about choices that he's made. Choices that he's made. And, please think about this, this isn't a situation that we see so many times and hear about where someone becomes a law breaker because they had either an abusive or no proper upbringing. Think about it. That's not the case here. You listened to his father. You listened to him testify. He had loving parents that were role models.*

Mr. Tokoly is correct that Petitioner had role models – *negative* role models. And, unfortunately, Petitioner emulated those negative role models and began to engage in alcohol abuse and lawless behavior at an early age. The only plausible reason that Petitioner's trial counsel failed to object to or otherwise rebut this false argument was because counsel was wholly ignorant regarding the Escamilla family.

Counsel was deficient in not investigating Petitioner's father's alcohol and physical abuse. Had counsel uncovered even a modicum amount of this brutality – or the extensive familial criminal history – counsel would not have been able to permit the wrongful characterization of Petitioner as a rational actor making choices that were in contradiction to his "proper upbringing." Petitioner had learned the catharsis of alcohol at home. Petitioner learned to respond to disagreements or displeasure with violence at home. Petitioner is a poignant product of his violent, abusive and chaotic upbringing. He may have had loving parents. But the role models he had at home were uniquely negative.

> **g.** **Unreasonable Findings Regarding Impact of Abuse & Mitigation Evidence**

The state habeas findings regarding the impact of his father's abusive tendencies are equally unreasonable in light of the extensive evidence of domestic abuse sustained by Petitioner. Jurors told Toni Knox that they wanted to hear something – an explanation – of how someone raised in such a good and loving household could grow up to commit such a heinous act. Toni Knox, Second Declaration; Knox Affidavit, 2008. In fact, Petitioner was not raised in such an upstanding household. Thus, the state habeas court's finding that "the degree and nature of the recently reported abuse was not sufficient to evoke much sympathy from the jury" are

unreasonable because they fail to consider the context of weekly beatings – against both mother and children. State Court Findings, Finding 116, page 34.

Curiously, the state habeas court found that Petitioner's "abuse evidence is not powerful in quality or quantity. As previously noted [Petitioner] presents no documentary evidence to substantiate the abuse claims. He relies entirely on anecdotal recollections from family and friends." State Court Findings, Finding 117, page 35. Actually, Petitioner's state habeas evidence included affidavit testimony from his sisters to substantiate the extensive nature of abuse in the family – much of it directed at Petitioner. In addition, two female friends of Petitioner's mother testified via affidavit that they saw bruises on Petitioner's mother's face on numerous occasions. Luiz Gonzalez Affidavit, p. 1, dated October 30, 2005 (averring that "I observed three or four occasions that Maria appeared to have been beaten and (sic) a black eye"); Margaret Barajas Affidavit, p. 1, dated October 30, 2005 (averring that "Maria told me that her husband would hit her and I saw bruises").

Numerous neighbors and family members *did* give *uncontroverted* testimony that Petitioner's father was horribly abusive, both physically and verbally. *Id.* Petitioner's younger brother even indicated that Petitioner got the brunt of the abuse. His older sister, Maria, confirms this to be true. Maria Escamilla Affidavit, 2008. Remarkably, the state habeas court reached its ultimate decision that no such abuse occurred based on the father's own testimony! Human nature indicates that an alcoholic and abusive parent is not going to admit his or her behavior helped create a damaged child. Of course Petitioner's father did not admit his maltreatment. Naturally, he did not admit that he beat his children and his wife, verbally assaulted them and tolerated – if not condoned and encouraged – the sons' alcohol and drug abuse and criminal activity.

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 59**

The state habeas court unreasonably found that Petitioner "fails to acknowledge the powerful impact of the mitigation theory his counsel did develop and present at trial." State Court Findings, Finding 123, page 37. First, the evidence of juror interviews contradicts that this purported mitigation theory was effective, much less powerful. Toni Knox, Second Declaration;

Toni Knox Affidavit, 2008. Sutton Affidavit, 2008. Most jurors did not feel that any mitigation theory was presented. Thus, the state habeas court findings on this issue are unreasonable in light of the facts and evidence.

Further, the issue on a failure to investigate is not what was actually presented at mitigation. Rather, the issue that must be resolved on a failure to investigate claim is what was presented in light of what should have been obtained via an adequate investigation. If trial counsel failed to properly conduct a mitigation investigation, then the ultimate "strategy" selected cannot be informed. Under *Strickland* and its progeny, such uninformed strategy is constitutionally deficient. *See Strickland*, *Williams*, *Wiggins*, and *Rompilla*. Strategic decisions based on incomplete investigation are not entitled to the traditional Sixth Amendment deference and are, subsequently, evaluated for their effectiveness based upon the universe of information that was available but never sought or uncovered.

Two jurors have indicated that had they been presented evidence of the true family dynamics, they both would have entertained the idea of a life sentence. Knox Affidavit, 2008. Sutton Affidavit, 2008. This evidence was presented to – and ignored by – the state habeas court. The refusal of the state court to fully consider the evidence presented regarding these two jurors undermined the reliability of the state courts' findings. Findings 126 and 127 suggest that had the undiscovered mitigation evidence been found and had that same evidence been presented, it would not have made any appreciable difference. State Court Findings, Findings

126-127, page 38.  These findings are patently unreasonable as the information regarding these two jurors precisely meets Petitioner's evidentiary burden – proving that had the evidence been evaluated it could have made a difference in the sentencing outcome.  Where two jurors indicate that they could have been willing to grant life over death had they been presented with Petitioner's true familial circumstances, Petitioner has met his burden of proof and is entitled to habeas relief.

Because Petitioner has demonstrated:  (1) that counsel was deficient in not conducting a proper investigation; (2) that such deficiency resulted in jurors not learning the true circumstances about Petitioner's abusive upbringing and family history; (3) that had such information been presented to Petitioner's jury, at least two jurors would have considered sentencing Petitioner to life rather than death; and, (4) that state court findings to the contrary are unreasonable in light of clearly established federal law; or, in the alternative; (5) that state court findings to the contrary are unreasonable in light of the evidence submitted to the state habeas court, Petitioner has satisfied his burden of proof and is entitled to habeas relief pursuant to 28 U.S.C. § 2254.

**A.2    PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS COUNSEL FAILED TO INTRODUCE READILY AVAILABLE MITIGATING EVIDENCE THAT SEVERAL OF PETITIONER'S FAMILY MEMBERS, INCLUDING HIS FATHER, HAVE A CRIMINAL HISTORY AND HAVE BEEN INCARCERATED, THAT HIS FATHER WAS AN ABUSIVE ALCOHOLIC AND THAT HE WAS RAISED IN AN ENVIRONMENT WITH VERY LITTLE SUPERVISION OR CONTROL**

*GUIDELINE 11.8.3 PREPARATION FOR THE SENTENCING PHASE*

*A.     As set out in Guideline 11.4.1, preparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case.  Counsel should seek information to present to the sentencing entity or*

*entities in mitigation or explanation of the offense and to rebut the prosecution's sentencing case.*

*B.     Counsel should discuss with the client early in the case the sentencing alternatives available, and the relationship between strategy for the sentencing phase and for the        guilt/innocence phase.*

*C.     Prior to the sentencing phase, counsel should discuss with the client the specific sentencing phase procedures of the jurisdiction and advise the client of steps being taken in preparation for sentencing.   Counsel should discuss with the client the accuracy of any information known to counsel that will he presented to the sentencing entity or entities, and the strategy for meeting the prosecution's case.*

*D.     If the client will be interviewed by anyone other than people working with defense counsel, counsel should prepare the client for such interview(s).   Counsel should discuss with the client the possible impact on the sentence and later potential proceedings (such as appeal, subsequent retrial or resentencing) of statements the client may give in the interviews.*

*E.     Counsel should consider, and discuss with the client, the possible consequences of having the client testify or make a statement to the sentencing entity or entities.*

*F. In deciding which witnesses and evidence to prepare for presentation at the sentencing phase, counsel should consider the following:*

*1. Witnesses familiar with and evidence relating to the client's life and development, from birth to the time of sentencing, who would be favorable to the client, explicative of the offense(s) for which the client is being sentenced, or would contravene evidence presented by the prosecutor;*

*2. Expert witnesses to provide medical, psychological, sociological or other explanations for the offense(s) for which the client is being sentenced, to give a favorable opinion as to the client's capacity for rehabilitation, etc. and/or to rebut expert testimony presented by the prosecutor;*

*3. Witnesses with knowledge and opinions about the lack of effectiveness of the death penalty itself;*

*4. Witnesses drawn from the victim's family or intimates who are willing to speak against killing the client.*

*ABA Guidelines for the Appointment & Performance of Counsel (1989)*

In *Williams v. Taylor*, the United States Supreme Court iterated that "it is undisputed that [a capital defendant has] a right -- indeed, a constitutionally protected right -- to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." *Williams*, 529 U.S. at 393. The importance of mitigating evidence stems from "the unique and irreversible penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 287 (1976)(plurality opinion). In *Woodson*, the Court expressed very clearly why mitigating evidence is so imperative in capital cases:

> In Furman, members of the Court acknowledge[d] what cannot fairly be denied that death is a punishment different from all other sanctions in kind rather than degree. A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.
>
> This Court has previously recognized that "(f)or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long.

