that counsel's deficiencies should be viewed not just in isolation but as a whole, their cumulative impact is utter and profound here.  Proceeding from this point, Escamilla respectfully resubmits that as delineated earlier in Claim One and Claim Two, subsections nine and ten, that what is presented in the cause at bar is a failure of meaningful adversarial testing.  The presumption of prejudice reserved by *Cronic* therefore obtains, prejudice is presumed, and this cause presents a full blown Sixth Amendment violation, warranting remand.

Alternatively and pursuant to *Strickland*, to prevail Escamilla must establish a reasonable probability that absent the complained-of deficiency the jury would have possessed a reasonable doubt regarding guilt and that the error was sufficiently serious as to deny Escamilla a fair trial with a reliable result.  *See, e.g., Mullins*, 315 F.3d at 456.

An appropriate inquiry in this context is whether the unadduced testimony exists elsewhere in the record.  *See, e.g., United States v. Harris*, 408 F.3d 186, 192 (5th Cir. 2005).  It does not.  The evidence Escamilla would have adduced, that the Gillett interview was secured by state action arrived at in no small part by the jail guard interaction (State Habeas Application, Exhibit 29), was not squarely presented elsewhere.

Another consideration is the necessary trade-offs imposed by such a decision to testify.  In this regard the *Mullins* Court noted that had defendant Mullins testified his testimony "would come at a high price," reasoning:

> The difficulty is that a denial by Mullins from the stand would come at a high price. It would juxtapose a police officer whose account is supported by Mullins's signed statement with a felon with a large incentive to lie. If Mullins took the stand his extensive criminal record and drug use would have come into evidence. The likelihood that the jury would credit the felon over the police officer whose testimony is supported by the defendant's signed statement does not meet the reasonable probability of a different outcome test. We can say only that his

> testimony *might* have persuaded, but not that there is a reasonable probability that it would have done so. In service of finality, the second prong of *Strickland* raises high the bar to relief, and here it has not been cleared.

*Mullins*, 315 F.3d at 456. This trade-off cost was not present here, however, because Escamilla was complaining only about testifying in a pretrial hearing. He would have done so without exposing himself to testifying in front of the jury or to cross-examination regarding other issues. *See Simmons*, 390 U.S. at 394, 88 S.Ct. at 976; *Riojas*, 530 S.W.2d at 302, n. 1. As a result, the absence of this trade-off also indicates prejudice.

That said, the trial court clearly concluded that had it accepted Escamilla's assertions it still would not have granted suppression. (State Habeas Findings of Fact and Conclusions of Law 20). Escamilla now turns to address these matters.

The trial court found it could have reasonably disbelieved Escamilla because he adduced no corroborating evidence of the jail guard interaction, Escamilla failed to establish that the interaction actually influenced him, Escamilla did not establish the interaction constituted an "interrogation," the interaction took place without violation of Escamilla's Sixth Amendment rights, and it was Gillett to whom the interview was given. (State Habeas Findings of Fact and Conclusions of Law 21-25).

This view unduly isolates the jail guard interaction from the interview events as a whole in violation of the principle that motions to suppress are to be reviewed and considered under a totality of the circumstances perspective. *See, e.g., Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979); *United States v. Jacquinot*, 258 F.3d 423, 430 (5th Cir. 2001). Moreover, the record reflects Gillett did not tell Escamilla that Escamilla did not have to talk, could stop whenever he desired, and that anything he said could be used against him. (Trial

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 102**

Transcript, Vol. 32, pp. 47-48). These salient matters were not rightly addressed in the courts below.

In sum, Escamilla was not maintaining that the jail guard interaction in isolation would have carried his motion but rather that this evidence would have added to, and thus ultimately carried, his argument of comprehensive state action. Isolation of his claim was inappropriate. *Cf. United States v. Arvizu,* 534 U.S. 266, 273-77, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (holding in Fourth Amendment context that the approach taken by the Ninth Circuit-evaluating and rejecting listed factors in isolation from each other-departed sharply from the teachings of numerous Supreme Court cases and failed to consider the "totality of the circumstances") (quoting *United States v. Cortez,* 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

The trial court also found that the guilt-innocence and mitigation phase evidence adduced by Texas was overwhelming, the Gillett interview was merely corroborative, and Texas exercised restraint in its use of the interview. (State Habeas Findings of Fact and Conclusions of Law 27-29). Escamilla respectfully disagrees with the view that the Gillett interview was of such minimal consequence.

For one, in rejecting his second habeas claim below the court regarded the Gillett interview as part and parcel of the State's cause. (State Habeas Findings of Fact and Conclusions of Law 59-60). This view cannot be reconciled with the view the court used of the interview, as merely corroborative, to reject the instant claim. Such irreconcilable views are a miscarriage of logic and should not be countenanced by the Republic, especially not in this most severe of contexts.

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 103**

Secondly, Escamilla submits that Texas rapidly capitalized upon the interview to such a degree that it could rightly be denominated the heart of Texas's case.   To this end, in closing argument at guilt-innocence Texas argued:   "and you listened to him, you see him for the remorseless killer that he was on November the 25th, of 2001.  It should leave no doubt that he knew he killed a police officer and that he was proud of it." (Trial Court Transcript, Vol. 37, p. 88).  In this manner, Texas used the exhibit to punctuate the first half of its guilt-innocence stage argument and to set the stage for its  mitigation phase contentions.  The interview was therefore not some throwaway matter in the eyes of Escamilla's adversary.

In the second half of its guilt-innocence stage closing argument Texas revisited the interview again, using it to call Escamilla a liar.  (Trial Court Transcript, Vol. 37, p. 94).  The record also strongly suggests that it was this interview Texas again referred to in its mitigation phase argument to denominate Escamilla a killer wholly lacking in regard for human life, possessed of great moral culpability, and devoid of remorse.  (Trial Court Transcript, Vol. 39, pp. 130-31, 133, 134, 155, 159).  Given this signal reliance upon the Gillett interview, Escamilla submits that its exclusion, far from being of no moment would have collapsed the moral force of Texas's cause.

As a final matter, Escamilla notes that in rejecting his ineffective assistance of counsel claim the trial court found that the interview accorded him "the benefit of the self-defense claim made during the interview." (State Habeas Findings of Fact and Conclusions of Law 31).  This finding ignores, however, the concession - complained of earlier in Claim Two - by counsel that forfeited self-defense utterly.  The trial court's view that Escamilla had the benefit of self-defense is therefore a miscarriage of logic.  The imprimatur of the Republic should not be

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 104**

affixed to such, especially when what it concerns is the most unique act the Republic can take. *Cf. Gardner v. Florida*, 430 U.S. 349, 357-58, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) (STEVENS, J., plurality opinion).

Restated, counsel foreclosed any such benefit of self-defense in an action Escamilla maintains was ineffective. Accordingly, the case reveals a reasonable probability that, but for counsel's error, the interview would have been denied admission and the result of the proceedings below would have been different.

### 9.    Conclusion

Because the Texas courts' determination of Escamillas habeas claims resulted in a decision that was contrary to and involved an unreasonable application of, clearly established Federal law - Escamilla's absolute and personal right to testify, habeas corpus should issue and Escamilla's requested relief be granted. *See Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). Further, because the Texas courts' determination of Escamilla's habeas claims resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court, this Court should grant his requested relief in its entirety. *Id.*

### D.    CLAIM FOUR:   LACK OF A FAIR CROSS-SECTION IN THE JURY PANEL

Petitioner, a Hispanic male, was tried by a jury devoid of minority representation. While this phenomenon can occur on occasion without violating the United States Constitution, in this case the lack of Hispanic representation on the jury panel violated Petitioner's rights, including Petitioner's Sixth and Fourteenth Amendment rights to a jury pulled from a fair cross section of

society.   The right to a fair cross section of the community in jury panels is encompassed in clearly established federal law as determined by the United States Supreme Court in *Duren v. Missouri*, 439 U.S. 357 (1979).   Nonetheless, the trial court ignored Petitioner's evidence submitted during the state habeas proceedings on this point, including the expert testimony of Dr. Harold J. Hietala, an Emeritus Professor of Anthropology and Statistical Science at Southern Methodist University.

Petitioner re-urges this claim before this Court and re-urges the persuasive evidence submitted by Dr. Hietala.   *See* Petitioner's State Habeas Record Exhibits, Volumes III, IV, V, VI, VII.

Through the testimony of Dr. Hietala, Petitioner demonstrated a significant racial disparity in Dallas County juries by considering an SMU/Dallas Morning News study analyzing the under-representation of Hispanics on Dallas jury panels as well as several actual cases in Dallas County, including the Rayford, Harris, Rivas, Battaglia, Doyle and Escamilla jury panels. Dr. Hietala conducted a study assessing a five-year period during which there were numerous indicators that Hispanics were uniformly under represented on Dallas jury panels. Dr. Hietala concluded that Hispanics were under represented on Petitioner's jury panel with a disparity range between 13.96% and 17.73%.  Such significant disparity is neither fair nor reasonable and violates Petitioner's constitutional rights.  The SMU/Dallas Morning News study further found that while Hispanics account for 25% of the total population of Dallas County, Hispanics only comprise 7% of a typical jury pool.   That lack of representation rises to the level of a constitutional irregularity.

In *Taylor v. Louisiana*, 419 U.S. 522 (1975), the United States Supreme Court explained:

The purpose of a jury is to guard against the exercise of arbitrary power – to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps over-conditioned or biased response of a judge. This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system.

Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial. "Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case....[T]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility,"

*Id.*, at 530-531 (citations omitted). The court went on to hold that "[d]efendants are not entitled to a jury of any particular composition,...but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* at 538.

As the Supreme Court later held in *Duren v. Missouri,*

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357 (1979). During the state proceeding, Petitioner established, through extrinsic evidence and the testimony of Dr. Hietala that Dallas County has a system in that:

(1)       excludes Hispanics, a distinctive group;

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 107**

(2)     the representation of this group is neither fair nor reasonable in relation to the

number of Hispanics in Dallas County; and,

(3)     this under representation is due to systematic exclusion.

The state habeas court marginalized Petitioner's evidence by challenging that Petitioner "presents no raw data from any of these studies. Moreover, although the time between the *Dallas Morning News* study and Doyle's trial may have spanned five years, the studies do not represent an analysis of the venires for every week during that five-year period." State Court Findings, Finding 161, p. 48.

Petitioner would urge that this five-year requirement is in contravention of clearly established law. In addition, by suggesting that *Duren*'s proof of weekly venire panels for nearly a year translates to requiring that Petitioner demonstrate this claim by presenting raw data for "every week during that five-year period" is an unreasonable application of clearly established law as set forth in *Duren*.

