IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CAUSE NO.: 3:06-CV-2248-BH

PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAY - 5 2008

CLERK, U.S. DISTRICT COURT
By _____
Deputy

---

LICHO ESCAMILLA,

VS.

NATHANIEL QUARTERMAN,
**Director of Texas Department of
Criminal Justice, Correctional
Institutions Division**

POLUNSKY UNIT, LIVINGSTON, TX

TDC NO. 999432

---

## EXHIBITS

---

The following exhibits are submitted with this Petitioner for Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254.

# EXHIBITS 1-25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

### CAUSE NO.: 3:06-CV-2248-BH

### PETITION FOR WRIT OF HABEAS CORPUS
### BY A PERSON IN STATE CUSTODY

---

**LICHO ESCAMILLA,**                    **POLUNSKY UNIT, LIVINGSTON, TX**

**VS.**

                                        **TDC NO. 999432**

**NATHANIEL QUARTERMAN,**
**Director of Texas Department of**
**Criminal Justice, Correctional**
**Institutions Division**

---

### EXHIBITS

---

   The following exhibits are submitted with this Petitioner for Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254.


# EXHIBITS 1-25

## EXHIBIT LIST

1. Affidavit, Toni Knox, 2008

2. Affidavit, Maria Escamilla, 2008

3. Affidavit, Dr. Glen T. Pearson, 2008

4. Affidavit, Brenda Hinojosa, 2008

5. Affidavit, Bruce Anton, 2008

6. Escamilla Family Criminal Records, Primetime Investigators, 2008 (sep. binder)

7. Human Rights Watch Report

8. deathpenalty.org Report on Botched Executions

9. CNN article – Dr. Jay Chapman

10. Affidavit, Brooke Busbee, Esq., 2006

11. Affidavit, Wayne Huff, Esq., 2006

12. Dr. Pearson letter, 2002

13. Toni Knox, Second Declaration, 2005 (sep. binder)

14. Toni Knox, Confidential notes re: Dr. Glen T. Pearson, 2005

15. Toni Knox, Confidential notes re: Elizabeth Amis, 2005

16. Toni Knox, Confidential notes re: James Sutton, 2005

17. Escamilla Family Criminal Records, Mitigation Partners 2005 (sep. binder)

18. Affidavit, Maria Escamilla, 2005

19. Affidavit, Brenda Hinojosa, 2005 – plus, attachments

20. Affidavit, Luiz Gonzalez, 2005

21. Affidavit, Margaret Barajas, 2005

22. Affidavit, Vickie White, 2005

23.    Toni Knox, Confidential notes re: Margaret Barajas, 2005

24.    Affidavit, James Sutton, 2008

# Exhibit 1

## AFFIDAVIT OF TONI L. KNOX

My name is Toni Knox. I am a resident of Dallas County, Texas. I am over the age of eighteen and fully competent to make this affidavit. All the facts stated here are within my personal knowledge.

1. I am a Licensed Clinical Social Worker in the State of Texas and specialize in the practice of mitigation in capital cases, both pre-trial and post-conviction. I have received training in mitigation through the National Association of Social Workers (NASW), National Alliance of Sentencing Advocates and Mitigation Specialists (NASAMS), National Association of Criminal Defense Lawyers (NACDL), Texas Criminal Defense Lawyers Association (TCDLA), The Center for American and International Law, and the Texas Defender Services. I have obtained over 150 hours in training in both CLE and CEU approved training seminars. I am also a member in good standing of the NASW, NASAMS, NACDL and TCDLA.

2. I received my Masters Degree in Social Work (MSSW) from the University of Texas at Arlington in 1993. At the time of my graduation in 1993, I obtained my LMSW (Licensed Master of Social Work) from the state of Texas by submitting my graduate transcript and passing the LMSW test administered by the Texas State Board of Social Work Examiners. After obtaining my LMSW, I completed three years of post graduate social work clinical experience with supervision and passed the LCSW (Licensed Clinical Social Worker) exam in 1996. The LCSW license includes the ability for private practice in individual therapy.

3. I have twelve years of experience in preparing psychosocial histories in a clinical setting, assessing family dynamics and recommending interventions, and assessing chemical dependency and mental health symptoms. I am very knowledgeable concerning the administration of psychotropic medications and their application. Since 2003, I have attended numerous seminars and training sessions concerning the preparation of mitigation, particularly in capital cases.

4. In June, 2005, Catherine Bernhard, Licho Escamilla's attorney for his state habeas appeal, ask me to complete a mitigation investigation, furnish a psychosocial history and assess the prior mitigation investigation. Ms. Bernhard also wanted me to interview the jurors regarding several particular issues. I frequently interview jurors in habeas investigations to understand what part of the mitigation presentation affected their decision. I normally end the interview by asking them "hypothetically, if certain things had been presented, would it have made a difference?" These hypothetical situations are not always related to the case. For example, I

Toni L. Knox Affidavit
April 30, 2008
Page 2 of 4

might ask if they learned that a defendant was mentally retarded, would
that make a difference. In Licho's case, I used various hypothetical
situations such as a father being alcoholic or sexual abuse.

