# DISPOSITION CODES

| | |
|---|---|
| JCJP | plea of not guilty, found guilty by the jury and sentenced by the jury |
| JCJG | plea of not guilty, found guilty by the jury and sentenced by the Judge |
| TBCT | plea of not guilty, found guilty by the Judge and sentenced by the Judge |
| TBCI | plea of not guilty, found innocent by the Judge |
| INST | instructed verdict, found innocent of charge |
| INN | plea of not guilty, found innocent by the jury |
| MISD | conviction on misdemeanor charge (non-reduction) |
| PGFR | agreed plea of guilty before the court, felony reduced to misdemeanor |
| PGBC | agreed plea of guilty before the court |
| PGBJ | open plea of guilty before the jury |
| PGJG | open plea of guilty before the court |
| NAOG | agreed plea non-adjudication of guilt |
| NAJG | open plea non-adjudication of guilt |
| DISM | charge dismissed |
| QUAS | quashed |
| HUNG | jury hung on verdict |
| MIST | mistrial |
| TRAN | transferred to another county/district court |
| CHOV | change of venue |
| MISC | felony case transferred to a county criminal court |
| JVTR | defendant found to be juvenile by the Judge, transferred to juvenile court |
| JVGR | defendant found to stand trial as an adult |
| JVJV | juvenile case returned to juvenile court |

| | |
|---|---|
| JGSA | judgement set aside |
| PRCS | probation reduced and case set aside |
| REVK | probation revoked |
| RVRD | probation revoked and sentence reduced |
| RVSP | non-adjudicated probation revoked and sentenced to straight probation |
| BTCP | probation following boot camp incarceration |
| SHPB | shock probation |
| WRTD | writ denied |
| WRTG | writ granted |
| BORD | bill of review denied |
| BORG | bill of review granted |
| ODLA | drivers license amended |
| ODLD | drivers license dismissed |
| ODLG | drivers license granted |

## DISMISSAL CODES

| | |
|---|---|
| NFOG | NO FINDINGS OF GUILT |
| MISC | FELONY CASE TRANSFERRED TO A COUNTY CRIMINAL COURT |
| BTCP | BOOT CAMP |
| STAL | SPEEDY TRIAL ACT LIMITATIONS |
| ROCW | REQUEST OF COMPLAINING WITNESS |
| NACT | NO ACTION TAKEN BY GRAND JURY |
| PLPR | PLACE ON PROBATION |
| REDI | REDUCED AND DISMISSED |
| REFL | REFILED |

**NBIL     NO BILL**
**THIS PHRASE, ENDORSED BY A GRAND JURY ON THE INDICTMENT, IS EQUIVALENT TO "NOT FOUND" OR "NOT A TRUE BILL", IT MEANS THAT IN THE OPINION OF THE GRAND JURY, EVIDENCE WAS INSUFFICIENT TO WARRANT THE RETURN OF A FORMAL CHARGE**

***DISPOSITION CODES***

***JCJP*** ***plea of not guilty, found guilty by the jury and sentenced by the jury***

***JCJG*** ***plea of not guilty, found guilty by the jury and sentenced by the judge***

***TBCT*** ***plea of not guilty, found guilty by the judge and sentenced by the judge***

***TBCI*** ***plea of not guilty, found innocent by the judge***

***INST*** ***instructed verdict, found innocent of charge***

***INN*** ***plea of not guilty, found innocent by the jury***

***MISD*** ***conviction on misdemeanor charge (non-reduction)***

***PGFR*** ***agreed plea of guilty before the court, felony reduced to misdemeanor***

***PGBC*** ***agreed plea of guilty before the court***

***PGBJ*** ***open plea of guilty before the jury***

***PGJG*** ***open plea of guilty before the court***

***NAOG*** ***agreed plea non-adjudication of guilt***

***NFOG*** ***no finding of guilt***

***DSCH*** ***discharged off probation***

***NAJG*** ***open plea non-adjudication of guilt***

***DISM*** ***charge dismissed***

***QUAS*** ***quashed***

***HUNG*** ***jury hung on verdict***

***MIST*** ***mistrial***

***TRAN*** ***transferred to another county district court***

***CHOV*** ***change of venue***

***MISC*** ***felony case transferred to a county criminal court***

***JVTR*** ***defendant found to be juvenile by the judge, transferred to juvenile court***

***JVGR*** ***defendant found to stand trail as an adult***

***JVJV*** ***juvenile case returned to juvenile court***

***JGSA*** ***judgement set aside***

***PRSA*** ***probation reduced and case set aside***

# Exhibit 7





So Long as They Die: Lethal Injections in the United States: I. Development of Lethal Injection Protocols 05/01/2008 01:11 PM

HUMAN
RIGHTS
WATCH

hrw.org | DEFENDING HUMAN RIGHTS WORLDWIDE

FRANÇAIS ESPAÑOL РУССКИЙ 한글 العربية עברית
RSS PORTUGUÊS DEUTSCH 中文 فارسی OTHER

Home
News Releases
About HRW
Contribute
Publications
Info by Country
Africa
Americas
Asia
Europe/Central Asia
Middle East/N. Africa
United States

Global Issues
Arms
Business
Children's Rights
Counterterrorism
Economic, Social & Cultural Rights
Health & Human Rights
HIV/AIDS
International Justice
LGBT Rights
Migrants
Prisons
Refugees
United Nations
Women's Rights
More...

Campaigns
Commentary
Film Festival
Photo Galleries
Audio / Video
Site Map
Contact Us
Corrections
Permissions
RSS

Search

<<previous | index | next>>

# I. Development of Lethal Injection Protocols

*It wasn't a medical decision. It was based on the other states that had all used a similar dose.*
—Donald Courts, pharmacy director at Louisiana State Penitentiary, explaining how Louisiana chose the specific chemicals and dosage amounts for its lethal injection protocol[2]

*The only thing that mattered was that the guy ended up dead. . . . [The warden] wasn't worried too much about the amount of medicine. He had certainly used the same types of medicine, but . . . he wasn't totally concerned about the amounts of what it may or may not do. They ended up dead, and that's all he was worried about.*
—Annette Viator, former chief legal counsel for Louisiana State Penitentiary, explaining her discussion with a Texas warden regarding the drugs used during Texas's lethal injection executions[3]

Different methods of execution have succeeded one another throughout the twentieth century in the United States, as changing public opinion and sensitivities has led public officials to reject older methods in favor of newer ones. At the time of their introduction, the electric chair and lethal gas were both touted as more humane forms of execution compared to earlier methods.[4] Each, however, proved cruel. Electrocution, in particular, shocked witnesses when, for example, prisoners erupted in flames.[5]

In the late 1970s, states turned to lethal injection, believing this was both a less expensive as well as a more humane way to kill condemned inmates.[6] In 1977, Oklahoma legislators passed the first lethal injection statute.[7] Texas passed a lethal injection statue the next day.[8] By 1981, five states had adopted lethal injection statutes.[9] Today, thirty-seven of the thirty-eight death penalty states have lethal injection statutes.[10] In nineteen states, lethal injection is the only method of execution allowed.[11]

States in the United States rely almost solely on lethal injections to execute condemned inmates. All twelve executions to date (as of April 1, 2006) have been by lethal injection, as were all sixty in 2005.[12] Of the 1,016 executions in the United States since the death penalty was reinstated in 1976, 848 were by lethal injection—three by the federal government and the rest by states.[13] At the start of 2006, there were 3,373 prisoners on death row—3,363 of whom face the possibility of a lethal injection execution.[14]

The statutes of fifteen states use language similar to Oklahoma's, requiring the use of a "lethal quantity of an ultra-short acting barbiturate or other similar drug in combination with a chemical paralytic to cause death."[15] It is not clear if the legislators intended the prisoner to die from the anesthetic or from the asphyxiation caused by the paralytic agent, or both. According to Dr. Jay Chapman, the architect of Oklahoma's two-drug statute, he "didn't

http://www.hrw.org/reports/2006/us0406/3.htm Page 1 of 11

care which drug killed the prisoner, as long as one of them did."[16] Thirteen states refer to an injection of a "substance or substances in a quantity to cause death" or language very close to that wording.[17] Seven states provide simply for the use of "lethal injection" executions.[18] Two state statutes use slightly different language from all the rest.[19] Only one state statute mandates corrections officials to choose among lethal injection options to find the most humane procedure possible.[20] Despite the variations in state statutory language authorizing lethal injections, thirty-six state corrections agencies today use the same three-drug sequence of sodium thiopental, pancuronium bromide and potassium chloride in their lethal injection drug protocols.[21]

No state statute prescribes drug dosages and the specific methods of administration; legislators have left these decisions to corrections officials. Nor does any state statute prescribe the manner of intravenous line access, the certification or training required for those who participate in executions, or other details concerning the administration of the drugs or monitoring of the procedures.[22] Legislators have given correctional agencies the authority "to promulgate necessary rules and regulations to facilitate the implementation of execution by lethal injection."[23] For example, in Florida the legislature did not specify how death by lethal injection would be accomplished, but left this decision up to the Department of Corrections, "because it has personnel better qualified to make such determinations."[24]

The public record offers scant insight into the basis on which state legislatures that chose specific lethal injection drugs did so. An analysis of state statutes and legislative histories provides no evidence that legislatures—other than possibly Oklahoma—relied on, or even sought input from, medical and scientific experts.[25] Rather, they simply copied the protocols developed by their colleagues from other states. For example:

A Circuit Court Judge in Kentucky noted:

> In developing a lethal injection protocol, the Commonwealth of Kentucky, Department of Corrections, did not conduct any independent scientific or medical studies or consult any medical professionals concerning the drugs and dosage amounts to be injected into the condemned. Kentucky appears to be no different from any other state or the Government of the United States.[26]

- When asked how the lethal injection protocol committee put together Tennessee's procedures, a committee member responded: "There wasn't a lot of discussion on it once the team had access to the information that was provided from other states. Indianapolis, Indiana, Florida, Texas, they all used the same chemicals."[27] The Tennessee Supreme Court found that Tennessee's protocol "was developed simply by copying the state method currently in use by some thirty other states."[28]

- According to a memorandum from the Washington State Department of Corrections: "All of our policies and procedures have been designed utilizing the State of Texas as a model ... [T]he states of Texas and Missouri have conducted numerous executions and remain the best and tested source of information."[29]

- A Wyoming warden noted "that Wyoming's injection procedure is cloned from the Texas injection procedure. Visited Warden Jack Pursley at Huntsville, Texas and participated in an execution seminar [*sic*]. So I am confident that Wyoming's policy based upon proven Texas procedures will be reliable."[30]

- According to a former warden of the Colorado State Penitentiary, Colorado

corrections officials went to Texas and Oklahoma to examine how they conducted lethal injection executions and then copied them, because their lethal injection protocols "seemed time-honored, tested, well-designed, and effective."[31]

- The Secretary of Pennsylvania's Department of Corrections noted that they "adopted almost to a T" the Texas lethal injection protocol.[32]