*Id.* at 304-05 (internal citations omitted).

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 63**

*Eddings v. Oklahoma* provides further proof that individualized sentencing is

fundamental to the fair and reasoned application of the death penalty. *Eddings v. Oklahoma*, 455

U.S. 104 (1982).

> Because sentences of death are "qualitatively different" from prison sentences,
> this Court has gone to extraordinary measures to ensure that the prisoner
> sentenced to be executed is afforded processes that will guarantee, as much as is
> humanly possible, that the sentence will not be imposed out of whim, passion,
> prejudice or mistake.

*Id.* at 117 (internal citation omitted). Thus, following these cases emphasizing the importance of

individual sentencing in relation to imposition of the death penalty, trial counsel has a

constitutional duty to present mitigating evidence that is readily available. While counsel in this

case claims to have devised a strategy regarding mitigation – that executing Petitioner would

cause harm to his father after having just lost his wife – that decision was reached without

consulting or considering the enormous amount of mitigation evidence that was available at the

time of trial, but unearthed by counsel.

There can be no serious question that *Strickland v. Washington* and its progeny are

clearly established federal law as envisioned by 28 U.S.C. § 2254 (d)(1). *Williams v. Taylor*,

529 U.S. 362, 390 (2000). The United States Supreme Court further reminded trial courts of the

investigative requirements of *Strickland* in its opinion in *Wiggins v. Smith*, 539 U.S. 510 (2003).

The *Wiggins* court stated that:

> [S]trategic choices made after thorough investigation of law and facts relevant to
> plausible options are virtually unchallengeable; and strategic choices made after
> less than complete investigation are reasonable precisely to the extent that
> reasonable professional judgments support the limitations on investigation. In
> other words, counsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations unnecessary. In any
> ineffectiveness case, a particular decision not to investigate must be directly

assessed for reasonableness in all the circumstances apply a heavy measure of deference to counsel's judgments.

*Id.* at 521-22 (*citing Strickland v. Washington*, 466 U.S. at 690-91).

## 1.    Unreasonable Findings Regarding Trial Counsel's "Strategy"

In the capital sentencing context, a "reliable adversarial testing process" generally requires that counsel present to the sentencing jury evidence of "the character and record of the individual offender and the circumstances of the particular offense," to allow the jury to reach the "reasoned moral response" to punishment required by the Constitution. *Eddings v. Oklahoma*, 455 U.S. 104, 111-12 (1982) (internal quotation marks and citation omitted). For only when all of the available information about the offender and the offense is subjected to the adversarial process "can [we] be sure that the jury has... made a reliable determination that death is the appropriate sentence." *Penry v. Johnson*, 532 U.S. 782, 797 (2001)(internal quotation marks and citation omitted).  In *Williams*, this Court emphasized that, to meet the constitutional imperative established in *Strickland*, counsel must conduct the "requisite diligent investigation" into mitigating evidence. In the wake of *Strickland*, a powerful judicial consensus has emerged among the federal courts of appeals and state supreme courts that "defense counsel has the obligation to conduct a reasonably substantial, independent investigation into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002) (en banc)(internal quotation marks and citation omitted), *petition for cert. filed* (U.S. filed June 13, 2002) (No. 01-10886). "Prevailing norms of practice," including standards issued by the American Bar Association, reflect the same consensus.  In this case, no such investigation was conducted.  Rather, trial counsel completely failed to develop powerful mitigation evidence that was readily available to them.

Petitioner presents, in the foregoing section of this habeas petition, voluminous mitigating evidence that was readily available to trial counsel *prior to* his capital murder trial. Petitioner requests that this mitigating evidence be evaluated by this Court in both his failure to investigate and his failure to present mitigating evidence sections of this brief. Rather than repeat the entire universe of available mitigating evidence herein again, Petitioner incorporates all the evidence set forth above for consideration in this section as well – including the sections addressing deficiency and prejudice.

The evidence presented by Petitioner during both his state and federal habeas proceedings proves that trial counsel wholly failed to discover – much less present – a wealth of mitigating evidence. Instead, trial counsel dogmatically contends that, "I believed then and believe now that [Petitioner's] best mitigation strategy was to focus on the tragedy it would be for Escamilla's father to lose his wife and then his son." Busbee Affidavit, p. 4, dated June 28, 2006.

By her own testimony, Ms. Busbee avers that she did not even attempt to devise a strategy to present mitigation evidence relevant to Special Issue No. 2. Instead of presenting readily available mitigating evidence that portrayed Petitioner's background and upbringing as violent, physically abusive, verbally abusive and chaotic, trial counsel opted to portray Petitioner's father as a victim. Trial counsel apparently decided, as a strategic matter, that no information about Petitioner's violent, chaotic, abusive upbringing was necessary – despite the unequivocal language of Special Issue No. 2 that asks the jury to consider Petitioner's background and character.

The repugnant nature of this purported "strategy" should be apparent. Without having any appreciation that Petitioner's father had regularly victimized Petitioner, his mother and his

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 66**

siblings, trial counsel opted to portray the father as a victim. Without realizing that Petitioner had been regularly victimized at the hand of his father – with belts, boards, whips and a closed fist – trial counsel permitted false information suggesting a "proper upbringing" to come into evidence without any objection. Without appreciating that the father had four sons with extensive criminal backgrounds, two for murder, trial counsel wanted to focus its *entire mitigation* strategy on the loss that might be borne by Petitioner's father.

This so-called "strategy" provides no explanation as to why trial counsel chose to shield the jury from learning anything about Petitioner's violent upbringing – or why counsel chose to sit mute while the prosecution spoke, misleadingly, of Petitioner's "proper upbringing." The only rational explication is that trial counsel was wholly ignorant to Petitioner's father as a victimizer himself, regularly beating his wife and children, coming home drunk and raising four sons with extensive criminal histories.

Two possible scenarios come to mind in these circumstances:

First, counsel was ignorant about the extensive mitigating evidence revealing the true character of Petitioner's family and, therefore, could not possibly consider this information in trying to meet their burden under Special Issue No. 2; or,

Second, counsel knew that they were required to provide mitigation evidence regarding Petitioner's character and background, were fully aware of the depth and breadth of the mitigation evidence, but consciously chose to ignore all the evidence about the family's extensive abuse, violence and criminal heritage, chose not to object to the prosecution's mischaracterization of Petitioner's "proper upbringing," chose to present the father as a mitigation witness, knowing that if the prosecution was aware that the father had beat his wife and children this might be revealed and his testimony undermined, but took the risk anyway;

and, finally, ignoring all the evidence of violence and abuse rendered at the hands of the father, chose to focus on the possible sadness that the abusive father might feel in losing both his wife and son.

It defies logic to pick the second option. This strategy – revealed as it has been during both the state and federal habeas proceedings as ill-informed – was really no strategy at all. Rather, trial counsel went into jury selection without any appreciation of the family wherein Petitioner was raised. Trial counsel began selecting jurors without any knowledge that they could demonstrate that Petitioner was horribly abused, had watched his father repeatedly beat his mother and his siblings, and had fallen in line with his other brothers, including his half-brother, in acting out through criminal behavior. There is no plausible way that adequate or effective counsel would opt for a strategy of "poor dad" when the facts reveal that the father had truly been the source of much of the family's pain and shortcomings.

Trial counsel's "strategic" decision to transform Petitioner's father into a victim strains all credulity. Thus, the state court findings on this issue are unreasonable. If counsel truly had possession or knowledge of the vast mitigating evidence, why would any effective counsel withhold such information – risking that the father's victimizing character might have been revealed during cross-examination? This "strategy" is so inherently spurious that it defies all logic and reasoning. Counsel simply was ignorant to the wealth of mitigating information that existed and, therefore, could not resort to this bounty when creating their strategy. As such, the state court findings giving deference to trial counsel's strategy are unreasonable under clearly established federal law and should be discarded.