In addition, the factual support Petitioner presented during state habeas proceedings demonstrates that Hispanics – over a five-year period, including the time when Petitioner was tried – were systematically under represented. *See* Petitioner's State Habeas Record Exhibits, Volumes III, IV, V, VI, and VII. The state habeas court's failure to credit Petitioner's statistical evidence and Petitioner's uncontroverted expert testimony qualifies as an unreasonable factual finding in light of the evidence submitted.

Finally, this claim, much like the claim set forth below regarding lethal injection, suffers from inadequate review by the state habeas court. When this court compares the State's Answer side by side with the state habeas court's findings, it is clear that the state habeas court just

changed the State's Answer from argument to "the Court finds." Otherwise, these findings are but a "rubber-stamping" of the State's Answer and provide no autonomous analysis. In fact, most of the state court's findings suffer from this same flaw.

The state findings are not entitled to the usual amount of AEDPA deference because they fail to provide any evidence of an independent review. It is nearly impossible that had the state court evaluated all of Petitioner's claims it would have agreed *with every word* and *every phrase* submitted by the State in its Original Answer. Such "review" fails to accord Petitioner with the requisite independent judicial evaluation of his claims provided by the writ of habeas corpus. For these reasons and the reasons presented below challenging the state habeas court's "rubber-stamped" opinion, Petitioner respectfully requests an evidentiary hearing on this issue. In the alternative, the evidence presented during state habeas proceedings provide this Court with ample reason to find in his favor on this claim, even with the weighty level of review mandated under the AEDPA.

### E: CLAIM FIVE: INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL FOR FAILING TO CHALLENGE A LACK OF FAIR CROSS-SECTION OF THE VENIRE

Petitioner incorporates all previously discussed cases, legal explanations and arguments regarding ineffective assistance of counsel. As set forth above, Petitioner received ineffective assistance of counsel at trial when counsel failed to adequately investigate the existence of readily available mitigating evidence and when counsel failed to present readily available mitigating evidence.

In addition to those previously detailed, Petitioner also received ineffective assistance of counsel when trial counsel failed to properly assert and preserve an objection to the lack of a fair

cross-section of the venire.  Petitioner, a Hispanic male, must rely on the actions of counsel to ensure that his trial comports with due process and that any jury selected is fairly constituted and chosen.  Counsel wholly failed to do so in this instance despite the obvious lack of Hispanic representation on Petitioner's venire.  Petitioner's trial by an all-white jury denied Petitioner the right to a fair trial as enshrined in *Batson v. Kentucky*, 476 U.S. 79 (1986) and *Duren v. Missouri*, 439 U.S. 357 (1979).

Counsel's failure to ensure that Petitioner had some minority representation on his jury precluded him from receiving a fair trial.  The failure to lodge an objection regarding the cross-section issue falls well below reasonable professional norms in a capital case.  As set forth in the 1989 ABA Guidelines,

GUIDELINE 11.7.2 VOIR DIRE AND JURY SELECTION

A. Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in      any criminal case, whether any procedures have been instituted for selection of juries in capital cases that present potential legal bases for challenge.

B. Counsel should be familiar with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding "death qualification" concerning any  potential juror's beliefs about the death penalty. Counsel should be familiar with techniques for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them possibly excludable.

*ABA Guidelines for the Appointment & Performance of Counsel (1989)*

Counsel fell below reasonable professional norms where they failed to consider the possible *Batson* and *Duren* consequences of the jury panel.  The frequent composition of all white juries, coupled with the documented racial bias during jury selection in Dallas County, is

well known and well documented.  *See Miller-El v. Dretke*, 545 U.S. 231 (2005); *Miller-El v. Cockrell*, 537 U.S. 322 (2003).

The state habeas court unreasonably "rubber-stamped" the State's Answer contending that underrepresentation "is unsupported by evidence.  Aside from conclusory newspaper and law review articles," Petitioner fails to demonstrate a claim of racial bias.  State Court Findings, Finding 155, p. 46 (speaking to the issue of reasons supporting Hispanics failure to report).

Counsel's failures resulted in Petitioner being tried by a jury that was not drawn from a fair cross section of the community.  This failing harmed Petitioner who was ultimately tried by an all-white jury in contravention of *Batson v. Kentucky*, 476 U.S. 79 (1986) and *Duren v. Missouri*, 439 U.S. 357 (1979).   Such failures have been consistently condemned by the United States Supreme Court in the various Miller-El line of cases.  *See Miller-El v. Dretke*, 545 U.S. 231 (2005); *Miller-El v. Cockrell*, 537 U.S. 322 (2003).

The state habeas findings fail to consider the racial injustice in Dallas County jury selection exposed by the United States Supreme Court in *Miller-El v. Dretke* and *Miller-El v. Cockrell*.  Accordingly, even under the heightened AEDPA review standard, Petitioner's claims of deficiency and prejudice based on counsel's failure to challenge his jury panel or the venire based on lack of a fair cross-section should succeed and he should be granted a new trial in this case.

**F:     CLAIM SIX:     THE ADMINISTRATION OF THE TEXAS DEATH PENALTY VIOLATES THE 8TH AMENDMENT'S BAN AGAINST CRUEL AND UNUSUAL PUNISHMENT**

Texas's use of a three-drug cocktail administered by non-medical personnel to execute individuals violates Petitioner's right to be free from cruel and unusual punishment.  Although

the United States Supreme Court recently denied this claim *as it relates to Kentucky*, *see Baze v. Rees*, the Court's fractured opinion does not foreclose Petitioner from raising his challenge to the methods used in Texas. Unlike Kentucky, Texas has a significant history – and a checkered past – regarding the execution of inmates.

### 1.    The Need for Discovery on the Texas Protocol

As an initial matter, Petitioner asserts that this claim has been made nearly impossible to present based on the State's failure to provide information about the method of execution in Texas. To fully address and present this claim under an Eighth Amendment challenge, and in light of *Baze*, Petitioner must be provided with a fair opportunity to develop the record on this claim. Petitioner's attempts to do so, in the past, were met with open objection from the State of Texas. Accordingly, any evidentiary shortcoming at this time can only be the result of the State's refusal to provide relevant and properly requested evidence to Petitioner.

Despite raising this claim in a timely fashion, Petitioner has been unable, thus far, to secure discovery on this issue preventing him from fully challenging the Texas execution procedures. Remarkably, the state relied on this lack of specific information as it relates to the administration of the three-drug cocktail in denying Petitioner's state claim.

The following portions of the State of Texas' state habeas response are relevant. Beginning on page 48, the State contends as follows:

> Applicant contends lethal injection, as is presently administered in Texas, is cruel and unusual because inmates being executed are subjected to unnecessary cruelty, suffering and pain. (Application, p. 46). There is no record or extrinsic evidence before the Court as to the lethal injection protocol under (sic) in Texas. None was offered at trial, and applicant admits her presents none with his application. (Application, p. 43). Applicant also fails to present any evidence that the method by which lethal injection is currently administered in Texas, whatever the

protocol may be, is the method by which it will be administered at the moment of his own execution.

State's Answer to Original Application for Writ of Habeas Corpus, at 48.

While at first blush this argument sounds powerful, the State then, in a footnote on the very same page, candidly admits that:

> Applicant filed an open records request with the Texas Department of Criminal Justice requesting a copy of the department's protocol for administering lethal injections. (Applicant's Ex. 36). The department refused the request under an exception to the open records statute, claiming disclosure could jeopardize prison security.

*Id.*

Thus, the State first faults Petitioner for failing to present evidence on this claim. Then, in a footnote, the State admits that the State – not Petitioner – is actually responsible for Petitioner's inability to obtain the evidence. It is not as though Petitioner did not ask for or seek the evidence. Rather, in true Kafkaesque fashion, the state blames Petitioner for not wrestling from the State the very information that the State continues to withhold from Petitioner. It is both an insult to logic and an affront to justice to demand that the person from who you withhold information somehow failed to get it from you and, therefore, his claim fails.

The most disconcerting component of this claim is that the state habeas court, in resolving this claim, relies – verbatim – on the State's Answer to find that:

> 181.   Applicant contends lethal injection, as it is presently administered in Texas, is cruel and unusual because inmates being executed are subjected to unnecessary cruelty, suffering and pain. (Application, p. 46). The Court finds there is no record or extrinsic evidence before the Court as to the lethal injection protocol practiced in Texas. None was offered at trial, and applicant admits he presents none with his application. (Application, p. 43).

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 113**

182.   The Court finds applicant also fails to present any evidence that the method by which lethal injection is currently administered in Texas, whatever that protocol may be, is the method by which it will be administered at the moment of his own execution.

183.   Thus, the Court finds applicant fails to prove facts entitling him to relief.

State Court Findings, Findings 181-183, pages 52-53.   The state habeas court does, in fact, actually put in a footnote the same information footnoted in the State's Answer that "Applicant filed an open records request with the Texas Department of Criminal Justice, requesting a copy of the department's protocol for administering lethal injections.   (Applicant's Ex. 36).   The department refused the request under an exception to the open records statute, claiming disclosure could jeopardize prison security."   This verbiage is nearly identical to the circular reasoning explaining why this claim should be denied – lack of data that was withheld from Petitioner by the State.   The only distinction in the findings and the State's Answer appears to be insertion of the phrase "The Court finds . . ."

These findings have prevented Petitioner from fairly presenting his claim and from the state habeas court from fairly evaluating the claim.   The Petitioner in *Baze* was able to rebut the State's allegations with evidence of the actual execution protocol.   However, in the end, Baze's claim failed for evidentiary reasons – failing to show a substantial risk of the wanton and unnecessary infliction of pain.   Due solely to the State's obstructionist behavior on this issue, Petitioner has been unable to properly pursue this claim.   And, still, paradoxically, the main reason the state habeas court ruled against Petitioner was his inability to obtain the documents he diligently sought, but was denied – the very documents needed to permit a legal assessment of his claim.   *See Baze v. Rees.*

For these reasons, Petitioner respectfully requests this Court permit him limited discovery on the issue of the three-drug cocktail and its administration prior to the resolution of this claim. Petitioner will submit a specific discovery request under separate cover shortly after filing this skeletal petition.

### 2. State Court's Rubber-Stamping of Petitioner's Claim

It is not uncommon for Texas state courts to completely rubber-stamp the State's proposed findings of fact and conclusions of law. Rubber-stamping occurs when the state habeas court accepts all the State's statements and arguments wholesale -- without any editing or apparent independent thought process. While this practice may not be prohibited in law, Petitioner would like to believe that in a capital cases, such findings are not entitled to great deference.