5. I knew from the juror questionnaire that Juror #3, Mr. James Sutton, was a
teacher. Based on this information, I believed Mr. Sutton had some
knowledge concerning child abuse and other situations which would affect
children when they were growing up. I asked Mr. Sutton if he had more
information about Licho's childhood if he might have considered that
information in his decision.

> *Mr. Sutton stated that the defense presentation at the
> guilt phase seemed disjointed and he had hoped to have
> more details about Licho's life. He did not find the
> testimony by father and sister effective. He remembers
> the father telling the story about Licho not wanting his
> father to kill the goat, but he said he thought that most
> children would have been opposed to killing an animal at
> that age. He would have liked to have heard from others
> about specific details concerning his life and more about
> what may have contributed to Licho behavior. Mr. Sutton
> says if a thorough story with the specific contributing
> factors had been presented, he would have taken them
> into consideration.* (Sutton Interview, Exhibit A)

6. From the address on the juror questionnaire, I knew that Mrs. Amis was
from a higher socio-economic neighborhood, as her home was listed on
the tax records as being worth $450,000. I hypothetically asked Mrs.
Amis if she knew of other factors, such as sexual abuse, if she might have
taken those factors into consideration.

> *Ms. Amis remembered all the previous incidents that
> were presented against Licho, including him stealing a
> car and trying to get away, the incident with the
> principal, and other illegal activities. She said they had
> quite a bit of information about his previous bad
> behavior. I asked her if she might have been able to
> consider other mitigating factors if they had been
> presented. For example, if it had been presented that
> someone had issues of abuse from childhood; would she
> have considered that to be mitigating? She responded
> that her mother had been abused as a child and she had*

Toni L. Knox Affidavit
April 30, 2008
Page 3 of 4

> *seen the effects on her mother's life. She would have*
> *considered some mitigation factors if proven and feels*
> *it may have swayed her to a life decision.* (Amis
> Interview, Exhibit B)

7.  I have my own personal "24 hour rule" for typing interviews. I have
    learned from other experienced mitigation specialists that it is important to
    type up interviews within twenty-four hours to be able to remember details
    more precisely. Therefore, it is only in some unusual circumstance that I
    would not type up an interview within twenty-four hours. Even when I am
    traveling, I have my computer and type up interviews. I have reviewed
    my handwritten notes and my typed juror interviews and believe them to
    accurately reflect the information from the interviews with Mr. Sutton and
    Mrs. Amis. Attached are the handwritten notes, which were written on the
    back of the juror questionnaire (Exhibit C).

8.  When I reviewed the information that was presented in Licho's trial for
    the punishment phase and the experts used, I was appalled by the lack of
    mitigation investigation. I am often critical of the lack of thoroughness in
    a mitigation investigation, but in Licho's case, there was basically no
    mitigation investigation. The fact that the attorney who was responsible
    for mitigation called the family (sister and father) to come to her office for
    an interview is the perfect example of why the ABA Guidelines
    recommends that the defense team have a mitigation specialist as part of
    the team.

9.  There was not a psychosocial history prepared by interviewing family
    members, friends, and other life history witnesses. Without a social
    history, an expert (psychiatrist and/or psychologist) cannot make an
    accurate mental health diagnosis without social history information. The
    defense hired a psychiatrist at the last minute to do a "drive-by"
    assessment of Licho, which consisted of about an hour interview with
    Licho in the holding cell during the trial and about an hour of reading
    some records (unsure what records). As a result, the psychiatrist was
    unable to accurately access Licho and his two page "letter report" to the
    defense attorney was "riddled" with inaccurate information. Additionally,
    it is recommended the mitigation theme(s) be well established prior to jury
    selection and trial so that this information can be used help screen for
    jurors and also to start front loading the mitigation theme(s). When I
    interviewed Dr. Pearson in September 2005, he stated that he had received
    no direction from the attorney and he felt it had been a last minute effort
    by the attorney to cover all the bases.

Toni L. Knox Affidavit
April 30, 2008
Page 4 of 4

10. From many years of experience in working on a locked psychiatric unit of a hospital and working with psychiatrists on a daily basis, I know it is only possible to provide a tentative mental health diagnosis based on the patient's behavior and the psychiatrist must depend on social history information obtained by the social worker and corroboration by family to be more confident in a diagnosis. It was not clear what the defense had requested Dr. Pearson to evaluate. It is the responsibility of the defense attorney (often with direction from the mitigation specialist) to provide the consulting expert guidance on the direction of their evaluation.

11. Licho's defense attorneys did not obtain their own records using Licho's release, but used the records furnished by the state. As a result, much of the information in the juvenile records was redacted because it contained substance abuse information. This information was critical information needed by the defense. The defense attorneys did establish that the defendant was under the influence of alcohol and drugs during the trial. This laid the ground work for an expert, such as toxicologist to testify concerning the effects of alcohol, but an expert was not utilized.