## Oklahoma

In 1977, Oklahoma enacted the first lethal injection statute. Its history illustrates the minimal inquiry legislators conducted before selecting a specific method of lethal injection. Facing the expensive prospect of fixing the state's broken electric chair, the Oklahoma legislature was looking for a cheaper and more humane way to execute its condemned inmates.[33] State Assembly member Bill Wiseman wanted to introduce a bill in the Oklahoma House of Representatives allowing for lethal injection executions in Oklahoma.[34] In 1976, he approached the Oklahoma Medical Association for help developing a drug protocol, but it refused to get involved based on ethical concerns about the cooperation of medical professionals in the development of execution methods.[35] Wiseman approached Dr. Jay Chapman, the state's medical examiner, and asked for his help in drafting a lethal injection statute.[36] Despite having "no experience with this sort of thing," Chapman agreed to help Wiseman.[37] Sitting in Wiseman's office in the Capitol, Chapman dictated the following lines, which Wiseman jotted down on a yellow legal pad: "An intravenous saline drip shall be started in the prisoner's arm, into which shall be introduced a lethal injection consisting of an ultra-short-acting barbiturate in combination with a chemical paralytic."[38] Meanwhile, State Senator Bill Dawson, concerned about the cost of replacing Oklahoma's broken electric chair, was also interested in introducing a lethal injection bill in the Oklahoma Senate. Senator Dawson consulted with his friend, Dr. Stanley Deutsch, then head of the Oklahoma Medical School's Anesthesiology Department.[39] After reviewing the language Chapman had composed for Assembly member Wiseman, Deutsch noted, in a letter to Senator Dawson, that anesthetizing condemned inmates would be a "rapidly pleasant way of producing unconsciousness" leading to death.[40]

Oklahoma's state statute copies nearly word-for-word the methods proposed by Chapman and approved in Deutsch's brief letter, stating that "the punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultra-short-acting barbiturate" in "combination with a chemical paralytic agent until death is pronounced by a licensed physician according to accepted standards of medical practice."[41] There is no evidence that Oklahoma state legislators consulted any other medical experts before adopting their lethal injection statute.[42] Human Rights Watch asked Chapman why he chose the two drugs (an ultra-short-acting barbiturate and a paralytic agent) for lethal injection executions. He stated: "I didn't do any research. I just knew from having been placed under anesthesia myself, what we needed. I wanted to have at least two drugs in doses that would each kill the prisoner, to make sure if one didn't kill him, the other would."[43] The Oklahoma state legislature has not significantly amended the statute regarding the drugs to be used during lethal injections since its original enactment.[44]

In addition to his work on the statute, Chapman developed the original three-drug protocol used by the Oklahoma Department of Corrections.[45] Although Oklahoma's statute specifies two drugs, Chapman included a third drug, potassium chloride.[46] When Human Rights Watch asked Chapman why he added a third drug to the two drugs specified in the statute, he

replied, "Why not?" He went on to explain that, even though the other chemicals, in the dosages called for, would kill the prisoner, "You just wanted to make sure the prisoner was dead at the end, so why not just add a third lethal drug?" He is not sure why he picked potassium chloride. "I didn't do any research ... it's just common knowledge. Doctors know potassium chloride is lethal. Why does it matter why I chose it?"[47]

## Texas

Almost immediately after Oklahoma passed its lethal injection statute, the Texas legislature passed a law authorizing executions by lethal injection.[48] Within ten years of the law's enactment, Texas had executed fifty-three prisoners by lethal injection.[49] The law delegates responsibility for developing protocols regarding the lethal substances to be used to the state corrections agency.[50] Because Texas was the first state to actually execute anyone by lethal injection, and immediately established itself as the state with the most lethal injection executions,[51] its protocols have had enormous influence on other states. Many state corrections officials consulted with Texas officials when developing their own protocols.[52]

Like its Oklahoma predecessor, the Texas protocol involves the use of three drugs.[53] But the state has refused to provide additional information on its procedures for lethal injections, citing security concerns.[54] The observations of Louisiana corrections officials who visited Texas shed light on the ad hoc and unscientific manner in which Texas has conducted its lethal injection executions.

In 1990, the Louisiana Department of Corrections formed a committee to create a lethal injection protocol. As a member of the committee, the Department's chief legal counsel consulted with the warden responsible for executions in the Texas Department of Corrections. She found the experience "surprising."[55] The warden refused to speak with the attorney over the phone about his protocols, explaining "he didn't say these things on the phone that he would rather say in person."[56]

When the attorney arrived in Texas with other members of the committee, the warden "asked us if any of us had tape recorders, if any of us were wired."[57] The warden then proceeded to speak about Texas's lethal injection protocols. According to the attorney, "He didn't really have so much of a policy about it, as he did just sort of—they did whatever worked at the time. He pretty much told us he didn't have a strict policy."[58] When the attorney inquired about the "medical portion" of Texas's lethal injection protocol, the warden told her:

[T]hat the only thing that mattered was that the guy ended up dead and that he wasn't worried too much about the amount of medicine. He had certainly used the same types of medicine, but that he wasn't totally concerned about the amounts or what it may or may not do. They ended up dead, and that's all he was worried about. The rest of our conversation with him tracked that same thing. He was not terribly concerned about policy, procedure, or who did what, when, where. Just so the right result happened.[59]

The Louisiana State Penitentiary pharmacy director has recounted a conversation he had in 1990 with the Texas Department of Corrections pharmacy director about the drugs Texas used in its lethal injections:

We were getting ready to hang up the phone, and I said, 'I have but just one question I need to ask you. Every other state I have spoken to is using 2 grams of sodium pentothal. Why

are y'all using five?' And he started laughing and said, 'Well, you see, when we did our very first execution, the only thing I had on hand was a 5-gram vial. And rather than do the paperwork on wasting 3 grams, we just gave all five.'[60]

Another member of the Louisiana committee observed a Texas lethal injection and noted that the administration of the drugs was on a "time frame that was fairly tight."[61] It seemed to him the execution team simply administered the drugs one after the other, without pausing to ascertain whether the drugs were having their intended effect.[62]

## Tennessee

In 1998, in response to the passage of a lethal injection statute, the Commissioner of Tennessee's Department of Corrections set up an "ad hoc" committee to develop an execution protocol. The committee was composed solely of department personnel, none of whom had any medical or scientific background.[63] The group met four times over five months; none of the meetings were public nor did the group seek public input.[64] The committee did not consult with physicians or pharmacologists, or with any other person who had medical or scientific training.[65] The committee gave Warden Ricky Bell, who had no college degree, the task of putting together the execution protocol.[66] An internal memorandum, written by a committee member, warned the committee about other states' problems with executions by lethal injection.[67] Nonetheless, Bell modeled Tennessee's present lethal injection execution protocols entirely on information he received from two other states' corrections departments—Indiana and Texas.[68]

## Lethal Injection Machines

The lack of care with which states developed their lethal injection protocols is well exemplified by their willingness to buy lethal injection machines from Fred Leuchter. From 1979 to 1990, Leuchter, a layperson with no engineering, medical or pharmacological training, was the only supplier of execution equipment in the United States. He built, installed, and repaired many different types of machinery for executions, including gas chambers, electrocution chairs, and the now-defunct lethal injection machine.[69] He tested his theories about what types and dosages of chemicals to use in the lethal injection machine by experimenting on pigs.[70]In his promotional material, Leuchter promised that his lethal injection machine would "insure a problem-free execution."[71] Seventeen states purchased the machine.[72] When he had an order to fill, Leuchter manufactured the machine in the basement of his house.[73]

The lethal injection machine had two parts—a "control module" and a "delivery module"—which allowed the executioners to start the lethal injection from a room separate from the inmate. The control module essentially consisted of two on/off switches, only one of which actually triggered the chemicals to flow from the delivery module. In this way, the two people assigned to push the two buttons would not know which one of them actually started the administration of the lethal injection drugs. The delivery module contained two syringes filled with saline, two syringes filled with sodium thiopental, two syringes filled with pancuronium bromide, and two syringes filled with potassium chloride. Once the machine was activated, it delivered the drugs, with saline flushes in between, for ten seconds each, one minute apart from one another, to an intravenous line running from the delivery module to the prisoner's vein. With the use of this machine, an execution should take "four minutes."[74]

Leuchter's execution equipment business stopped abruptly in 1990. It did not stop because correction agencies realized that Leuchter was totally unqualified to construct such equipment, but because he testified as an expert witness on behalf of a Holocaust denier.[75] In the course of discrediting Leuchter as an expert witness, the prosecutor established that Leuchter in fact had no engineering credentials, and held only a Bachelor of Arts degree in history.[76]

It is not clear how many states actually used Leuchter's lethal injection machine or how many prisoners were unwitting guinea pigs for his deadly invention. What is remarkable, however, is that states ever bought Leuchter's lethal injection machines in the first place. One can only speculate as to how much—if any—research the states did into Leuchter and his lethal injection machine before they signed purchase agreements.

## Public Access to Lethal Injection Protocols

Human Rights Watch is aware of only one state, New Jersey, which has ever opened its lethal injection protocol to public input and comment.[77] While thirty-six lethal injection states make public the names of the drugs used during their lethal injection executions and the basic method of administration, corrections officials claim that reasons of security prevent them from making the entire protocol available to the public. Human Rights Watch does not know if the parts of the protocols that remain secret provide fuller details of what the execution team is supposed to do before, during, and after the execution.

Some states do not even have written protocols. Louisiana did not have a written protocol until 2002, nine years after the legislature authorized lethal injection executions. During that period, seven prisoners were executed by lethal injection, with the protocol passed down by "word of mouth" between members of various execution teams.[78] The Florida Department of Corrections has not promulgated an administrative regulation nor published any guidance prescribing the lethal injection procedures it uses to execute condemned prisoners. The Florida Supreme Court agreed with the corrections department that a published protocol is not needed because the department has the authority to change its rules any time for any reason.[79]

---

[2] Special Hearing, *Code v. Cain*, Case No. 138,860-A, February 11, 2003, Vol. II, p. 33.

[3] Special Hearing, *Louisiana v. Code*, Case No. 138,860, March 18, 2003, Vol. II, p. 58-59.

[4] Concerns over the barbarity of hanging led states to change their method of execution from hanging to electrocution. Even though the first electrocution executions were terribly botched, by 1913, thirteen states had changed to electrocution because of "a well-grounded belief that electrocution is less painful and more humane than hanging." *Malloy v. South Carolina*, 237 U.S. 180, 185 (1915) (noting the adoption of electrocution by eleven states following the decision by a New York commission that it was more humane). See generally Craig Brandon, *The Electric Chair: An Unnatural American History* (New York: McFarland & Company, 1999), p. 67-88. By 1949, twenty-six states had changed to electrocution. After numerous electrocution botches, states began rejecting electrocution execution methods in favor of lethal gas. Nevada was the first state to adopt lethal gas executions, in 1921. In an attempt to make lethal gas executions more humane, the Nevada legislature passed a law providing that lethal gas would be administered "without warning and while [the inmate was] asleep in his cell." See William J. Bowers, Glenn L. Pierce, and John F. McDevitt, *Legal Homicide: Death as Punishment in America, 1864-1982* (Boston: Northeastern University Press, 1984), p. 12. In *State v. Gee Jon*, the Nevada Supreme Court emphasized that the legislature "sought to provide a method of inflicting the death penalty in the most humane manner known to modern science." 211 P. 676, 682 (Nevada 1923).