## 2.     Unreasonable Application of *Williams, Wiggins* and *Rompilla*

The following legal argument was presented to the United States Supreme Court on behalf

of the Petitioner in *Wiggins. See Petitioner's Brief, Wiggins v. Smith (filed by* JENNER &

BLOCK, *Counsel for Petitioner* January 9, 2003). The application of this argument to

Petitioner's case is obvious and fitting. While federal habeas counsel could strive to improve the

below quoted materials, the arguments remain presented in essentially their original format:

> To assess what *Strickland* demands of defense counsel in a capital case, it is critical to understand the unique nature of capital sentencing. At a capital sentencing hearing, the defendant stands convicted of murder, and the issue is whether the defendant should be condemned to die. The process is structured to focus the sentencer on the *extent* of the defendant's personal culpability. Indeed, for a quarter century, the Supreme Court's Eighth Amendment jurisprudence has required that capital sentencing procedures implement "the principle that punishment should be directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh*, 492 U.S. 302, 319-20 (1989) (explaining *Eddings*, 455 U.S. at 111 and *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)).
>
> A capital sentencer must, therefore, be afforded the opportunity to assess "the character and record of the individual offender," as well as "the circumstances of the particular offense." *Eddings*, 455 U.S. at 112 (internal quotation marks and citation omitted). As the United States Supreme Court has explained, [i]f the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse. *Penry v. Lynaugh*, 492 U.S. at 319 (internal quotation marks and citation omitted); *see also Penry v. Johnson*, 532 U.S. at 797; *Johnson v. Texas*, 509 U.S. 350, 375 (1993) (O'Connor, J., dissenting).
>
> The sentencer's constitutionally prescribed task is thus to render "a reasoned moral response" to the unique individual circumstances of the capital defendant. *Penry v. Lynaugh*, 492 U.S. at 327; *see also California v. Brown*, 479 U.S. 538 (1987) (O'Connor, J., concurring); *Eddings*, 455 U.S. at 111 (consideration of offender's life history is a "'constitutionally indispensable part of the process of inflicting the penalty of death").
>
> To ensure that capital sentencers can fulfill this obligation, this Court has repeatedly struck down state-imposed barriers to full consideration of such evidence. *See, e.g.,*

*Eddings*, 455 U.S. at 113-15 (invalidating sentence where state decision allowed as mitigation evidence only evidence that would tend to excuse criminal liability); *Lockett v. Ohio*, 438 U.S. 586, 597 (1978) (invalidating Ohio law that did not permit consideration of, *inter alia*, defendant's character, age, prior record, lack of specific intent to cause death, and role in the crime); *Penry v. Lynaugh*, 492 U.S. at 322 (reversing conviction because jury had no vehicle to express a "reasoned moral response" to evidence of mental retardation and childhood abuse); *Skipper v. South Carolina*, 476 U.S. 1, 2 (1986) (reversing conviction when State prohibited consideration of evidence that defendant "made a good adjustment" during his time in jail); *Sumner v. Shuman*, 483 U.S. 66, 77-78 (1987) (invalidating statute that prohibited individualized consideration for defendant convicted of murder while serving a life sentence); *Hitcheoek v. Dugger*, 481 U.S. 393,398-99 (1987) (invalidating Florida sentencing instructions that forbade jury from considering nonstatutory mitigating evidence); *Mills v. Maryland*, 486 U.S. 367, 384 (1988) (holding that State may not restrict juries to giving effect only to mitigating circumstances as to which all jurors agree).

There can be no doubt that a lawyer's failure to prepare and present a case in mitigation can threaten the reliability of the sentencer's "reasoned moral response" fully as much as these state-imposed impediments. *See, e.g., Williams*, 529 U.S. at 396-98; *see also Penry v. Johnson*, 532 U.S. at 797 (jury must "be able to consider and give effect to [a defendant's mitigating] evidence in imposing sentence") (internal quotation marks and citation omitted; alteration in original). As the Court observed in a related context, defense counsel's failure to conduct an adequate investigation "puts at risk both the defendant's right to an ample opportunity to meet the case of the prosecution, and the reliability of the adversarial testing process." *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (internal quotation marks and citation omitted). The prosecution's case for death will usually focus on the facts of the crime, harm to the victim's family, and the negative aspects of the defendant's character and life history. To meet that case, defense counsel must give the jury a reason to spare the defendant's life. Typically, that will mean adducing evidence of the defendant's background and character that might "reduce [a defendant's] moral responsibility.., to a level at which capital punishment would strike [a] juror as excessive." *Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996) (Posner, J.). It is only when the sentencing jury has the opportunity to consider all available mitigation evidence, and the prosecution's case for death has thus been subject to full adversarial testing, that "we can be sure that the jury has.., made a reliable determination that death is the appropriate sentence." *Penry v. Johnson*, 532 U.S. at 797 (internal quotation marks and citation omitted). *Williams v. Taylor* reaffirmed in the clearest possible terms that capital defense counsel's duty under *Strickland* must be measured by reference to the unique requirements of capital sentencing, and that counsel's duty therefore must generally encompass a thorough investigation of the defendant's life history. *See Strickland*, 466 U.S. at 691 (explaining counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). Trial counsel in *Williams* failed to conduct an

investigation that would have uncovered evidence of Williams' "nightmarish" childhood. This Court held that trial counsel had failed to fulfill their "obligation to conduct a thorough investigation of the defendant's background." 529 U.S. at 396. Justice O'Connor (joined by Justice Kennedy) reiterated in concurrence that Williams' counsel had failed to conduct the "requisite, diligent investigation" into Williams' "troubling background and unique personal circumstances." *Id.* at 415 (O'Connor, J., concurring).

Wi*lliams* broke no new ground. It merely confirmed the consistent understanding of numerous courts of appeals that *Strickland* requires a thorough investigation for mitigation evidence, and that counsel's failure to do so constitutes deficient performance absent an extremely strong reason for believing such an investigation unwarranted. *As* the *en banc* Fifth Circuit recently held unanimously, "we consider it indisputable that, in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a reasonably substantial, independent investigation into potential mitigating circumstances." *Neal v. Puckett,* 286 F.3d at 236-37 (internal quotation marks and citation omitted). Indeed, it is well-established in the courts of appeals that "[i]n a capital case the attorney's duty to investigate all possible lines of defense is strictly observed." *Stouffer v. Reynolds*, 168 F.3d 1155, 1167 (10th Cir. 1999) (internal quotation marks and citation omitted); *see also Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir. 1994) (professional norms require defendant's lawyers "to collect as much information as possible about [the defendant] for use at the penalty phase of his state court trial"); *Porter v.Singletary*, 14 F.3d 554, 557 (1 lth Cir. 1994) ("An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigation evidence."); *Coleman v. Mitchell*, 268 E3d 417, 450 (6th Cir. 2001) (case law "has strongly established defense counsel's Sixth Amendment duty to independently investigate in preparation for the penalty phase of a capital trial"); *see also Mayfield v. Woodford*, 270 E3d 915,927-28 (9th Cir. 2001) (en banc); *Jermyn v. Horn*, 266 F.3d 257, 304-08 (3d Cir. 2001); *Emerson v. Gramley*, 91 E3d at 905-07.

*Petitioner's Brief, Wiggins v. Smith*, at pages 21-24.

These words have the same forceful applicability in Petitioner's case as they did in *Wiggins v. Smith.* And, it was these very arguments that convinced the United States Supreme Court to hold that Wiggins did, in fact, receive the ineffective assistance of counsel during the sentencing phase of his trial.

### 3. Deficiency of Investigation

Similar to Wiggins, Petitioner was denied the effective assistance of during the penalty phase of *his trial*. Counsel wholly failed to investigate the nature of Petitioner's background and upbringing. Most families do not produce lawless-minded individuals without some serious deficiencies or abuse in the household. Yet, most families – and individual family members -- refuse to admit that there is alcoholism, sexual abuse, physical abuse or other crucial shortcomings in the home environment. As a result of this truism, one that is embraced, at least implicitly, in the guiding ABA standards, counsel are expected to investigate many sources beyond Petitioner and his family. Bruce Anton Affidavit, 2008.

Petitioner herein incorporates all the information and evidence he presented in the previous ineffective assistance of counsel section of this brief for failure to investigate. The evidence previously presented and incorporated herein demonstrates the deficiency of trial counsels' investigation. In addition, Petitioner would highlight that he was raised in a environment of continuing violence and abuse. His father apparently took out his frustrations on all members of the Escamilla family, including his wife and his children. He punched his daughter in the face. He bloodied his daughter's back during one beating. He hit his daughter while she was holding her newborn child in her arms. He broke a board on top of his oldest son's head. He broke a whip on Petitioner's back side. He left black eyes and bruises on his wife's face. No member of the family was immune.

Beyond the sheer physical brutality, Petitioner's father would terrorize family members. He would punish the children by forcing them to sand rusted metal in the sun, until the daughters would be permitted to stop due to dehydration. The boys, however, were not similarly relieved. Petitioner's father would intentionally try to scare Petitioner's mother by shooting guns in the air

– knowing this scared her. The boys would be made to sit on their knees as a punishment and remain there until their father grew bored or fell asleep. Maria Escamilla Affidavit, 2008.

All the Escamilla children tried to shield their mother from their father's abuse – to no avail. When sent to their rooms, they would have to hear their mother's screams and cries as their father beat her. Every member of the family carried bruises beneath their clothes.

Far from being a "proper upbringing," as suggested by the prosecution, this was a family terrorized and victimized by a tyrannical and alcoholic father.

Counsel wholly failed to accurately portray the household where Petitioner was raised. While trial counsel brought Petitioner's father forward to testify during the penalty phase of this trial, they were curiously unaware that this man had regularly beaten his children with sticks, wood planks, belts, whips and his closed fist. While short in stature, this man had terrorized his children and his wife. Beyond the beatings suffered by the children, his wife was also victimized and regularly bruised at the hands of her tyrannical husband.