This rubber-stamping procedure has been roundly condemned and should be completely eradicated – particularly in capital cases. More importantly, in light of the AEDPA's heightened standard of review and deference, this practice needs to be eliminated for federal habeas relief to have any meaningful relevance. At a minimum, this court should not countenance what appears to be mere *pro forma* review. To do so is tantamount to suspending the great writ in violation of Article I, Section 9. In addition, to accept the rubber-stamped findings of the trial court would deny Petitioner his due process rights by denying him the opportunity to be heard "at a meaningful time and in a meaningful manner."

The Fourth Circuit has condemned the rubber-stamping process. In *Chicopee Mnfg. Corp. v. Kendall Co.*, the court admonished:

> The manner in which the opinion of the District Judge was prepared in this case cannot be aproved. There is authority for the submission to the court of proposed findings of fact and conclusions of law by the attorneys for the opposing parties in a case, and the adoption of such of the proposed findings and conclusions as the judge may find proper. But there is no authority in the federal courts that countenances the preparation of the opinion by the attorney for either side. That practice involves the failure of the trial judge to perform his judicial function and when it occurs without notice to the opposing side, as in this case, it amounts to a denial of due process.

*Chicopee*, 288 F.2d 719, 725 (4th Cir. 1961)(internal citations omitted), *cert. denied*, 368 U.S. 825 (1961). The United States Supreme Court has also warned against negative ramifications of allowing the trial judge to become an extension of the prosecutor's office. In denouncing the practice of rubber-stamping, the Court warned:

> We, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record. We are also aware of the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor.

*Anderson v. City of Bessemer*, 470 U.S. 564, 571 (1985)(internal citations omitted). In the instant case, the errors memorialized by the trial court suggest that the judge simply received the State's Original Answer as proposed findings in electronic form and simply inserted the phrase "The Court finds" where appropriate.

Rubber-stamped findings are entitled to less deference than those findings entered by an impartial trier of fact. As the Fifth Circuit stated in *Luhr Bros., Inc. v. Shepp*:

> In addition, in cases such as the instant one, where the district court's Findings of Fact and Conclusions of Law are near-verbatim recitals of the prevailing party's proposed findings and conclusions, with minimal revision, we should approach such findings with "caution." We may "take into account the District Court's lack of personal attention to factual findings in applying the clearly erroneous rule," and we "can feel slightly more confident in concluding that important

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 116**

> evidence has been overlooked or inadequately considered when factual findings
> [are] not the product of personal analysis and determination by the trial judge."

*Luhr*, 157 F.3d 333, 338 (5th Cir. 1998)(internal citations omitted), *cert. denied sub nom.*, *Jones v. Luhr Bros.*, 526 U.S. 1050 (1999). The Fifth Circuit has recognized that at least four other circuits, the Fourth Circuit, the Seventh Circuit, the Ninth Circuit and the Tenth Circuit, have demanded stricter appellate review of rubber-stamped findings. *Id.* at 338 n.4. *See also Cuthbertson v. Biggers Bros., Inc.*, 702 F.2d 454, 458-59 (4th Cir. 1983); *Gimbel v. Commodity Futures Trading Com'n*, 872 F.2d 196, 199 (7th Cir. 1989); *Alcock v. Small Bus. Admin.*, 50 F.3d 1456, 1459 n.2 (9th Cir. 1995); *Ramey Constr. Co., Inc. v. Apache Tribe*, 616 F.2d 464, 467 (10th Cir. 1980).

In the instant case, and particularly in the instant claim, the state habeas findings fail to move beyond the verbatim argument presented by the State in its Original Answer. Beginning on page 48 and continuing through page 51 – including footnotes – the state habeas court adopted the State's Original Answer as its "Findings of Fact and Conclusions of Law." See State's Original Answer, pages 48-51; State Court Findings, Findings 181-194.

This "review" does not come across as an independent evaluation of Petitioner's claims. Rather, the state habeas court's wholesale adoption of the State's arguments into its "findings" implies that the findings were not the product of the court. Rather, the words of the State used in its brief opposing Petitioner's habeas relief literally became the words of the State, through its court, in denying any evaluation of his claims.

Petitioner would ask that the findings of the state habeas court be considered in light of their identity to the State's Original Answer. Any separation between these documents appears

to be in title only.  As such, these findings should not receive the ordinary deferential treatment

afforded under AEDPA habeas review.

### 3.    Legal Basis for Claim

The continued use of sodium thiopental, pancuronium bromide, and potassium chloride,

individually and in any combination, violates the Eighth Amendment's proscription against cruel

and unusual punishment.  The use and combination of these chemicals, commonly referred to as

the "three-drug cocktail," carries an unusually high and unnecessary risk of an inmate

experiencing pain and suffering.  While jurors in Texas are commonly told during voir dire that

the inmate will be strapped to a gurney and painlessly put to sleep, empirical evidence gathered

throughout the United States repudiates such claim.  B e l o w  a r e  s e v e r a l  i n s t a n c e s  w h e r e

executions have gone dreadfully wrong.  Each example involves a Texas inmate.

1. *March 13, 1985. Texas.* **Stephen Peter Morin.** *Lethal Injection.* Because of Morin's history of drug abuse, the execution technicians were forced to probe both of Morin's arms and one of his legs with needles for nearly 45 minutes before they found a suitable vein.

2. *August 20, 1986. Texas.* **Randy Woolls.** *Lethal Injection.* A drug addict, Woolls helped the execution technicians find a useable vein for the execution.

3. *June 24, 1987. Texas.* **Elliot Rod Johnson.** *Lethal Injection.* Because of collapsed veins, it took nearly an hour to complete the execution.

4. *December 13, 1988. Texas.* **Raymond Landry.** *Lethal Injection.* Pronounced dead 40 minutes after being strapped to the execution gurney and 24 minutes after the drugs first started flowing into his arms.  Two minutes after the drugs were administered, the syringe came out of Landry's vein, spraying the deadly chemicals across the room toward witnesses. The curtain separating the witnesses from the inmate was then pulled, and not reopened for fourteen minutes while the execution team reinserted the catheter into the vein. Witnesses reported "at least one groan." A spokesman for the Texas Department of Correction, Charles Brown (sic), said, "There was something of a delay in the execution because of what officials called a 'blowout.' The syringe came out of the vein, and the warden ordered the (execution) team to reinsert the catheter into the vein."

5. *May 24, 1989. Texas.* **Stephen McCoy.** *Lethal Injection.* He had such a violent physical reaction to the drugs (heaving chest, gasping, choking, back arching off the gurney, etc.) that one of the witnesses (male) fainted, crashing into and knocking over another witness. Houston attorney Karen Zellars, who represented McCoy and witnessed the execution, thought the fainting would catalyze a chain reaction. The Texas Attorney General admitted the inmate "seemed to have a somewhat stronger reaction," adding "The drugs might have been administered in a heavier dose or more rapidly."

10. *April 23, 1992. Texas.* **Billy Wayne White.** *Lethal Injection.* White was pronounced dead some 47 minutes after being strapped to the execution gurney. The delay was caused by difficulty finding a vein; White had a long history of heroin abuse. During the execution, White attempted to assist the authorities in finding a suitable vein.

11. *May 7, 1992. Texas.* **Justin Lee May.** *Lethal Injection.* May had an unusually violent reaction to the lethal drugs. According to one reporter who witnessed the execution, May "gasped, coughed and reared against his heavy leather restraints, coughing once again before his body froze ..." Associated Press reporter Michael Graczyk wrote, "Compared to other recent executions in Texas, May's reaction was more violent. He went into a coughing spasm, groaned and gasped, lifted his head from the death chamber gurney and would have arched his back if he had not been belted down. After he stopped breathing, his eyes and mouth remained open."

18. *April 23, 1998. Texas.* **Joseph Cannon.** *Lethal Injection.* It took two attempts to complete the execution. After making his final statement, the execution process began. A vein in Cannon's arm collapsed and the needle popped out. Seeing this, Cannon lay back, closed his eyes, and exclaimed to the witnesses, "It's come undone." Officials then pulled a curtain to block the view of the witnesses, reopening it fifteen minutes later when a weeping Cannon made a second final statement and the execution process resumed.

19. *August 26, 1998. Texas.* **Genaro Ruiz Camacho.** *Lethal Injection.* The execution was delayed approximately two hours due, in part, to problems finding suitable veins in Camacho's arms.

23. *December 7, 2000. Texas.* **Claude Jones.** *Lethal Injection.* Jones was a former intravenous drug abuser. His execution was delayed 30 minutes while the execution "team" struggled to insert an IV into a vein. He had been a longtime intravenous drug user. One member of the execution team commented, "They had to stick him about five times. They finally put it in his leg." Wrote Jim Willett, the warden of the Walls Unit and the man responsible for conducting the execution, "The medical team could not find a vein. Now I was really beginning to worry. If you can't stick a vein then a cut-down has to be performed. I have never seen one and would just as soon go through the rest of my career the same way. Just when I was really getting worried, one of the medical people hit a vein in the left leg. Inside calf to be exact. The executioner had warned me not to panic as it was going to take a while to get the fluids in the body of the inmate tonight because he was going to push the drugs through very slowly. Finally, the drug took effect and Jones took his last breath."

Michael L. Radelet, *Some Examples of Post-Furman Botched Executions*, Death Penalty Resource Information Center  (attached to this Brief as an Exhibit).

It is undisputed that new technology and newer pharmaceutical options exist for a rapid and pain-free death.  The creator of the three-drug cocktail has since repudiated this approach as the most medically sound in the twenty-first century.  In fact, the Oklahoma medical examiner, Dr. Jay Chapman, who originated the chemical triad has revealed that many safer and more humane alternatives exist in medicine.  *Lethal Injection Creator:  Maybe It's Time to Change Formula*, available at CNN.com (attached to this Brief as an Exhibit).

In addition to the advancement of medical options for a pain-free death, there remain constitutional shortcomings in the actual administration of the current three-drug cocktail.  Respondent has thus far refused Petitioner's inquiry into the actual chemicals used in Texas and the method for his forthcoming execution.  In a rather devious fashion, the State of Texas challenged Petitioner's presentation of this claim during the state habeas proceedings by arguing that he could not list the actual chemicals or protocol that might be used – first, by noting that his open records request was denied *by the State* for prison security reasons, and, second, by noting that Petitioner could not affirmatively demonstrate what method would be used to execute him when the time became ripe to do so.  *See* State's Answer, at p. 48-49.