    I declare under penalty of perjury under the laws of the state of Texas that the foregoing is true and correct.

_____
Toni Knox

Subscribed and sworn to before me this __30th__ day of __April__, 2008 in Richardson, Texas.

_____
Notary Public, State of Texas

Sheila J. Vest
Notary's Printed Name

# EXHIBIT A

*Mitigation Partners*

## ATTORNEY – CLIENT PRIVILEGED

**CONFIDENTIAL MEMORANDUM**

To:     Catherine Bernhard

From:  Toni Knox

Date:  September 30, 2005

Re:    Licho Escamilla

---

Interview with Juror # 3, James Sutton
*1544 River Oaks Dr., Irving, Texas, 75060  972 254-4982*

---

I talked with Mr. Sutton by telephone and asked if I could meet with him to discuss Licho's trial. He was willing to talk with me, but wanted to talk on the phone rather than in person.

Parole question: Mr. Sutton didn't remember what the 40 year question was about. He couldn't really remember instructions about parole. He was very vague about this question.

Stun belt: Mr. Sutton described Licho as wearing a button down shirt, but couldn't remember other details about his dress or anything out of the ordinary. He did not know that Licho was wearing a stun belt until the last day. After Licho threw the water and stood up, he didn't really notice. The jury was quickly moved out of the court room and he saw Licho fall to the ground, but didn't really understand why at that point. He did not know until later when the judge told them that Licho had been wearing a stun belt and that it had been used.

Mr. Sutton stated that the defense presentation at the guilt phase seemed disjointed and he had hoped to have more details about Licho's life. He did not find the testimony by father and sister effective. He remembers the father telling the story about Licho not wanting his father to kill the goat, but he said he thought that most children would have been opposed to killing an animal at that age. He would have liked to have heard from others about specific details concerning his life and more about what may have contributed to Licho behavior. Mr. Sutton says if a thorough story with the specific contributing factors had been presented, he would have taken them into consideration.

# EXHIBIT B

## *Mitigation Partners*

**ATTORNEY – CLIENT PRIVILEGED**

**CONFIDENTIAL MEMORANDUM**

To:     Catherine Bernhard

From:  Toni Knox

Date:   October 13, 2005

Re:     Licho Escamilla

> Interview with Juror # 7, Elizabeth Amis
> *4013 Bryn Mawr, Dallas, Texas, 75225,  214/363-4407*

I talked with Ms. Amis by phone.

Parole question:  Ms. Amis did remember something about the question of parole and 40 years. She said that she was under the impression that Licho would be eligible for parole and she didn't know how long he would be incarcerated.  That contributed to her vote for the death penalty. She says that if it had been 40 years without parole, she might have voted for life rather than death.

Stun belt:  Ms. Amis did not know that Licho had been wearing a stun belt during the trial and felt that he had been dressed appropriately.  She said after the incident with the water that the judge came in and told the jury that Licho had assaulted a female bailiff and there had been concern about him trying to escape.

Ms. Amis remembered all the previous incidents that were presented against Licho, including him stealing a car and trying to get away, the incident with the principal, and other illegal activities.  She said they had quite a bit of information about his previous bad behavior.  I asked her if she might have been able to consider other mitigating factors if they had been presented. For example, if it had been presented that someone had issues of abuse from childhood; would she have considered that to be mitigating?  She responded that her mother had been abused as a child and she had seen the effects on her mother's life.  She would have considered some mitigation factors if proven and feels it may have swayed her to a life decision.

She said that Licho seemed angry and hostile throughout the trial and she didn't feel that he showed any remorse.

# EXHIBIT C

# JURY QUESTIONNAIRE

Juror No. _**113**_

PLEASE PRINT DARK ENOUGH TO MAKE COPIES:

NAME: _Sutton     James     Edward_

| Last | First | Middle | Maiden (If Applicable) |

---

## *DEATH PENALTY*

Are you in favor of the death penalty?   [✓] YES  [ ] NO   Please explain your answer. _____

_Under certain conditions and with regard to the nature of the crime committed against innocent victims I believe it is a fair and equitable punishment. I do believe, however, that it should be used with upmost caution._

With reference to the death penalty, which of the following statements would best represent your feelings: (Circle only one)

1.    I believe that the death penalty is appropriate in all capital murder cases.

(2)   I believe that the death penalty is appropriate in some capital murder cases and I could return a verdict resulting in death in a proper case.

3.    Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances.

4.    I believe that the death penalty is appropriate in some capital murder cases, but I could never return a verdict which assessed the death penalty.

5.    I could never, under any circumstances, return a verdict which assessed the death penalty.

6.    None of the above. (If none of the above, please state your position.) _____
_____
_____

Has there been any particular event in your life that has influenced the way you feel about the death penalty?