[5] On August 10, 1982, Virginia executed Frank J. Coppola by electrocution. An attorney who was present stated that it took two fifty-five-second jolts to kill Coppola. During the second jolt, Coppola's head and leg caught on fire, and the room smelled like smoke and burning flesh. Deborah W. Denno, "Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death over the Century," *William and Mary Law Review*, 1994, p. 551, 664-665. On July 8, 1999, Florida executed Allen Lee Davis by electrocution. Davis's body was lit on fire during the electrocution. His face, body, and head were deeply burned. During the execution, Davis's face became red, and he tried to get the guard's attention by making noises that witnesses described as "screams," "yells," "moans," "high-pitched murmurs," "squeals," or "groans." Brief for Petitioner, *Bryan v. Moore*, 528 U.S. 960 (1999), p. 3 (citations omitted). "Before he was pronounced dead ... the blood from his mouth had poured onto the collar of his white shirt, and the blood on his chest had spread to about the size of a dinner plate, even oozing through the buckle holes on the leather chest strap holding him to the chair." "Davis Execution Gruesome," *Gainesville Sun*, July 8, 1999, p. A1. Davis's execution was the first in Florida's new execution chair, built especially to accommodate his 350-pound frame. Later, Florida Supreme Court Justice Leander Shaw said, "The color photos of Davis depict a man who—for all appearances—was brutally tortured to death by the citizens of Florida." *Provenzo v. State*, 744 So.2d 413, 440 (Florida 1999).

[6] Deborah Denno, "Lethally Humane?" *America's Experiment with Capital Punishment: Reflections on the Past, Present, and Future of the Ultimate Penal Sanction*, James R. Acker, Robert M. Bohm, and Charles S. Lanier, eds. (Durham: Carolina Academic Press, 2003), p. 711. E.g., in 1981, several years after Oklahoma became the first state to adopt lethal injection, a spokesperson for the Oklahoma Corrections Department confirmed that the state changed from the electric chair to lethal injection for "humane" reasons: "People don't realize it, but the electric chair can take 11 minutes to kill people. The first shock knocks you unconscious, but then it would just cook you. You would literally fry." Mary Thornton, "Death By Injection," *Washington Post*, October 6, 1981, p. A1. "Being a former farmer and horse trainer, I know what its like to try to eliminate an injured horse by shooting him . . . Now you call the veterinarian and the vet gives it a shot and the horse goes to sleep—that's it. I myself have wondered if maybe this isn't part of our problem [with capital punishment], if maybe we should review and see if there aren't even more humane methods now—the simple shot or tranquilizer." Henry Scharzschild, "Homicide by Injection," *New York Times*, December 23, 1982, p. A15 (quoting Ronald Reagan). On National Public Radio's *Talk of the Nation*, aired February 23, 2006, State Senator David Ralston, a Republican from Georgia, stated: "I know other states debated the propriety of using electrocution and our Supreme Court here in 2001 decided that that was a cruel and inhumane form of punishment. The legislature in response to that adopted what was becoming more accepted, and that was the lethal injection." See *Talk of the Nation* Transcript, http://www.npr.org/templates/story/story.php?storyId=5230227 (retrieved April 13, 2006) (copy on file at Human Rights Watch).

[7] Human Rights Watch telephone interview with Dr. Jay Chapman, former Oklahoma chief medical examiner, Santa Rosa, California, March 23, 2006.

[8] See Vince Beiser, "A Guilty Man," *Mother Jones*, September/October 2005, http://www.motherjones.com/news/feature/2005/09/guiltyman.html (retrieved March 30, 2006). See also Death Penalty Information Center (DPIC), "Execution Database," http://www.deathpenaltyinfo.org/getexecdata.php (retrieved March 31, 2006).

[9] DPIC, "Execution Database."

[10] Nebraska is the only state that requires execution by electrocution. DPIC, "Methods of Execution," http://www.deathpenaltyinfo.org/article.php?scid=8&did=245 (retrieved March 31, 2006).

[11]See Appendix A for a list of states, which allow the death penalty, and the methods of execution allowed.

[12] DPIC, "Methods of Execution."

[13] Ibid.

[14] Criminal Justice Project, NAACP Legal Defense Fund, *Death Row USA*, January 1, 2006, http://www.naacpldf.org/content/pdf/pubs/drusa/DRUSA_Winter_2006.pdf (retrieved April 13, 2006).

[15] These fifteen states with two-drug statutes are: Arkansas, Idaho, Illinois, Maryland, Mississippi, Montana, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Dakota, Wyoming.

[16] Interview with Chapman.

[17] These thirteen states with statutes that refer generally to "substances" or "drugs" sufficient to cause death are: Arizona, California, Connecticut, Delaware, Georgia, Indiana, Kansas, Kentucky, Louisiana, New York, Ohio, Texas, and Washington.

[18] These seven states with simple "lethal injection" statutes are: Alabama, Florida, Missouri, South Carolina,

Tennessee, Utah, Virginia.

[19] These two states are Colorado and Nevada. See Colorado Review Statute Section 16-11-401 ("sodium thiopental or other equally or more effective substance sufficient to cause death"); Nevada Review Statute Annotated Section 176.355(1) ("a lethal drug").

[20] In Kansas, the statute reads: "The mode of carrying out a sentence of death in this state shall be by *intravenous injection of a substance or substances in a quantity sufficient to cause death in a swift and humane manner.*" Kansas Criminal Procedure Code Section 22-4001.

[21] The "two drug" statutes do not expressly prohibit the use of additional drugs, so the correction agencies were able to adopt three-drug protocols.

[22] Deborah Denno, "When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What it Says About Us," *Ohio State Law Journal*, Vol. 63, 2002, p. 207-260 (includes redacted versions of state lethal injection protocols).

[23] Tennessee Code Annotated 40-23-114(c).

[24] *Sims v. State*, 754 So. 2d 657, 670 (Florida 2000).

[25] Human Rights Watch telephone interview with Deborah Denno, professor of law at Fordham University Law School, New York, New York, March 16, 2006. Denno has conducted the only existing comprehensive study of lethal injection state protocols. In addition to her academic work, she serves as an expert witness on behalf of prisoners challenging state lethal injection procedures.

[26] *Baze, et al. v. Rees, et al.*, Case No. 04-CI-1094, July 8, 2005, p. 6.

[27] Testimony of Warden Richard Peabody, Special Hearing, *Abdr'Rahman v Sundquist* et al., Case No. 02-2236-III,Vol. II, September 16, 2003, p. 63.

[28] *Abdur'Rahman v. Bredesen, et al.*, Tennessee Supreme Court, October 17, 2005, No. M2003-01767-COA-R3-CV, p. 77a.

[29] Unsigned memorandum from the State of Washington, Department of Corrections, to Louisiana State Penitentiary Warden Richard L. Peabody, dated October 10, 1990, read into evidence by Warden Peabody, *Louisiana v. Code*, p. 108.

[30] Letter from Wyoming Warden Duane Shillinger to Louisiana Warden Richard Peabody, dated October 2, 1990, read into evidence by Warden Peabody, *Louisiana v. Code*, p. 108-109.

[31] Human Rights Watch telephone interview with Gene Atherton, former warden of the Colorado State Penitentiary (where death row is located in Colorado), March 30, 2006.

[32] Human Rights Watch telephone interview with Jeffrey A. Beard, secretary, Pennsylvania Department of Corrections, March 28, 2006.

[33] Denno, "When Legislatures Delegate Death," p. 96.

[34] Beiser, "A Guilty Man."

[35] Ibid.

[36] Interview with Chapman.

[37] Ibid.

[38] Ibid.

[39] Denno, "When Legislatures Delegate Death," p. 95.

[40] Letter from Stanley Deutsch, Ph.D., M.D., professor of anesthesiology, University of Oklahoma Health Sciences Center, to the Honorable Bill Dawson, Oklahoma state senator, February 28, 1977 (copy on file with Human Rights Watch) (Deutsch Letter).

[41] Oklahoma Statue Annotated Title 22, Section 1014(A). Also, see Deutsch Letter (Deutsch writes that unconsciousness and then death would be produced by "the administration ... intravenously ... in [specified] quantities

of ...an ultra short acting barbiturate" in "combination" with a "nueormuscular [*sic*] blocking agent" to create a "long duration of paralysis"). See also Oklahoma Engrossed Senate Bill No. 10, March 2, 1977 (copy on file with Human Rights Watch). Some senators disagreed with the state's adoption of lethal injection executions. One senator's proposed amendment, which failed, called for "inserting the following after the word 'by' on line four, adopting the Biblical procedure of 'Eye for Eye', i.e., each person convicted shall be executed in the same manner as the death of the victim for which the conviction occurred, and striking all remaining language through line eight on p. 2." Amendment Motion, April 20, 1977 (copy on file with Human Rights Watch).

[42] Denno, "When Legislatures Delegate Death," p. 96.

[43] Interview with Chapman.

[44] Oklahoma Statue Annotated, Title 22, Section 1014(A).

[45] Interview with Chapman.

[46] Ibid.

[47] Ibid.

[48] Denno, "When Legislatures Delegate Death," p. 96.

[49] DPIC, "Execution Database."

[50] Texas Criminal Procedure Code Annotated Article 43.14.

[51] Texas has executed 362 condemned inmates by lethal injection. DPIC, "Execution Database."

[52] E.g., Colorado, Florida, Indiana, Kentucky, Missouri, Tennessee, Washington, and Wyoming (as described at the beginning of the section of this report on "Development of Lethal Injection Protocols").

[53] Texas Department of Criminal Justice, "Death Row Facts," http://www.tdcj.state.tx.us/stat/drowfacts.htm (retrieved March 21, 2006).

[54] Letter to Alberta Phillips, Editorial Department of the *Austin-American Statesman*, from James L. Hall, assistant general counsel, Office of the General Counsel, Texas Department of Criminal Justice, dated January 2, 2004. Hall explains:

> Information about execution procedures is held in the strictest of confidence, is generally not reduced to writing, and is known only to a few people within the Department. That confidentiality is maintained to ensure that security procedures established for executions are not compromised. Thus, to the extent we have written policies and procedures responsive to your request, that information has been found to be confidential and not available to the public.

(copy of letter on file with Human Rights Watch).

[55] See Testimony of Annette Viator, Special Hearing, *Cain v. Code*, Case No. 138,860-A, March 18, 2003, Vol. II, p. 32.

[56] Ibid.

[57] Ibid.

[58] Ibid., p. 33.

[59] Ibid.

[60] Testimony of Donald Courts, Special Hearing, *Louisiana v. Code*, Case No. 138,860, March 18, 2003, Vol. II, p. 58-59.

[61] Testimony of Deputy Warden Richard Peabody, Special Hearing, *Louisiana v. Code*, Case No. 138,860A, September 16, 2003, p. 48.

[62] Regardless of any misgivings they had, the Louisiana execution protocol team chose a lethal injection protocol for Louisiana that "paralleled the procedure in Texas fairly closely." Ibid., p. 46.

[63] See Memorandum from Jim Rose, assistant commissioner of operations, to Donal Campbell, commissioner for the Tennessee Department of Corrections, June 22, 1998 (copy on file with Human Rights Watch). For a description of the

committee members qualifications (or lack thereof), see Deposition of Debra K. Inglis, general counsel for the Tennessee Department of Corrections, *Rahman v. Sundquist, et al.*, Case No. 02-2236-III, March 25, 2003, p. 15-16, 38 (copy on file with Human Rights Watch) (Deposition of Inglis).