Had counsel actually spoken with more family members beyond Petitioner's father – who obviously was not going to admit to being physically abusive and an alcoholic – and Petitioner's half-sister, trial counsel would have learned that Maria left home at the earliest possible moment to avoid the beatings and chaos of an alcoholic family. Maria had been beaten bloody the night before she left. Undoubtedly, this beating was the last straw, and she fled the household. When confronted by her family many months later at her cousin's house, Maria begged her cousins to let her stay and not return her to her father's home. Maria Escamilla Affidavit, 2008.

The physical abuse did not cease for Maria even upon leaving the home. Shortly after her second child was born, and while holding her newborn child, Maria recounts that her father hit her with the baby in her arms. This was similar to an earlier childhood instance where Maria's

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 73**

father punched her in the face and bloodied her mouth with her younger cousin, Rachel, sitting in between her and her father. *Id.* Apparently, nothing and no one could stand in the way of Jose Escamilla when he felt that a beating was needed.

The boys also engaged in fighting with neighborhood kids for "pleasure" or sport. Maria details incidents where Jose, Jr., would throw Licho into a circle of older boys and young men and send someone in the circle to fight Licho. At one point, Jose, Jr., even sent one of Licho's close friends into the circle, suggesting that no bonds were sacred in this family. Rather, you fought to survive. You fought for respect. Jose, Jr., later indoctrinated his youngest brother, Juan, into this same fighting circle. These were boys who learned that fighting and surviving such fights and beatings was honorable. The tougher you were, the better you were. Violence – and surviving violence – was a badge of honor.

The medical expert hired by trial counsel was predictably impotent. His retention was eleventh hour. He was unqualified for the job he was assigned. Dr. Pearson confided in Toni Knox, the state habeas investigator, that he does not regularly do much forensic work. Likewise, he does not frequently evaluate capital defendants or work on death penalty cases. Dr. Pearson certainly has never testified in a capital case. Pearson Affidavit, 2008. And, this was the only time that he has ever worked with Ms. Busbee.

There is no explanation as to why trial counsel would hire as a "mitigation" expert someone that does not regularly perform mitigation work or that does not regularly work with capital defendants. Further, and much more troubling, is the fact that this expert was not asked to perform his evaluation on Petitioner until *after* the trial had already begun. Any information that Dr. Pearson might have provided would have been completely fruitless for jury selection and the early phases of trial. This eleventh-hour retention of an expert was a hollow exercise

that, predictably, yielded absolutely nothing of benefit to Petitioner.  Reasonable professional norms, existing at the time of Petitioner's trial, demanded more . . . much more.

Counsel's failure to dig deeper when they were admittedly aware of the serious legal troubles involving the Escamillas, is inexplicable.  Even a cursory review would have uncovered that the patriarch of the family had serious criminal troubles of his own – involving alcohol and weapons.  Such minimal investigation would also have uncovered that Petitioner's uncles and male cousins likewise also have histories of murder, assault, crimes of violence and substance abuse.  Jay Matthews Affidavit, 2008.  Petitioner is not an exception in his family – he is the standard that is tragically, but consistently, replicated among the Escamilla males.

The presentation of such information would have provided appropriate context for jurors to assess Petitioner's moral blameworthiness.  Jurors indicated during the state habeas proceedings that they needed more context, some context to explain why Petitioner would commit the crime he committed.  No such context was ever forthcoming, solely because trial counsel was unaware that such contextual evidence was readily available.

Instead, counsel – having failed to uncover this readily available mitigation evidence – permitted the State to present Petitioner as the lone rebel in the family, the only lawless individual to flow forth from an upstanding and law abiding home.  Special Issue No. 2 requires the jury to assess the background of an individual as it impacts that individual's behavior.  Without an appreciation of the true circumstances of Petitioner's upbringing, the jury was ill-equipped to reach a reliable decision on the issue.

Because counsel failed to properly evaluate the universe of possible mitigation evidence, deference to their strategic decisions is not required.  Instead, this Court has the freedom to

evaluate the existing realm of mitigating evidence to assess whether the failure to provide certain mitigating evidence was constitutionally deficient.

The state habeas court findings on the issue of deficiency:

(1)  resulted in a decision that was contrary to and involved an unreasonable application of clearly established federal law; and,

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

### 4.    Prejudice

Toni Knox, the state investigator, testified during the state proceedings that two jurors indicated to her their willingness to consider the realm of mitigating evidence that Petitioner has and the fact that such evidence, if presented, might have swayed their decision.  Toni Knox, Second Declaration; Knox Affidavit, 2008.

The evidence and argument presented in the foregoing section regarding ineffective assistance of counsel for failing to investigate readily available mitigating evidence is incorporated herein for all purposes and also demonstrates the requisite level of prejudice necessary to succeed on a claim for failure to present mitigating evidence.

Toni Knox's most recent affidavit testimony confirms that both Ms. Amis and Mr. Sutton indicated a willingness to her to consider and evaluate the non-presented mitigating evidence. *See also* Sutton Affidavit, 2008.   This same information was presented to, but discounted by, the state habeas court.  For all the reasons set forth above in the preceding section regarding failure to investigate, that Petitioner incorporates fully herein, the state habeas findings fail to properly find prejudice. Much like the findings regarding deficient performance, these findings:

(1)  resulted in a decision that was contrary to and involved an unreasonable

application of clearly established federal law; and,

(2)  resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the state court proceedings.

Petitioner's trial counsel wholly failed to purse a viable mitigation strategy in Petitioner's

case.  Trial counsel ignored a wealth of classic mitigation evidence – opting to withhold this

evidence and instead to portray Petitioner's father as man who the jury should protect against

losing both his wife and his son.

The evidence submitted by Ms. Knox, both during the state proceedings and these

proceedings, demonstrates by more than a preponderance of the evidence, that had this jury

panel been presented with evidence of Petitioner's violent and abusive upbringing, been

informed about the criminal history in this family, at least two jurors would have been inclined

to evaluate this information and, further, that it might have made a difference in their sentencing

decision.  *See also* Sutton Affidavit, 2008.

At a minimum, Petitioner should be entitled to an evidentiary hearing to provide him a full

opportunity to develop and demonstrate the prejudice that he suffered during sentencing.  Had

counsel actually presented jurors with evidence of his real upbringing, there is a reasonable

probability that he would have been sentenced to life, rather than death.  The evidence presented

to the state habeas court was sufficient to merit a finding of both deficiency and prejudice on this

issue.  In the alternative, Petitioner prays this Court grant his requested habeas relief and order

the state provide him with a new punishment proceeding at which time his voluminous

**B.     CLAIM TWO:  INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL FOR CONCEDING PETITIONER'S GUILT WITHOUT FIRST CONSULTING HIM**

"The evidence is overwhelming, that [Mr. Escamilla] committed the offense of murder. . . . "I am going to ask you to . . . find [Mr. Escamilla]  guilty of murder because he is. . . . " (Trial Court Transcript, Vol. 37, pp. 89-91).  With these words, trial counsel surrendered Escamilla's claim of self-defense and conceded his guilt.  The remaining substance of counsel's argument was directed at reasoning that the jury should convict Escamilla of murder rather than capital murder because Officer James was not acting in the lawful discharge of an official duty. (Trial Court Transcript, Vol. 37, pp. 89-91).

### 1.     State Habeas Claim

Escamilla asserted below that he was not consulted regarding this concession.  (State Habeas Application, Exhibit 29).  Indeed, Escamilla would never have agreed to such a concession because it is at odds with his view that he acted to preserve his own life:

> Brook Busbee did not advise me that she was going to ask the jury to find me guilty of murder.  I did not agree to this strategy.  I did not think that I was guilty of murder.  I felt I had acted in self defense.  If I had been consulted, I would have told my attorneys that I did not agree to this strategy.

(State Habeas Application Exhibit 29).

### 2.     State Trial Court's Rejection of the Claim

The state trial court found no *Strickland* deficiency.  (State Habeas Findings of Fact and Conclusions of Law 38-55).  The trial court first noted Ms. Busbee's previous affidavit (State Habeas Application, Exhibit 28) wherein she recited: "We did not discuss strategy with Licho. He did not know that I was going to argue that the jury should find him guilty of murder." (State Habeas Findings of Fact and Conclusions of Law 41).  To resolve the claim, however, the trial

court looked to subsequent affidavits given by trial counsel. (State Habeas Findings of Fact and Conclusions of Law 41-45, relying upon State's Writ Exhibits C and D).

Therein, Escamilla's counsel related a contrary proposition: they did discuss the concession with Escamilla. *See id.* Relying upon these latter contrary assertions, the trial court concluded: "that, by informing [Escamilla] of this strategy [Escamilla's counsel] fulfilled their constitutional obligation. [Escamilla's counsel] had no duty to obtain [Escamilla]'s express consent to this strategy." (State Habeas Findings of Fact and Conclusions of Law 44). Relying further upon these affidavits, the trial court determined that Escamilla refused to participate in strategy discussions. (State Habeas Findings of Fact and Conclusions of Law 44). Thus, because the trial court viewed Escamilla as unresponsive, it concluded counsel could not be deficient for failing to secure his assent within the ambit of *Nixon*. (State Habeas Findings of Fact and Conclusions of Law 45).