In what could only be characterized as an obtuse response to Petitioner's challenges to Texas's execution method, the State challenges that "Petitioner downplays the dosages of the chemicals involved, fails to adequately describe the procedure, and misapplies the descriptive terminology, in order to paint a picture of executions in which the condemned are forced to undergo a lingering and excruciating death while rendered completely helpless and unable to communicate their suffering.  This scenario has no basis in reality." *Id.* at 50.  Petitioner urges

this Court to take judicial notice of the many reported instances of lethal injection executions that have gone incredibly wrong. *See supra.*

Petitioner further asserts that the State of Texas's Kafkaesque approach to this issue should be remedied with discovery at the federal court level. In rhetoric that calls to mind Franz Kafka's novel, The Trial, the State of Texas simultaneously faults Petitioner for failing to obtain the information that the State refuses to provide and then adds that Petitioner cannot be sure that the State will continue to use these procedures when, if ever, he is executed. FRANZ KAFKA, THE TRIAL (1925).

If the historical practices of Texas – put into place since 1986 when it became the first state to utilize lethal injection – are any indicator, Petitioner will be executed through the administration of the three-drug cocktail Petitioner challenges. What Petitioner does not yet appreciate – due solely to the obstructionism of the State of Texas -- is whether a physician or any individual trained in the mixture or administration of the three-drug cocktail will participate in the execution of Petitioner. Not only does Petitioner challenge the drugs used to executed Texas inmates, he also challenges that the manner in which the execution occurs carries an unconstitutionally high level of risk that pain and suffering will occur. Discovery is paramount on this issue.

Curiously, Texas remains wedded to using the three-drug cocktail that many states outlaw for use on animals! Thus, while animals cannot be euthanized in many states via the drug combination currently administered in Texas, condemned human beings may. *Baze v. Rees* (Stevens, J., concurring). Such disconnect and inconsistency devalues human life and violates the Eighth Amendment.

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 121**

The recent Supreme Court's plurality opinion in *Baze v. Rees*, (decided April 16, 2008)

neither precludes nor forecloses this Court's consideration of Petitioner's claim.

### 4.    Human Rights Watch Report

Human Rights Watch recently published an essay regarding the issue of lethal injection.

Petitioner includes this report, in nearly its entire form, to demonstrate that Texas' alleged

protocol has been deemed by Louisiana officials privy to the Texas protocol as "surprising" and

not really any protocol at all.   The information provided herein gives further support to

Petitioner's Eighth Amendment claim and request for discovery.  The lack of regularity and lack

of protocols reported in the Human Rights Watch report suggests, at a minimum, that Petitioner

should be provided access to a member of the Texas Department of Criminal Justice that can

testify to the existence, or non-existence, of standard protocols in Texas executions.

### G. Development of Lethal Injection Protocols

*It wasn't a medical decision. It was based on the other states that had all used a similar dose.*
—Donald Courts, pharmacy director at Louisiana State Penitentiary, explaining how Louisiana chose the specific chemicals and dosage amounts for its lethal injection protocol

*The only thing that mattered was that the guy ended up dead. . . . [The warden] wasn't worried too much about the amount of medicine. He had certainly used the same types of medicine, but . . . he wasn't totally concerned about the amounts of what it may or may not do. They ended up dead, and that's all he was worried about.*

—Annette Viator, former chief legal counsel for Louisiana State Penitentiary, explaining her discussion with a Texas warden regarding the drugs used during Texas's lethal injection executions

Different methods of execution have succeeded one another throughout the twentieth century in the United States, as changing public opinion and sensitivities has led public officials to reject older methods in favor of newer

ones. At the time of their introduction, the electric chair and lethal gas were both touted as more humane forms of execution compared to earlier methods. Each, however, proved cruel. Electrocution, in particular, shocked witnesses when, for example, prisoners erupted in flames.

In the late 1970s, states turned to lethal injection, believing this was both a less expensive as well as a more humane way to kill condemned inmates. In 1977, Oklahoma legislators passed the first lethal injection statute. Texas passed a lethal injection statue the next day. By1981, five states had adopted lethal injection statutes. Today, thirty-seven of the thirty-eight death penalty states have lethal injection statutes. In nineteen states, lethal injection is the only method of execution allowed.

States in the United States rely almost solely on lethal injections to execute condemned inmates. All twelve executions to date (as of April 1, 2006) have been by lethal injection, as were all sixty in 2005. Of the 1,016 executions in the United States since the death penalty was reinstated in 1976, 848 were by lethal injection—three by the federal government and the rest by states. At the start of 2006, there were 3,373 prisoners on death row—3,363 of whom face the possibility of a lethal injection execution.

The statutes of fifteen states use language similar to Oklahoma's, requiring the use of a "lethal quantity of an ultra-short acting barbiturate or other similar drug in combination with a chemical paralytic to cause death." It is not clear if the legislators intended the prisoner to die from the anesthetic or from the asphyxiation caused by the paralytic agent, or both. According to Dr. Jay Chapman, the architect of Oklahoma's two-drug statute, he "didn't care which drug killed the prisoner, as long as one of them did." Thirteen states refer to an injection of a "substance or substances in a quantity to cause death" or language very close to that wording. Seven states provide simply for the use of "lethal injection" executions. Two state statutes use slightly different language from all the rest. Only one state statute mandates corrections officials to choose among lethal injection options to find the most humane procedure possible. Despite the variations in state statutory language authorizing lethal injections, thirty-six state corrections agencies today use the same three-drug sequence of sodium thiopental, pancuronium bromide and potassium chloride in their lethal injection drug protocols.

No state statute prescribes drug dosages and the specific methods of administration; legislators have left these decisions to corrections officials. Nor does any state statute prescribe the manner of intravenous line access, the certification or training required for those who participate in executions, or other details concerning the administration of the drugs or monitoring of the procedures. Legislators have given correctional agencies the authority "to promulgate necessary rules and regulations to facilitate the implementation of

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 123**

execution by lethal injection." For example, in Florida the legislature did not specify how death by lethal injection would be accomplished, but left this decision up to the Department of Corrections, "because it has personnel better qualified to make such determinations."

The public record offers scant insight into the basis on which state legislatures that chose specific lethal injection drugs did so. An analysis of state statutes and legislative histories provides no evidence that legislatures—other than possibly Oklahoma—relied on, or even sought input from, medical and scientific experts. Rather, they simply copied the protocols developed by their colleagues from other states. For example:

A Circuit Court Judge in Kentucky noted:

In developing a lethal injection protocol, the Commonwealth of Kentucky, Department of Corrections, did not conduct any independent scientific or medical studies or consult any medical professionals concerning the drugs and dosage amounts to be injected into the condemned. Kentucky appears to be no different from any other state or the Government of the United States.

When asked how the lethal injection protocol committee put together Tennessee's procedures, a committee member responded: "There wasn't a lot of discussion on it once the team had access to the information that was provided from other states. Indianapolis, Indiana, Florida, Texas, they all used the same chemicals." The Tennessee Supreme Court found that Tennessee's protocol "was developed simply by copying the state method currently in use by some thirty other states."

According to a memorandum from the Washington State Department of Corrections: "All of our policies and procedures have been designed utilizing the State of Texas as a model ... [T]he states of Texas and Missouri have conducted numerous executions and remain the best and tested source of information."

A Wyoming warden noted "that Wyoming's injection procedure is cloned from the Texas injection procedure. Visited Warden Jack Pursley at Huntsville, Texas and participated in an execution seminar [sic]. So I am confident that Wyoming's policy based upon proven Texas procedures will be reliable."

According to a former warden of the Colorado State Penitentiary, Colorado corrections officials went to Texas and Oklahoma to examine how they conducted lethal injection executions and then copied them, because their lethal injection protocols "seemed time-honored, tested, well-designed, and effective." The Secretary of Pennsylvania's Department of Corrections noted that they "adopted almost to a T" the Texas lethal injection protocol.

**Oklahoma**

In 1977, Oklahoma enacted the first lethal injection statute. Its history illustrates the minimal inquiry legislators conducted before selecting a specific method of lethal injection. Facing the expensive prospect of fixing the state's broken electric chair, the Oklahoma legislature was looking for a cheaper and more humane way to execute its condemned inmates. State Assembly member Bill Wiseman wanted to introduce a bill in the Oklahoma House of Representatives allowing for lethal injection executions in Oklahoma. In 1976, he approached the Oklahoma Medical Association for help developing a drug protocol, but it refused to get involved based on ethical concerns about the cooperation of medical professionals in the development of execution methods. Wiseman approached Dr. Jay Chapman, the state's medical examiner, and asked for his help in drafting a lethal injection statute. Despite having "no experience with this sort of thing," Chapman agreed to help Wiseman. Sitting in Wiseman's office in the Capitol, Chapman dictated the following lines, which Wiseman jotted down on a yellow legal pad: "An intravenous saline drip shall be started in the prisoner's arm, into which shall be introduced a lethal injection consisting of an ultra-short-acting barbiturate in combination with a chemical paralytic." Meanwhile, State Senator Bill Dawson, concerned about the cost of replacing Oklahoma's broken electric chair, was also interested in introducing a lethal injection bill in the Oklahoma Senate. Senator Dawson consulted with his friend, Dr. Stanley Deutsch, then head of the Oklahoma Medical School's Anesthesiology Department. After reviewing the language Chapman had composed for Assembly member Wiseman, Deutsch noted, in a letter to Senator Dawson, that anesthetizing condemned inmates would be a "rapidly pleasant way of producing unconsciousness" leading to death.

Oklahoma's state statute copies nearly word-for-word the methods proposed by Chapman and approved in Deutsch's brief letter, stating that "the punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultra-short-acting barbiturate" in "combination with a chemical paralytic agent until death is pronounced by a licensed physician according to accepted standards of medical practice." There is no evidence that Oklahoma state legislators consulted any other medical experts before adopting their lethal injection statute. Human Rights Watch asked Chapman why he chose the two drugs (an ultra-short-acting barbiturate and a paralytic agent) for lethal injection executions. He stated: "I didn't do any research. I just knew from having been placed under anesthesia myself, what we needed. I wanted to have at least two drugs in doses that would each kill the prisoner, to make sure if one didn't kill him, the other would." The Oklahoma state legislature has not significantly amended the statute regarding the drugs to be used during lethal injections since its original enactment.