[ ] YES   [✓] NO   If yes, please explain. _____
_____
_____
_____
_____

1

9/30 ~if ne - people knew

- Button down dress shirt -
- didn't know he was wearing stun belt
- didn't remember - what the 40 years was
      about
      well be in prison.
      - father & sister
          - Dad - goat to be killed
          - Would have taken
                  into consideration
          - Would have considered
              and would like to
              have known other
              factors -

No story - disjointed
      presentation

# JURY QUESTIONNAIRE

Juror No. **144**

**PLEASE PRINT DARK ENOUGH TO MAKE COPIES:**

NAME: _Amis        Elizabeth        Speer_

       Last          First          Middle        Maiden (If Applicable)

### DEATH PENALTY

Are you in favor of the death penalty?   [X] YES  [ ] NO   Please explain your answer. _____

_Although the death penalty is a difficult verdict, I do believe if proven guilty without a doubt the death penalty can be an appropriate verdict_

With reference to the death penalty, which of the following statements would best represent your feelings: (Circle only one)

1.     I believe that the death penalty is appropriate in all capital murder cases.

(2.)    I believe that the death penalty is appropriate in some capital murder cases and I could return a verdict resulting in death in a proper case.

3.     Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances.

4.     I believe that the death penalty is appropriate in some capital murder cases, but I could never return a verdict which assessed the death penalty.

5.     I could never, under any circumstances, return a verdict which assessed the death penalty.

6.     None of the above. (If none of the above, please state your position.)_____
_____

Has there been any particular event in your life that has influenced the way you feel about the death penalty?

[ ] YES   [X] NO   If yes, please explain. _____
_____
_____
_____
_____

1

10/1    Tuesday night –
                    – left mog w/ his husband –
            today is very busy


                40 years
- Judge – md
                  up for parole –
Lieho looked distainful look – looked angry

Presentate    Previous behavior –

                    – Principal –
                    – stole car – wrong way
                    – ~~Dien~~. elf he had been
                              abused
                    – strong background in abus –
                         Ⓜ was abused – could have
                                        affected he.
- Trying to escape –
- Assaulted – bailoff –
              Judge came to talk


        – Might have given life w/out parole

# Exhibit 2

| **LICHO ESCAMILLA CASE** | $ | **DALLAS DISTRICT COURTS** |
|---|---|---|
| | $ | |
| | $ | **CAUSE NO. 3:06-cv-2248** |
| **STATE OF TEXAS** | $ | |
| **COUNTY OF DALLAS** | $ | |
| | $ | |

### AFFIDAVIT OF MARIA ESCAMILLA

My name is **Maria Escamilla**. I am over the age of 18 and am competent to make this affidavit. This testimony is based on personal knowledge and is true and correct.

I am the older sister of Licho Escamilla. I am the daughter of Jose Escamilla. I have two other brothers, an older brother Jose, Jr., and a younger brother, Juan. My brother Licho was tried for capital murder by the State of Texas. Before his trial, I never spoke with either of his lawyers or any investigator. This is true even though I was at his trial everyday. I was also living at the family house before Licho's trial. I do not believe that his lawyers even knew I was Licho's sister. It would have been easy for the lawyers or their investigator to talk to me about my family and my childhood. The only person I have spoken to about Licho's case before this was Ms. Toni Knox. Now, I have also talked to Licho's habeas lawyer.

The only two people that Licho's murder trial lawyers talked to were my half-sister, Brenda Hinojosa, and my father, Jose Escamilla. No other family members were contacted. At the time of Licho's murder trial, my dad, my half-sister Brenda, her daughter Rachel and I all lived together. My brother Juan was either at the Government Center jail facility in Dallas or at the Lew Sterrett jail in Dallas. And, while my brother Jose was also in custody before Licho's trial, I remember that he got out sometime just before or during Licho's trial.

I have a pretty big family and at the time before Licho's trial we all lived within about six blocks of each other. My grandmother was still living at the time of Licho's trial. She lived on Palicio in Dallas. Her house was only a couple of blocks from my family's house.

My uncle, Eliezar, and his family lived next door to my grandmother. My Uncle Eliezar has a son, Carlos, a daughter ,Eloisa, and a daughter, Maria de Jesus. Eliezar was married to Maggie or Margaret. My other uncle, Benito, lived one street over from our family on Peoria. Uncle Benito was married to Julia. He has four sons, Natalo, Benito, Julio and Jesse. He also has a daughter, Beatrice. My other uncle, Juan, lived off of Peoria. He is married to Pacha – or at least that is the only name I have known her by. Uncle Juan has four children; one son, Eliezar, and three daughters, Gloria, Maria and Cindy. Juan's son Eliezar went to prison once for driving his car into a group of people. My two brothers have also had some legal trouble. My older brother, Jose, Jr., is in Federal Prison and I think he has a sentence of 15 to 18 years. My younger brother, Juan, has been in and out of jail and is currently in jail again at Lew Sterrett in Dallas. I would describe my childhood as "not normal." I believe my childhood was abusive. My father would hit us. He hit us several times a week. [CONT.]