[64] Memorandums from the four meetings are on file with Human Rights Watch. See also Testimony of Ricky Bell, Transcript of Proceedings, *Abu-Ali Abdur'Rahman v. Sundquist*, Case No. 02-2236-III, May 29, 2003, p.204 (copy on file with Human Rights Watch) (Testimony of Bell).

[65] Inglis Deposition, p. 15-16; Testimony of Bell, p. 200-209.

[66]Testimony of Bell, p. 200.

[67] Memorandum from Virginia Lewis to the Committee Members (copy on file with Human Rights Watch). Quoting from a 1997 National Legal Aid and Defender Association study, the memo states: "Lethal injections are also the most frequently botched means of execution—defined to include unanticipated problems or delays that caused, or could have caused, unnecessary agony for the prisoner and/or witnesses." Lewis continues in her own words, "Unfortunately the critics consider length of time and difficulty in finding suitable veins to be 'botched' cases and the criticism is worse when veins collapse and the IV has to be restarted." Ibid. (It is not clear from the committee's notes or committee member trial testimony what Lewis's title was within the Department of Corrections.)

[68] Petitioner's Brief, *Abdur'Rahman v. Bredesen, et al.*, February 15, 2006, p. 4.

[69] Beiser, "A Guilty Man." See also James Bandler, "Fred Leuchter: Killing Time with Death's Efficiency Expert," *In These Times*, June 20-July 3, 1990, p. 22.

[70] Stephen Trombley, *The Execution Protocol: Inside America's Capital Punishment Industry* (New York: Crown Publishers, 1992), p. 76-78.

[71] Fred A. Leuchter Associates, Inc., "Execution by Lethal Injection Missouri: Lethal Injection Machine Manual State of Missouri," October 15, 1988 (copy on file with Human Rights Watch).

[72] According to Leuchter, during his time in business, he consulted with or provided equipment to twenty-seven states. Seventeen states and the United States Army purchased lethal injection machines from Leuchter. Those states included: Arizona, California, Colorado, Delaware, Illinois, Mississippi, Missouri, Montana, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Texas, Utah, Washington, and Wyoming. Denno, "Is Electrocution an Unconstitutional Method of Execution?" p. 627, footnote 496.

[73] Trombley, *The Execution Protocol*, p. vii.

[74] Ibid, p. 78.

[75] Leuchter himself denied that the Nazis could have killed six million Jews in gas chambers. His anti-Holocaust conclusions were printed in a book, *The Leuchter Report*. Fred Leuchter, *The Leuchter Report: The End of Myth: An Engineering Report on the Alleged Execution Gas Chambers of Auschwitz, Birkenau and Madjanek*, (Poland: Samisdat Publishers, Ltd., 1988), http://www.ihr.org/books/leuchter/leuchter.toc.html (retrieved April 1, 2006).

[76] Bandler, "Fred Leuchter," p. 22-23. Despite the fact that Leuchter admitted misrepresenting himself as an engineer to various states when he provided equipment or advice for their death penalty practice, Leuchter never faced criminal charges. Consent Agreement, *Commonwealth v. Leuchter*, No. EN 90-102, Massachusetts District Court, signed June 11, 1991, p. 1.

[77] In 2001, the New Jersey Department of Corrections (NJDOC) proposed to re-adopt and amend the regulations setting forth New Jersey's lethal injection protocol. The amendment also included the removal of the emergency crash cart from the execution chamber. New Jerseyans Against the Death Penalty (NJDAP) brought an action challenging the regulations. The court held that the proposed changes in the regulations lacked an adequate administrative record demonstrating that they were based upon "reasoned medical opinion." In Re Readoption, 367 New Jersey Superior, p. 69. Without such a record, the court found, NJDOC was unable to demonstrate that the regulations at issue comport with contemporary standards of decency and morality. Ibid. NJDOC subsequently held a public hearing on February 4, 2005 but has yet to promulgate final regulations. The process was halted when then Governor Richard Codey signed into law a death penalty moratorium for New Jersey at the beginning of 2006. See "New Jersey's execution protocol up for comment," http://www.democracyinaction.org/dia/organizations/ncadp/news.jsp?key=1223&t (retrieved March 22, 2006).

[78] Testimony of Dora Rabalais, director of legal programs at Louisiana State Penitentiary, Angola, Special Hearing, *Code v. Cain*, Vol. 1, No. 138,860-A, February 10, 2003, p. 25. "Word of mouth" from Testimony of David Meredith,

former member of Louisiana State Penitentiary Execution Team, Special Hearing, *Code v. Cain,* Vol. 1, No. 138,860-A, February 10, 2003, p. 19.

[79] *Sims v. State,* 754 So. 2d 657, 670 (Florida 2000).

<<previous | index | next>>

April 2006

HUMAN RIGHTS WATCH

Contribute to Human Rights Watch

Home | About Us | News Releases | Publications | Info by Country | Global Issues | Campaigns | Community | Bookstore | Film Festival | Search | Site Map | Contact Us | Press Contacts | Privacy Policy

© Copyright 2006, Human Rights Watch 350 Fifth Avenue, 34th Floor New York, NY 10118-3299 USA

# Exhibit 8



DP
IC
Death Penalty Information Center

# Some Examples of Post-Furman Botched Executions

Michael L. Radelet

University of Colorado
May 24, 2007

**NOTE:** *The below list is not intended to be a comprehensive catalogue of botched executions, but simply a listing of well-known examples.*

1. *August 10, 1982. Virginia.* **Frank J. Coppola.** *Electrocution.* Although no media representatives witnessed the execution and no details were ever released by the Virginia Department of Corrections, an attorney who was present later stated that it took two 55-second jolts of electricity to kill Coppola. The second jolt produced the odor and sizzling sound of burning flesh, and Coppola's head and leg caught on fire. Smoke filled the death chamber from floor to ceiling with a smokey haze.[1]

2. *April 22, 1983. Alabama.* **John Evans.** *Electrocution.* After the first jolt of electricity, sparks and flames erupted from the electrode attached to Evans's leg. The electrode burst from the strap holding it in place and caught on fire. Smoke and sparks also came out from under the hood in the vicinity of Evans's left temple. Two physicians entered the chamber and found a heartbeat. The electrode was reattached to his leg, and another jolt of electricity was applied. This resulted in more smoke and burning flesh. Again the doctors found a heartbeat. Ignoring the pleas of Evans's lawyer, a third jolt of electricity was applied. The execution took 14 minutes and left Evans's body charred and smoldering.[2]

3. *Sept. 2, 1983. Mississippi.* **Jimmy Lee Gray.** *Asphyxiation.* Officials had to clear the room eight minutes after the gas was released when Gray's desperate gasps for air repulsed witnesses. His attorney, Dennis Balske of Montgomery, Alabama, criticized state officials for clearing the room when the inmate was still alive. Said noted death penalty defense attorney David Bruck, "Jimmy Lee Gray died banging his head against a steel pole in the gas chamber while the reporters counted his moans (eleven, according to the Associated Press)."[3] Later it was revealed that the executioner, Barry Bruce, was drunk.[4]

4. *December 12, 1984. Georgia.* **Alpha Otis Stephens.** *Electrocution.* "The first charge of electricity ... failed to kill him, and he struggled to breathe for eight minutes before a second charge carried out his death sentence ..."[5] After the first two minute power surge, there was a six minute pause so his body could cool before physicians could examine him (and declare that another jolt was needed). During that six-minute interval, Stephens took 23 breaths. A Georgia prison official said, "Stephens was just not a conductor" of electricity.[6]

5. *March 13, 1985. Texas.* **Stephen Peter Morin.** *Lethal Injection.* Because of Morin's history of drug abuse, the execution technicians were forced to probe both of Morin's arms and one of his legs with needles for nearly 45 minutes before they found a

Search DPIC

Advanced search | Search tips

Related Items

Lethal Injection Information

suitable vein.[7]

6. *October 16, 1985. Indiana.* **William E. Vandiver.** *Electrocution.* After the first administration of 2,300 volts, Vandiver was still breathing. The execution eventually took 17 minutes and five jolts of electricity.[8] Vandiver's attorney, Herbert Shaps, witnessed the execution and observed smoke and the smell of burning. He called the execution "outrageous." The Department of Corrections admitted the execution "did not go according to plan."[9]

7. *August 20, 1986. Texas.* **Randy Woolls.** *Lethal Injection.* A drug addict, Woolls helped the execution technicians find a useable vein for the execution.[10]

8. *June 24, 1987. Texas.* **Elliot Rod Johnson.** *Lethal Injection*. Because of collapsed veins, it took nearly an hour to complete the execution.[11]

9. *December 13, 1988. Texas.* **Raymond Landry.** *Lethal Injection.* Pronounced dead 40 minutes after being strapped to the execution gurney and 24 minutes after the drugs first started flowing into his arms.[12] Two minutes after the drugs were administered, the syringe came out of Landry's vein, spraying the deadly chemicals across the room toward witnesses. The curtain separating the witnesses from the inmate was then pulled, and not reopened for fourteen minutes while the execution team reinserted the catheter into the vein. Witnesses reported "at least one groan." A spokesman for the Texas Department of Correction, Charles Brown (sic), said, "There was something of a delay in the execution because of what officials called a 'blowout.' The syringe came out of the vein, and the warden ordered the (execution) team to reinsert the catheter into the vein."[13]

10. *May 24, 1989. Texas.* **Stephen McCoy.** *Lethal Injection.* He had such a violent physical reaction to the drugs (heaving chest, gasping, choking, back arching off the gurney, etc.) that one of the witnesses (male) fainted, crashing into and knocking over another witness. Houston attorney Karen Zellars, who represented McCoy and witnessed the execution, thought the fainting would catalyze a chain reaction. The Texas Attorney General admitted the inmate "seemed to have a somewhat stronger reaction," adding "The drugs might have been administered in a heavier dose or more rapidly."[14]

11. *July 14, 1989. Alabama.* **Horace Franklin Dunkins, Jr.** *Electrocution.* It took two jolts of electricity, nine minutes apart, to complete the execution. After the first jolt failed to kill the prisoner (who was mildly retarded), the captain of the prison guard opened the door to the witness room and stated "I believe we've got the jacks on wrong."[15] Because the cables had been connected improperly, it was impossible to dispense sufficient current to cause death. The cables were reconnected before a second jolt was administered. Death was pronounced 19 minutes after the first electric charge. At a post-execution news conference, Alabama Prison Commissioner Morris Thigpen said, "I regret very very much what happened. [The cause] was human error."[16]

12. *May 4, 1990. Florida.* **Jesse Joseph Tafero.** *Electrocution.* During the execution, six-inch flames erupted from Tafero's head, and three jolts of power were required to stop his breathing. State officials claimed that the botched execution was caused by "inadvertent human error" -- the inappropriate substitution of a synthetic sponge for a natural sponge that had been used in previous executions.[17] They attempted to support this theory by sticking a part of a synthetic sponge into a "common household toaster" and observing that it smoldered and caught fire.[18]

13. *September 12, 1990. Illinois.* **Charles Walker.** *Lethal Injection.* Because of equipment failure and human error, Walker suffered excruciating pain during his execution. According to Gary Sutterfield, an engineer from the Missouri State Prison who was retained by the State of Illinois to assist with Walker's execution, a kink in the plastic tubing going into Walker's arm stopped the deadly chemicals from reaching