The trial court then addressed Mr. Escamilla's assertion (State Habeas Application Exhibit 29) that he could not voice complaint because of the stun belt. (State Habeas Findings of Fact and Conclusions of Law 48-54). The court rejected this, relying upon: the absence of any observable fear, the absence of evidence that the belt was used in a manner that would inspire fear, and its characterization of Escamilla as a disciplinary problem. *Id.* Thus, the court concluded Escamilla knew of the strategy and did not challenge it because he had no objection; the court viewed Escamilla's countervailing affidavit as incredible. (State Habeas Findings of Fact and Conclusions of Law 53-54).

The trial court then addressed the second *Strickland* prong. (State Habeas Findings of Fact and Conclusions of Law 56-70). The court found that *Cronic's* presumption of prejudice did not obtain because counsel performed their adversarial duty. (State Habeas Findings of Fact

and Conclusions of Law 57).  Next, the court concluded that the concession, "even if made

without [Escamilla]'s knowledge or consent, does not equate with a complete failure to function

as [Escamilla]'s advocate."  (State Habeas Findings of Fact and Conclusions of Law 58).

Looking to *Nixon*, the court noted that such concession may be the only reasonable

choice (State Habeas Findings of Fact and Conclusions of Law 58) and then concluded that,

because the State's case was formidable, it was a reasonable choice here.  (State Habeas

Findings of Fact and Conclusions of Law 59-60).  The court detailed what it considered the

salient strong points of the State's cause, to-wit:  eyewitness testimony, flight, ballistic and DNA

corroboration, and the Gillett interview.  (State Habeas Findings of Fact and Conclusions of Law

59-60).

The court found that self-defense was not a viable strategy.  (State Habeas Findings of

Fact and Conclusions of Law 61, 63-67).  The court noted that because Escamilla had no interest

in testifying, counsel would have had to rely upon the Gillett interview.  (State Habeas Findings

of Fact and Conclusions of Law 63, relying upon State's Writ Ex. D).  The court determined that

Escamilla's statements therein failed to establish self defense.  (State Habeas Findings of Fact

and Conclusions of Law 63, 64, citing to TEX. PEN. CODE ANN. §§ 9.31, 9.32).  Moreover, the

court concluded that the physical evidence and eyewitness testimony contradicted any self-

defense claim.  (State Habeas Findings of Fact and Conclusions of Law 65-66).  Thus, the court

determined "the jury would never have found that [Escamilla] justifiably killed Officer James in

self-defense" and that pursuit of such claim was an "insurmountable task."  (State Habeas

Findings of Fact and Conclusions of Law 67).

The concession strategy, the court concluded, afforded the jury an alternative to a capital

murder conviction.  *Id.*  The trial court consequently found that Escamilla "demonstrates only

that no meritorious defense was available . . . not that his counsel chose the wrong one" and found no prejudice.  (State Habeas Findings of Fact and Conclusions of Law 68-69).

### 3.    Inconsistent Affidavits

At the threshold, Escamilla urges the inconsistency between counsel's initial and subsequent affidavits.  Either counsel consulted Escamilla regarding strategy or failed to. Counsel's affidavits create a manifest conflict in this aspect, and thus, fail to resolve the issue. The mere existence of such distinct recollections concerning consultation pose a signal inconsistency, undermining the state court's reliance upon such.

The Fourteenth Amendment protects against deprivation of life or liberty in the absence of " due process of law." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986); U.S. CONST. amend. XIV.  Elementally, "[t]he fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363, 1369 (1914) (citation omitted).  Such opportunity must be granted at a meaningful time and in a meaningful manner.  *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).  This requirement has as its goal fairness.  *Daniels v. Williams, supra.*

A live hearing was warranted to afford Escamilla's claim a meaningful and appropriate opportunity for hearing given this manifest inconsistency. Less was afforded below, and such lack constitutes a summary disposition in derogation of the principle that habeas applications often warrant a hearing to resolve contested issues.  *See, e.g., Fontaine v. United States*, 411 U.S. 213, 215, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973); *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963).  As a consequence, the disposition below cannot rightly be said to have promoted the goal of fairness contemplated by Due Process.

### 4. Silent Acquiescense Considered in Context

To the extent that the state court found Escamilla's course and actions to constitute silent acquiescence or abdication, Escamilla submits that any such a determination is incredible. Silent acquiescence is at diverse odds with Esacmilla's character. Restated, the cause sub judice reflects that Escamilla was motivated by a profound desire to live. To this very end, Escamilla viewed his course in the light of clear self-defense. (State Habeas Application Exhibit 29). The determination of abdication or silent acquiescence therefore has no basis in Escamilla's character.

As a further consideration, if it was to be held that counsel did view Escamilla as abdicating his role despite his determined will to live, this abdication should have raised the specter of a need for profound investigation into existing mitigation evidence concerning an abrupt change of character. This is logical for silent acquiescence out of the blue by a person previously possessed of a strong will to live signals the urgent need for investigation into a sudden inexplicable change of character. Where counsel's strategy is to concede guilt as it purportedly was here, there emerges a necessary and concomitant duty to prepare a viable strategy for the punishment proceedings that surely would follow such admission. Yet, as adduced above in Claim One, this was not done.

### 5. Self-defeating

Self-defense was not an albatross to cast off but a cause to take up to forward Escamilla's interests. Not only was counsel's method of operation was at odds with Escamilla's view of the cause, but it was also self-defeating.

The concession rendered null and void counsel's previous successful efforts at securing a self-defense instruction that were based entirely upon Escamilla's view adduced in the Gillett

interview. Restated, the concession foreclosed any claim of self-defense. That in addressing his third state habeas claim - *see* Claim Three, *infra* - the court found that Escamilla gained "the benefit of the self-defense claim made during the interview" (State Habeas Findings of Fact and Conclusions of Law 31) is a finding thus devoid of logic. Such finding is implicitly contrary to the holding of *Simmons v. United States*, that it is intolerable to surrender one constitutional right for the sake of another. 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968).

The self-defeating nature of counsel's act was by no means lost on Escamilla's adversary. Indeed, Texas quickly seized upon counsel's abandonment of self defense: "if you notice, even [Escamilla]'s lawyer didn't bother to try to argue that to you." (Trial Court Transcript, Vol. 37, p. 92). Nor was this concession without signifigance for the jury for - given the presence and views of juror Fletcher, as complained of in Claim Fourteen, *infra* - such concession was necessarily fatal to not just guilt-innocence but also mitigation.

The concession foreclosed the only viable gateway to any subsequent residual doubt argument. Just as the failure to ascertain the details and relevance of an offense forecloses the ability to raise a convincing residual doubt argument, *see, e.g., Rompilla v. Beard*, 545 U.S. 374, 386, 125 S.Ct. 2456, 2465, 162 L.Ed.2d 360 (2005), so too did the failure to urge self-defense foreclose the ability to make a latter residual doubt contention.

Again, the self-defeating abandonment of self-defense and implicit foreclosure of residual doubt contentions were not missed by Escamilla's adversary at trial. To this end, in its closing mitigation phase argument, Texas argued that complainant was defenseless (Trial Court Transcript, Vol. 39, p. 130), and there existed nothing mitigating about the facts of the case. (Trial Court Transcript, Vol. 39, p. 132). Escamilla respectfully submits that counsel could not contest this or give voice to any residual doubt because of the earlier concession and

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 83**

abandonment of self-defense. (Trial Court Transcript, Vol. 37, pp. 89-91). The strategy was self-defeating, and thus, not reasonable.

### 6.     Counsel's Imperative

Escamilla recognizes that a given case can place competing demands upon counsel. As masterfully phrased by the United States Army Court of Military Review, the law allocates to counsel the responsibility of "all but the most fundamental decisions in the defense of a case. Sometimes this means that counsel must act contrary to his client's desires, for a client's desires and a client's best interests are sometimes incompatible." *United States v. Williams*, 22 M.J. 584, 588 (ACMR 1986).

Case law recognizes that where evidence of guilt is overwhelming and the concession of guilt concerns a lesser charge it is a sound tactic to acknowledge guilt. *See, e.g., Underwood v. Clark*, 939 F.2d 473, 474 (7th Cir. 1991). As the Eleventh Circuit wrote:

> When faced with the duty of attempting to avoid the consequences of overwhelming evidence of the commission of an atrocious crime, such as a deliberate, considered killing *without the remotest legal justification or excuse*, it is commonly considered a good trial strategy for a defense counsel to make some *halfway* concessions to the truth in order to give the appearance of reasonableness and candor and to thereby gain credibility and jury acceptance of some more important position. To be effectual, trial counsel should be able to do this without express approval of his client and without risk of being branded as being professionally ineffective because others may have different judgment or less experience.