In addition to his work on the statute, Chapman developed the original three-drug protocol used by the Oklahoma Department of Corrections. Although Oklahoma's statute specifies two drugs, Chapman included a third drug, potassium chloride. When Human Rights Watch asked Chapman why he added a third drug to the two

drugs specified in the statute, he replied, "Why not?" He went on to explain that, even though the other chemicals, in the dosages called for, would kill the prisoner, "You just wanted to make sure the prisoner was dead at the end, so why not just add a third lethal drug?" He is not sure why he picked potassium chloride. "I didn't do any research … it's just common knowledge. Doctors know potassium chloride is lethal. Why does it matter why I chose it?"

**Texas**

Almost immediately after Oklahoma passed its lethal injection statute, the Texas legislature passed a law authorizing executions by lethal injection. Within ten years of the law's enactment, Texas had executed fifty-three prisoners by lethal injection. The law delegates responsibility for developing protocols regarding the lethal substances to be used to the state corrections agency. Because Texas was the first state to actually execute anyone by lethal injection, and immediately established itself as the state with the most lethal injection executions, its protocols have had enormous influence on other states. Many state corrections officials consulted with Texas officials when developing their own protocols.

Like its Oklahoma predecessor, the Texas protocol involves the use of three drugs. But the state has refused to provide additional information on its procedures for lethal injections, citing security concerns. The observations of Louisiana corrections officials who visited Texas shed light on the ad hoc and unscientific manner in which Texas has conducted its lethal injection executions.

In 1990, the Louisiana Department of Corrections formed a committee to create a lethal injection protocol. As a member of the committee, the Department's chief legal counsel consulted with the warden responsible for executions in the Texas Department of Corrections. She found the experience "surprising." The warden refused to speak with the attorney over the phone about his protocols, explaining "he didn't say these things on the phone that he would rather say in person."

When the attorney arrived in Texas with other members of the committee, the warden "asked us if any of us had tape recorders, if any of us were wired." The warden then proceeded to speak about Texas's lethal injection protocols. According to the attorney, "He didn't really have so much of a policy about it, as he did just sort of—they did whatever worked at the time. He pretty much told us he didn't have a strict policy." When the attorney inquired about the "medical portion" of Texas's lethal injection protocol, the warden told her:

[T]hat the only thing that mattered was that the guy ended up dead and that he wasn't worried too much about the amount of medicine. He had certainly used the same types of medicine, but that he wasn't totally concerned about the amounts or what it may or may not do. They ended up dead, and that's all he was worried about. The rest of our conversation with him tracked that same thing. He was not

terribly concerned about policy, procedure, or who did what, when, where. Just so the right result happened.

The Louisiana State Penitentiary pharmacy director has recounted a conversation he had in 1990 with the Texas Department of Corrections pharmacy director about the drugs Texas used in its lethal injections:

We were getting ready to hang up the phone, and I said, 'I have but just one question I need to ask you. Every other state I have spoken to is using 2 grams of sodium pentothal. Why are y'all using five?' And he started laughing and said, 'Well, you see, when we did our very first execution, the only thing I had on hand was a 5-gram vial. And rather than do the paperwork on wasting 3 grams, we just gave all five.'

Another member of the Louisiana committee observed a Texas lethal injection and noted that the administration of the drugs was on a "time frame that was fairly tight." It seemed to him the execution team simply administered the drugs one after the other, without pausing to ascertain whether the drugs were having their intended effect.

Human Rights Watch, *Development of Lethal Injection Protocols* (attached to this Brief as an Exhibit).

Without providing Petitioner access to discovery, he is unable to fully present the full realm of evidence that demonstrates that Texas does not have a regular or suitable protocol in place to protect Petitioner from facing a substantial risk of and wanton and unnecessary infliction of pain during execution. Based on the foregoing examples of failed Texas executions and the Human Rights Watch report indicating a lack of consistent execution protocol for Texas executions, Petitioner has met his burden in demonstrating "substantial risk" of wanton and unnecessary pain. Thus, Petitioner's case is qualitatively distinct from the Supreme Court's recent plurality decision in *Baze v. Rees*, and is not foreclosed thereby. Rather, Petitioner – even without the aid of discovery – has already established that Texas inmates, unlike their Kentucky peers, face a serious and substantial risk that they will endure "wanton and unnecessary pain"

during execution. Accordingly, Petitioner's request for habeas relief on this ground should be granted.

### G: CLAIM SEVEN: MITIGATION DEFINITION UNLAWFUL

Escamilla's complaint to the trial court that the statutory definition of mitigation was unconstitutionally narrow was overruled. (I. C.R. at 93-94, 104).

### 1. State Habeas Complaint

Accordingly, during state habeas proceedings, Escamilla complained that the submitted definition of "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness" was unconstitutionally narrow. (State Habeas Application at 47). Escamilla contended that this instruction impermissibly directed jurors to disregard mitigating evidence unrelated to moral blameworthiness. *Id.*

Escamilla cited the requirement that the sentencer "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record . . . as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). (State Habeas Application at 47). Escamilla noted that the Texas death penalty statute had been upheld because it enabled sentencing juries to consider "whatever mitigating circumstances" a defendant could adduce. (State Habeas Application at 48, relying upon *Lockett*, 438 U.S. at 607 (referring to *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)).

Escamilla relied upon the underlying rationale for this rule, to ensure the death penalty was not imposed in an arbitrary or capricious fashion. (State Habeas Application at 48). As a consequence, a sentencer may not be precluded from considering "any relevant mitigating

evidence." *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (quoting *Eddings*, 455 U.S. at 114). (State Habeas Application at 48).

Escamilla contended that TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(f)(4) allows jurors to disregard manifold types of constitutionally relevant mitigating evidence that have nothing to do with a capital defendant's moral culpability or blameworthiness. (State Habeas Application at 49). Thus, Escamilla argued that the instruction served as an unconstitutional limitation upon the types of mitigation evidence a jury can consider. (State Habeas Application at 49). The unacceptable risk foreseen by *Lockett* consequently obtained. (State Habeas Application at 50). As the *Lockett* Court wrote:

> There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.

*Lockett*, 438 U.S. at 605, 98 S.Ct. at 2954.

Consequently, Escamilla submitted that the charge at bar violated the Constitution because the instruction imposed a limitation upon the jury's consideration of mitigating evidence. (State Habeas Application at 50). Escamilla also urged that the harm was particularly egregious here because, as adduced in Claim One, *supra,* the belatedly discovered and presented mitigation evidence was unconscionably minimal given what was actually available. (State Habeas Application at 50).

## 2. State Court Findings

The trial court initially found that Escamilla's complaint was procedurally barred because

it was not raised on direct appeal. (State Habeas Findings of Fact and Conclusions of Law 196-99). Thereafter, the trial court concluded that this complaint was without merit because it was previously rejected by the Court of Criminal Appeals, Escamilla had not asserted new arguments, nor had Escamilla proven his complaint by a preponderance of the evidence. (State Habeas Findings of Fact and Conclusions of Law 200-04). Lastly, the trial court concluded that Escamilla was not harmed because he did not allege or refer to evidence his jury was precluded from considering, and so, his complaint operated only as an attack upon the face of the statute, not its application. (State Habeas Findings of Fact and Conclusions of Law 205-08).

### 3.     Procedural Bar

The procedural bar should not obtain because Escamilla's seventeenth issue on appeal challenged the mitigation special issue. *Escamilla*, 143 S.W.3d 814. Because this claim also challenges the mitigation instructions the procedural bar should not foreclose its presentation.

That aside, fundamental fairness requires that Escamilla be afforded a right to have this constitutional challenge to the imposed death sentence reviewed. Due to the structure of the AEDPA, claims not properly raised before the trial court can be precluded from review not based upon their merits but rather merely upon counsels' failure to present his claims. Such procedural bar or default violates fundamental fairness. To execute an individual who received ineffective assistance of counsel at trial, and later on appeal, violates all notions of fundamental fairness and should not be endorsed by the Republic.

This is the case because a death sentence is unlike any other act of the Republic. *Gardner v. Florida*, 430 U.S. 349, 357-58, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) (STEVENS, J., plurality opinion) (stating, "From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other

legitimate state action."); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991

(1976) (opinion of Justices STEWART, POWELL, and STEVENS) ("Death, in its finality,

differs more from life imprisonment than a 100-year prison term differs from one of only a year

or two."); *see also, California v. Ramos,* 463 U.S. 992, 998-999, 103 S.Ct. 3446, 3452 (1983)

(recognizing the qualitative difference of death).   Society and Escamilla should therefore be

accorded a meaningful review of Escamilla's constitutional challenges to his sentence of death.

### 4.   Individualized Sentencing Requires that Mitigating Evidence In Any Form May Not be Precluded From Consideration

It is signally important that the jury be required "to make an individualized determination

on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v.*

*California,* 512 U.S. 967, 983, 114 S.Ct. 2630, 2640 (1994) (citing *Lockett,* 438 U.S. 586, 602-

605, 98 S.Ct. 2954, 2963-2965, 57 L.Ed.2d 973 (1978)).   To reach this individualized

determination, a jury must be allowed to consider all mitigating evidence:

> We have imposed a separate requirement for the selection decision, where the
> sentencer determines whether a defendant eligible for the death penalty should in
> fact receive that sentence. "What is important at the selection stage is an
> *individualized* determination on the basis of the character of the individual and
> the circumstances of the crime." *Zant* [*v. Stephens,* 462 U.S. 862, 879, 103 S.Ct.
> 2733, 2743-44, 77 L.Ed.2d 235 (1983)]; *see also Woodson v. North Carolina,* 428
> U.S. 280, 303-304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality
> opinion). That requirement is met when the jury can consider relevant mitigating
> evidence of the character and record of the defendant and the circumstances of the
> crime. *Blystone v. Pennsylvania,* 494 U.S. 299, 307, 110 S.Ct. 1078, 1083, 108
> L.Ed.2d 255 (1990) ("requirement of individualized sentencing in capital cases is
> satisfied by allowing the jury to consider all relevant mitigating evidence"); see
> *Johnson v. Texas,* 509 U.S. 350, 361, 113 S.Ct. 2658, 2665, 125 L.Ed.2d 290
> (1993).

*Tuilaepa,* 512 U.S. at 972-973, 114 S.Ct. at 2635.

In its earlier decision, *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384

(1988), the Supreme Court enunciated the governing principle:

> It is beyond dispute that, in a capital case, "'the sentencer [may] not be precluded
> from considering, *as a mitigating factor,* any aspect of a defendant's character or
> record and any of the circumstances of the offense that the defendant proffers as a
> basis for a sentence less than death.'"  The corollary that "the sentencer may not
> refuse to consider *or be precluded from considering* 'any relevant mitigating
> evidence'" is equally "well established."

*Mills*, 486 U.S. at 374-75 (citations omitted) (emphasis in original).