**AFFIDAVIT**                                                                                          Page One of Three

*M. Es.*

But, he hit us every week. Licho got hit the most of all of us. When my father hit us, he would always put us on our knees and hit us on our butts and backs. We would get bruised up. We were all too scared to tell people about my father hitting us. It seemed like it was normal. I just thought that everyone got hit. My father would yell at us and hit us. As we got older, it got worse for the boys. One time, my father hit my brother Jose so hard and so many times that he broke a four by four on his head. Another time, my father hit Licho so hard and so many times that he broke his cow whip tool on Licho. One time when my brother Juan talked back to my father and he told Juan, "Let's take it outside. You want to act like a man, let's take it outside." These type of things happened all the time. He hit all of us every week. I remember one time when my father thought I was hugging a boy and he hit me with his fist in my mouth. My father busted my lip and it was bleeding. He did this in our truck with Brenda's daughter, Rachel, sitting in between us. Another time, right before I moved out of the house when I was 17, my father hit me with a belt when I came home. He kept hitting me with the belt all the way down the hall and until I got in my room and on my bed. He just kept hitting me on my back, butt and legs. The next day, my father told my mother, "I whopped her ass", and he picked up the shirt I was wearing with lines of blood. He was laughing. The next day, I left the house because it was so awful at home. My family found me living at my cousin's house months later. My family asked me to come home but I begged my cousins to please let me stay with them. This made my father really angry. Later, when I was older, my father hit me when I was holding my newborn child. My father would always cuss at us and talk down to us. He called me a whore and called my brothers and my mother names. He would yell at the boys and tell them they "act like a dog" and they "act like an animal." My father also hit my mother. He would hit her with his fists. My mother would have bruises on her legs, back and arms. It was the same way with us. My father hit us where the bruises would not show. My father would go after my mother and he would hit her. He would send us to our rooms and then go after her. We could hear her scream and cry when he hit her. When we got older, we would try to stop my father. Even when we were in our rooms, we could hear everything. My sister and I also fist-fought. My older brother, Jose, Jr., would put Licho into a circle and then throw someone in the circle and make him fight. When Juan got older, Jose, Jr. also made Juan fight boys at our house. He would put Juan in the circle and sometimes make him fight boys Jose's age. One time, Jose made Licho fight his close friend. This really hurt and upset Licho. My father drank a lot. He drank all the time. Sometimes we would have to go pick him up from my uncle's house because he was so drunk. Other times my mom would have to go bring him in from outside the house because he was so drunk he did not realize he was home and the car was still running. The boys also drank a lot. There were guns at our house and in our neighborhood. My father knew that guns scared my mother so he would shoot guns into the air when he had been drinking to scare her. There were also drive-by shootings in my neighborhood. I remember one time when Juan and I were outside our house and a drive-by happened. My dad came out of the house with a gun. There were gunshots all the time in our neighborhood. [CONT.]

**AFFIDAVIT**                                                      Page Two of Three

*M. E.*

My family grew up in a very violent neighborhood. My brothers and I also grew up in a very abusive home where my father hit us every week and drank all the time. I was so happy to be able to leave that home when I was 17. While growing up, at times I wished I was dead. I would cry myself to sleep or even tried to take pills so I would not wake up. I have never dealt with this situation, just for the fact that everyone I love is no longer with me, they are all locked up or dead. I believe they get locked up because this is their way of getting away from all we had to go through. It is not so easy for me to do that, since I have children of my own. My father tells me all the time, sometimes with random phone calls, that my girls will end up being "nothing". I just tell him that God has their life planned out and I know they will grow up to be great people. He tells me that in time I will see that I was not a great person myself and that I will see in them how bad I was. It seems to me as if this negativity and verbal abuse will never end. I used to go see my dad all the time but now I only go over once or maybe twice a month, so the kids can see him for a few minutes. Then I find an excuse to leave his house. After my mom died, a little bit of myself and my brothers died with her. "FURTHER AFFIANT SAYETH NOT."

X _____

Maria Escamilla

**Affiant**

SUBSCRIBED AND SWORN TO before me on this the _1st_ day of _May_, 2008.

_____

Notary Public in and for the State of Texas

My Commission Expires:

_9-26-2010_

Notary's Printed Name: _Jay D. Matthews_



**AFFIDAVIT**

**Page Three of Three**

M.E.

# Exhibit 3

| | | |
|---|---|---|
| **LICHO ESCAMILLA CASE** | $ | **DALLAS DISTRICT COURTS** |
| | $ | |
| | $ | **CAUSE NO. 3:06-cv-2248** |
| **STATE OF TEXAS** | $ | |
| **COUNTY OF DALLAS** | $ | |

### AFFIDAVIT OF GLEN T. PEARSON, M.D.

BEFORE ME, the undersigned authority, personally appeared, _Glen T. Pearson, M.D._ , who, being by me duly sworn, deposed as follows:

My name is **GLEN T. PEARSON, M.D.** I am above the age of 18 years, of sound mind, and competent to make this Affidavit. All of this testimony is based on my personal knowledge and is true and correct:

I, Glenn T. Pearson, M.D., am a child psychiatrist. I was retained by Ms. Brook Busbee to evaluate Licho Escamilla. He was already in trial when I saw him. I do not recall if I knew that this was a death penalty case. I have never testified in a death penalty case. I am opposed to the death penalty. I believe that every person should be given a life sentence rather than a sentence of death. I was never asked to testify in this case. "FURTHER AFFIANT SAYETH NOT."

x _____

Glen T. Pearson, M.D.
**Affiant**

SUBSCRIBED AND SWORN TO before me on this the __1st__ day of __May__ , 2008.