Walker. In addition, the intravenous needle was inserted pointing at Walker's fingers instead of his heart, prolonging the execution.[19]

14. *October 17, 1990. Virginia.* **Wilbert Lee Evans.** *Electrocution.* When Evans was hit with the first burst of electricity, blood spewed from the right side of the mask on Evans's face, drenching Evans's shirt with blood and causing a sizzling sound as blood dripped from his lips. Evans continued to moan before a second jolt of electricity was applied. The autopsy concluded that Evans suffered a bloody nose after the voltage surge elevated his high blood pressure.[20]

15. *August 22, 1991. Virginia.* **Derick Lynn Peterson.** *Electrocution.* After the first cycle of electricity was applied, and again four minutes later, prison physician David Barnes inspected Peterson's neck and checked him with a stethoscope, announcing each time "He has not expired." Seven and one-half minutes after the first attempt to kill the inmate, a second cycle of electricity was applied. Prison officials later announced that in the future they would routinely administer two cycles before checking for a heartbeat.[21]

16. *January 24, 1992. Arkansas.* **Rickey Ray Rector.** *Lethal Injection.* It took medical staff more than 50 minutes to find a suitable vein in Rector's arm. Witnesses were kept behind a drawn curtain and not permitted to view this scene, but reported hearing Rector's eight loud moans throughout the process. During the ordeal Rector (who suffered from serious brain damage) helped the medical personnel find a vein. The administrator of State's Department of Corrections medical programs said (paraphrased by a newspaper reporter) "the moans did come as a team of two medical people that had grown to five worked on both sides of his body to find a vein." The administrator said "That may have contributed to his occasional outbursts." The difficulty in finding a suitable vein was later attributed to Rector's bulk and his regular use of antipsychotic medication.[22]

17. *April 6, 1992. Arizona.* **Donald Eugene Harding.** *Asphyxiation.* Death was not pronounced until 10 1/2 minutes after the cyanide tablets were dropped.[23] During the execution, Harding thrashed and struggled violently against the restraining straps. A television journalist who witnessed the execution, Cameron Harper, said that Harding's spasms and jerks lasted 6 minutes and 37 seconds. "Obviously, this man was suffering. This was a violent death .. . an ugly event. We put animals to death more humanely."[24] Another witness, newspaper reporter Carla McClain, said, "Harding's death was extremely violent. He was in great pain. I heard him gasp and moan. I saw his body turn from red to purple."[25] One reporter who witnessed the execution suffered from insomnia and assorted illnesses for several weeks; two others were "walking vegetables" for several days.[26]

18. *March 10, 1992. Oklahoma.* **Robyn Lee Parks.** *Lethal Injection.* Parks had a violent reaction to the drugs used in the lethal injection. Two minutes after the drugs were dispensed, the muscles in his jaw, neck, and abdomen began to react spasmodically for approximately 45 seconds. Parks continued to gasp and violently gag until death came, some eleven minutes after the drugs were first administered. Tulsa World reporter Wayne Greene wrote that the execution looked "painful and ugly," and "scary." "It was overwhelming, stunning, disturbing -- an intrusion into a moment so personal that reporters, taught for years that intrusion is their business, had trouble looking each other in the eyes after it was over."[27]

19. *April 23, 1992. Texas.* **Billy Wayne White.** *Lethal Injection.* White was pronounced dead some 47 minutes after being strapped to the execution gurney. The delay was caused by difficulty finding a vein; White had a long history of heroin abuse. During the execution, White attempted to assist the authorities in finding a suitable vein.[28]

20. *May 7, 1992. Texas.* **Justin Lee May.** *Lethal Injection.* May had an unusually violent reaction to the lethal drugs. According to one reporter who witnessed the execution, May "gasped, coughed and reared against his heavy leather restraints,

coughing once again before his body froze ..."[29] Associated Press reporter Michael Graczyk wrote, "Compared to other recent executions in Texas, May's reaction was more violent. He went into a coughing spasm, groaned and gasped, lifted his head from the death chamber gurney and would have arched his back if he had not been belted down. After he stopped breathing, his eyes and mouth remained open."[30]

21. *May 10, 1994. Illinois.* **John Wayne Gacy.** *Lethal Injection.* After the execution began, the lethal chemicals unexpectedly solidified, clogging the IV tube that lead into Gacy's arm, and prohibiting any further passage. Blinds covering the window through which witnesses observed the execution were drawn, and the execution team replaced the clogged tube with a new one. Ten minutes later, the blinds were then reopened and the execution process resumed. It took 18 minutes to complete.[31] Anesthesiologists blamed the problem on the inexperience of prison officials who were conducting the execution, saying that proper procedures taught in "IV 101" would have prevented the error.[32]

22. *May 3, 1995. Missouri.* **Emmitt Foster.** *Lethal Injection.* Seven minutes after the lethal chemicals began to flow into Foster's arm, the execution was halted when the chemicals stopped circulating. With Foster gasping and convulsing, the blinds were drawn so the witnesses could not view the scene. Death was pronounced thirty minutes after the execution began, and three minutes later the blinds were reopened so the witnesses could view the corpse.[33] According to William "Mal" Gum, the Washington County Coroner who pronounced death, the problem was caused by the tightness of the leather straps that bound Foster to the execution gurney; it was so tight that the flow of chemicals into the veins was restricted. Foster did not die until several minutes after a prison worker finally loosened the straps. The coroner entered the death chamber twenty minutes after the execution began, diagnosed the problem, and told the officials to loosen the strap so the execution could proceed.[34] In an editorial, the St. Louis Post-Dispatch called the execution "a particularly sordid chapter in Missouri's capital punishment experience."[35]

23. *January 23, 1996. Virginia.* **Richard Townes, Jr.** *Lethal Injection.* This execution was delayed for 22 minutes while medical personnel struggled to find a vein large enough for the needle. After unsuccessful attempts to insert the needle through the arms, the needle was finally inserted through the top of Mr. Townes's right foot.[36]

24. *July 18, 1996. Indiana.* **Tommie J. Smith.** *Lethal Injection.* Because of unusually small veins, it took one hour and nine minutes for Smith to be pronounced dead after the execution team began sticking needles into his body. For sixteen minutes, the execution team failed to find adequate veins, and then a physician was called.[37] Smith was given a local anesthetic and the physician twice attempted to insert the tube in Smith's neck. When that failed, an angio-catheter was inserted in Smith's foot. Only then were witnesses permitted to view the process. The lethal drugs were finally injected into Smith 49 minutes after the first attempts, and it took another 20 minutes before death was pronounced.[38]

25. *March 25, 1997. Florida.* **Pedro Medina.** *Electrocution.* A crown of foot-high flames shot from the headpiece during the execution, filling the execution chamber with a stench of thick smoke and gagging the two dozen official witnesses. An official then threw a switch to manually cut off the power and prematurely end the two-minute cycle of 2,000 volts. Medina's chest continued to heave until the flames stopped and death came.[39] After the execution, prison officials blamed the fire on a corroded copper screen in the headpiece of the electric chair, but two experts hired by the governor later concluded that the fire was caused by the improper application of a sponge (designed to conduct electricity) to Medina's head.

26. *May 8, 1997. Oklahoma.* **Scott Dawn Carpenter.** *Lethal Injection.* Carpenter was pronounced dead some 11 minutes after the lethal injection was administered. As the drugs took effect, Carpenter began to gasp and shake. "This was followed by a guttural

sound, multiple spasms and gasping for air" until his body stopped moving, three minutes later.[40]

. *June 13, 1997. South Carolina.* **Michael Eugene Elkins.** *Lethal Injection.* Because kins's body had become swollen from liver and spleen problems, it took nearly an hour to find a suitable vein for the insertion of the catheter. Elkins tried to assist the executioners, asking "Should I lean my head down a little bit?" as they probed for a vein. After numerous failures, a usable vein was finally found in Elkins's neck.[41]

28. *April 23, 1998. Texas.* **Joseph Cannon.** *Lethal Injection.* It took two attempts to complete the execution. After making his final statement, the execution process began. A vein in Cannon's arm collapsed and the needle popped out. Seeing this, Cannon lay back, closed his eyes, and exclaimed to the witnesses, "It's come undone." Officials then pulled a curtain to block the view of the witnesses, reopening it fifteen minutes later when a weeping Cannon made a second final statement and the execution process resumed.[42]

29. *August 26, 1998. Texas.* **Genaro Ruiz Camacho.** *Lethal Injection.* The execution was delayed approximately two hours due, in part, to problems finding suitable veins in Camacho's arms.[43]

30.*October 5, 1998. Nevada.* **Roderick Abeyta.** *Lethal Injection.* It took 25 minutes for the execution team to find a vein suitable for the lethal injection.[44]

31. *July 8, 1999. Florida.* **Allen Lee Davis.** *Electrocution.* "Before he was pronounced dead ... the blood from his mouth had poured onto the collar of his white shirt, and the blood on his chest had spread to about the size of a dinner plate, even oozing through the buckle holes on the leather chest strap holding him to the chair."[45] His execution was the first in Florida's new electric chair, built especially so it could accommodate a man Davis's size (approximately 350 pounds). Later, when another Florida death row nate challenged the constitutionality of the electric chair, Florida Supreme Court stice Leander Shaw commented that "the color photos of Davis depict a man who -- for all appearances -- was brutally tortured to death by the citizens of Florida."[46] Justice Shaw also described the botched executions of Jesse Tafero and Pedro Medina (q.v.), calling the three executions "barbaric spectacles" and "acts more befitting a violent murderer than a civilized state."[47] Justice Shaw included pictures of Davis's dead body in his opinion.[48] The execution was witnessed by a Florida State Senator, Ginny Brown-Waite, who at first was "shocked" to see the blood, until she realized that the blood was forming the shape of a cross and that it was a message from God saying he supported the execution.[49]

32. *May 3, 2000. Arkansas.* **Christina Marie Riggs.** *Lethal Injection.* Riggs dropped her appeals and asked to be executed. However, the execution was delayed for 18 minutes when prison staff couldn't find a suitable vein in her elbows. Finally, Riggs agreed to the executioners' requests to have the needles in her wrists.[50]

33. *June 8, 2000. Florida.* **Bennie Demps.** *Lethal Injection.* It took execution technicians 33 minutes to find suitable veins for the execution. "They butchered me back there," said Demps in his final statement. "I was in a lot of pain. They cut me in the groin; they cut me in the leg. I was bleeding profusely. This is not an execution, it is murder." The executioners had no unusual problems finding one vein, but because Florida protocol requires a second alternate intravenous drip, they continued to work to insert another needle, finally abandoning the effort after their prolonged failures.[51]

34. *December 7, 2000. Texas.* **Claude Jones.** *Lethal Injection.* Jones was a former intravenous drug abuser. His execution was delayed 30 minutes while the execution am" struggled to insert an IV into a vein. He had been a longtime intravenous drug er. One member of the execution team commented, "They had to stick him about five times. They finally put it in his leg." Wrote Jim Willett, the warden of the Walls Unit

and the man responsible for conducting the execution, "The medical team could not find a vein. Now I was really beginning to worry. If you can't stick a vein then a cut-down has to be performed. I have never seen one and would just as soon go through the rest of my career the same way. Just when I was really getting worried, one of the medical people hit a vein in the left leg. Inside calf to be exact. The executioner had warned me not to panic as it was going to take a while to get the fluids in the body of the inmate tonight because he was going to push the drugs through very slowly. Finally, the drug took effect and Jones took his last breath."[52]