*McNeal v. Wainwright*, 722 F.2d 674, 676 (11th Cir. 1984) (citation omitted) (emphasis supplied).

To be sure, while Escamilla's preference was known this alone is not dispositive given the foregoing duties allocated to counsel; however, these duties were not discharged as required by the Sixth Amendment. As delineated above in subsection five and below in subsections nine

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 84**

and ten, there was a legal justification, self-defense. Moreover, as set forth below in subsections nine and ten, trial counsel passed far beyond the territory of any halfway concession.

### 7. Failure to Object

The State court found on the one hand that Escamilla was consulted by counsel and not only voiced no objection but rather silently acquiesced. Yet, the court also found that Escamilla was a discipline problem. This creates a conflict for silent acquiescence and presenting a disciplinary problem are not acts of the same character; rather, they are by their very nature schizophrenic acts.

To the extent that Escamilla was faulted for not objecting to counsel's alleged strategy and the state court found the stun belt cannot be considered to have deterred any objection on Escamilla's part, Escamilla respectfully disagrees. As Escamilla has related: "When [trial counsel Busbee] argued that I was guilty of murder, I could not blurt out for her to stop trying to get me convicted because of the stun belt." (State Habeas Application Exhibit 29). To implicitly require Escamilla to object personally fails in logic to adequately comprehend the infirmity imposed by a device designed to impose such.

Further, courts have declined to place such a personal objection requirement upon a defendant. *United States v. Mullins*, 315 F.3d 449, 454-55 (5th Cir. 2002). The rationale of such refusal is found in "the reality of . . . [commonplace] protocols of the court" and in the echoing of the Second Circuit's measure: "'[a]t trial, defendants generally must speak only through counsel, and, absent something in the record suggesting a knowing waiver, silence alone cannot support an inference of such a waiver.'" *Id.* at 455, and n.23 (quoting *Chang v. United States*, 250 F.3d 79, 84 (2nd Cir. 2001)). This rationale finds mooring here given the added deterrent and protocol of the stun belt.

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 85**

## 8.  *Nixon* and the Absolute Right to Plea Not Guilty

Our Constitution reserves to a defendant the absolute right to enter a plea or proceed to

trial. *Florida v. Nixon*, 543 U.S. 175, 187, 125 S.Ct. 551, 560, 160 L.Ed.2d 565 (2004); *see also*

*Smith v. United States*, 3:03CR122-GHD, 2007 WL 3355875, *2 (N.D. Miss. Nov. 8, 2007)

(memorandum op.) (only westlaw citation is currently available) (reiterating this principle).  This

right is ultimate and reserved exclusively to the province of a defendant.  *Brookhart v. Janis,* 384

U.S. 1, 6-7, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966).  Such a decision requires the attorney to both

consult with a defendant and secure his consent.  *Nixon, supra.*  Such constitutional rights are so

sacrosanct that they fall within the purview of a defendant's own "ultimate authority."  *Id.*

(quoting *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); citing

*Wainwright v. Sykes,* 433 U.S. 72, 93, n. 1, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (BURGER, C.

J., concurring)).  Given this prescribed gravity, a waiver of this right is not to be found lightly.

Indeed, every reasonable presumption against the  waiver of fundamental constitutional

rights is to be indulged and the courts of the Republic are not to presume acquiescence in the

loss of such rights.  *See Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed.

1461 (1938) (citing to *Aetna Insurance Co. v. Kennedy,* 301 U.S. 389, 393, 57 S.Ct. 809, 811,

812, 81 L.Ed. 1177; *Hodges v. Easton*, 106 U.S. 408, 412, 1 S.Ct. 307, 27 L.Ed. 169 (1882);

*Ohio Bell Telephone Co. v. Public Utilities Commission*, 301 U.S. 292, 307, 57 S.Ct. 724, 731,

81 L.Ed. 1093 (1937)).

Beyond question, in *Nixon*, the highest Court found that concession of guilt during

argument did not operate as the functional equivalent of a guilty plea.  To so hold, the Court first

concluded that the concession notwithstanding, defendant Nixon retained the rights accorded a

defendant in a criminal trial and noted that the guilt phase component was separated from the

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 86**

punishment phase. *Nixon,* 543 U.S at 188, 125 S.Ct. at 561. The Court distinguished *Brookhart* on the grounds that the proceedings in *Nixon* were not comparably truncated nor was Nixon deprived of the full rights to confrontation and cross-examination. *Nixon,* 543U.S at 188-89, 125 S.Ct. at 561. The cause sub judice, though, reflects a concession that was far more fatal, and thus, not countenanced by *Nixon.*

### 9.   *Nixon* **Distinguished**

Counsel's three-fold decision to: forego Escamilla's self-defense view, abandon the self-defense charge, and to completely concede guilt was the functional equivalent of entering a guilty plea without Escamilla's consent. To this end, Escamilla submits the following reasons his case does not fall within the paradigm of approved guilt-concession contemplated by *Nixon.*

First, counsel in *Nixon* conceded guilt with a sole eye toward punishment and prepared for the same. 543 U.S. at 181, 125 S.Ct. at 557 ("Corin turned his attention to the penalty phase, believing that the only way to save Nixon's life would be to present extensive mitigation evidence centering on Nixon's mental instability."). Here, however, as delineated above in Claim One, counsel failed to rightly prepare for the obvious and imminent contingency of a punishment proceeding. On this basis alone, counsel's concession falls outside the protected ambit of *Nixon.*

Second, also absent in *Nixon* was a viable means to wholesale exoneration, or the legal justification or excuse contemplated by the Eleventh Circuit in *McNeal, supra.* Here, in contrast, there was a self-defense charge. That the trial court determined that Escamilla's statements failed to establish self defense (State Habeas Findings of Fact and Conclusions of Law 63, 64) are thus demonstrated to be devoid of logic for it was these very statements that caused the trial court to grant this charge. That failure of logic notwithstanding, means existed

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 87**

for the jury to conclude Escamilla took complainant's life and yet still acquit Escamilla. By abandoning this complete defense counsel departed from the accepted course of acknowledging guilt to gain credibility with the jury and secure a conviction on a lesser charge. Counsel instead abandoned a complete defense and eliminated the underpinning of the self-defense charge, Esamilla's own words. Counsel's concession therefore eliminated Escamilla's credibility in the eyes of the jury.

This is not the turning of attention to the mitigation phase approved by *Nixon*. 543 U.S. at 181, 125 S.Ct. at 557. Rather, it was a strike against Escamilla's complete defense and veracity proper in the face of an ineffectively investigated and prepared mitigation case, as adduced in Claim One, *supra*. Moreover, given the presence and views of juror Fletcher, as complained of in Claim Fourteen, *infra*, such concession was fatal to not just guilt-innocence but also mitigation.

Third, given the brevity of the closing argument (occupying only two and three quarters pages in the record) its sacrificial nature, and the absence of a substantial presentation of mitigation evience - *see* Claim One, *supra* - this is not the meaningful opposition of the prosecution's case contemplated by *Nixon*, 543 U.S. at 178-79. This, instead, was a concession of guilt and moral culpability that operated as the functional equivalent of a guilty plea. *Cf. United States v. Thomas*, 417 F.3d 1053, 1056 (9th Cir. 2005), *cert. denied*, 546 U.S. 1121, 126 S.Ct. 1095, 163 L.Ed.2d 909 (2006) (assuming counsel's concession of guilt in the absence of consultation or consent was deficient). Such a concession is not permitted by *Nixon*.

Fourth, the concession, albeit to the lesser-included charge of murder, operated as the functional equivalent of a guilty plea against Esamilla's view of self-defense adduced in the Gillett interview. The reasoning of the dissenting views in *Haynes v. Cain*, therefore applies.

298 F.3d 375, 384 (5th Cir. 2002) (Parker, J., Wiener, J., DeMoss, J., dissenting).  The dissent

there observed:

> Trial counsel's concession as to [the defendant's] guilt on the second degree
> murder charge can only be described as the functional equivalent to a forced
> guilty plea over the objection of the defendant. *See State v. Carter*, 270 Kan. 426,
> 14 P.3d 1138, 1148 (Kan.2000) (defense counsel's strategy of conceding felony
> murder in an attempt to prevent conviction of first degree murder even though the
> defendant maintained his innocence on all charged crimes was the functional
> equivalent to entering a guilty plea and violated both the Sixth Amendment and
> defendant's due process rights to a fair trial); *Nixon v. Singletary*, 758 So.2d 618,
> 625 (Fla.2000) (counsel's comments conceding defendant's guilt were the
> functional equivalent of a guilty plea). In my view, *Faretta, Brookhart* and *Jones*
> clearly establish that the Sixth Amendment is violated when counsel concedes the
> accused's guilt as to a lesser crime over the accused's express objection

*Id.* 298 F.3d at 386-87.  While *Nixon* was later decided differently (see subsection eight, *supra*)

Escamilla maintains that the underlying logic of the *Haynes v. Cain* dissent remains sound.