Moreover, the Eighth Amendment requires that a jury cannot be "misled regarding the

role it plays in the sentencing decision."  *Romano v. Oklahoma*, 512 U.S. 1, 7, 114 S.Ct. 2004,

2009-10, 129 LEd.2d 1 (1994) (relying upon *Caldwell v. Mississippi*, 472 U.S. 320, 336, 105

S.Ct. 2633, 2643, 86 L.Ed.2d 231 (1985)).  As a consequence, the procedure at issue in *Woodson*

was struck down because "it permitted *no* consideration of 'relevant facets of the character and

record of the individual offender or the circumstances of the particular offense.'"  *Lockett*, 438

U.S. at 604, 98 S.Ct. at 2964 (quoting *Woodson*, 428 U.S. at 304, 96 S.Ct. at 2991).

As a consequence, it is clearly established federal law that no barrier can be imposed

between the sentencer and its consideration of mitigating evidence.  *Mills*, 486 U.S. at 376

(citing to *Lockett, supra*; *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347

(1987); *Eddings,* 455 U.S. at 102; *and, Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90

L.Ed.2d 1 (1986)).  Whatever a given barrier's specific form, where a sentencer fails to consider

all mitigation evidence, the rule of *Lockett* is violated, and the duty to remand for re-sentencing

obtains. *Mills*, 486 U.S. at 377.

### 5. Rationale of the Requirement and Import of Dissenting Views

As adduced above in subsection three, death is a qualitatively unique act of the Republic. *Gardner v. Florida*, 430 U.S. at 357-58, 97 S.Ct. at (STEVENS, J., plurality opinion); *Woodson,* 428 U.S. at 305, 96 S.Ct. at 2991(opinion of Justices STEWART, POWELL, and STEVENS); *California v. Ramos,* 463 U.S. at 998-999, 103 S.Ct. at 3452 (1983). From this signal difference issues two corresponding demands: (i) "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case," *Woodson v,* 428 U.S. at 305; and (ii) a corresponding greater degree of scrutiny. *Ramos*, *supra.* It is therefore of vital import to not just Escamilla but also "to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner*, 430 U.S. at 358, 97 S.Ct. at, 1204.

Justice Souter, looking to the heightened standard of reliability prescribed by *Woodson* wrote that "The Eighth Amendment entitles a defendant to a jury capable of a reasoned moral judgment about whether death, rather than some lesser sentence, ought to be imposed." *Simmons v. South Carolina,* 512 U.S. 154, 172, 114 S.Ct. 2187, 2198, 129 L.Ed.2d 133 (1994) (SOUTER, J. concurring). As a consequence, Justice Souter concluded that the Eighth Amendment "requires provision of 'accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die,' *Gregg v. Georgia,* 428 U.S. 153, 190, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.), and invalidates 'procedural rules that ten[d] to diminish the reliability of the sentencing determination,' *Beck v. Alabama,* 447 U.S. 625, 638, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392 (1980)." *Simmons*, 512 U.S. at 172, 114 S.Ct. at 2198 (SOUTER, J. concurring).

That these views find their genesis in dissenting opinions is of some moment for the Republic's jurisprudence amply illustrates in this context that dissenting views over time become recognized as correct as society's mores evolve. Our jurisprudence, like our society, evolves as it progresses or advances. *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958).

### 6.    A Reasonable Juror's Interpretation

In reviewing the constitutionality of a capital sentencing charge, a court must ask how a reasonable juror could have understood it. The jury instructions are reviewed in context. *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991). The question asked is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct.1190, 1198, 108 L.Ed.2d 316 (1990)). The question asked therefore, "'is not what the State Supreme Court declares the meaning of the charge to be, but rather what a reasonable juror could have understood the charge as meaning.'" *California v. Brown*, 479 U.S. 538, 541. 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (quoting *Francis v. Franklin,* 471 U.S. 307, 315-316, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985); and citing *Sandstrom v. Montana,* 442 U.S. 510, 516-517, 99 S.Ct. 2450, 2455, 61 L.Ed.2d 39 (1979)).

### 7.    A Three-Fold Failure

Escamilla submits that the submitted instructions fail such review for three reasons. First, the instruction was too limiting. Second, it allowed unchecked discretion which gives genesis to bias and caprice. Finally, the instruction inevitably leads to failure.

#### (a)  Too Limiting

Here, each juror was instructed that "mitigating evidence" was only "evidence that a juror might regard as reducing the defendant's moral blameworthiness." However, common law does not possess such a narrow view of what constitutes mitigating evidence. Our law, instead, contemplates consideration of "any aspect of a defendant's character or record" with particular respect afforded "the uniqueness of the individual." *Lockett*, 438 U.S. at 604-05, 98 S.Ct. at 2965. Restated, mitigating evidence is not to be tied only to moral culpability.

"Any aspect" and individual "uniqueness" are not rightly said to be terms confined to moral blameworthiness for by their very nature they encompass the entirety of an individual's character and persona. As prime examples, devotion to family and religious faith have been recognized as mitigating factors. *Cf. Brown v. Payton*, 544 U.S. 133, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2004); *Bevel v. State*, - So.2d - No. SC05-2213, 2008 WL 731701, *17 n. 4 (Fla. 2008).

Escamilla's jurors, however, could not consider any such evidence unrelated to his moral blameworthiness because they were bound by the limited definition. Thus, the jury had no recourse save to disregard Escamilla's love and compassion for a helpless animal (Trial Court Transcript Vol. 39, p. 25); his cooperative playfulness as a child (Trial Court Transcript Vol. 39, p. 107-08); his tender and absolute devotion to his mother (Trial Court Transcript Vol. 39, pp. 25, 28, 45, 56, 108-09); and, his obvious love for family. (Trial Court Transcript Vol. 39, pp. 26, 28). In this regard, Escamilla cannot improve upon the stirring words of his sister that while she did not condone his behavior "it doesn't take away from how much he cared about his mom." (Trial Court Transcript Vol. 39, p. 69).

Nor could the jury under the submitted definition rightly account for the potential of a religious awakening whilst incarcerated. (Trial Court Transcript Vol. 39, p. 123). Thus,

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 135**

although there was and is good in Licho Escamilla - and given his young age ample time remaining for such an awakening - the instruction foreclosed consideration of these matters. As a result, though Texas denominated Escamilla an enemy, the instruction was so narrow that the principle advocated by Doctor King to "discover the element of good [in an] enemy . . . realize that there is some good there and look at those good points which will over-balance the bad points" could be afforded no ground by the jury. *Loving Your Enemies*, November 17, 1957.

### (b)    Unchecked Discretion

To be sure, the unbridled discretion afforded the sentencer in making the selection decision, as embodied in *Tuilaepa, supra,* and *Buchanan, supra*, has been relied upon to defeat a challenge to the absence of mitigation definitions:

> The current Texas mitigation or Penry capital sentencing special issue conforms to the Supreme Court's holdings in *Buchanan v. Angelone* and *Tuilaepa v. California*, both of which recognized the Eighth Amendment authorizes a state to permit a capital sentencing jury to exercise virtually unfettered discretion at the *selection* phase, i.e., when it determines whether to impose or withhold a death sentence on a criminal defendant whom it has properly determined is eligible to receive same. Under the holdings in *Buchanan* and *Tuilaepa*, the striking breadth of the Texas mitigation capital sentencing issue does *not* require any limiting or constricting definitions. Thus, petitioner's complaints about the absence of definitions for the terms "personal moral culpability," and "moral blameworthiness" are utterly without arguable merit.

*Moore v. Quarterman*, 526 F.Supp.2d 654, 721-24 (W.D.Tex. 2007) (memorandum op. and order).

The words of the High Court in this regard are:  the sentencer may be given 'unbridled discretion in determining whether the death penalty should be  imposed after it has found that the defendant is a member of the class made eligible for that penalty.'" *Tuilaepa*, 512 U.S. at 979-980, 114 S.Ct. at 2639 (quoting *Zant v. Stephens*, 426 U.S. 862, 875, 103 S.Ct. 2733, 2742, and

citing *Barclay v. Florida,* 463 U.S. 939, 948-951, 103 S.Ct. 3418, 3424-3425, 77 L.Ed.2d 1134

(1983) (plurality opinion)).  The purportedly saving measure of unbridled discretion, though, is

by no means certain.

This is because unbridled discretion carries with it "an evident danger."  *Graham v.*

*Collins,* 506 U.S. 461, 479, 113 S.Ct. 892, 904, 122 L.Ed.2d 260 (1993) (THOMAS, J.,

concurring) (citations omitted).  That danger is "the potential role of racial and other illegitimate

prejudices in a system where sentencing juries have boundless discretion."  *Id.* 506 U.S. at 480

(citing to, inter alia, Justice Douglas's concurrence at *Furman v. Georgia,* 408 U.S. 238, 252-53,

92 S.Ct. 2726, 2733-34, 33 L.Ed.2d 346 (DOUGLAS, J. concurring)).  Thus, Justice Thomas

considered that behind *Furman*'s "condemnation of unguided discretion lay the specter of racial

prejudice-the paradigmatic capricious and irrational sentencing factor."  *Graham v. Collins,* 506

U.S. 461, 484, 113 S.Ct. 892, 906 (1993) (THOMAS, J., concurring).

The dangers of unbridled discretion are squarely presented here.  Escamilla's status as a

Hispanic-American squarely raises this evident danger.  It is beyond peradventure that Hispanic-

Americans are a minority group.  *See, e.g., Georgia v. Ashcroft,* 539 U.S. 461, 474 n.1, 123 S.Ct.

2498, 2508 (2003).  Even the most cursory review of case law reflects documentation that Texas

is by no means immune to the exercise of Government's powers to the disadvantage of

minorities even in this modern era of the Republic's history.  *See, e.g, League of United Latin*

*American Citizens v. Perry,* 54 U.S. 399, 126 S.Ct. 2594, 1654 L.Ed.2d 609 (2006) (finding a

Voting Rights Act violation in District 23 of Texas); *Bush v. Vera*, 517 U.S. 952, 970, 116 S.Ct.

1941, 1957 (1996) (addressing challenge to Texas' redistricting in North Texas, "Finally, and

most significantly, the objective evidence provided by the district plans and demographic maps

suggests strongly the predominance of race.").

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 137**

Discrimination is extant not only in the overall scheme of governmental power but also in the application of the death penalty:

> Empirical evidence concerning racial disparities in the system of capital punishment continues to mount, especially discrimination against capital defendants whose murder victims are white. This finding is replicated in a host of jurisdictions, from Georgia, South Carolina, North Carolina to Florida and Texas. These disparities are explained by prosecutorial discretion, political factors influencing the selection of prosecutors and judges, and racial stereotyping by jurors. The effects are undeniable, unchallenged, and statistically robust.