_____
Notary Public in and for the State of Texas

My Commission Expires:
__9/26/2010__

Notary's Printed Name:
__Jay D. Matthews__

AFFIDAVIT                                                                   Page One of One

# Exhibit 4

**LICHO ESCAMILLA CASE**

$
$
$
$
$

**DALLAS DISTRICT COURTS**

**CAUSE NO. 3:06-cv-2248**

**STATE OF TEXAS**
**COUNTY OF DALLAS**

<u>**AFFIDAVIT**</u>

BEFORE ME, the undersigned authority, personally appeared, *Brenda Hinojosa*, who, being by me duly sworn, deposed as follows:

My name is **BRENDA HINOJOSA**. I am over the age of 18 years, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated:

I, Brenda Hinojosa, born 11/28/1968, presently reside at 4146 Maybeth Street, Dallas, TX 75212 . The Escamilla household was dysfunctional during my formative years and the years that Licho was raised. When my mom first married Jose, Sr., (called Dad from this point forward), I did not like him. Part of it was jealousy, as I did not want him taking part of my mother. Another was the fact he was old-fashioned. He was very rigid. My Dad was physically and verbally abusive to my mom. I had to watch my mom take physical and verbal abuse from my dad countless times. It was bad to know it was going on with your mom when I was 7, 8 or 9 years old, but he did this abuse in front of me. He would pull her by the hair, drag her, kick her, etc. Even though she was beaten numerous times, she never went to the hospital or called the police. I could never understand why mom took this abuse. Dad was doing this abuse in a sober state of mind because he had made a promise not to drink for a certain period of time. As I got older, Dad began to drink but his behavior did not get worse when he drank. His abuse towards mother was present when he was sober. It seemed like the alcohol to took the edge off. As for violence against me, he only hit me once, a slap in the face when I told him he was not my father. I was probably 14 or 15 years old, he was upset due to coming home drunk. Mom discipline me because she was my mom, since I was not his daughter. Really I felt like dad did not want to use physical discipline on any of the children because his dad had beaten him. Yet he had to use discipline from time to time and he did this with the boys, but not the girls. For a long time he did not hit the kids during discipline; instead he made us kneel in the corner of the house for 15 to 30 minutes, or longer. Sometimes we manipulated the time by falling asleep, going to the restroom and taking extra time coming back. This was not done outside, it was done inside the house. I think this was a family discipline tradition that he used since all his brothers used the same form of discipline with their kids. But when the boys got older and would skip school, he would use the belt or switch on them. He hated to see the brothers fighting one another and this always led to a switching. I recall when the boys knew they were going to be spanked, they would put on two or three pairs of pants to help lesson the pain. [CONT.]

Page One of Three

AFFIDAVIT



I did not see this but I heard that one time Dad hit Jose, Jr. with a stick; now that sounded like abuse but I did not see it occur. Discipline got harder on the boys until they reached their early teens and it seemed like Dad got tired of disciplining and became so frustrated that he just stopped. Dad slowed down on hitting Mom when Licho was about 12 years old. But by then Licho was being influenced by his older brother Jose, Jr. He was being exposed to older kids that his brother Jose would befriend. Alcohol was being used in that same time frame, I know this due to Jose and Licho smelling like alcohol. Licho associated with his older brother, Jose, which led him to hang out with older males. Jose is about 3.5 years older than Licho. I do not believe this was beneficial to Licho in his formative years. I believe this exposed Licho to drugs and alcohol at a young age. When Licho got to his early teens, I was seldom home, because I was working and going to school. I am not aware of any sexual abuse at the house by anyone or on anyone. My sister, Maria Elena Escamilla, grew up in the home with me; we call her "Nena". She wanted to stay out late at night and often times she got in trouble. Nena ran away once. Her running away led Mom to stop taking her medicine and this was not good; Mom would get so worried about Nena. As for Licho's early years, I seem to recall him having trouble concentrating in school; I would guess he is ADD even though he was never diagnosed with it. Licho was placed in Daycare immediately after mother had him, due to her going back to work. I think Licho needed a lot of attention and he loved to be hugged. He required the physical touch more than the others but often times he did not get enough of it. Mom showed more affection towards Juan than she did Licho; Juan was the baby and I guess that is why. As he got older, I recall Licho getting beat up pretty bad in the late summer or fall of 1998. I took Licho to the hospital because of facial and head contusions; and his head was swollen from the beating. I think this may have done some damage to him that was never diagnosed. But from what I saw and know as factual, I would say the following areas made Licho become what he is became, in no definite order:

1) Violence at home; seeing the physical and verbal abuse of his Dad against his Mom, not to mention the criminal cases against his brother, Jose.
2) The discipline tactics used on him by his Dad.
3) Jose's influence on him as an older brother, exposing him to an older group of men. Licho wanted to be accepted by Jose, so this made his influence even greater.
4) The high crime area that we grew up around, infested with drugs and gangs.
5) The lack of nurturing and overall acceptance from his older brother, Mom and Dad.
6) The death of his Mom. Licho felt like he had failed her and felt responsible for putting her through a lot of stress and disappointment. Licho became depressed and angry. This is when his drinking became more obvious to me. This loss impacted my family enormously due to never losing anyone before. Having lost an older brother two weeks prior to my mother, I was in a deep depression and my father devoted himself to work. Nena had problems with her husband and eventually separated. Rachel Hinojosa, my daughter, starting cutting on herself, and had to go to counseling. Juan and Licho, the youngest at the time, were left to survive as teens. My mother had given her full attention to the boys, cooking for them, washing their clothes and talking with them. Now they felt lost without their mother. The adults in our family, including my dad, sister and myself, were attempting to manage our own lives that had been turned upside down. [CONT.]

AFFIDAVIT                                                    Page Two of Three



I gave about a 45 minute interview to Attorney Busbee early in the investigation.
I also translated for Dad during this interview. The main line of questioning was if Jose Jr.
was involved in the shooting, too. Busbee also wanted to know if there was any type of
revenge against the cops, or in particular this cop. Busbee asked about the family tree but
more-or-less wanted to know why Licho had killed the cop and any extenuating
circumstances. I then went many months without ever hearing back from Busbee. Then I
was told to show up at trial with my Dad. They did not want Jose, Jr. to come and testify.
"FURTHER AFFIANT SAYETH NOT."

X _____

Brenda Hinojosa
**Affiant**

SUBSCRIBED AND SWORN TO before me on this the _22nd_ day of _April_ , 2008.



Notary Public in and for the State of Texas

My Commission Expires:                  Notary's Printed Name:

_9-26-2010_                              _Jay O. Matthews_

JAY D. MATTHEWS
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
9-26-2010

**AFFIDAVIT**                                    **Page Three of Three**



# Exhibit 5

STATE OF TEXAS                          §
                                        §                **AFFIDAVIT**
COUNTY OF DALLAS                         §

My name is Bruce Anton. I am a criminal defense attorney and have been practicing
criminal defense for 28 years. I have tried well over 50 cases to jury verdict. In
addition, during the past eight years I have worked on at least eight federal death
penalty habeas cases.

I am familiar with the professional norms and guidelines for mitigation investigation
since the year 2000. It has been well established for many years that mitigation
investigation is necessary to properly prepare for jury selection and the penalty phase
of trial. The minimum acceptable level of a mitigation investigation would include
gathering a social history, educational records, medical records and talking to all
available and willing family members. Meeting regularly with the accused is also
critical to establishing a sufficient level of trust so that he/she will open up to the
attorney.

The standards of practice are quite clear that the mitigation investigation cannot rest
on what the defendant and family tell the lawyer. As an experienced criminal defense
attorney, I am well aware that defendants and family members are not usually
completely candid about the family situation. Experience dictates that speaking with
the family will only reveal part of the story. Most experienced criminal defense
attorneys would agree that sources beyond the family are necessary in conducting a
mitigation investigation.

It is now beyond dispute, particularly in Dallas County, that in conducting a
mitigation investigation, a mitigation expert must be employed to evaluate for
organic impairment or other mitigation leads. In choosing such an expert, I would
want to know that (1) they are familiar with capital cases; (2) they fully understand
and appreciate the legal concept of mitigation; (3) they are instructed as to what items
possibly qualify as legal mitigation (such as physical abuse, substance abuse, etc.);
(4) they have either testified in capital cases or are willing to testify; and most
importantly, (5) they are able to have their evaluation completed prior to jury
selection so that I will know, in advance of jury selection, what the mitigation options
are.

I cannot imagine waiting until jury selection or later in the trial to conduct mitigation
interviews with family members that were readily available before trial. I cannot
imagine waiting until jury selection or later in the trial to have my mitigation expert
evaluate my capital client. This delay would completely undermine any opportunity
to inform and educate the jury panel about my mitigation strategy. This delay would
also prevent me from knowing throughout the trial what strategy I would be using if
my client were convicted.

The 1989 ABA Guidelines regarding the performance of capital counsel do not appear to sanction a delayed mitigation investigation. Based on my understanding of the facts regarding Licho Escamilla's case, I believe that neither Mr. Wayne Huff nor Ms. Brook Busbee performed an adequate mitigation investigation. I base this opinion on my understanding of professional norms in Dallas County at the time Escamilla was prosecuted; the governing ABA Guidelines that require immediate investigation; my understanding that the mitigation strategy should be formed, after evaluating the relevant mitigation evidence, prior to jury selection so that I can pick a jury panel based on the strategy I plan to use.