35. *June 28, 2000. Missouri.* **Bert Leroy Hunter.** *Lethal Injection.* Hunter had an unusual reaction to the lethal drugs, repeatedly coughing and gasping for air before he lapsed into unconsciousness.[53] An attorney who witnessed the execution reported that Hunter had "violent convulsions. His head and chest jerked rapidly upward as far as the gurney restraints would allow, and then he fell quickly down upon the gurney. His body convulsed back and forth like this repeatedly. ... He suffered a violent and agonizing death."[54]

36. *November 7, 2001. Georgia.* **Jose High.** *Lethal Injection.* High was pronounced dead some one hour and nine minutes after the execution began. After attempting to find a useable vein for 39 minutes, the emergency medical technicians under contract to do the execution abandoned their efforts. Eventually, one needle was stuck in High's hand, and a physician was called in to insert a second needle between his shoulder and neck.[55]

37. *May 2, 2006. Ohio.* **Joseph L. Clark.** *Lethal Injection.* It took 22 minutes for the execution technicians to find a vein suitable for insertion of the catheter. But three or four minutes thereafter, as the vein collapsed and Clark's arm began to swell, he raised his head off the gurney and said five times, "It don't work. It don't work." The curtains surrounding the gurney were then closed while the technicians worked for 30 minutes to find another vein. Media witnesses later reported that they heard "moaning, crying out and guttural noises."[56] Finally, death was pronounced almost 90 minutes after the execution began. A spokeswoman for the Ohio Department of Corrections told reporters that the execution team included paramedics, but not a physician or a nurse. [57]

38. *December 13, 2006. Florida.* **Angel Diaz.** *Lethal Injection.* After the first injection was administered, Mr. Diaz continued to move, and was squinting and grimacing as he tried to mouth words. A second dose was then administered, and 34 minutes passed before Mr. Diaz was declared dead. At first a spokesperson for the Florida Department of Corrections claimed that this was because Mr. Diaz had some sort of liver disease. After performing an autopsy, the Medical Examiner, Dr. William Hamilton, stated that Mr. Diaz's liver was undamaged, but that the needle had gone through Mr. Diaz's vein and out the other side, so the deadly chemicals were injected into soft tissue, rather than the vein. Two days after the execution, Governor Jeb Bush suspended all executions in the state and appointed a commission "to consider the humanity and constitutionality of lethal injections."[58]

39. *May 24, 2007. Ohio.* **Christopher Newton.** *Lethal Injection.* According to the Associated Press, "prison medical staff" at the Southern Ohio Correctional Facility struggled to find veins on each of Newton's arms during the execution. Newton, who weighted 265 pounds, was declared dead almost two hours after the execution process began. The execution "team" stuck Newton at least ten times with needles before getting the shunts in place were the needles are injected. [59]

40. *June 26, 2007. Georgia.* **John Hightower.** *Lethal Injection.* It took approximately 40 minutes for the nurses to find a suitable vein to administer the lethal chemicals, and death was not pronounced until 7:59, 59 minutes after the execution process began. [60]

Endnotes

1. Deborah W. Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death over the Century*, 35 WILLIAM & MARY L. REV. 551, 664-665 (1994).
2. For a description of the execution by Evans's defense attorney, see Russell F. Canan, Burning at the Wire: The Execution of John Evans, in FACING THE DEATH PENALTY: ESSAYS ON A CRUEL AND UNUSUAL PUNISHMENT 60 (Michael L. Radelet ed. 1989); see also Glass v. Louisiana, 471 U.S. 1080, 1091-92 (1985).
3. David Bruck, *Decisions of Death*, THE NEW REPUBLIC, Dec. 12, 1984, at 24-25.
4. Ivan Solotaroff, *The Last Face You'll Ever See,* 124 ESQUIRE 90, 95 (Aug. 1995).
5. *Two Charges Needed to Electrocute Georgia Murderer*, N.Y. TIMES, Dec. 13, 1984, at 12.
6. Editorial, N.Y. TIMES, Dec. 17, 1984, at 22.
7. *Murderer of Three Women is Executed in Texas*, N.Y. TIMES, March 14, 1985, at 9.
8. *Killer's Electrocution Takes 17 Minutes in Indiana Chair*, WASH. POST, Oct. 17, 1985, at A16.
9. *Indiana Executes Inmate Who Slew Father-In-Law*, N.Y. TIMES, Oct. 17, 1985, at 22.
10. *Killer Lends A Hand to Find A Vein for Execution*, L.A. TIMES, Aug. 20, 1986, at 2.
11. *Addict Is Executed in Texas For Slaying of 2 in Robbery*, N.Y. TIMES, June 25, 1987, at A24.
12. *Drawn-out Execution Dismays Texas Inmates*, DALLAS MORNING NEWS, Dec. 15, 1988, at 29A.
13. *Landry Executed for '82 Robbery-Slaying*, DALLAS MORNING NEWS, Dec. 13, 1988, at 29A.
14. *Witness to an Execution*, HOUS. CHRON., May 27, 1989, at 11.
15. John Archibald, *On Second Try, Dunkins Executed for Murder*, BIRMINGHAM NEWS, July 14, 1989, at 1.
16. Peter Applebome, 2 *Jolts in Alabama Execution,* N.Y. TIMES, July 15, 1989, at 6.
17. Cynthia Barnett, Tafero Meets Grisly Fate in Chair, GAINESVILLE SUN, May 5, 1990, at 1; Cynthia Barnett, A Sterile Scene Turns Grotesque, GAINESVILLE SUN, May 5, 1990, at 1; Bruce Ritchie, *Flames, Smoke Mar Execution of Murderer*, FLORIDA TIMES-UNION (Jacksonville), May 5, 1990, at 1; Bruce Ritchie, *Report on Flawed Execution Cites Human Error,* FLORIDA TIMES-UNION (Jacksonville), May 9, 1990, at B1.
18. Bill Moss, *Chair Concerns Put Deaths on Hold,* ST. PETERSBURG TIMES, July 18, 1990, at 1B.
19. *Niles Group Questions Execution Procedure,* UNITED PRESS INTERNATIONAL, Nov. 8, 1992 (LEXIS/NEXUS file).
20. Mike Allen, *Groups Seek Probe of Electrocution's Unusual Events*, RICHMOND TIMES-DISPATCH, Oct. 19, 1990, at B1; Mike Allen, *Minister Says Execution Was Unusual*, RICHMOND TIMES- DISPATCH, Oct. 20, 1990, at B1; DeNeen L. Brown, *Execution Probe Sought,* WASH. POST, Oct. 21, 1990, at D1.
21. Karen Haywood, *Two Jolts Needed to Complete Execution*, THE FREE-LANCE STAR (Fredericksburg, Vir.), Aug. 23, 1991, at 1; *Death Penalty Opponents Angry About Latest Execution,* RICHMOND TIMES-DISPATCH, Aug. 24, 1991, at 1; *Virginia Alters its Procedure for Executions in Electric Chair*, WASH. POST, Aug. 24, 1991, at B3.
22. Joe Farmer, Rector, 40, Executed for Officer's Slaying, ARKANSAS DEMOCRAT-GAZETTE, Jan. 25, 1992, at 1; *Joe Farmer, Rector's Time Came, Painfully Late*, ARKANSAS DEMOCRAT GAZETTE, Jan. 26, 1992, at 1B; Sonja Clinesmith, *Moans Pierced Silence During Wait*, ARKANSAS DEMOCRAT GAZETTE, Jan. 26, 1992, at 1B; Marshall Frady, Death in Arkansas, THE NEW YORKER, Feb. 22, 1993, at 105.
23. *Gruesome Death in Gas Chamber Pushes Arizona Toward Injections*, N.Y. TIMES, Apr. 25, 1992, at 9.
24. Charles L. Howe, *Arizona Killer Dies in Gas Chamber*, S.F. CHRON., Apr. 7, 1992, at A2.
25. Id.
26. Abraham Kwok, *Injection: The No-Fuss Executioner*, ARIZONA REPUBLIC, Feb. 28, 1993, at 1.
27. Wayne Greene, *11-Minute Execution Seemingly Took Forever,* TULSA WORLD, Mar. 11, 1992, at A13.
28. *Another U.S. Execution Amid Criticism Abroad*, N.Y. TIMES, Apr. 24, 1992, at B7.

29. Robert Wernsman, *Convicted Killer May Dies*, ITEM (Huntsville, Tex.), May 7, 1992, at 1.
30. Michael Graczyk, *Convicted Killer Gets Lethal Injection,* HERALD (Denison, Tex.), May 8, 1992.
31. Scott Fornek and Alex Rodriguez, *Gacy Lawyers Blast Method: Lethal Injections Under Fire After Equipment Malfunction*, CHICAGO SUN-TIMES, May 11, 1994, at 5; Rich Chapman, *Witnesses Describe Killer's 'Macabre' Final Few Minutes,* CHICAGO SUN-TIMES, May 11, 1994, at 5.
32. Rob Karwath & Susan Kuczka, *Gacy Execution Delay Blamed on Clogged IV Tube,* CHICAGO TRIB., May 11, 1994, at 1 (Metro Lake Section).
33. *Because they could not observe the entire execution procedure through the closed blinds, two witnesses later refused to sign the standard affidavit that stated they had witnessed the execution. Witnesses to a Botched Execution,* ST. LOUIS POST-DISPATCH, May 8, 1995, at 6B.
34. Tim O'Neil, *Too-Tight Strap Hampered Execution,* ST. LOUIS POST-DISPATCH, May 5, 1995, at B1; Jim Slater, *Execution Procedure Questioned*, KANSAS CITY STAR, May 4, 1995, at C8.
35. *Witnesses to a Botched Execution*, ST. LOUIS POST-DISPATCH, May 8, 1995, at 6B.
36. *Store Clerk's Killer Executed in Virginia*, N.Y. TIMES, Jan. 25, 1996, at A19.
37. *The involvement of this anonymous physician violated rules of both the American Medical Association and the Indiana State Medical Association.* Sherri Edwards & Suzanne McBride, Doctor's Aid in Injection Violated Ethics Rule: *Physician Helped Insert the Lethal Tube in a Breach of AMA's Policy Forbidding Active Role in Execution*, INDIANAPOLIS STAR, July 19, 1996, at A1.
38. Id.; Suzanne McBride, *Problem With Vein Delays Execution*, INDIANAPOLIS NEWS, July 18, 1996, at 1.
39. Doug Martin, *Flames Erupt from Killer's Headpiece,* GAINESVILLE SUN, March 26, 1997, at 1. Medina was executed despite a life-long history of mental illness, and the Florida Supreme Court split 4-3 on whether to grant an evidentiary hearing because of serious questions about his guilt. This puts to rest any conceivable argument that Medina could have been guilty "beyond a reasonable doubt." Medina v. State, 690 So.2d 1241 (1997). The family of the victim had joined in a plea for executive clemency, in part because they believed Medina was innocent. Id., at 1252, n. 6. Even the Pope appealed for clemency. Martin, op. cit.
40. Michael Overall & Michael Smith, *22-Year-Old Killer Gets Early Execution,* TULSA WORLD, May 8, 1997, at A1.
41. *Killer Helps Officials Find A Vein At His Execution*, CHATTANOOGA FREE PRESS, June 13, 1997, at A7.
42. *Cannon was executed for a crime committed when he was 17 years old. 1st Try Fails to Execute Texas Death Row Inmate*, ORLANDO SENT., Apr. 23, 1998, at A16; Michael Graczyk, *Texas Executes Man Who Killed San Antonio Attorney at Age 17*, AUSTIN AMERICAN-STATESMAN, Apr. 23, 1998, at B5.
43. Michael Graczyk, Reputed Marijuana Smuggler Executed for 1988 Dallas Slaying, ASSOCIATED PRESS, August 27, 1998.
44. Sean Whaley, *Nevada Executes Killer*, LAS VEGAS REVIEW- JOURNAL, Oct. 5, 1998, at 1A.
45. *Davis Execution Gruesome*, GAINESVILLE SUN, July 8, 1999, at 1A.
46. Provenzano v. State, 744 So.2d 413, 440 (Fla. 1999).
47. Id.
48. Id., at 442-44.
49. Mary Jo Melone, *A Switch is Thrown, and God Speaks,* ST. PETERSBURG TIMES, July 13, 1999, p. 1B.
50. Ron Moore, *At Last I can be with my Babies*, SCOTTISH DAILY RECORD, May 4, 2000, at 24.
51. Rick Bragg, Florida Inmate Claims Abuse in Execution, N.Y. TIMES, June 9, 2000, at A14; Phil Long & Steve Brousquet, *Execution of Slayer Goes Wrong; Delay, Bitter Tirade Precede His Death*, MIAMI HERALD, June 8, 2000.
52. Sarah Rimber, "Working Death Row," N.Y. TIMES, Dec. 17, 2000, at 1
53. David Scott, *Convicted Killer Who Once Asked to Die is Executed*, ASSOCIATED PRESS, June 28, 2000.