Because counsel was informed that Escamilla sought a total defense and they failed to provide it,

the concession was a decision beyond their authority.  *Id.* at 387.

Based upon the foregoing, the concession of guilt in the absence of Escamilla's consent,

and contrary to his known view of the cause, constituted deficient representation in derogation of

his Sixth Amendment right to the effective assistance of counsel.  The question therefore

becomes one of prejudice.

### 10. <u>Prejudice</u>

That the concession was of signal import is beyond peradventure.  The record reflects

that the jury accorded counsel's argument, and thus the concession, no little attention as the

jury's note - requesting a definition of the word police - was directed towards the substance of

counsel's closing argument.  (Trial Court Transcript, Vol. 37, p. 96).  As a consequence,

Escamilla submits that the jury was highly attentive to counsel's argument and the complained-of concession was correspondingly fatal.

The deficiency of an un-counseled concession was so profound here that the presumption of prejudice envisioned by *Cronic* applies. 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed. 2d 657 (1984). The presumption obtains where, inter alia, there is a complete breakdown in the adversarial process. 466 U.S. at 662; *Wright v. Van Patten,* 128 S.Ct. 743, 746, n. *, 169 L.Ed.2d 583 (2008). Just such a breakdown is evident here because counsel's concession was so near complete at the guilt-innocence phase (the only exception being the argument that Officer James was not acting in his lawful capacity, an argument doomed *ab initio*) that it was a mere precursor to the mitigation phase.

This concession therefore forsook the entire cause because (I) as adduced in Claim One, *supra,* the groundwork for mitigation was not rightly placed, (II) it eliminated any residual doubt and eviscerated Escamilla's personal credibility, and (III) it forsook any hope of a positive mitigation outcome because, as complained of in Claim Fourteen, *infra,* one juror viewed self-defense as the salient mitigating factor. This concession was therefore by no means a halfway measure, *cf. McNeal, supra,* but rather was the complete failure of testing contemplated by *Bell v. Cone,* 535 U.S. 685, 697, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002).

The presumption of prejudice that *Cronic* "reserve[s] for situations in which counsel has entirely failed to function as the client's advocate" therefore finds mooring here. *Nixon,* 543 U.S. at 561. The arguable wisdom of counsel's concession avails nothing in this context, *see Haynes,* 298 F.3d at 387 (dissenting op.), for the concession violated Escamilla's absolute rights.

Thus, prejudice is presumed and this cause presents a full blown Sixth Amendment violation, warranting remand. *See, e.g., United States v. Swanson*, 943 F.2d 1070 (9th Cir. 1991).

Alternatively, if *Strickland* is held to apply, Escamilla was prejudiced for the very reasons adduced above. Namely, counsel's concession effectively prevented the jury from acquitting Escamilla on the case as a whole or upon a theory of self-defense; the very charge counsel secured. Secondly, counsel's concession effectively labeled Escamilla an abject liar. In this fashion, counsel set the stage for a finding of guilt and then, as set forth in Claim One above, afforded no barrier to the even swifter imposition of the most severe penalty extant.

Even if it might be said that no rationale person could have believed his self-defense claim, it was fatally prejudicial to abandon Escamilla's view of his own actions given the imminence of the mitigation phase. Restated, the strongest ground upon which to launch an argument that Escamilla was not morally reprehensible - his own view that he was acting merely to preserve his life - was struck down by counsel's argument, rending it unavailable for later use. Accordingly, the case reveals a reasonable probability that, but for counsel's error, the result of the proceedings below would have been different.

### 11.   Conclusion

Because the Texas courts' determination of Escamillas habeas claims resulted in a decision that was contrary to and involved an unreasonable application of, clearly established Federal law - a  defendant's ultimate mastery of his own defense -  habeas corpus should issue. *See Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). Further, because the Texas courts' determination of Escamilla's habeas claims resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court, this

Court should grant his requested relief in its entirety. *Id.*

### C.  CLAIM THREE:  INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL FOR PRECLUDING PETITIONER FROM TESTIFYING AT THE SUPPRESSION HEARING

In his third ground for relief below, Escamilla contended that trial counsel was

ineffective for failing to allow him to testify in the pretrial hearing regarding admissibility of the

Gillett interview.  (State Habeas Application, pp. 27-29). Texas, however, gained admission of

the video and deployed it to maximum effect.

### 1.  Propriety of the Interview's Admission Contested on Direct Appeal

On direct appeal, Escamilla complained that the trial court erroneously denied his motion

to suppress the interview because Gillett was acting as a state agent. *Escamilla*, 143 S.W.3d at

822-25.  The Court of Criminal Appeals initially summarized the pertinent testimony in the

following fashion:

> The evidence from the suppression hearing shows that the police followed their established practice when they permitted the reporter to interview appellant in jail after appellant consented to the interview in response to a request by the reporter. Appellant claims that the reporter became a "state agent" when, after appellant consented to the interview but before the interview occurred, a Dallas police officer called the reporter and, according to appellant, "asked [the reporter] to get [appellant] to talk because [appellant] would not talk to the police."

*Escamilla*, 143 S.W.3d at 822.  The Court continued then in its response to Escamilla's

contention:

This assertion, however, suggests something that is out of context with the entire conversation between the officer and the reporter and a full reading of the record. The record from the suppression hearing reflects:

Q. [PROSECUTION]: Now, between the time that the interview was set and the time that you conducted the interview, did you have any conversations with any law enforcement officers?

A. [GILLETT, THE REPORTER]: Yes, sir, I did.

Q. Who was that?

A. Sergeant Joe Decorte, the Sergeant from the Special investigative Unit of the Dallas Police Department.

Q. And, when did you talk to him, do you recall?

A. Sometime after I learned that I had the okay to do the interview with [appellant], but before the actual interview.

Q. And, what was that conversation, to the best of your recollection?

A. I was very uncomfortable getting a phone call that near the time of the-of the interview. I thought that he was going to attempt to-was going to tell me that they had found a reason for him not to talk to me. There was-had been a lid on things the day before. I don't know why, we just-there were road blocks in terms of public information that I hadn't seen routinely and I was afraid that he was going to put a road block to the interview.

Q. And, what did he say?

A. I asked him, are you going to try to block me. And, he said, well no, I want you to get him to talk. He won't talk to me. Words to that. That's not quote, that's, you know, what my recollection, my impression of what he said.

Q. All right. What else was said, if you recall, during your conversation with him.

A. That's all. I was uncomfortable taking the phone call.

Q. The remark that was made, how did you review that remark by him, that I hope you get him to talk or whatever the words were that he used?

A. I thought he was, you know, I was still sensitive about thinking he was going to try to block the interview. And, he said, like a laugh, a throw away, you know, he won't talk to me so, maybe, you know, maybe you can get him to confess, something like that.

Q. And, you don't recall the exact words he used, is that correct?

A. No, that is my recollection, is he said, he chuckled and said, hell, no, I want you to get him to confess, he won't talk to me.

Q. Did you just-

A. But, he did it in a laughing way. It was not a direct order or anything.

Q. And, that was my next question. Did you take that comment by him as any kind of directions to you as to what you should do?

A. No, sir, absolutely not.

Q. And, was it more in the nature of just an off the cuff remark by him?

A. That's correct, it was.

Q. And, in terms of the questions that you were going to ask for the interview, were they your questions?

A. Yes, sir, absolutely.

Q. Did anyone tell you what to ask or direct you to ask questions in any certain way?

A. No, sir.

*Escamilla*, 143 S.W.3d at 823-25 (relying upon Trial Transcript Vol. 32, pp. 17-19). The Court

of Criminal Appeals concluded its analysis as follows:

> This record clearly does not present the scenario where the police employ an informant to deliberately elicit incriminating statements from an in-custody defendant solely for the purpose of helping the police gather evidence against the defendant. *See generally State v. Hernandez,* 842 S.W.2d 306, 312-16 (Tex.App.-San Antonio 1992, pet. ref'd), cert. denied, 509 U.S. 927, 113 S.Ct. 3049, 125 L.Ed.2d 733 (1993) (thorough discussion of how non-law enforcement personnel can become state agents for Sixth Amendment purposes). In this case, the record supports a finding that the officer expressed to the reporter a hope that appellant would incriminate himself during the interview with the reporter. This was not an offer to the reporter to act as a state agent and did not convert an otherwise legal interview into an illegal one. *See Hernandez,* 842 S.W.2d at 314 (creation of an agency between law enforcement and non-law enforcement personnel depends upon the existence of an agreement between them at the time of the elicitation). Even if this was an offer by the police to the reporter to become a state agent, there is no evidence to support a finding that the reporter accepted this offer. *See*

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 94**

*id.* On this record, we cannot conclude that the reporter was acting as a state agent when he interviewed appellant.

*Escamilla*, 143 S.W.3d at 824 (footnotes omitted).

### 2.     Habeas Claim

During State habeas proceedings Escamilla explained:

> I told my attorneys that one of the detention officers had said that it would be good for me to talk to Bud Gillett. No one asked me if I wanted to testify about this at the hearing on the admissibility of the interview. If my attorneys had told me that I had a right to testify about this matter in the pretrial hearing, I would have done so.