William S. Laufer, Nien-he Hsieh, *Choosing Equal Justice*, 30 Am. J. Crim. L. 343, 356 (Summer 2003) (footnotes omitted). Plainly, "the problems so evident before *Gregg* still prevail." Anthony N. Bishop, *The Death Penalty in the United States: An International Human Rights Perspective*, 43 S. Tex. L. Rev. 1115, 1180 (Fall 2002).

That the problem persists is a violation committed in the plain face of mounting evidence under a weak rubric: "The United States Supreme Court has also ignored the growing evidence of racial disparity in the application of the death penalty, holding that so long as there is no showing that racism was a factor against the particular defendant sentenced to death, then the death penalty is not being applied in a discriminatory manner." *Id.* at 1181. Consequently, far from saving the instructions from constitutional error, the unbridled discretion present here gave ground from which it could rise.

### (c)     Inevitable Failure

Finally, Escamilla reiterates the mandate of an individualized determination. *Tuilaepa v. California,* 512 U.S. 967, 983, 114 S.Ct. 2630, 2640 (1994) (citing *Lockett*, 438 U.S. 586, 602-605, 98 S.Ct. 2954, 2963-2965, 57 L.Ed.2d 973 (1978)). Given this mandate, Escamilla submits the salient observation that experience reflects the impossibility of satisfying this mandate *and* remaining consistent with the elimination of arbitrariness and discrimination in the capital

context. *Callins v. Collins*, 510 U.S. 1141, 1144, 1149, 1155, 114 S.Ct. 1127, 1132, 1129, 1136 (1994) (BLACKMUN, J., dissenting). As Justices Blackmun and Thomas observed, several Members of the Supreme Court have noted the existence of tension between the need for individualized fairness and the need for consistency. *Id.* 510 U.S. at 1151; 114 S.Ct. at 1133 (citations omitted); *Graham v. Collins,* 506 U.S. 461, 479, 113 S.Ct. 892, 904, 122 L.Ed.2d 260 (1993) (THOMAS, J., concurring) (citations omitted).

As Justice Blackmun observed the "theory underlying *Penry* and *Lockett* . . . that an appropriate balance can be struck between the *Furman* promise of consistency and the *Lockett* requirement of individualized sentencing if the death penalty is conceptualized as consisting of two distinct stages." *Callins v. Collins*, 510 U.S. at 1152, 114 S.Ct. at 1134 (BLACKMUN, J., dissenting). Escamilla submits that herein lies the raison d'etre of the two aspect approach and its signal failure and unacceptability:

> It simply reduces, rather than eliminates, the number of people subject to arbitrary sentencing. It is the decision to sentence a defendant to death-not merely the decision to make a defendant eligible for death-that may not be arbitrary. While one might hope that providing the sentencer with as much relevant mitigating evidence as possible will lead to more rational and consistent sentences, experience has taught otherwise. It seems that the decision whether a human being should live or die is so inherently subjective-rife with all of life's understandings, experiences, prejudices, and passions-that it inevitably defies the rationality and consistency required by the Constitution.

*Callins v. Collins,* 510 U.S. 1141, 1152, 114 S.Ct. 1127, 1134-1135, 127 L.Ed.2d 435, 1134, 127 L.Ed.2d 435, 62 USLW 3546 - 1135, 127 L.Ed.2d 435, 62 USLW 3546 (1994) (BLACKMUN, J., dissenting).

Just as the death penalty experiment has failed at large, *id.* 510 U.S. at 1145, 114 S.Ct. at 1130, so too has the machinery of its implementation failed here. Thus, because the proper

course when confronting "irreconcilable constitutional commands" is not to sacrifice one but rather "to admit the futility of the effort to harmonize them" it is follows that it must be accepted that "the death penalty cannot be administered in accord with our Constitution." *Id.* 510 U.S. at 1156, 114 S.Ct. at 1137. It is intolerable that one constitutional right be surrendered for the sake of another constitutional right. *Simmons*, 390 U.S. at 394, 88 S.Ct. at 976. Thus, no correct individualized determination can warrant death and remain consistent with the ideals of the Republic. Escamilla, therefore, submits that the day for abandonment of the death penalty, foreseen by the Honorable Justice Blackmun to come after his passing, has arrived. *Callins v. Collins,* 510 U.S. at 1158, 114 S.Ct. at 1139.

Such a jurisprudential change would be consistent with the notion of progress of society. *Cf. Trop v. Dulles*, 356 U.S. at 101, 78 S.Ct. at 598. The Republic's retention of the penalty is a globally condemned anomaly:

> The international community views the United States as monolithic and anomalous in its retention of the death penalty. Whereas virtually all democracies--and certainly all Western industrialized ones--have repudiated the death penalty as unnecessary or even a violation of basic human rights, the United States continues to sentence offenders to death to punish ordinary (non-treasonous) crimes. Indeed, over the past forty years, as the international community has increasingly repudiated capital punishment, the size of the death-row population in this country has increased dramatically.

Carol S. Steiker, Jordan M. Steiker, *A Tale of Two Nations:  Implementation of the Death Penalty in "Executing" Versus "Symbolic" States in the United States,* 84 TEX. L. REV. 1869, 1870 (2006).

As a consequence, though tragically Justice Blackmun no longer lives,  the time to abandon placement of the Republic's imprimatur upon death has finally arrived in the form of the cause sub judice here in the very "center of the modern American death penalty." *Id.* at

1875. This is appropriate for "[i]It is no coincidence that Justice Blackmun chose a death penalty case from Texas in which to express [his condemnation of the penalty]." Brent Newton, *A Case Study in Sytemic Unfairness: The Texas Death Penalty, 1973-1994*, 1 TEX. F. ON C.L. & C.R. 1, 37 (Spring 1994).

### 8.   Conclusion

Because the Texas courts' determination of Petitioner's habeas claims resulted in a decision that was contrary to *and* involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, habeas corpus should issue. *See Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). Further, because the Texas courts' determination of Petitioner's habeas claims resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court, this Court should grant his requested relief in its entirety. *Id.*

### H:   CLAIM EIGHT:   INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL FOR FAILING TO CHALLENGE THE UNLAWFUL MITIGATION DEFINITION

As noted in Claim Seven, *supra*, while trial counsel preserved the objection to the state court's unconstitutionally narrow mitigation definition (I. C.R. at 93-94, 104), appellate counsel did not raise the issue. (State Habeas Findings of Fact and Conclusions of Law 196-99).

### 1.   State Habeas Complaint

During state habeas proceedings, Escamilla complained that appellate counsel failed to complain that the submitted definition of "mitigating evidence" was unconstitutionally narrow. (State Habeas Application at 51). Escamilla noted that he was entitled to constitutionally effective representation on appeal. (State Habeas Application at 51) (citing, inter alia, *Evitts v. Lucey*, 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985)). Escamilla recited that the

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 141**

controlling standard was that adduced in *Strickland*. (State Habeas Application at 51) (citing *Evitts*, 469 U.S. at 396). Escamilla then contended that the failure to raise the issue was "clearly deficient" and noted that the issue had been raised in numerous capital appeals. (State Habeas Application at 51) (citing, inter alia, *Ladd v. State*, 3 S.W.3d 547, 573 (Tex. Crim. App. 1999); *Cantu v. State*, 939 S.W.2d 627, 648-49 (Tex. Crim. App. 1996)). Lastly, Escamilla noted that he had addressed the merits of his earlier contention that the mitigation definition was unconstitutionally narrow and submitted that the limited definition was "particularly critical" given trial counsel's failure to discover and present mitigating evidence with particular reference to his first ground. (State Habeas Application at 52).

### 2. State Court Findings

The trial court found that because as adduced earlier in its findings there was no unconstitutional limit in the submitted definition, Escamilla failed to demonstrate harm, and so, counsel's decision not to raise the issue was not deficient. (State Habeas Findings of Fact and Conclusions of Law 209-214).

### 3. Standard

Criminal defendants possess a constitutional right to effective assistance of counsel on appeal. *Evitts v. Lucey,* 469 U.S. 387, 393-95, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). Such a claim premised upon "the failure to argue an issue on appeal is governed by *Strickland*, which requires [the reviewing court] to determine whether: (1) the attorney's performance was deficient, and (2) the deficiency prejudiced the defendant." *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000) (citations omitted).

To satisfy the deficiency prong, Escamilla must show that the performance of his appellate counsel was deficient in an "objectively unreasonable" manner; that is, "counsel

unreasonably failed to discover nonfrivolous issues . . . ."  *Smith v. Robbins,* 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (citation omitted).  To show prejudice, Escamilla must demonstrate "a reasonable probability that, but for [counsel's omission] he would have prevailed on his appeal."  *Id.* (citation omitted).  Stated differently,  Escamilla must show that "the appeal would have had, with reasonable probability, a different outcome if the attorney adequately addressed the issue." *United States v. Dovalina,* 262 F.3d 472, 474-75 (5th Cir. 2001). Escamilla must next "demonstrate that the attorney's deficient performance led to a fundamentally unfair and unreliable result." *Id.* (citation omitted).

### 4.    Deficiency - a Nonfrivolous Issue

To be sure, an "attorney need not advance *every* argument, regardless of merit, urged by the appellant." *Evitts,* 469 U.S. at 394, 105 S.Ct.at  835 (citing *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (emphasis in original)); *accord Ellis v. Lynaugh,* 873 F.2d 830, 840 (5th Cir.1989) ("The Constitution does not require appellate counsel to raise every nonfrivolous ground that might be pressed on appeal."; citing to *Barnes, supra*).   Indeed, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  *Barnes,*  463 U.S. at 751-752, 103 S.Ct. at 3313.

This issue, though, was not frivolous.  First, the fact that it has been raised before proves its cognizability.  *See Moore v. Quarterman,* 526 F.Supp.2d 654, 721-24 (W.D.Tex. 2007) (memorandum op. and order); *Avila v. Quarterman,* 499 F.Supp.2d 713, 729 (W.D.Tex. 2007).

Second, its previous rejection is of no moment for counsel operates, especially in the capital context, in an environment where jurisprudence, like our society, evolves as it progresses or advances. *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958).  The

responsibility to raise issues that appear foreclosed by earlier decisions therefore obtains. If this were not the case, the High Court would never have the opportunity to revisit what appears settled law. Indeed, in this very generation that which seemed to be settled law beyond and above challenge, the Federal Sentencing Guidelines, is now denominated advisory. *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Such changes take place only at the hands of determined counsel who set the course of legal attack squarely into the winds of what appears settled law.