In addition, as stated above, I have worked on at least eight federal death penalty cases. Mr. Wayne Huff has been one of the attorneys on three of these cases. In the cases I have had with Mr. Huff, as well as cases I've spoken about with other practitioners, it is my experience that Mr. Huff routinely claims not to have a file that the post-conviction litigant can review. The lack of a file convinces me that no file was created.

_____

BRUCE ANTON

SUBSCRIBED AND SWORN TO before me on this 2nd day of May 2008, by the person known to me to be Bruce Anton.

Notary Public in and for The State of Texas

Janine E. Hargraves
Printed Name of Notary

My commission expires: 9-25-2008

# Exhibit 6

# PRIMETIME INVESTIGATIONS

*"Your Prime Investigation Source"*

P.O. BOX 2530, WYLIE, TX 75098

PHONE   214- 415- 0181

FAX      972-429-8216

January 7, 2008

University of Oklahoma / College of Law
300 Timberdell Rd
Norman, OK 73019
Attention: Meg Penrose

> RE:   Case: Licho Escamilla
>       Documents: Criminal Cases Involving Licho's Relatives

Dear Meg:

You will find enclosed CERTIFIED copies of criminal cases involving family members of Licho Escamilla. All the cases enclosed are from Dallas County, except the DWI case from Cameron County on Alfredo Hinojosa.   A few cases remain pending, as they are in storage and could not be found in December in Dallas; they have been re-ordered and we hope to have them in the days ahead.  Two cases had been destroyed on Jose Escamilla but a few other cases on Alfredo Hinojosa are still being researched in Hidalgo County.  These are marked as "Pending / Storage" and "Pending / Hidalgo County".  Below is a summary of all the cases, including the ones pending or destroyed; the  "F" cases are felony and "M" cases are misdemeanor:

| **Alfredo Hinojosa** | **DOB  09/21/1961** | |
|---|---|---|
| 86-CCR-2387-A | 1986 DWI | (Cameron County) |
| CR-113938-A | Possession of Marijuana | (Pending / Hidalgo Co.) |
| CR-543-83-C | Aggravated Assault Deadly Weapon | (Pending / Hidalgo Co.) |
| CR-105-87-C | Murder | (Pending / Hidalgo Co.) |

| **Juan Escamilla** | **DOB 08/20/1948** | |
|---|---|---|
| MA-9153353 | Unlawful Carrying of Weapon | (Destroyed) |
| F-7804467 | Prohibited Weapon | (Pending / Storage) |

| **Eliezar Escamilla** | **DOB 10/05/1957** | |
|---|---|---|
| F-9775621 | Burglary of Habitat | (Pending / Storage) |

| **Jose Alfonso Escamilla** | **DOB 08/16/1942** | |
|---|---|---|
| MA-8923384 | Unlawful Carrying of Weapon | (Destroyed) |
| MA-9140928 | Unlawful Carrying of Weapon - Handgun | (Destroyed) |

1

**Eliezar Escamilla**          **DOB 05/06/1973**

| | | |
|---|---|---|
| F-0454866 | Assault | |
| F-0454867 | Assault | |
| F-9746530 | Murder | (Pending / Storage) |
| F-9746550 | Aggravated Assault / Deadly Weapon | |
| M-0405601 | Assault | |
| M-0405559 | Assault | |
| M-0458028 | Assault DV | |
| M-0458029 | Assault DV | |
| M-0458032 | Assault DV | |
| M-0458033 | Assault DV | |

**Juan Escamilla**          **DOB 09/30/1983**

| | |
|---|---|
| F-0773346 | Aggravated Assault / Deadly Weapon |
| F-0773174 | Aggravated Assault / Deadly Weapon |
| F-0757125 | Aggravated Robbery / Deadly Weapon |
| F-0334671 | UPF - Felon |
| F-0334670 | Possession of Controlled Substance |
| F-0157490 | Evading Arrest / Det MV |
| F-0157491 | Unauthorized Use of a Motor Vehicle |
| M-0688446 | Driving While License Suspended |
| M-0235458 | Unlawful Carrying of Weapon - Handgun |

**Jose A. Escamilla, Jr.**          **DOB 09/03/1978**

| | | |
|---|---|---|
| F-0020647 | Possession of Controlled Substance | |
| F-9755456 | Possession of Prohibited Weapon | |
| F-9652623 | Theft - $1500 | (Pending / Storage) |
| MB0321102 | DWI | |
| MB0321103 | Driving While License Suspended | |
| MA0321107 | Unlawful Carrying of Weapon - Handgun | |
| MA0372081 | Assault | |
| MB0136632 | Theft - $1500 | |

Additional investigation continues involving Brenda Hinojosa and Toni Knox.
I will call you in the days ahead to discuss my interviews with these subjects.

Sincerely,

*Jay Matthews*

Jay Matthews
Owner & PI in The State of Texas

Established in 1997 by the Texas Commission on Private Security / Lic. No. A08814
Established in 1988 by the Texas Department of Insurance / Lic. No. 293490

2