54. Letter from attorney Cheryl Rafert to Missouri Governor Mel Carnahan, June 30, 2000.
55. Rhonda Cook, *"Gang leader executed by injection Death comes 25 years after boy, slain"* ATLANTA JOURNAL CONSTITUTION, Nov. 7, 2001, p. B1.
56. Alan Johnson, *'It Don't Work,' Inmate Says During Botched Execution,* COLUMBUS (Ohio) DISPATCH, May 3, 2006.
57. Adam Liptak, *'Trouble Finding Inmate's Vein Slows Lethal Injection in Ohio*, N.Y. TIMES, May 3, 2006; John Mangels, *Condemned Killer Complains Lethal Injection 'Isn't Working,'* PLAIN DEALER (Cleveland), May 3, 2006.
58. Adam Liptak & Terry Aguayo, *After Problem Execution, Governor Bush Suspends the Death Penalty in Florida,* NEW YORK TIMES, Dec. 16, 2006.
59. ASSOCIATED PRESS, May 24, 2007.
60. Lateef Mungin, *Triple Murderer Executed After 40-minute Search for Vein*, ATLANTA JOURNAL-CONSTITUTION, June 27, 2007.

---

See also, **Methods of Execution** and **Descriptions of Execution Methods**

---

©2008 Death Penalty Information Center

MSNBC.com

# Doctors: Botched execution likely painful

## Some speculate this week's lethal injection caused slow, excruciating death

**The Associated Press**
updated 9:29 p.m. MT, Sat., Dec. 16, 2006

JACKSONVILLE, Fla. - Death penalty foes have warned for years of the possibility that an inmate being executed by lethal injection could remain conscious, experiencing severe pain as he slowly dies.

That day may have arrived.

Angel Nieves Diaz, a career criminal executed for killing a Miami topless bar manager 27 years ago, was given a rare second dose of deadly chemicals as he took more than twice the usual time to succumb. Needles that were supposed to inject drugs into the 55-year-old man's veins were instead pushed all the way through the blood vessels into surrounding soft tissue. A medical examiner said he had chemical burns on both arms.

"It really sounds like he was tortured to death," said Jonathan Groner, associate professor of surgery at the Ohio State Medical School, a surgeon who opposes the death penalty and writes frequently about lethal injection. "My impression is that it would cause an extreme amount of pain."

The error in Diaz's execution led Gov. Jeb Bush to suspend all executions Friday. Separately, a federal judge extended a moratorium on executions in California, declaring that its method of lethal injection violates the constitutional ban on cruel and unusual punishment.

They were just the latest challenges to lethal injection — the preferred execution method in 37 states. Missouri's injection method, similar to California's, was declared unconstitutional last month by a federal judge. The U.S. Supreme Court has upheld executions despite the pain they might cause, but has left unsettled the issue of whether the pain is unconstitutionally excessive.

**Painkiller may wear off before execution**

Diaz was given three drugs: to deaden pain, paralyze the body and cause a fatal heart attack. A study published last year in the British medical journal The Lancet concluded that the painkiller, sodium pentothal, could wear off before inmates die, subjecting them to excruciating pain when the potassium chloride causes a heart attack.

That study has been cited in unsuccessful appeals for death row inmates, who have claimed any pain experienced during lethal injection violates the cruel and unusual standard.

Dr. Nik Gravenstein, professor and chairman of anesthesiology at the University of Florida, said it is impossible to say how much pain the chemicals produce since inmates can't be interviewed while being executed, but he said patients given lower levels of the same chemicals for various treatments "describe this as being painful."

Dr. William Hamilton, the Gainesville medical examiner who performed the autopsy on Diaz, refused to say if Diaz died painfully until the autopsy is complete.

Florida Corrections Secretary James McDonough said the execution team did not see any swelling of Diaz's arms that would have indicated that the chemicals were going into tissues and not his veins.

McDonough also said reports that he received indicated Diaz had fallen asleep and was snoring.

However, witnesses reported Diaz was moving as long as 24 minutes after the first injection, including grimacing,

blinking, licking his lips, blowing and attempting to mouth words.

It took 34 minutes for Diaz to die. Executions by lethal injection normally take about 15 minutes, with the inmate unconscious and motionless within three to five minutes.

**IV needles difficult to put in**

Gravenstein said it can be difficult to get IV needles in their proper place. In a hospital setting, the average is 1.6 tries to successfully place an IV.

"The whole process has a lot of opportunity not to go as intended," he said.

He said someone should have realized what was happening.

"To have given somebody many times what is necessary and then to give them many more times again, it doesn't pass what one might call the 'red face test.' It just doesn't make sense. You have to be suspicious that something's not right," Gravenstein said.

Dr. Philip Lumb, chairman of the anesthesiology department at the Keck School of Medicine at the University of Southern California, was critical of the second dosage given to Diaz. He said he has never made any statements for or against the death penalty.

"If an IV has to be given a second time, it is an indication it has not done right the first time," Lumb said.

An attorney representing Diaz's family, D. Todd Doss, said legal action was being considered.

"We are still grieving. It continues to get worse and worse, learning the details of what happened," said Sol Otero, Diaz' niece from Orlando. "The excruciating pain and torture my uncle went through for 34 minutes. He was literally crucified."

*© 2008 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*

URL: http://www.msnbc.msn.com/id/16241245/

# Exhibit 9

CNN.com AMERICAN MORNING SITUATION ROOM LOU DOBBS TONIGHT PAULA ZAHN NOW LARRY KING LIVE ANDERSON COOPER 360° NANCY GRACE SCHEDULES
Member Center: Sign In | Register International Edition
SEARCH THE WEB CNN.COM Search
Home World U.S. Weather Business Sports Analysis Politics Law Tech Science Health Entertainment Offbeat Travel Education Specials Autos I-Reports

HEALTH

Tools: Save | Print | E-mail | Most Popular |

# Lethal injection creator: Maybe it's time to change formula

Dr. Jay Chapman, who created the formula for lethal injection execution in the late 1970s, says newer drugs might be more effective today.

HEALTH LIBRARY
In association with MayoClinic.com
Health Library

HEALTH VIDEO LIBRARY
In association with Healthology
Healthology

RELATED
Convicted iller fears last moments
Executed may suffer agonizing deaths

RELATED
I-Report: Your opinion

- Lethal injection, created in late 1970s in Oklahoma, has been widely adopted
- Doctor who devised the method says drug formula may need updating
- Newer drugs might be more effective, doctor says

By Elizabeth Cohen
CNN

Adjust font size:

**ATLANTA, Georgia** (CNN) -- When Gary Gilmore was choosing between the firing squad and the electric chair in 1977, Dr. Jay Chapman remembers discussing the inhumanity of each option with his colleagues at the Oklahoma state medical examiner's office.

"We said this is really ridiculous. We kill animals more humanely than we kill people," said Chapman.

But Chapman, then the chief medical examiner in Oklahoma, supported the death penalty. So when state legislators asked him to come up with a more humane alternative, he went to work.

For three weeks Dr. Chapman contemplated the best way to kill someone, the best combination of drugs that when injected, would take life swiftly and painlessly.

He came up with a lethal three-drug cocktail, and to his great surprise, over the past 25 years, 37 states adopted it nearly to the letter. But now, after concerns that instead of causing an instant death it sometimes provides a slow, painful, one, Chapman has rethought whether his formula is optimal.

"It may be time to change it," Chapman said in a recent interview. "There are many problems that can arise ... given the concerns people are raising with the protocol it should be re-examined."

A recent study found sometimes inmates given lethal injections slowly suffocate while conscious but unable to communicate. Judges have ruled the procedure unconstitutional in two states, and 11 states have stopped using lethal injection.

One problem was illustrated last year when it took nearly 90 minutes to execute Joseph Clark, who'd murdered two people in Ohio. Witnesses reported that Clark raised his head off the gurney and said repeatedly, "don't work, don't work," and moaned and groaned as he struggled with prison officials.

News accounts of the execution also quoted Clark as asking, "Can you just give me something by mouth to end this?"

Chapman's protocol involves using an anesthetic to render the inmate unconscious; a paralytic to stop the inmate's breathing; and a drug to stop the heart.

One criticism has been that the anesthetic, sodium thiopental, doesn't completely anesthetize all inmates.

"Now there are other agents that work much faster and much easier," Chapman said, specifically pointing out an anesthetic called Diprivan. "Absolutely [Diprivan] would be better [for an execution]. If you're wanting to give someone something so there's no sensation, no awareness of what's going on, that's the drug."

The other major criticism of the lethal injection method has been that if the prisoner isn't completely unconscious, he will feel the asphyxiation caused by the second drug, pancuronium bromide, which paralyzes all muscles, including those needed to breathe.

When asked why he included the asphyxiation drug in his formula, Chapman answered, "It's a good question. If I were doing it now, I would probably eliminate it."



He added he wouldn't change the third drug, potassium chloride, which is highly effective at stopping the heart and causing cardiac arrest.

Chapman still stands by his formula as a sound -- if not perfect -- method of execution. "It works if it's administered competently," he said. "But you have to have some skills to do it. You have to have the ability to find a vein and mix the drugs, because [some of them] come as a powder."