(State Habeas Application, Exhibit 29). Escamilla specifically contended that his testimony would have increased the evident state action present and diminished the view that his consent was voluntary. (State Habeas Application, p. 28). Escamilla, however, was not informed of his right to so testify.

### 3.     Trial Court Findings

The trial court rejected this claim. (State Habeas Findings of Fact and Conclusions of Law 11-34). At the outset, the trial court found Escamilla did not inform counsel of this jail guard interaction. (State Habeas Findings of Fact and Conclusions of Law 14). In so concluding, the state court relied upon counsel's affidavits that they discussed the reason he consented to the interview with Escamilla and he simply shrugged without explication. (State Habeas Findings of Fact and Conclusions of Law 15, relying upon State's Writ Exhibits C and D). The court found this purported inquiry consistent with counsel's vigorous efforts at suppression; proceeding from this premise of zeal, the court found it extremely unlikely counsel would have ignored additional evidence and failed to counsel Escamilla about testifying. (State

Habeas Findings of Fact and Conclusions of Law 16-18).  Ultimately, the court faulted Escamilla

for exhibiting no interest.  (State Habeas Findings of Fact and Conclusions of Law 18).

Then, assuming the veracity of Escamilla's assertion, the court addressed prejudice.

(State Habeas Findings of Fact and Conclusions of Law 19).  The court concluded that

Escamilla's assertions notwithstanding it would have nonetheless admitted the interview for

several reasons.  (State Habeas Findings of Fact and Conclusions of Law 20).  First, because

Escamilla adduced no corroborating evidence of the jail guard interaction it could have

reasonably disbelieved him.  (State Habeas Findings of Fact and Conclusions of Law 21).

Second, Escamilla failed to establish that the interaction actually influenced him.  (State Habeas

Findings of Fact and Conclusions of Law 22).  Third, Escamilla did not establish the interaction

constituted an interrogation.  (State Habeas Findings of Fact and Conclusions of Law 23, relying

upon *Rhode Island v. Innis*, 446 U.S. 291, 300-02, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)).

The court further determined it could have concluded the interaction took place without

violation of Escamilla's Sixth Amendment rights.  (State Habeas Findings of Fact and

Conclusions of Law 24).  The court noted that it was Gillett to whom the interview was given

and looked to the Court of Criminal Appeals' direct appeal conclusion that Gillett was not acting

as a state agent.  (State Habeas Findings of Fact and Conclusions of Law 25, citing *Escamilla*,

143 S.W.3d at 822-24).

The court then turned to the evidence adduced against Escamilla, concluding that it was

overwhelming and viewing the Gillett interview as merely corroborative.  (State Habeas

Findings of Fact and Conclusions of Law 27).  The court also noted the similarly potent

punishment phase evidence of Texas and its restraint in use of the interview.  (State Habeas

Findings of Fact and Conclusions of Law 28-29).  Notably, the court also found that Escamilla gained "the benefit of the self-defense claim made during the interview."  (State Habeas Findings of Fact and Conclusions of Law 31).

Therefore, the court concluded that while the Gillett interview aided Texas's cause it was not essential to guilt or punishment, and thus, counsel was not ineffective for not presenting Escamilla's jail guard interaction testimony.  (State Habeas Findings of Fact and Conclusions of Law 32-33).

### 4.   Right to Testify

Escamilla possessed a personal right to testify.  *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704, 2708 - 2709 (1987) (noting that the right emanates from several constitutional provisos and noting that it is an essential part of due process pursuant to *Faretta v. California*, 422 U.S. 806, 819, n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975)).  This personal right could not be waived by counsel.  *United States v. Mullins*, 315 F.3d 449, 454 (5th Cir. 2002), *cert. denied* 541 U.S. 1031, 124 S.Ct. 2096, 158 L.Ed.2d 713 (2004).

Indeed, in this particular setting, the right was even more protected than it would have been during the trial proper.  This is the case for Escamilla could have testified in the pre-trial hearing without exposing himself to testifying in front of the jury or to cross-examination regarding other issues under both Supreme Court jurisprudence and Texas case law.  *See Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968) ("when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he

makes no objection"); *Riojas v. State*, 530 S.W.2d 298, 302, n. 1 (Tex. Crim. App. 1975); *Lopez v. State*, 384 S.W.2d 345, 348 (Tex. Crim. App. 1964).

## 5.   **Standard of Review**

Where a defendant contends counsel interfered with his right to testify the appropriate vehicle for relief is an ineffective assistance of counsel claim. *Sayre v. Anderson,* 238 F.3d 631, 634 (5th Cir. 2001) (quoting and relying upon *United States v. Brown,* 217 F.3d 247, 258-59 (5th Cir.2000)).  More precisely, when a defendant asserts that it was counsel and not the court or the prosecutor that interfered with his right, *Strickland* applies. *Mullins*, 315 F.3d. at 52-53.  While *Strickland's* application is recognized in this context, Escamilla alternatively submits below that *Cronic's* presumption should nonetheless obtain.

In the interest of conciseness, Escamilla submits the following synthesis and amplification of the controlling standard:

> *Strickland* requires that a defendant show both that: (1) trial counsel's performance was deficient and (2) that the deficient performance prejudiced the defense.  Ineffective assistance of counsel is a mixed question of law and fact, and we review the district court's grant of habeas relief *de novo,* while crediting the district court's express or implied findings of discrete historic fact that are not clearly erroneous.

> To satisfy the first element of *Strickland,* the defendant must show that "counsel's performance fell below an objective standard of reasonableness."  In determining whether counsel's performance was deficient, we must be highly deferential to counsel's trial strategy.  In the past, we examined counsel's decision on whether a defendant will testify as part of counsel's trial strategy.  In examining that strategy, we keep in mind that "the decision whether to put a Defendant on the stand is a 'judgment call' which should not easily be condemned with the benefit of hindsight."

At the same time it cannot be permissible trial strategy, regardless of its merits otherwise, for counsel to override the ultimate decision of a defendant to testify contrary to his advice. . . .

*Mullins,* 315 F.3d at 453-54.

### 6.    Context and Affidavits

The trial court resolved the conflict of whether the matter was conferred upon between Escamilla and counsel by resorting to counsel's affidavit assertions that when counsel discussed the reason Escamilla consented to the interview he shrugged and adduced no explanation. (State Habeas Findings of Fact and Conclusions of Law 15, relying upon State's Writ Exhibits C and D). However, the fact remains that Ms. Busbee gave a previous affidavit (State Habeas Application, Exhibit 28) wherein she recited in pertinent part that "We did not discuss strategy with Licho. . . . ." (State Habeas Findings of Fact and Conclusions of Law 41). As noted earlier, however, in Claim Two, subsection three, the affidavits given by counsel create a manifest inconsistency regarding whether strategy was in fact discussed.

Given this internal conflict between counsel's affidavits they should not have been regarded as dispositive. Moreover, the additional conflict extant between counsel's and Escamilla's affidavits establishes that an evidentiary hearing was warranted consistent with the principle that habeas applications often warrant a hearing to resolve contested issues. *See, e.g., Fontaine,* 411 U.S. at 215, 93 S.Ct. at 36; *Sanders,* 373 U.S. 1. Escamilla, therefore, respectfully submits that resolution upon affidavits without a hearing was not proper.

### 7. Deficiency

Because Escamilla's position did not change it was his affidavit assertion and not counsel's that should have prevailed. Notably, in this regard, the state court determined that Escamilla possessed no interest in strategy or issues. (State Habeas Findings of Fact and Conclusions of Law 18). Again, as adduced earlier in Claim Two, subsection four, such acquiescence is at diverse odds with what is clearly known of his person. The cause sub judice reflects that Escamilla was motivated by a profound desire to live. Escamilla is not an individual who seeks to go quietly into death; such a sentiment is at irreconcilable odds with his seminal will to live. Acquiescence and abdication are therefore utterly incompatible with his character. With direct reference to *Mullins,* 315 F.3d at 455, Escamilla respectfully submits that the answer to the question of whether there is credible evidence of his claim must be yes.

Escamilla therefore respectfully submits that he was effectively prevented from testifying by counsel's omissions because the matter was not accorded to be his ultimate decision as required by the law of the Republic. As a consequence, counsel was deficient within the ambit of *Strickland. See, e.g., Mullins,* 315 F.3d at 455-56. The next inquiry is whether counsel's deficiency in this aspect prejudiced Escamilla's defense. *See, e.g,, id.*, 315 F.3d at 456.

### 8. Prejudice

At the threshold, Escamilla pauses to alternatively submit that *Cronic* should control. This is called for because the instant claim, like Claims One and Two above, is grounded in his Sixth Amendment right to effective assistance of trial counsel. It has been envisioned that it is possible for errors to cumulatively infect a trial. *See Derden v. McNeel,* 938 F.2d 605, 609 (5th Cir. 1991) (recognizing cumulative error analysis in the habeas context). Given the principle