Third, as initially adduced above in Claim Seven, subsection eight, the instruction was too limiting because: (1) our law contemplates consideration of "any aspect of a defendant's character or record" with particular respect afforded "the uniqueness of the individual," *Lockett,* 438 U.S. at 604-05, 98 S.Ct. at 2965, and these terms cannot rightly be confined to moral blameworthiness; (2) it allowed unchecked discretion which carries with it the evident danger of bias and caprice, *cf. Graham v. Collins,* 506 U.S. 461, 479, 113 S.Ct. 892, 904, 122 L.Ed.2d 260 (1993) (THOMAS, J., concurring), a danger that is manifest in the implementation of capital sentencing nationally; and, (3) the attempt to balance the competing demands of individualized sentencing and maintain consistency produce inevitable failure. *See Callins v. Collins,* 510 U.S. 1141, 1152, 114 S.Ct. 1127, 1134-1135, 127 L.Ed.2d 435, 1134, 127 L.Ed.2d 435, 62 USLW 3546 - 1135, 127 L.Ed.2d 435, 62 USLW 3546 (1994) (BLACKMUN, J., dissenting). The question that remains is one of prejudice.

### 5.    Prejudice

Appellate counsel's failure to raise this issue cannot be justified by strategic reasoning. Indeed, such issue has been raised in other similar cases. *See Moore v. Quarterman,* 526 F.Supp.2d 654, 721-24 (W.D.Tex. 2007) (memorandum op. and order); *Avila v. Quarterman,*

499 F.Supp.2d 713, 729 (W.D.Tex. 2007). Moreover, as delineated above, in subsection eight of Claim Seven, the issue is meritorious and should result in reversal. Thus, there exists a reasonable probability that, but for counsel's omission of the issue Escamilla would have prevailed. The result of counsel's deficiency, therefore, produced a fundamentally unfair and unreliable outcome.

### 6.    Conclusion

Because the Texas courts' determination of Petitioner's habeas claims resulted in a decision that was contrary to *and* involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, habeas corpus should issue and Escamilla's requested relief be granted. *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). Further, because the Texas courts' determination of Escamilla's habeas claims resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court, this Court should grant his requested relief in its entirety. *Id.*

### I:    CLAIM NINE:  PROBABILITY DEFINITION UNLAWFUL

Special Issue Number 1 provided as follows:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Licho Escamilla, would commit criminal acts of violence that would constitute a continuing threat to society?

(I. C.R. 323). Trial counsel unsuccessfully objected that the term "probability" used in the first special issue diluted the reasonable doubt standard in derogation of Due Process. (Trial Court Transcript Vol. 39, pp. 127-28). Counsel specifically contended that the issue placed the burden upon Escamilla "[b]y allowing the State to prove beyond a reasonable doubt a mere probability,

which is another way of simply stating that all the State has to prove is that probability exist[s], not that the Defendant would be dangerous beyond a reasonable doubt." (Trial Court Transcript Vol. 39, p. 127). These contentions were rejected. (Trial Court Transcript Vol. 39, p. 128).

### 1.    State Habeas Complaint

Accordingly, during state habeas proceedings, Escamilla complained that the submitted "future dangerousness" issue increased the punishment for capital murder beyond the prescribed statutory maximum. (State Habeas Application at 53-54). Therefore, the issue acted as the functional equivalent of an element that had to be proven before a jury beyond a reasonable doubt. (State Habeas Application at 53-54) (citing to and relying upon *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)). Thus, Escamilla reasoned, because the determination of future dangerousness exposes one to a penalty exceeding the maximum based upon the verdict alone, it must be proven beyond a reasonable doubt. (State Habeas Application at 54).

Escamilla contended that the probability term eviscerated the reasonable doubt standard. (State Habeas Application at 54-55). Escamilla noted that the placing of competing burdens can only produce confusion and frustration. (State Habeas Application at 55) (citing to *Boyde v. California,* 497 U.S. 370 (1990)). Escamilla also took issue with the concept of "probability beyond a reasonable doubt." (State Habeas Application at 55) (citing to *Horne v. State*, 607 S.W.2d 556, 565 (Tex. Crim. App. 1980) (Robert, J., concurring)). Escamilla further contended that the proper inquiry was "whether the reasonable doubt standard has been tainted by other instructions that may allow the jury to find an element of the crime based on a burden of proof

that is below that required by the due process clause." (State Habeas Application at 56) (citation omitted).

### 2.     **State Court Findings**

The trial court found that Escamilla's complaint about the future dangerousness issue bore no merit. (State Habeas Findings of Fact and Conclusions of Law 215-227). The court first found the complaint procedurally barred because it was not raised on direct appeal. (State Habeas Findings of Fact and Conclusions of Law 216-219). Thereafter, the trial court concluded that this complaint was without merit because the Court of Criminal Appeals and the Fifth Circuit have found this contention wanting. (State Habeas Findings of Fact and Conclusions of Law 200-04) (relying upon, inter alia, *Rayford v. State*, 125 S.W.3d 521, 534 (Tex. Crim. App. 2003); *Kunkle v. Cockrell*, No. C-01-302, 2002 U.S. Dist. LEXIS 26951, *93 (S.D. Tex. Sept. 2, 2003) (not designated for publication), *aff'd by Kunkle v. Dretke*, 352 F.3d 980 (5th Cir. 2003)). The Court noted Escamilla contended this jurisprudence was erroneous "because the future dangerousness special issue is an aggravating circumstance to which *Apprendi* and *Ring* apply and because the term 'probability' requires, at most, proof by a preponderance of the evidence." (State Habeas Findings of Fact and Conclusions of Law 223). The court faulted Escamilla for providing no authority for this position and found that the punishment special issues were not aggravating factors within the ambit of *Apprendi* and *Ring.* (State Habeas Findings of Fact and Conclusions of Law 223-24).

The trial court also rejected Escamilla's assertion that the probability term lessens the State's burden because the issue requires the State to prove this probability beyond a reasonable doubt. (State Habeas Findings of Fact and Conclusions of Law 225).

### 3.     **Procedural Bar**

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY - Page 147**

The procedural bar should not obtain because Escamilla's twenty-second issue on appeal challenged the Texas death penalty scheme for failing to define "probability." *Escamilla*, 143 S.W.3d 828. Because this claim also challenges this term the procedural bar should not foreclose the issue.

Alternatively, fundamental fairness requires that society at large and Escamilla be afforded a right to have constitutional challenges to the imposed death sentence reviewed. Due to the structure of the AEDPA, claims not rightly raised can be precluded from review not based upon their merits but upon an advocate's decision not to advance the claim. Such procedural bar or default violates fundamental fairness. A death sentence is unlike any other act of the Republic. *Gardner*, 430 U.S. at 357-58, 97 S.Ct. at 1204. Given the unmatched gravity of the sentence, Escamilla should be afforded meaningful review of his constitutional challenges to his sentence of death.

### 4.  Due Process Requires Texas to Prove All Elements Beyond a Reasonable Doubt

As the door, Escamilla adduces that the presumption of innocence is a basic component of a fair trial under the Republic's justice system. *Estelle*, 425 U.S. at 503. From this principle, *Winship* drew the fundamental precept: "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072-73, 25 L.Ed.2d 368 (1970). The common law adherence to this standard was viewed as reflecting "'a profound judgment about the way in which law should be enforced and justice administered.'" *Id.* 397 U.S. at 361-62, 90 S.Ct. at 1071 (quoting *Duncan v. Louisiana*,391 U.S. 145, 155, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968)).

Thus, "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 1224, 143 L.ED.2d  (1999).  The requirements of the Due Process clause extends to the sentencing process. *Gardner*, 430 U.S. at 358, 97 S.Ct. at 1205.

These principles are particularly compelling in capital cases.  The Eighth Amendment requires States to apply special procedural safeguards when they seek the death penalty. *Gregg v. Georgia*, 428 U.S. 153 (1976).  When the State fails to afford these minimal protections, the constitutional prohibition against "cruel and unusual punishments" forbids its use. *Furman v. Georgia*, 408 U.S. 238 (1972).

The *Winship* principle thus extends to requiring the State to bear the burden of proving beyond a reasonable doubt all elements that result in an increased penalty. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).  That is, as Justice Thomas wrote, concurring in the judgment:  "In the areas of capital punishment, unlike any other area, we have imposed special constraints on a legislature's ability to determine what facts shall lead to what punishment – we have restricted the legislature's ability to define crime." *Apprendi*, 530 U.S. at 522-23.  The United States Supreme Court recently reaffirmed this principle of jury findings beyond a reasonable doubt in the capital context. *See Ring v. Arizona*, 536 U.S. 584, 589, 602, 122 S.Ct. 2428, 2439, 153 L.Ed.2d 556 (2002).

### 5.    The Burden Should Apply

The application of this principle to Escamilla's case is manifest.  Because a positive finding on the first issue paves the way for the death penalty, the State must prove the elements

of the issue beyond a reasonable doubt lest as previously: "When a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as 'a tail which wags the dog of the substantive offense.'" *Id.* at 495 (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986)).

The person who is charged with actions that expose him to the death penalty has an absolute entitlement to a jury trial on all the elements of the charge." *Almendarez-Torres v. United States*, 523 U.S. 224, 227 (1998) (SCALIA, J., dissenting) (emphasis deleted). However, the charge here was couched in terms of probability unconscionably lowering the burden of proof.

### 6.   **Application of the Principle**

The instruction submitted to the jury asks whether Texas proved beyond a reasonable doubt a probability. The construct is illogically vague:

> What did the Legislature mean when it provided that a man's life or death shall rest upon whether there exists a 'probability' that he will perform certain acts in the future? Did it mean, as the words read, is there A probability, some probability, any probability? We may say there is a twenty percent probability that it will rain tomorrow, or a ten or five percent probability. Though this be a small probability, yet it is some probability, A probability, and no one would say it is no probability or not a probability. It has been written: 'It is probable that many things will happen contrary to probability,' and 'A thousand probabilities do not make one fact.' The statute does not require a particular degree of probability but only directs that Some probability need be found. The absence of a specification as to what degree of probability is required is itself a vagueness inherent in the term as used in this issue. Our common sense understanding of the term leaves the statute too vague to pass constitutional muster.

*Jurek v. State*, 522 S.W.2d 934, 945  (Tex. Crim. App. 1975), *aff'd by Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (Odom, J., concurring in part and dissenting in part) (notes omitted).