He added that he's heard reports that in one execution, the IV needle was inserted incorrectly, pointing toward the prisoner's hand rather than his body. "You have to be an idiot to do that," said Chapman, who's a forensic pathologist.

He also criticized prison officials for inserting the IV inside the death chamber rather than beforehand. "It seems ridiculous to me to be trying to find a vein when everyone's inside the chamber, feeling nervous and fiddling around trying to find the vein," he said. "That's just ludicrous to me."

He also cited another "incompetency:" the execution of Angel Nieves Diaz last year that took 34 minutes because IV needles were inserted straight through his veins and into the flesh in his arms. Then-Florida Gov. Jeb Bush subsequently suspended all executions.

Even proponents of the death penalty say they have doubts about whether the three-drug formula is the best way to execute someone. "I think it's a dumb way to do it," said Michael Rushford, president of the Criminal Justice Legal Foundation, a group that advocates the death penalty. "It's a complicated procedure, and open to criticism."

Instead, Rushford said he supports using carbon monoxide, which he described as being "simple, fast, and painless."

Chapman disagreed with that assessment. But he had another idea. "The simplest thing I know of is the guillotine. And I'm not at all opposed to bringing it back. The person's head is cut off and that's the end of it."

*Elizabeth Cohen is a CNN Medical News correspondent. Senior producer Jennifer Pifer and associate producer Sabriya Rice contributed to this report.*

Tools: Save | Print | E-mail | Most Popular |

Next story in Health    Health

**FOLLOW RELATED TOPICS**

| Search Topic | E-mail Alerts |
|---|---|
| Oklahoma | |
| Capital Punishment | |
| Gary Gilmore | |

ACTIVATE

What are E-mail Alerts? | Manage Alerts | Create Your Own

**TOP STORY**

CNN

**'D.C. Madam' believed dead**

A woman who police believe to be Deborah Jeane Palfrey, known as the "D.C. Madam," was found dead in Florida Thursday, according to Tarpon Springs police.

**LATEST NEWS**

MOST POPULAR    TOP STORIES    BEST VIDEO

- Immigrant: No more money to Mexico
- 14th-century shipwreck laden with treasure found
- Incest dad 'spent days in cellar'
- Don't let a hospital kill you
- Parents increase reward

International Edition | Languages | CNN TV | CNN International | Headline News | Transcripts | Advertise with Us | About Us | Contact Us

# Exhibit 10

# AFFIDAVIT

COUNTY OF DALLAS
STATE OF TEXAS

BEFORE ME, the undersigned official, on this day appeared Brook Busbee, who is personally known to me, and first being duly sworn according to law upon her oath, deposed and said as follows:

"My name is Brook Busbee. I am over 18 years of age, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

"I have been licensed by the Supreme Court of Texas as an attorney since November 1979. I worked as an assistant District Attorney in Travis County, Texas from 1979 through 1981. I was the chief felony prosecutor for the 147th Judicial District Court.

"I moved to Dallas and began the private practice of law in December 1981. I have represented thousands of individuals charged with felonies in Dallas and her contiguous counties. In 1985, I was certified by the Texas Board of Legal Specialization in Criminal Law, and I have been continually certified to this date. My practice is limited to criminal law.

"I have tried three death penalty cases in Dallas County: State v. Mark Robertson, State v. Patrick Murphy, Jr., and State v. Licho Escamilla. I have also represented Mr. Brian Roberson in his post-conviction writ challenge to his death sentence. I speak Spanish, and represent many Spanish-speaking individuals, although in this instance, Mr. Escamilla spoke English.

"I was first chair counsel on Patrick Murphy, and although technically considered first chair in Robertson and Escamilla, I deferred the position to more experienced co-counsel. In Mr. Escamilla's case, particularly, I deferred to C. Wayne Huff. Mr. Huff and I were both appointed to the case by the Honorable Lana McDaniel, presiding judge of the 203rd Judicial District Court of Dallas County, Texas.

"We did not ask the Court for a forensic social worker ("mitigation expert") to assist us, but we did have the help of a defense investigator, Cliff Jenkins, who investigated Escamilla's background for us. He contacted several members of Escamilla's family and any friends and neighbors he could find.

"I spent a great deal of time and effort developing evidence for a mitigation defense. I relied on evidence of physical and emotional childhood abuse evidence in the two other death penalty cases I have tried, Robertson and Murphy. I am well aware of its mitigating potential and I know how to search for and develop such evidence, even without the help of a forensic social worker. We searched for such evidence in Escamilla's case but found none.

"We hired two experts to assist us. We had an EEG performed on Escamilla and had Dr. Jay Crowder evaluate him for organic brain damage. He found none. Dr. Pearson performed a psychological evaluation, personally interviewing Escamilla and reviewing various records, including Escamilla's TYC and medical records. I had hired Dr. Pearson because of his special expertise in adolescent behavior disorders, hoping that he could assist us in explaining why our client had committed the heinous acts that he had committed. Dr. Pearson could find no psychological excuse or explanation for Escamilla's behavior that could have been presented to a jury in mitigation. His opinion, expressed to me at the conclusion of his interview, was (as I recall) that Escamilla was simply a very violent and conscienceless young man. He found him 'disturbing.' It was clear to me that to present psychiatric evidence concerning Escamilla would be tantamount to proving the State's case for the death penalty.

"Beginning immediately after my appointment to the case in 2005, my assistant, Virginia McDonald, and I made numerous attempts to speak with Escamilla's father, Jose Escamilla, his sister Brenda Hinojosa, and his brothers, Juan and Jose Escamilla, Jr. We had a very difficult time getting them to meet or talk with us, and we were frustrated by their repeated efforts to dodge us. I believe the family was avoiding us because they wanted to hire a different attorney to represent Escamilla.

"I made several attempts to speak with both of Escamilla's brothers, Jose Jr. and Juan. All of my efforts to talk with Jose Jr. were rebuffed. He refused to meet with me or speak to me. I had similar trouble with Juan, but I did finally talk to him before Escamilla's trial in the holdover. As I recall, he was serving a jail sentence at the time. He told me the same things the rest of his family had told us.

Juan serving a jail sentence @ the time

"On March 7, 2002, Escamilla's father, Jose Escamilla, and Escamilla's sister, Brenda Hinojosa, finally met with Mr. Huff and me at my office. We couldn't get any other family members to come to this meeting. The meeting lasted for four hours, during which we discussed Escamilla's childhood and his family and medical history. His family helped us obtain Escamilla's medical records, and they told us that Escamilla had a substance abuse problem that he didn't receive treatment for while in juvenile detention facilities. They also told us that Escamilla changed for the worse when his mother died, drinking heavily and becoming volatile, and they insisted that his murder spree was ? attributable to this change in him. They led us to neighbors and friends, Sofia Barajas and Jesse Cisneros, who made similar remarks about the change in Escamilla after his mother's death.

"I remember speaking with Escamilla's other sister, Maria, and another young female member of the family, possibly Rachel Hinojosa, during the punishment phase of trial. I can't remember if I met them before trial, but our investigator, Cliff Jenkins, did. I remember them as off-putting, overly dramatic young women. I do not believe they would have made good defense witnesses because they would have shifted the jury's attention onto them and away from Escamilla.

"If anyone had mentioned that Escamilla's father was abusive or an alcoholic, we would have fully investigated and tried to develop evidence of it. No family member, neighbor, or friend ever told us, or even suggested, that Escamilla's father had a drinking problem or that he was abusive to anyone. There were many opportunities for a family member or friend to tell us such information. In addition to the initial March 2002 meeting, I met with family members on two other occasions. In total, I spent over eleven hours in person with members of Escamilla's family. My assistant, Virginia McDonald,

also spent time talking with family members. Everyone we spoke to gave us the same impression – that the Escamillas were a fine family and that Escamilla's father was a good man and father. Even Escamilla had nothing but good things to say about his father, and he vehemently denied that he had been abused when I asked.

"Furthermore, Brenda Hinojosa was a trained social worker, employed for many years by the Dallas County Juvenile Probation Department. She conversed with us in a manner that made it clear that she was well versed in psycho-social causes of criminal behaviors. She was clear and unequivocal in her insistence that Escamilla had been raised in a loving family, and that all of his problems stemmed from their mother's death.

"I investigated the criminal history of Escamilla's brothers, but I don't remember looking for his father's criminal history. Even if I had found one, though, I doubt I would have used it. I believe that Escamilla's father was a very compelling mitigation witness. He was emotional on the stand, his testimony was touching, and he was a sympathetic figure - a small man who looked like he had worked hard his whole life. I recall noticing that several of the jurors were visibly moved by his testimony; some even cried. In my opinion, attacking Escamilla's father rather than using him as a mitigation witness would have been less effective and beneficial to Escamilla's punishment defense. I believed then and believe now that Escamilla's best mitigation strategy was to focus on the tragedy it would be for Escamilla's father to lose his wife and then his son.

"As I stated in my December 2005 affidavit, I didn't discuss trial strategy with Escamilla, but this was only because he would not engage in conversation about his trial. The first time I discussed legal issues with him, he advised me that he knew Mr. Huff and I knew what we were doing and that we should do what we thought was right.

"Mr. Huff and I continued to meet with Escamilla before and throughout his trial to tell him what was going on and what we were going to do, including our plan to argue that he was guilty only of the lesser-included offense of murder. Given the strength of the State's case on guilt, Mr. Huff and I agreed that this strategy in the guilt phase would be more effective than arguing that Escamilla acted in self-defense. Even though I did

not specifically discuss my closing argument with Escamilla, he knew that this was our strategy, and he never once expressed an objection to it or any of our other plans.

"Escamilla would shrug acquiescence, nod, or look away as though it was boring when we talked to him. His primary concerns were his wardrobe, his medication (sleeping pills), and whether his family would be present in court. I don't recall him ever asking me to explain or amplify on anything that he was told or anything that occurred during the trial, other than to ask me as the jury verdict was being read which answers would result in the death penalty.

"We talked to Escamilla about the Gillett interview before the pretrial hearing on its admissibility. We regularly asked Escamilla about things we believed he might have first-hand knowledge of. In the notes I made regarding the facts related to the interview and possible arguments for its exclusion, there is no notation that Escamilla informed me that a jailer told him he should do the Gillett interview. Also, I have no recollection of Escamilla telling me this. If he had mentioned it, I know we would have investigated it. I question whether Escamilla would have been willing to testify about any such statement because he had no interest in ever taking the stand at his trial. If he had told this to us, however, we would have given him the opportunity to testify to it.

"On the few occasions during the trial that Mr. Escamilla asked to speak to me in private, he was allowed to do so. I don't believe that the stun belt he wore in any way deterred him from speaking his mind, privately or in open court. In my opinion, he was not afraid of being shocked by the stun belt, as he misbehaved throughout his trial. He spent much of his energy taunting and insulting the bailiff who held the control to the stun belt, he smarted off to the judge during voir dire, and he threatened a state's witness (Hector Zarate) as he left the stand, saying, "Tu sigas, puta." ("You're next, whore."). Furthermore, when the jury's answers to the special issues were read, Escamilla picked up the water pitcher sitting on the defense table and threw it at the jury. It wasn't until he threw the pitcher that the bailiff activated the stun belt.

"Mr. Huff and I offered Escamilla the best defense we could, and our punishment defense made the jury's decision to assess a death sentence difficult. In the end, I think