## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| LICHO ESCAMILLA, | ) | |
| Petitioner, | ) | |
| vs. | ) | No. 3:06-CV-2248-O (BH) |
| | ) | |
| RICK THALER,[1] Director, | ) | |
| Texas Department of Criminal | ) | |
| Justice, Correctional Institutions Division, | ) | |
| Respondent. | ) | Referred to U.S. Magistrate Judge |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order* 3-251, this case has been automatically referred for findings, conclusions, and recommendation.  Based on the relevant filings and applicable law, the petition should be **DENIED in part** and **DISMISSED without prejudice in part.**

## I.  BACKGROUND

Petitioner, an inmate currently incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division (TDCJ-CID), filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his October 31, 2002 conviction for capital murder in Cause No. F01-59398-P.  Respondent is Rick Thaler, Director of TDCJ-CID.

### A.  Factual History

On December 18, 2001, the State indicted petitioner for capital murder in Cause No. F01-59398-P.  It alleged that petitioner shot and killed Christopher James, a Dallas police officer who was acting in the lawful discharge of an official duty, and that petitioner knew James was a peace officer. (Tr.:2).  (Trial Transcript at 2).  On October 21-31, 2002, petitioner was tried before a jury, found guilty, and sentenced to death.  (*Id.* at 10-15, 327).

---

[1] On July 15, 2009, Rick Thaler succeeded Nathaniel Quarterman as Director of the Correctional Institutions Division of the Texas Department of Criminal Justice.  Under Rule 25(d) of the Federal Rules of Civil Procedure, Thaler "is automatically substituted as a party."

The Texas Court of Criminal Appeals recounted the evidence presented at trial as follows:

The evidence shows that the victim was one of four off-duty Dallas police officers working extra jobs at a nightclub.  The nineteen-year-old appellant shot and killed the victim and wounded one of the other off-duty police officers (who survived the shooting) outside the club.  An employee of the club (Bravo) testified that two "cops" were approaching the scene of a fight at the parking valet station in front of the club when the shooting started.

Q. [PROSECUTION]: And, go ahead and tell the jury what you remember from there?

A. [BRAVO]: Well, then after that, all of the fighting and whatever. Then, the cops were like on their way to help.

Q: The cops were on their way to help, is that what you said?

A: Yes.

Q: All right.  Go ahead?

A: And, well, as soon as, well, they didn't even get the chance to get to the guy, when the guy just bring out a gun and started shooting.

Q: And, what happens then?

A: Well, it sounded like the first cop got shot, then the [victim].  The shooting just like keep going on and on.  Then the guy tried to took [sic] off and he stopped like midway where [the victim] was on the floor.  He was like, shoot him a couple of times, and then just took off, and a couple of cops–a couple of policemen just followed him.

A valet parking employee (Gonzales) testified that appellant shot two uniformed police officers as they were approaching the scene of the disturbance at the parking valet station.  Gonzales testified that he could tell they were police officers.

Q. [PROSECUTION]: And, then what happened?

A. [GONZALES]: When I turned around, I saw two police officers coming and [appellant] fired at them.

Q.  And, the two persons that you saw coming, you could tell that they were police officers; is that right?

2

A. Yes.

Q. And, where did you see the two police officers coming from?

A. Further away in front of where we were at.

Q. Could you take your pointer and point to the area that you first saw the two police officers on State's Exhibit 10?

A. Yes.

Q. Go ahead, please?

A. (Witness did as requested.)

Q. And, you are pointing to an area that looks like it is on the driveway area, pretty close to the front of Club DMX; is that right?

A. Yes.

Q. And, they were in uniform?

A. Yes.

The off-duty police officer who was wounded in the shooting (Lockett) testified that he was walking toward a disturbance (which he described as a breach of the peace) in the valet parking area when the shooting started.

Q. [PROSECUTION]: Please, tell the jury what it is that you recall seeing?

A. [LOCKETT]: Okay. At that time, I was standing there. They,–the disturbance was in the valet area. And, I started walking over there, the people that's in the valet area, as I last recall, three Latin males and one Latin male running away, or several Latin males that were running toward me, I see these, at this time, three Latin males trying to attack this one Latin male. And, I grabbed the one Latin male from behind, and as I am pulling him to the ground, we fall to the ground and we begin to struggle as I hear gunfire. And, as I hear gunfire, the next thing I know I am shot and on the ground. I am shot in my left wrist and the bullet goes from my left wrist into the palm of my hand. And that is basically the last thing that I remember.

Lockett also testified that his and the victim's clothing "clearly identified"

3

them as police officers.

> Q. [PROSECUTION]: All right.  Do you remember if November the 24th, Saturday, at 2001, was a rather cold evening?

> A. [LOCKETT]: Yeah, it was chilly.  I think we had like skull caps or a wool cap with Dallas PD emblem and the black jackets with the Dallas Police emblem on the chest and the police emblem on my left side.

> Q.  And, you were wearing such a jacket on that occasion?

> A.  Yes.

> Q.  And, was [the victim] also wearing a police jacket just as you described, as best as you can recall?

> A.  Yes, as best as I can recall, I think he was also wearing a jacket.

> Q.  And, were you both clearly identified as Dallas Police Officers?

> A.  Yes, we were.

A police officer (Rivera), who arrived at the club soon after the shooting, testified that he unbuttoned the victim's "uniform shirt" and ballistic vest to perform CPR on the victim.

> Q. [PROSECUTION]: When you were ministering to him, did I understand you to say that in order to do the CPR, you had to unbutton some of his clothing and to do something with some of the apparel that he was wearing?

> A. [RIVERA]: Yes, sir.  I unbuttoned his uniform shirt, unbuckled the front of his Sam Brown Belt.  He was wearing his ballistic vest. There are velcro straps that come to the front.  And, basically, I pulled the straps out and removed the front panel, so that–we can work on him medically.

The evidence also shows that, soon after the shootings at the club, appellant was arrested and transported to a hospital because he suffered a minor gunshot wound in an exchange of gunfire with one of the other off-duty police officers. Several witnesses at the hospital heard appellant commenting about how he had shot a "faggot cop."  For example, a police officer (Hay), who accompanied appellant to the hospital, testified:

4

Q. [PROSECUTION]: And, what happens as far as he is concerned that you recall there?

A. [HAY]: Once we were in the actual trauma room, the doctor asked him, if he knew where he was at. And, he replied, I am at Parkland because I shot a faggot cop.

Q. And, what then occurs after that, that you recall?

A. He made several more statements along those lines. He repeated that phrase several times. I recall, that after the attending physician conducted their initial examination and the nurses started to file out to get–to do their business, he looked at myself and another Officer, Joe Allen, and started laughing and said, yeah, yeah, mother fuckers, I thought I was invincible like that cop thought he was, but I guess, I am not. And, then he made another statement and was laughing and said that he would be–he said, yeah, mother fucker, I will be out of here in forty-eight hours.

Q. And, the words that you are telling the jury right now are your recollection, not of your language, but of the language he used.

A. That is correct.

Appellant later admitted during a videotaped interview with a television reporter that he knew he was shooting a police officer.

Q. [GILLETT]: Now, you've, you've told me already you knew you were shooting at a police officer–the first one...

A. [APPELLANT]: Yeah.

Q. ...so there's no question that you knew you were shooting at a police officer the first time.

A. Yeah.

Q. You think you killed him?

A. Yeah. Hell yeah. I killed that MF.

*Escamilla v. State*, 143 S.W.3d 814, 817-19 (Tex. Crim. App. 2004).

At the punishment phase of the trial, the prosecution offered evidence that petitioner shot and

killed another victim, Michael Torres, on November 8, 2001. (R. 38:77-81, 152) (Trial Record, Volume 38 at 77-81, 152). He was adjudged delinquent for the unauthorized use of a motor vehicle at age thirteen, after leading police on a high-speed chase. (R. 38:25-29; R. 46:State's Ex. #143). At seventeen, he was also adjudged delinquent for committing aggravated assault on a public servant by attacking an assistant principal with a tire iron. (R. 38:40, 49-5; R. 46:State's Ex. #144). On September 10, 2001, petitioner was placed on felony probation for stealing a vehicle and leading police on a high-speed chase. (R. 38:70-4; R. 46:State's Ex. #142). The complete videotape of petitioner's television interview, which had been presented in edited form during the guilt phase of the trial, was also shown to the jury. (R. 39:20; R. 45:State's Ex. #1(b)).

The defense presented testimony from petitioner's father, his half-sister Brenda Hinojosa, and three family friends, Sara Barajas, Sophia Barajas, and Jessie Cisneros. His father testified that petitioner was one of four children he had with petitioner's mother, that petitioner was close to him, and that he was an obedient child who was kind to animals and loved his mother very much, hugging and kissing her often. He also testified that he owned a tire business, that petitioner began helping him there at age eight, and that petitioner ran the tire shop for a time in 1999, after the father was injured in a car accident. When petitioner's mother died in 2000, petitioner was incarcerated in the Texas Youth Commission (TYC) and was advised by telephone. After he was released, petitioner cried a lot, stopped eating, and began drinking a lot, and the father believed that petitioner wanted to die. The father also testified that before petitioner shot Michael Torres, someone had shot at and damaged his tire shop, causing him to move in with his step-daughter. (R. 39:22-30, 38).

Brenda testified that she was the supervisor of the intake unit of the Dallas County Juvenile Probation Department. Her mother married petitioner's father in 1977, and Brenda began living

6

with the family at that point.  Petitioner had a close relationship with his mother.  He helped her with cooking and chores when he was not at the tire shop, confided in her, and never recovered from her death.  Petitioner was a normal child until age eleven, when two adult men beat him, and his older brother Jose retaliated by shooting at the men.  Jose was sent to the TYC, and petitioner blamed himself, having seen the pain his parents went through during that year.  When petitioner was later sent to TYC, he was injured while in custody and never received the grief, drug, and psychological counseling that he needed.  Brenda also confirmed that petitioner was not eating or sleeping after his mother died, started losing a lot of weight, and began drinking heavily.  (R. 39:45-65).

Sara Barajas testified that she had lived next door to the Escamilla family since she was a child, and that she had witnessed petitioner's altercation with the assistant principal.  The principal threw a big rock and hit petitioner in the head, causing a deep gash, before petitioner hit him with the tire iron.  Sara also testified that her mother, who was a friend of the Escamillas, had told one of the defense attorneys that Sara had been a witness to the incident during a telephone conversation the previous evening.  Sara said that she was testifying reluctantly because her best friend was a cousin of Michael Torres, whom petitioner killed.  (R. 39:84-91, 101-04).

Sophia Barajas testified that she lived next door to the Escamilla family and had four children.  The families were friendly with one another, and the children played together.  Petitioner was kind to the smaller children in the neighborhood, and she saw him watering his mother's garden and hanging Christmas lights for her.  After his mother died, she saw that he changed, keeping to himself and drinking more.  (R. 39:105-10).

Jesse Cisneros testified that he grew up on the same street as petitioner and spent time with him and his older brother Jose causing mischief, such as shooting BB guns, turning on the fire

hydrant, breaking into the local swimming pool, and smoking marijuana. Cisneros also had problems with the law, including being charged with stealing a car. Cisneros at one point stopped being friends with petitioner's older brother because the brother's friends were tougher. Cisneros moved away from the neighborhood but would come back to visit his mother, and he saw petitioner after his mother had died. Petitioner had lost a lot of weight and looked troubled. Cisneros was a land surveyor and a minister at the time of trial. He believed that if petitioner received a life sentence, he would have the opportunity to know God, as Cisneros did when he was in jail, and petitioner could then do the work of God. (R. 39:114-23).

**B.    Procedural History**

In his direct appeal, petitioner raised thirty-one points of error. The Texas Court of Criminal Appeals affirmed petitioner's conviction in a published opinion. *Escamilla v. State*, 143 S.W.3d 814, 817-19 (Tex. Crim. App. 2004). The Supreme Court subsequently denied a petition for certiorari. *Escamilla v. Texas*, 544 U.S. 950 (2005). On January 6, 2006, petitioner filed a state application for writ of habeas corpus raising ten grounds for review. (State Habeas Transcript, vol. 1:7-9). The Court of Criminal Appeals denied petitioner's state application by written order on the findings of the trial court without an evidentiary hearing. *Ex parte Escamilla*, No. WR-67,421-01 (Tex. Crim. App. Oct. 10, 2007).

Petitioner filed a skeletal federal habeas petition on December 21, 2007, and a complete petition on May 2, 2008. Respondent filed an answer on October 14, 2008, and provided the state court records. Petitioner filed a reply brief on January 14, 2009, and the issues are now ripe.

**C.  Substantive Issues**

Petitioner asserts that:

● his constitutional rights were violated because the jury in his case was not chosen from a panel that represented a fair cross-section of the community (ground four);

● the instructions given to the jury at the punishment phase violated his due process rights because:

> • the term "probability" as used in the first special punishment issue diluted the reasonable doubt standard (ground nine);

> • the statutory definition of mitigation evidence is unconstitutionally narrow (ground seven);

> • Texas' "12-10 rule" fails to inform the jury of the consequences of a deadlock at punishment (ground eleven);

● trial counsel provided ineffective assistance by:

> • failing to investigate and present available mitigating evidence (ground one);

> • conceding petitioner's guilt without first consulting him (ground two);

> • precluding petitioner from testifying at the suppression hearing (ground three);

> • failing to challenge the racial composition of the jury venire (ground five);

> • failing to properly object to an unacceptable juror (ground fourteen);

● appellate counsel provided ineffective assistance by:

> • failing to challenge the statutory definition of mitigation evidence (ground eight);

> • failing to challenge the term "probability" as used in the first special punishment issue (ground ten);

● the Texas death penalty statute is unconstitutional because

> • the State is not required to find the absence of mitigating factors beyond a reasonable doubt (ground twelve);

> • it sends mixed signals to the jury by allowing the jurors to consider and evaluate evidence in an inconsistent fashion when deciding punishment (ground thirteen);

> • it permits open-ended jury discretion in sentencing (ground fifteen); and

●the administration of the death penalty in Texas violates the ban against cruel and unusual punishment (ground six).

## II. ADMISSIBILITY OF EXHIBITS

Respondent claims that exhibits 1, 15, 16, and 24 are inadmissible under Federal Rule of Evidence 606(b) and Supreme Court and Fifth Circuit case law.  He also asserts that exhibits 1-6 and 24 were not created until after the state habeas court denied relief in petitioner's case and are therefore unexhausted and procedurally barred.

### A.  **Rule 606(b)**

Exhibit 1 is a social worker's affidavit regarding interviews she had with two jurors regarding what potential mitigation evidence they might have taken into consideration had it been presented at trial.  Exhibits 15 and 16 are her notes from the interviews, and exhibit 24 is an affidavit from one of the jurors she interviewed.

Rule 606(b) of the Federal Rules of Evidence states that:

> Upon an inquiry into the validity or a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or concerning the juror's mental processes in connection therewith.

FED. R. EVID. 606(b).  The rule goes on to state that a juror may testify about any extraneous prejudicial information that was improperly brought to the jury's attention, any outside influence that was improperly brought to bear on any juror, and any mistake on the jury verdict form.  Further, if a juror's testimony is inadmissible under this rule, any affidavit or statement from the juror would also be inadmissible.  *Id.*

In *Williams v. Collins*, 16 F.3d 626 (5th Cir. 1994), a habeas petitioner attempted to use post-

verdict interviews with jurors to prove that the trial attorney's alleged ineffective assistance was prejudicial under *Strickland v. Washington*, 466 U.S. 668 (1984). The Fifth Circuit held that the district court had not abused its discretion in not allowing testimony from trial jurors at the evidentiary hearing as to whether their deliberations would have been different if they had been presented with mitigating evidence that was not presented at trial.  In particular, it held that "the post-verdict inquiry of jury members, as live witnesses or by affidavit, is inappropriate and precluded by" Rule 606(b).  *Id*. at 636.  Based on *Williams*, exhibits 1, 15, 16 and 24 are not permissible under the Federal Rules of Evidence and will not be considered.

**B.**     **Exhaustion**

Petitioner acknowledges that he did not provide Exhibits 1-6 and 24 to the state habeas court but contends that they are not unexhausted because they bolster or supplement, but do not fundamentally alter, his claim that trial counsel were ineffective for failing to investigate and present certain mitigating evidence.  *See Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005).  Because it appears that petitioner is entitled to no habeas relief on the allegedly partially unexhausted claim, the Court bypasses the procedural issue and considers Exhibits 2-6 in evaluating the merits of the claim.  *See* 28 U.S.C. § 2254(b)(2); *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998).

### III. AEDPA

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996.  Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Because petitioner filed his petition after its effective date, the Act applies.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions.

Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000). In this case, the denial of petitioner's state writs constitutes an adjudication on the merits. *See Ex parte Thomas*, 953 S.W.2d 286, 288-89 (Tex. Crim. App. 1997) (holding that a denial, rather than a dismissal, signifies an adjudication on the merits). The AEDPA standards enumerated in 28 U.S.C. § 2254(d) apply.

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). A decision is contrary to clearly established federal law, within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* instructs that a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). A state court unreasonably applies Supreme Court precedent

if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the petitioner rebuts the presumption by clear and convincing evidence under § 2254(e)(1).

## IV.  PROCEDURAL BAR

Respondent contends that petitioner's jury panel (fourth ground) and jury instruction claims (seventh and ninth grounds) are procedurally barred.

When a state prisoner has defaulted a federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the petitioner can establish cause for the default and actual prejudice as a result of the alleged violation *or* that failure to consider the claims would result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To satisfy the independent and adequate requirements, the dismissal of a claim must "clearly and expressly" indicate that it rests on state grounds which bar relief, *and* the bar must be strictly and regularly followed by state courts and applied to the majority of similar claims. *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001), *citing Amos v. Scott*, 61

13

F.3d 333, 338-39 (5th Cir. 1995).

As discussed below, Respondent is correct that these grounds are procedurally barred.  In an abundance of caution, however, the claims are also addressed on the merits.

## VI.  JURY PANEL

In his fourth ground for relief, petitioner asserts that his rights under the Sixth and Fourteenth Amendments were violated because the jury in his case was not chosen from a fair cross-section of the community.  Respondent contends that this ground is procedurally barred[2] and without merit.

The Supreme Court has held that the Sixth Amendment right to a jury trial requires that the jury be selected from a representative cross-section of the community.  *Taylor v. Louisiana*, 419 U.S. 522, 528-29 (1975).  Jury venires must not systematically exclude distinctive groups in the community.  *Duren v. Missouri*, 439 U.S. 357, 363-64 (1979).  In order to establish a *prima facie* Sixth Amendment fair cross-section violation, petitioner must show that: 1) the group that was alleged to have been excluded is a distinctive group in the community; 2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of this group in the community; and 3) this under-representation is due to systematic exclusion of the group in the jury selection process.  *Id*. at 364.

Under Texas law, the names on the "jury wheel" are taken from the lists of persons registered

---

[2] At the state habeas level, the trial court found that by failing to object to the jury venire at trial, petitioner had waived any error on collateral review.  (S.H.Tr.9:2778-79).  An objection at trial is needed to preserve even constitutional errors for appellate review. *See Allridge v. State*, 850 S.W.2d 471 (1991).  The Fifth Circuit has held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a claim.  *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999).  Because petitioner's fourth ground for relief was denied at the state level on the basis of an independent and adequate state ground, he may not raise it in his federal petition unless he can establish either cause and prejudice or that a failure to consider this claim on its merits would result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750; *Jones v. Johnson*, 171 F.3d at 277.  Because he does not allege either exception in his petition or reply brief, his fourth ground for relief is procedurally barred.

to vote in Dallas County, and those with a driver's license or a state identification card showing an address there, so long as they are not already disqualified. TEX. GOV'T CODE ANN. § 62.004(a) (Vernon 1998).  The Fifth Circuit has held that the use of the voter registration list as the *sole* source of potential jurors does not violate the Sixth Amendment. *United States v. James*, 528 F.2d 999, 1022 (5th Cir. 1976).  Texas' use of *both* the voter registration list and the list of all persons with a driver's license or state identification card is not an inherently exclusive method of selection.

Petitioner proffers the affidavit of SMU professor Dr. Harold Hietala, who was asked by petitioner's state writ attorney to determine whether there was substantial under-representation of any distinct group in the venire panel(s) from which petitioner's jury was chosen.  Dr. Hietala used the 2000 census figures for Dallas County and two studies about people who reported for jury duty during certain periods of time to compare the percentage of Hispanics over the age of eighteen with the number who reported for jury service generally and for service in several death penalty cases, including petitioner's.  Dr. Hietala acknowledged that he looked at the numbers of Hispanics who reported for jury service rather than those who were summoned, and that the general study as well as other studies of death-penalty venires do not indicate that there is a "compelling argument for under-representation relative to jury summons." (S.H.Tr.4:1119-1137).  He also acknowledged that the percentage of Hispanics actually summoned for jury service for petitioner's trial was quite similar to the percentage in Dallas County, according to the 2000 Census.  (S.H.Tr.4:1124). Although none of the studies he conducted or considered actually examined the number of Hispanics qualified for jury service as compared to those who actually reported, he concluded that there would still be an under-representation. (S.H.Tr.4:1135). Dr. Hietala also concluded that both Hispanics and young people had been systematically excluded from juries in Dallas County for a period of five

years.  (*Id.* at 1140).

Petitioner has failed to meet the second requirement of *Duren*.  He has not shown that Hispanics are under-represented on jury venires in comparison to the number in the community qualified for jury service.[3]  The Fifth Circuit has found that this is the appropriate comparison under the second prong of *Duren*.  *See Pondexter v. State*, 942 S.W.2d 577, 580-81 (Tex. Crim. App. 1996); *United States v. Brummit*, 665 F.2d 521, 529 (5th Cir. 1981).

Petitioner has also not shown systematic exclusion of Hispanics *in the jury selection process*. He essentially complains that Hispanics were summoned but did not report for jury service, and that this created the under-representation in the jury venires studied by Hietala.  At the state level, petitioner asserted that this is systematic because of low juror pay and because jury summonses are not enforced by the county.  (S.H.Tr.1:54).  A failure to report to jury service is not a systematic exclusion of Hispanics from jury venires by the State.  While low pay and a failure to enforce summons may suppress juror turnout, petitioner has failed to show that this is a systematic exclusion of Hispanics as opposed to any other group of potential jurors including, young people from the ages of eighteen to thirty-four (a group that Dr. Hietala also determined was under-represented).

The state habeas court found that petitioner had failed to prove both the second and third prongs of the *Duren* test because the statistics did not show that the number of Hispanics in jury venires was not fair and reasonable in relation to the number of Hispanics actually qualified for jury

---

[3]  Under Texas state law, a person is not *disqualified* from jury service in Dallas County if he or she is over the age of eighteen, a citizen of both Texas and Dallas County, and does not have any prior felony conviction on his or her record. TEX. GOV'T CODE ANN. § 62.004(a) (Vernon Supp. 2004).  However, a potential juror may claim an exemption from jury service and not report for service if he or she: 1) is over seventy-years old; 2) has legal custody of a child under ten that would be left without adequate supervision; 3) is a high school or college student; 4) has served on a jury with the past two years; 5) is the primary caretaker of an invalid; or 6) is a member of the military on deployment.  TEX. GOV'T CODE ANN. §§ 62.106(a), 62.107(a) (Vernon 2003).

service or that any under-representation was due to *systematic exclusion*. (S.H.Tr.9:2780-87).[4]  It concluded that this ground is without merit. (S.H.Tr.9:2779-80, 2788).  This conclusion is not an unreasonable application of federal law.  Petitioner has not shown that this claim entitles him to relief, and it should be denied.

## VII.  JURY INSTRUCTIONS

In grounds seven, nine and eleven, petitioner asserts that the instructions given to the jury at the punishment phase of a Texas capital murder trial are unconstitutional.

### A.   "Probability"

In his ninth ground, petitioner argues that the term "probability" as used in the following special punishment issue violates his due process rights because it dilutes the reasonable doubt standard:

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Licho Escamilla, would commit criminal acts of violence that would constitute a continuing threat to society?[5]

The jury answered "yes".  (Tr.:323-24); *see also* TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(e)(1) (Vernon 1991).  Respondent contends the claim is procedurally barred[6] and lacks merit.

Petitioner relies on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536

---

[4]  The state habeas court found that any under-representation in the jury venires studied by Hietala could also be caused by incorrect addresses or summonses addressed to teenagers who no longer live at home, to disabled or ill persons, or to persons who choose not to report. (S.H.Tr.9:2785).

[5]  Defense counsel's objection at trial that the term "probability" diluted the reasonable doubt standard contained within the issue was overruled.  (R. 39:127-29).

[6]  Petitioner asserts that his ninth ground is not procedurally barred because this claim was raised on direct appeal.  (Pet. at 148).  On appeal, however, he argued that the federal constitution is violated because the term "probability" is not defined for the jury.  *Escamilla*, 143 S.W.3d at 828.  The state habeas court found that this ground was not raised on direct appeal and was therefore procedurally barred. (S.H.Tr.9:2798-99).  The state procedural rule that prohibits a petitioner from raising an issue at the state habeas level that could have been raised on direct appeal but was not is an adequate state ground capable of barring federal habeas review.  *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004); *Soria v. Johnson*, 207 F.3d 232, 249 (5th Cir. 2000).  This claim is procedurally barred.

U.S. 584 (2002). In *Apprendi*, the Supreme Court held that a jury, rather than a judge, must find beyond a reasonable doubt any fact that exposes a criminal defendant to a penalty greater than the statutory maximum. *Id*. at 482-83. In *Ring*, the Supreme Court extended the rule announced in *Apprendi*, holding that capital murder defendants are entitled to a jury determination on any fact that increases their maximum punishment, such as aggravating circumstances that make a capital defendant eligible for the death penalty. *Ring*, 536 U.S. at 588. Petitioner asserts that due process requires that future dangerousness be proven beyond a reasonable doubt because the first special issue "paves the way" for the death penalty. (Pet. at 149-50).

The future-dangerousness special issue that the jury was required to answer in this case passes constitutional muster. *See Jurek v. Texas*, 428 U.S. 262 (1976). The Fifth Circuit has consistently held that the terms used in the Texas future-dangerousness special issue, including the term "probability", are not unconstitutionally vague and can instead be understood in their common meaning. *See Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996); *James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir. 1993). It has found the term "probability" has a plain meaning such that the discretion left to the jury in answering the future-dangerousness issue is no more than the discretion that exists in the jury system itself. *Milton v. Procunier*, 744 F.2d 1091, 1095-96 (5th Cir 1984). It has also found that nothing in *Apprendi* and *Ring* or *Blakely v. Washington*, 124 S.Ct. 2531, 2537 (2004) (reaffirming *Apprendi* in holding that a state judge violates the Sixth Amendment when he sentences a defendant beyond the statutory maximum assessed by the jury based on his own finding), even requires that the future dangerousness special issue be subjected to a reasonable doubt burden of proof. *Rowell v. Dretke*, 398 F.3d 370, 379 (5th Cir. 2005). Rather, accepting an argument that the term "probability" swallows the reasonable doubt standard would constitute a new

constitutional rule that would be a violation of *Teague v. Lane*, 489 U.S. 288 (1989). *Id.*

In denying this claim, the state habeas court found that the special punishment issues are not aggravating factors under *Apprendi/Ring* and rejected petitioner's contention that the term "probability" lessens the burden of proof. (S.H.Tr.9:2800). This is not an unreasonable application of federal law, and petitioner's ninth claim for relief is without merit.

## B.    Definition of Mitigation Evidence

In his seventh ground for relief, petitioner asserts that the statutory definition of mitigation evidence provided to the jury, that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing a defendant's moral blameworthiness", is unconstitutionally narrow. (*See* Tr.:320). The definition was provided in connection with the following special issue:

> Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

The jury answered "no". (Tr.:323-24); *see also* TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(e)(1) (Vernon 1991). Petitioner claims the definition does not include evidence about his character, record, or uniqueness as an individual, including his love and devotion for his family, playfulness as a child, previous compassion for a helpless animal, or potential for a religious awakening while in prison. (Pet. at 135). He also argues that the jury is given unchecked discretion to choose to impose the death penalty. Respondent claims this ground is procedurally barred[7] and without merit.

---

[7]  At the state habeas level, the state habeas court first found that petitioner's seventh ground was not raised on direct appeal and was therefore procedurally barred. (S.H.Tr.9:2795-96). Petitioner contends that a failure to consider this claim would result in a fundamental miscarriage of justice. (Pet. at 130-31). Petitioner has not met this showing because he has not shown that he is either actually innocent of capital murder or that, but for a constitutional error, no reasonable juror would have found him eligible for the death penalty. *Sawyer v. Whitley*, 505 U.S. 339-344 (1992). This claim is procedurally barred.

In *Boyde v. California*, 494 U.S. 370, 377-78 (1990), the Supreme Court stated that the "Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence." In *Payne v. Tennessee*, 501 U.S. 808, 822 (1991), it noted that "[w]e have held that a State cannot preclude the sentencer from considering any relevant mitigating evidence that the defendant proffers in support of a sentence less than death." Neither Supreme Court nor Fifth Circuit case law supports petitioner's contention that the definition of mitigating evidence given to the jury in his case unconstitutionally limited the consideration of relevant mitigating evidence. In fact, the Fifth Circuit has held that this definition does not unconstitutionally limit or preclude the consideration of any mitigating factor, including aspects of a defendant's character or record and circumstances of the offense offered as a basis for a sentence less than death. *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001), *citing Lockett v. Ohio*, 438 U.S. 586, 604 (1978). *Beazley* noted that virtually any evidence is capable of being viewed as having some bearing on a defendant's moral culpability, and good character evidence can also be considered by a jury through the future dangerousness special issue. *Id.*

The jury in petitioner's case was also instructed at the punishment phase of the trial that "[y]ou shall consider all evidence admitted at the guilt or innocence stage and the punishment phase, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty." (Tr.:319). This second instruction clarifies that the jury was free to consider all evidence offered at trial, including petitioner's character and background, in order to reach its decision on the special issues; it addresses petitioner's chief complaint regarding the definition of mitigating evidence.

The state habeas court's conclusion that the statutory definition of mitigating evidence is not

unconstitutional is not contrary to federal law.  Petitioner's seventh ground is without merit.

**C.**     **12-10 Rule**

In his eleventh ground for relief, petitioner alleges that his Eighth and Fourteenth Amendment rights were violated because the jury in his case was instructed that it could not vote "yes" to the mitigation special issue unless ten or more jurors agreed with that answer or "no" unless all twelve jurors agreed with that answer.  (Tr.:319-20).  He claims that the "12-10 rule" prevented the jury from giving due consideration to mitigating evidence, undermined its sense of responsibility for imposing a death sentence, relieved the State of its duty to prove beyond a reasonable doubt that petitioner merited a death sentence, and that these instructions were excessively vague, resulting in arbitrary and capricious sentencing patterns.  Because Texas law in actuality requires that a defendant receive a life sentence if the jury hangs on the mitigation issue, he argues, the jurors should have been instructed regarding the consequences of a jury deadlock.

Petitioner cites *Mills v. Maryland*, 486 U.S. 367, 383 (1988), in which the Supreme Court struck down Maryland's capital sentencing system because a single juror could preclude the jury from considering certain evidence to be mitigating, and the jury could be prevented from considering mitigating factors if the twelve jurors did not agree on the specific facts.  In *Jones v. United States*, 527 U.S. 373, 381 (1999), however, the Supreme Court subsequently considered whether a federal death penalty defendant's Eighth Amendment rights were violated because the jury was not instructed about the consequences of a jury deadlock at the punishment phase of the trial.  Under the federal death penalty statute, the jury was required to consider all aggravating and mitigating factors and determine whether the aggravating factors outweighed the mitigating factors.  All aggravating factors in a federal death penalty case must be proven beyond a reasonable doubt, whereas the jury

may consider a mitigating circumstance so long as one juror finds that its existence has been established by a preponderance of the evidence. The court did not instruct the jury, as requested by the defense, that if it was unable to reach an unanimous decision with regard to the sentence to be imposed, the judge would sentence Jones to life imprisonment without possibility of parole. The jury unanimously found the existence of two statutory and two non-statutory aggravating factors beyond a reasonable doubt, and various jurors found the existence of ten mitigating factors. After weighing these factors, it unanimously recommended that Jones be sentenced to death. *Jones*, 527 U.S. at 376-80. The Supreme Court held that the Eighth Amendment was not violated because: 1) the jury was not misled about its role at punishment; 2) the object of the jury system is to secure unanimity by a dialogue among the jurors; and 3) the government has a strong interest in having the jury express the conscience of the community that might be undermined if the jury was informed of the consequences of a deadlock in a capital sentencing proceeding. *Id.* at 382.

Since *Jones*, the Fifth Circuit has rejected an argument that the "12-10 rule" in Texas violated a capital murder defendant's Eighth and Fourteenth Amendments. *See Alexander v. Johnson*, 211 F.3d 895, 897, n. 5 (5th Cir. 2000). It has also consistently held that any ruling that the "12-10 rule" violated the federal Constitution would be a new constitutional rule of criminal procedure as defined in *Teague v. Lane*, 489 U.S. 288, 311-13 (1989), and therefore could not form the basis for federal habeas-corpus relief. *See Hughes v. Dretke*, 412 F.3d 582 (5th Cir. 2005); *Alexander*, 211 F.3d at 897; *Davis v. Scott*, 51 F.3d 457, 467 (5th Cir. 1995); *Webb v. Collins*, 2 F.3d 93 (5th Cir. 1993). At the state habeas level, the Court of Criminal Appeals denied this claim on direct appeal based on its previous case law. *Escamilla*, 143 S.W.3d at 828. The denial of this ground at the state level is not contrary to clearly established federal law, and it should be denied.

## VIII.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL–GENERAL

In his second, third, fifth, and fourteenth ground for relief, petitioner asserts that his trial counsel were ineffective for failing to object to the composition of the jury venire, for failing to challenge a juror for cause, for preventing petitioner from testifying at the suppression hearing, and for failing to obtain petitioner's consent before conceding guilt.

To successfully state a claim of ineffective assistance of counsel, petitioner must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A failure to establish either prong of this test requires a finding that counsel's performance was constitutionally effective. *Id.* at 696. The Court may address the prongs in any order.  *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

To determine whether counsel's performance is constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*, 466 U.S. at 689.  Further, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691.

To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  In the context of ineffective assistance of trial counsel, the prejudice component of the *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted).  Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have

been different absent the alleged errors of counsel. *Strickland*, 466 U.S. at 695-96. Petitioners must

"affirmatively prove prejudice." *Id.* at 693. They cannot satisfy the second prong of *Strickland* with

mere speculation and conjecture. *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992).

Conclusory allegations are also insufficient. *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990).

## A.     Jury Venire

In his fifth ground for relief, petitioner asserts that trial counsel were ineffective for failing

to object to the lack of a fair cross-section of the community in the jury venire. As noted in the

discussion of his fourth ground, petitioner has failed to present any evidence that there was a

systematic exclusion of Hispanics from the jury venire. Counsel were not ineffective for failing to

make a meritless objection. *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).

## B.     Objection to Juror

In his fourteenth ground for relief, petitioner asserts that a juror stated that she was unable

to apply the law regarding mitigation evidence because she believed that such evidence only applies

in cases of self-defense, and that his trial counsel were ineffective for failing to challenge her for

cause and for failing to preserve error on the issue.[8]  (Pet. at 182).

On direct appeal, the Court of Criminal Appeals held that petitioner had not preserved error

with respect to this juror – although defense counsel stated on the record that she was objectionable

because of her views on mitigating evidence and requested an additional peremptory strike to use

against her, counsel did not challenge her for cause. *Escamilla*, 143 S.W.3d at 821-22. Even so, it

---

[8]  Notwithstanding Respondent's contention that petitioner failed to exhaust this claim, the interests of justice would be better served by reaching the merits. *See* 28 U.S.C. § 2254(b)(2) (providing that the Court may deny a habeas petition on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998) (reaffirming pre-AEDPA law that "when, as in this case, exhaustion is not waived, courts have the 'discretion in each case [under § 2254(b)(2)] to decide whether the administration of justice would be better served by insisting on exhausting or by reaching the merits of the petition forthwith'").

noted in a footnote that the juror did state during voir dire that she would be open to the possibility of a life sentence even in a case involving a "dangerous police officer killing." *Escamilla*, 143 S.W.3d at 822, n. 1.  It also cited to *Green v. State*, 934 S.W.2d 92, 105, n. 6 (Tex. Crim. App. 1996), in which it held that a failure to grant a challenge for cause because a potential juror does not find particular evidence mitigating is not a meritorious point of error on appeal.  While the federal constitution requires a vehicle by which to consider relevant mitigating evidence, each juror may or may not believe certain evidence is mitigating. *Id.*; *see also Robertson v. State*, 871 S.W.2d 701, 712 (Tex. Crim. App. 1993).

The state court's denial of this ground is not contrary to clearly established federal law.  The standard for determining whether a venire member may be excluded for cause is whether his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).  A state's sentencing guidelines must not preclude jurors from considering any aspect of a defendant's character or background as a mitigating factor. *Lockett v. Ohio*, 438 U.S. 586 (1978).  However, a defendant in a capital case is not entitled to challenge prospective jurors for cause simply because they might view the defendant's mitigating evidence as aggravating evidence instead. *Soria v. Johnson*, 207 F.3d 232, 244 (5th Cir. 2000); *see also Johnson v. Texas*, 509 U.S. 350 (1993).

Petitioner's sole complaint is to the juror's stated reluctance to view certain evidence as mitigating.  This did not disqualify her as a juror under either Texas or federal case law, however. She never stated that the *only* evidence she would consider to be mitigating would be evidence of self-defense, only that she might consider self-defense evidence to be a type of mitigating evidence. (R. 26:48-9).  She also stated her willingness to consider a life sentence if sufficient mitigating

evidence was presented even in a case where a police officer was killed, although she could not articulate what type of mitigating evidence this might be.  (R. 26:29, 31-2, 49).  She was therefore not prevented or substantially impaired in her duties as a juror.  A challenge for cause would not have been granted by the trial court, and its denial would not have been cause for a reversal on direct appeal.  Accordingly, trial counsel were not ineffective for failing to challenge this juror for cause.  Petitioner's fourteenth ground for relief is without merit and should be denied.

## C.   <u>Suppression Hearing</u>

In his third ground for relief, petitioner claims that his trial attorneys were ineffective by precluding him from testifying at the suppression hearing prior to his trial, during which the trial court determined the admissibility of a videotaped interview petitioner gave to a local television reporter.  (R. 32:140).  He claims he would have testified that one of the detention officers at the Dallas County Jail told him that it would be good for him to speak to the reporter.

At the state habeas proceedings, petitioner submitted an affidavit stating that he told his attorneys that one of the detention officers at the jail said that it would be good for him to talk to the reporter.  It also states that no one asked him if he wanted to testify about this at the suppression hearing, and that he would have if his attorney had informed him that he had a right to testify.  (State Application, Ex. #29).  Petitioner's two trial attorneys, Wayne Huff and Brooke Busbee, also submitted affidavits.  Huff's affidavit states that he does not recall petitioner ever telling him about a jailer encouraging him to do the television interview; Huff would have investigated it if he had.  Huff recalled that when he asked petitioner why he had done the interview, he shrugged his shoulders and had no explanation.  Huff felt that petitioner would not have been a good witness on the stand, even during the pretrial hearing, because he was unpredictable and might erupt on the

stand. (S.H.Tr.9:2524). Busbee's affidavit states that she has no recollection of petitioner telling her that a jailer told him that he should do the interview, and her notes about the television interview do not include any notation to this effect. Had petitioner told them this, the attorneys would have investigated and would have given him the opportunity to testify. She questioned whether he would have done so, because he had no interest in ever taking the stand at his trial. (S.H.Tr.9:2531).

The state habeas court found that petitioner never told his attorneys about this alleged statement from a guard, and defense counsel did not deny him the opportunity to present the alleged testimony. (S.H.Tr.9:2745). It also found that the record supported counsel's version of events because they both fought vigorously to exclude the videotape of the interview from petitioner's trial on several different grounds. The court found it extremely unlikely that defense counsel would have ignored additional evidence that might have a bearing on admissibility or that they would not have advised petitioner of his right to testify at the hearing if they had been told about it. (S.H.Tr.9:2745-46). The court concluded that even if his allegation were true, petitioner had failed to show prejudice because there was no reasonable probability that the outcome would have differed. The interview would still have been admissible under state law for several different reasons, and even without it, the evidence against petitioner was overwhelming. (S.H.Tr.9:2747-50).

The state court's decision is not a result of an unreasonable determination of the facts or an unreasonable application of the *Strickland* standard. The record supports the state court's finding that petitioner never informed his attorneys of this statement. The state court's factual findings on this issue are presumptively correct, and petitioner has not shown clear and convincing evidence that rebuts this presumption. Because petitioner never informed his attorneys of this alleged comment, his attorneys were not ineffective in failing to have him testify at the hearing. Nor has prejudice

been shown.  There was a substantial evidence at trial that petitioner shot and killed the victim, including eyewitness testimony and his own acknowledgments to people at the hospital that he shot and killed a police officer.  Petitioner's statements to the reporter were in the same vein as the ones he made to medical and police personnel at the hospital, and therefore there is no reasonable probability that he would not have been convicted had the videotape been excluded from evidence.  Because petitioner has failed to prove either prong of the *Strickland* standard, his third ground for relief should be denied.

### D.   <u>Conceding Guilt</u>

In his second ground for relief, petitioner asserts that his attorneys were ineffective for conceding that he was guilty of murder without first obtaining his consent.

During closing statements, Busbee argued that petitioner was guilty of the lesser-included offense of murder but was not guilty of capital murder because the police officer was not acting in the lawful discharge of an official duty as required by the Texas statute that defines capital murder of a police officer. (R. 37:89-91).  *See* TEX. PENAL CODE ANN. § 19.03(a)(1) (Vernon 1973).

Petitioner's state habeas affidavit states that he spoke to Busbee most of the time, that she did not advise him that she was going to ask the jury to find him guilty of murder, and that he did not believe that he was guilty of murder.  He felt he acted in self-defense, and he would not have agreed to conceding guilt if he had been asked.  He could not blurt out anything to Busbee during this argument because of the stun belt.  (S.H.Tr.3:654, Ex. #29).

Huff's affidavit states that petitioner left the strategic decisions up to his trial counsel, but they kept him informed of their plans, including their defense strategy of arguing that he was guilty of only the lesser-included offense of murder.  He recalled telling petitioner that there was no

credible way to argue that he was not guilty of anything given the strength of the State's case, that petitioner had no objection to this strategy, and that they would have discussed it further if he had. Petitioner was not surprised by this strategy during closing arguments, but if he had been, he would not have been afraid to speak up due to the stun belt. Finally, counsel considered a self-defense strategy but did not believe it had any merit because the evidence to the contrary was overwhelming. Nevertheless, he requested a self-defense charge, but only in the hopes that it would be refused and potentially inject error in the jury charge. (S.H.Tr.9:2524).

Busbee's first state habeas level affidavit, which was submitted along with petitioner's state application, states that counsel did not discuss trial strategy with petitioner and that he did not know that she was going to argue to the jury that he should be found guilty of murder. (S.H.Tr.3:652, Ex. #28). Her second affidavit, submitted with the State's response, explains that she made this statement in the earlier affidavit because petitioner would not engage in conversation about his trial. He had told counsel that he knew that they knew what they were doing and should do what was right. Busbee further states she and Huff continued to meet with petitioner before and during trial and informed him of their trial strategies, including their plan to argue that he was guilty only of the lesser-included offense of murder. She and Huff agreed that this was a more effective strategy than arguing self-defense. Whenever they spoke to petitioner, he would shrug, nod, or look away as though it was boring to him. He was primarily concerned with his wardrobe, whether he received his sleeping pills, and whether his family would be present in court. Busbee did not believe that petitioner was afraid of the stun belt or that the stun belt prevented him from speaking his mind in court. He spent a lot of time taunting and insulting the bailiff who held control of the stun belt, and he threatened a state's witness, but the stun belt was never activated until he threw a water pitcher

29

at the jury after his sentence was read. (S.H.Tr.9:2530-31).

The state habeas court found that trial counsel consulted with petitioner about their strategy of conceding guilt to the lesser included offense of murder. (S.H.Tr.9:2752). It found that the attorneys' affidavits corroborated each other, and that by informing petitioner of this strategy, counsel fulfilled their constitutional obligation and had no duty to obtain petitioner's express consent on this issue. (S.H.Tr.9:2753). The court found that petitioner showed no interest in this or any other strategic decision, and that counsel could not be deemed deficient for not obtaining an unresponsive client's assent to an important strategic decision. (*Id*. at 2754). It also found that the affidavits stating that petitioner showed no fear of the stun belt were credible, that the belt was never used in a manner that would inspire fear, and that petitioner's behavior during trial reflected this. He was a discipline problem during the entire trial, making profane hand gestures towards the bailiff, challenging the authority of the bailiffs and threatening to disarm one of them, smarting off to the judge during voir dire, and threatening a state's witness during punishment as he left the stand by stating "you're next, whore." (S.H.Tr.9:2754-55). The court concluded that counsel were not deficient. (S.H.Tr.9:2756).

The trial court also concluded that petitioner had failed to establish prejudice because the evidence of guilt was substantial, and neither the concession strategy nor the self-defense strategy had much chance of succeeding. The court further found that a self-defense argument based on statements petitioner made to the reporter would have been contrary to the physical evidence and eyewitness testimony, acquittal was extremely unlikely, and counsel might have lost credibility with the jury by making this argument. Accordingly, the court concluded that petitioner had failed to show prejudice because he had failed to show any meritorious defense that was available to him.

(S.H.Tr.9:2758-60).

The state habeas court's conclusions are not an unreasonably application of the *Strickland* standard. In *Florida v. Nixon*, 543 U.S. 175 (2004), the Supreme Court addressed whether trial counsel is ineffective for failing to obtain a client's express consent to concede guilt at his capital murder trial. Nixon had given a detailed statement to the police detailing his guilt in a kidnaping and murder. His trial counsel determined that the best course would be to concede guilt at trial, thereby preserving credibility for penalty-phase evidence of mental instability. While counsel attempted to explain this strategy several times, Nixon was unresponsive and neither approved nor disapproved of this strategy. *Id*. at 179-82. The Supreme Court held that the failure to obtain Nixon's express consent did not automatically render counsel's representation deficient. Defense counsel has a duty to discuss potential strategies with the defendant, but when a defendant neither consents nor objects to the strategy, counsel is not automatically barred from pursuing the strategy. *Id*. at 178, 187. Instead, the reasonableness of the strategy must be judged according to the *Strickland* standard. *Id*. at 192. The Court also noted that counsel for a capital murder defendant may reasonably decide to focus on the penalty phase of the trial and cannot be deemed ineffective for an unwillingness to engage in a "useless charade" of contesting guilt. *Id*. at 192-93.

Here, given petitioner's many statements that he intentionally shot and killed a person he knew to be a police officer, trial counsel determined that the only viable defense at the guilt phase of the trial was to argue that petitioner was *only* guilty of murder because the police officer was not acting in the lawful discharge of an official duty. Counsel informed petitioner of this strategy and he did not object. While petitioner claims that he acted in self-defense, there was absolutely no evidence at trial that supports this assertion, and counsel were not ineffective for pursuing a defense

with no support in the record. Because counsel's trial strategy was reasonable based on the circumstances, petitioner has not met his burden under *Strickland* with respect to this claim, and it should be denied.

## V. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL - MITIGATION

In his first ground for relief, petitioner asserts that his trial counsel were ineffective for failing to investigate and present mitigating evidence.

A failure to investigate the basis of a mitigation defense can amount to ineffective assistance of counsel. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000). In *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003), the Supreme Court noted that "*Williams v. Taylor* is illustrative of the proper application of [the *Strickland* ] standards." Rejecting an attempt to justify a limited mitigation investigation "as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead", the Court found that the relevant issue was "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was *itself reasonable*." *Id.* at 521-23. It held that under *Strickland,* whether trial counsel used "reasonable professional judgment" to support a limited investigation into potential mitigation evidence is determined through an objective review of counsel's performance under the prevailing professional norms and in the context of his/her perspective at the time of trial. *Id.* at 522-23. Applying this standard, the Court found counsel ineffective for failing to investigate potential mitigating evidence beyond a series of tests conducted on Wiggins by a psychologist, a written pre-sentence investigation report, and records from the Department of Social Services (DSS). *Id.* at 523-24. This failure prejudiced Wiggins because a social history report and/or follow-up on the information in the DSS records would have revealed that he suffered from severe deprivation

and abuse by an alcoholic mother and from physical and sexual abuse in subsequent foster care, and there was a reasonable probability that the jury would have returned a different verdict at sentencing if confronted with this evidence. *Id.* at 524-25, 534-36.

Subsequently, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the Supreme Court held that trial counsel were ineffective for failing to examine the court's file for Rompilla's prior rape and assault conviction despite notice that the State intended to present evidence of this prior conviction in support of its request for the death penalty. 545 U.S. at 383. The file contained "mitigation leads" from the prison files indicating a very different history from that provided to counsel by Rompilla and his family, including a childhood in a slum environment, a history of alcohol abuse, and previous psychological tests that pointed to schizophrenia, other disorders, and a low level of cognition. *Id.* at 390-91. In pursing these leads, counsel would have discovered that Rompilla's parents were severe alcoholics, their children were neglected, Rompilla was frequently physically abused by his father, and Rompilla suffered from organic brain damage and significantly impaired cognitive function. *Id.* at 391-2. The Court concluded that Rompilla was prejudiced by this failure because there was a reasonable probability that he would not have been sentenced to death had the jury heard this evidence. *Id.* at 393.

Here, petitioner claims trial counsel failed to hire a qualified mitigation expert, to perform an independent social history of him, and to investigate and present evidence of physical abuse, the family's criminal history, and his substance abuse.

### A.    State Habeas Proceedings

#### 1.    Evidence

At the state habeas level, petitioner submitted several affidavits in support of his claims. The

affidavit of his half-sister Brenda sets out the history of her step-father's and her mother's upbringing, their first marriages, and their marriage and life with their children.  Brenda continued to live with the family on weekends while she attended college, and she helped her parents because of their illiteracy.  The family had many financial hardships.  Petitioner had a close relationship with both of his parents, he was the most affectionate of the children, and he was always kissing and hugging his mother and father.  The family began a downward cycle when petitioner was beaten by two men after a girl accused him of touching her inappropriately at a party.  Their brother Jose subsequently shot one of the men and was sentenced to one year in the TYC.  Petitioner felt that this was his fault, as did his parents.  Her mother had a heart attack and died in October 2000, while petitioner was in the TYC.  While all of the family was devastated by her death, petitioner was particularly hard hit because he felt guilty over being incarcerated.  After her death, Brenda's step-father and his sons were extremely depressed.  Her sister Maria then moved back home with her two children and took petitioner's room, causing him to spend time away from the family.  Petitioner began drinking more and seemed lost after his mother's death.  Brenda met once with attorney Busbee and provided names to the investigator of possible character witnesses, but most of them were not called to testify.  Her affidavit does not mention that her step-father physically abused either her mother or her siblings.  (Pet. Ex. #19).

Petitioner's sister Maria's affidavit states that she saw her father hit her mother with a belt and his hand, and that petitioner would try to shield his mother.  Her father was a harsh disciplinarian with petitioner and his two brothers and once made the children stand out in the sun sanding the rust on pieces of metal.  Her father would hit them with his belt, switches, and a wooden stick, but petitioner prided himself on not crying when beaten by his father or receiving licks at

34

school.  Her father was very family-oriented and would take the entire family to any type of celebration.  She spent much time with her father because her mother was frequently working.  Her brother Jose was a bad influence on petitioner.  He shot a man for beating up petitioner and went to TYC for it, was in a gang and encouraged petitioner to join and fight people, encouraged Juan in the same manner after petitioner went to TYC, never visited petitioner when he was on trial, and once punched her after she moved out of the house at age seventeen.  When a neighbor boy attempted to molest her, her mother concealed it from her father for fear he would kill the boy.  Her father now blames her for her divorce and does not agree with the way she is raising her daughters.  Maria's affidavit makes no mention of speaking to the defense team and does not state that she would have testified about the abuse if she been called as a witness.  (Pet. Ex. #18).

Luis Gonzalez and Margaret Barajas were friends of petitioner's mother.  In their affidavits, they state that they were aware she was physically abused by her husband.  Gonzalez states that he worked with her from 1997 to 2000, and she would tell him of her family's problems, including her husband's drinking, aggressive nature, and tendency to get into fights.  Gonzalez also observed three or four occasions when she appeared to have a black eye.  (Pet. Ex. #20).  Barajas states that she was a neighbor of the Escamilla family in the early 1980s.  Petitioner's mother would visit and talked about her husband's drinking and lack of involvement with the family or in disciplining the children.  She complained that petitioner and his brother did not listen to her and often got into trouble.  Barajas would not allow petitioner to visit her home because he was disrespectful because he cursed and smoked in her house.  Petitioner's father gave more money to his mother than to his wife and children. (Pet. Ex. #21).  Neither Gonzalez' nor Barajas' affidavits state a willingness to testify at petitioner's trial.

Vickie White's affidavit states that she worked at a day care center petitioner attended when he was five years old, and he was a "terror" who would step on other children when they were sleeping on their mats.  He would come to school dirty and without underwear, and she cleaned him off and gave him clean underwear.  Petitioner was proud that his brother was in a gang and would tell other children that his brother would beat them up if they "messed" with him. (Pet. Ex. #22).  White does not state that she would have been willing to testify at petitioner's trial.

Social worker Toni Knox's declaration sets forth the family history, beginning with petitioner's parents' upbringing, their first marriages and children from those marriages, and continuing with their life together and their children's lives.  (Pet. Ex. #13).  Knox references a letter from petitioner's brother Juan outlining abuse by his father and the effect of his mother's death on petitioner as well as an interview with Brenda's daughter, Rachel.[9]

Also included in petitioner's state habeas evidence is a letter to counsel from a psychologist, Dr. Glen Pearson, dated November 29, 2002.  Pearson examined petitioner on October 2, 2002, in order to determine whether he had any mental disorder that could either explain the crime or be considered mitigation evidence.  He also reviewed petitioner's criminal history.  He found no evidence of mental illness or disorder that might explain or mitigate his behavior.  Petitioner grew up in a close-knit family, his parents were "deeply concerned" about the social development of their children, and the family remained supportive throughout his arrests and incarcerations.  Pearson diagnosed petitioner as meeting the criteria for alcohol and drug abuse and dependence and for an antisocial personality disorder.  Petitioner spoke about shooting the police officer and was concerned

---

[9]  The hearsay statements of Juan and Rachel Hinojosa in Knox's declaration have not been considered.  *See* 28 U.S.C. § 2246 (stating that evidence in support of a petition for writ of habeas corpus may be taken orally, by deposition, or by affidavit).  Even if considered, however, this information would not change the outcome.

with the drama of the moment with no concern for the officer's death.  This indifference contrasted "starkly" with his emotionality in speaking about his closeness to, and concern for, his own family. Pearson's letter does not reference any abuse reported by petitioner.  (Pet. Ex. #12).

Petitioner also submitted his own affidavit.  (S.H.Tr.3:653, ex. #29).   It does not mention any abuse of him or his mother by his father.  (S.H.Tr.3:653).

Along with its response, the State also submitted several affidavits.  Attorney Huff's affidavit states that he has been either first or second chair in 26 death-penalty cases, 24 of which were litigated before juries.  He and Busbee employed a defense investigator, Cliff Jenkins, to look into petitioner's background and locate family members, friends, and neighbors for them. Counsel had difficulty getting petitioner's family to meet with the defense team, but eventually were able to with meet with some of his family in Busbee's office.  At one point during the meeting, they separated the family members and spoke to them individually.  Huff specifically asked whether there was any abuse in the family or of petitioner, and no one mentioned any.  No one suggested or mentioned that petitioner's father was an alcoholic.  Counsel received the impression that he was a good person and a good father.  Huff asked petitioner specifically if there was any abuse, as he needed to know about it for mitigation purposes, and petitioner denied any.  Counsel knew that petitioner had a drinking problem and used drugs, and as part of the defense theorized that his substance abuse became worse after his mother's death and played a role in the murder.  (S.H.Tr.9:2523-24).

Busbee's affidavit states that she had tried three death-penalty cases in Dallas County and had represented another death-row inmate in his state post-conviction challenge to his sentence.  She spent a great deal of time and effort developing mitigation evidence, had previously presented evidence of physical and emotional childhood abuse in other cases, and knew its mitigating

potential. They searched for this type of evidence in petitioner's case but found none. While they did not hire a forensic social worker, they did hire a defense investigator to investigate petitioner's background and two experts to examine him. Petitioner underwent an EEG, and Dr. Jay Crowder examined him for organic brain damage, but none was found. Dr. Pearson, an expert in adolescent behavior disorders, evaluated petitioner but found no psychological excuse or explanation for petitioner's behavior that could have been used as mitigation evidence. He instead stated that petitioner was a very violent and conscienceless young man. Counsel therefore decided not to present any psychiatric evidence at trial.

Immediately after she was appointed, Busbee and her legal assistant made numerous attempts to contact petitioner's father, his half-sister Brenda, and his brothers Juan and Jose. They had a difficult time getting the family to speak to them. Jose refused to meet with Busbee despite several attempts to speak to him, but she did eventually meet with Juan while he was serving a jail sentence. He told her the same things that the rest of the family told her. On March 7, 2002, Brenda and petitioner's father met with both counsel for four hours, and they discussed petitioner's childhood and his family and medical history. She also met with family members on two other occasions, the defense investigator met with Maria before trial, and her legal assistant spoke to family members. No one mentioned that petitioner's father was abusive or an alcoholic; if someone had, the defense would have fully investigated and tried to develop evidence. Two neighbors and petitioner's family members told counsel that petitioner had a substance abuse problem, he never received treatment while in juvenile detention, he changed for the worse after his mother died, he began drinking heavily and became volatile, and his murder spree was attributable to that. When Busbee directly asked petitioner if he had been abused, he vehemently denied it. He and everyone else, including

Brenda, a trained social worker employed by the Dallas County juvenile probation department, gave the impression that petitioner's father was a good man and father. Busbee recalled meeting Maria and another female family member during trial, but did not believe that they would have made good defense witnesses because they appeared to be off-putting, overly dramatic young women who would have shifted the attention onto themselves and away from petitioner. Busbee was aware of petitioner's brothers' criminal history, but did not recall looking for his father's criminal history. She would not have used it had she discovered it because petitioner's father made a compelling witness. He was emotional on the stand, his testimony was touching, and he was a sympathetic figure. Several of the jurors appeared to be moved by his testimony, and some even cried. Busbee believed that the best mitigation strategy was to focus on the tragedy it would be for petitioner's father to lose his wife and then his son. (S.H.Tr.9:2528-30).

Virgina McDonald 's affidavit states that she was Busbee's legal assistant and worked on petitioner's case beginning in November of 2001, when Busbee was appointed. McDonald attempted to contact petitioner's father, his half-sister Brenda, and his brothers Jose and Juan numerous times for weeks but had great difficulty getting anyone in the family to communicate with her. Either no one would answer the telephone or she would be told that the person was not available but would not receive a return call after leaving a message. She eventually told petitioner that she was having a difficult time reaching his family, and she continued to have difficulty even after he told her that he would have them call her. She set up several appointments for petitioner's father, sister, and brother, but they either cancelled or did not appear. When McDonald finally spoke with Brenda and asked her what in his background might have caused him to commit the murder, she only mentioned their mother's death. She never told McDonald that petitioner had

either been abused or witnessed abuse, only that everyone babied petitioner.  McDonald was never able to contact petitioner's brother Jose.  In April of 2002, she began documenting communications between the office and petitioner and his family.  (S.H.Tr.9:2534-35).  A copy of her documentation, which reflects numerous  attempts to speak to family members and notations of conversations with Brenda  and Maria was also submitted as an exhibit.  (S.H.Tr.9:2536-41).

2.      *State Court Findings*

The state habeas court found that at the time of trial in 2002, the American Bar Association's 1989 guidelines recommended that counsel secure the assistance of experts where necessary or appropriate for the presentation of mitigating evidence.  Consistent with these guidelines, petitioner's counsel had hired a defense investigator and two doctors to examine him.  The investigator investigated petitioner's background and contacted several family member, Dr. Crowder examined petitioner for organic brain damage, and Dr. Pearson performed a psychological examination.  (S.H.Tr.9:2763-64).  The court concluded that trial counsel pursued appropriate expert assistance in their mitigation investigation.  (S.H.Tr.9:2764).

With respect to the mitigation investigation, the state habeas court found Busbee's and McDonald's sworn assertions to be true and credible.  (S.H.Tr.9:2764).  Counsel diligently investigated petitioner's background by making extensive efforts to speak to both of petitioner's brothers, finally speaking to petitioner's brother Juan, having the defense investigator speak to Maria Escamilla, Brenda Hinojosa, and petitioner's father, and meeting with Brenda and petitioner's father.  (S.H.Tr.9:2764-67).  The court noted that none of the evidence submitted by petitioner, including Maria's affidavit and Toni Knox's letter from his brother Juan, deny these contacts.  (S.H.Tr.9:2765).  It found that counsel obtained petitioner's medical records and also contacted any

friends and neighbors they could find.  Counsel were aware of petitioner's brothers' criminal histories and met with Juan while he was serving a jail sentence.  (S.H.Tr.9:2764, 2767).  Counsel were well aware of petitioner's substance abuse problems through family interviews and his TYC records.

Although counsel were unaware of any abuse by petitioner's father, there was no documentary evidence of any, so information about the abuse would have had to come from petitioner's family.  No family members, friends, or neighbors ever told counsel about such abuse; they denied that any abuse occurred even after being specifically questioned by the defense team.  The court found that petitioner denied any abuse, he made no mention of any abuse to the psychologist who examined him, and he even stated during the television interview after he was arrested that his family did its best in raising him.  (S.H.Tr.9:2767-72).  Counsel had made every effort to uncover evidence of abuse, petitioner and his family chose not to disclose such evidence, and counsel had no reason to disbelieve them.  The state court therefore concluded that petitioner had failed to prove that counsel did not make reasonable efforts to discover this mitigating evidence, and he had therefore failed to prove any deficiency in representation.  (S.H.Tr.9:2772-73).

The state habeas court further concluded that petitioner had failed to prove that he was prejudiced by any failure to present certain mitigating evidence at trial. (S.H.Tr.9:2777-78).  In particular, the state court found unpersuasive petitioner's contention that evidence of his father's alcoholism and abuse and his brother's bad influence would have negated the State's argument that petitioner was the "black sheep".  The state court found that the degree and nature of the recently reported abuse was insufficient to evoke much sympathy from the jury.  It was not powerful in quality or quantity, was impugned by other evidence, including petitioner's statements to Dr.

Pearson and the television reporter, and was outweighed by the strength of the State's case.  The

state court found that counsel's decision to paint a sympathetic portrait of petitioner had a powerful

impact but could not overcome the evidence of petitioner's "execution-style" murder of a police

officer, in addition to his previous murder of Michael Torres.  (S.H.Tr.9:2773-2777).

**B.**     **Federal Proceedings**

  *1.     New Evidence*

At the federal level, petitioner presented additional affidavits and criminal records of his

family. (Pet. Ex. #6).  Brenda's new affidavit states that petitioner's father was physically and

verbally abusive to her mother, and that she saw this many times, but her mother never called the

police or went to the hospital.  Her step-father only hit her once when she told him that he was not

her father, and she believed that he did not want to use physical discipline on any of the children

because his father had beaten him.  He would have the children kneel in the corner for fifteen to

thirty minutes or longer.  When the boys became older and began skipping school or fighting each

other, which he hated to see, he would use a belt or switch on them.  She heard that her step-father

hit Jose with a stick, but she did not see that.  He stopped disciplining the boys when they reached

their early teens and he became frustrated with their behavior.  Petitioner was then influenced by his

older brother, who exposed him to drugs and alcohol.  Their mother showed more affection towards

Juan than petitioner, and Maria got in trouble because she wanted to stay out late.  (Pet. Ex. #4).

Maria's new affidavit states that she does not believe petitioner's attorneys even knew she

was his sister, that she never spoke with them or the investigator, and that the only people she spoke

to about petitioner's case were Toni Knox and the habeas attorney.  She claims that trial counsel

only spoke to Brenda and her father, and that no other family members were contacted.  At the time

of petitioner's trial, she lived with her father.  Her father would hit them several times a week, placing them on their knees and hitting their backs and bottoms, and petitioner was hit the most.  Her father would curse at them, call them names, hit her mother, drank a lot, and fired guns in the air to scare her mother.  She was beaten by her father right before she moved out of the home at age seventeen and he once hit her while she held her child.  Her brother Jose would encourage petitioner and Juan to fight other boys.  Maria does not state that she would have been willing to testify to this information at trial.  (Pet. Ex. #2).

Knox's declaration opines that there was no investigation of potential mitigating evidence. She criticizes the lack of a psychosocial history prepared by interviewing family members, friends and other life witnesses in order to make an accurate mental health diagnosis.  (Pet. Ex. #1).  Bruce Anton's affidavit opines that a mitigation expert should have been employed in order to meet the professional norms and guidelines at the time of petitioner's trial, and that counsel began the investigation too late by not interviewing family members until jury selection.  (Pet. Ex. #5).  Dr. Pearson's affidavit states that petitioner was already "in trial" when he saw him, that he had never testified in a death penalty case, and that he is opposed to the death penalty.  (Pet. Ex. #3).

Petitioner also submits the criminal histories of his father, his brothers, and several members of his father's and mother's extended families, many of whom lived in close proximity to him.  (Pet. Ex. #6).  Petitioner's father was convicted in 1989 and 1991 for misdemeanor unlawful carrying of a weapon.  His brothers Jose and Juan have been convicted of numerous misdemeanors and felonies; some occurred prior to petitioner's trial and some after.  (Pet. Ex. 6).

2.    *Specific Claims*

Petitioner claims that trial counsel failed to conduct a thorough investigation into potentially

mitigating evidence (Pet. at 8, claim a); conduct a timely investigation (Pet. at 9, claims c, d); interview his relatives and friends  (Pet. at 9, claims b, g); investigate the family's criminal history in order to rebut the prosecution's theory that petitioner was the "black sheep" of the family (Pet. at 9, claims e, i); hire a qualified mitigation expert (claim f); and perform an independent social history of him (claim h).

### a.    Timing of Investigation and Types of Experts

Petitioner claims that counsel were ineffective for failing to complete their investigation until after his trial had already begun, to hire his expert earlier, to hire a qualified mitigation expert, and to perform an independent social history of petitioner,

The record reflects that petitioner's trial attorneys began investigating potentially mitigating evidence immediately after being appointed.  They did not complete this investigation earlier because petitioner's family was reluctant to meet with them, avoided phone calls, did not return phone calls, cancelled meetings, or did not appear for scheduled meetings.  Notably, much of petitioner's evidence in support of his claim comes from these same family members.

Dr. Pearson's new affidavit states that he did not meet with petitioner until trial had begun. He was hired due to his expertise in adolescent behavior disorders and was provided petitioner's TYC and medical records.  (Pet. Ex. #10).  His report does not provide any reason for petitioner's behavior to which he could have testified.  He found no evidence of a mental illness or disorder, but rather, a young man with characteristics of substance abuse and dependence and an antisocial personality disorder.   (Pet. Ex. #12).   Petitioner has presented no evidence that any other psychologist would have been willing to testify contrary to these findings, or that Dr. Pearson would have testified differently if he had been retained earlier or called to testify.

With regard to the alleged failure to have a social history done of petitioner and his family and to hire a competent mitigation expert, petitioner cites to the 2003 American Bar Association guidelines for counsel in death penalty cases as evidence of counsel's ineffectiveness. (Reply at 3). Petitioner was tried in 2002, however. The state habeas court made a factual finding that the ABA standards in place at the time of trial did not recommend these actions. It found that the applicable guidelines stated that counsel should hire appropriate expert assistance, which petitioner's counsel did; they hired a defense investigator, a psychologist, and a psychiatrist. (S.H.Tr.9:2763-64). This factual finding is presumed correct, and petitioner has not presented clear and convincing evidence that this factual finding is erroneous. Even assuming for the sake of argument that a failure to follow ABA guidelines was *de facto* deficient representation, petitioner has failed to establish that counsel failed to follow the guidelines in place at the relevant time.

Petitioner also claims that Dr. Pearson was not a qualified expert because he had never testified in a death penalty case, did not regularly work on capital cases, and did not understand the legal definition of mitigation. (Pet. at 49). Trial counsel understood this concept, however, and hired Pearson to conduct a psychological examination to try to determine if there was any explanation for petitioner's actions. Pearson determined that petitioner has an antisocial personality disorder, and counsel made the strategic decision not to call him as a witness. Petitioner has not shown that the state court's determination that counsel were not ineffective for hiring Pearson under the then applicable ABA standards was an unreasonable one. He has also failed to establish that counsel were ineffective for making the strategic decision not to call him as a witness.

### b. *History of Abuse*

Petitioner asserts that his attorneys' mitigation investigation was deficient because they did

45

not did not question family and friends to learn of his father's physical abuse or present this type of

evidence.  As noted earlier, the applicable test under *Strickland* is whether trial counsel used

"reasonable professional judgment" to support a limited investigation into potential mitigation

evidence. *Wiggins*, 539 U.S. at 522-23.  To show that counsel were ineffective for failing to call

certain witnesses, the petitioner must identify the witness and the proposed testimony, show that the

testimony would have been favorable to the defense, and show that the witness was available and

willing to testify.  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *Alexander v. McCotter*,

775 F.2d 595, 602 (5th Cir. 1985).

Petitioner identifies numerous friends and family that were never contacted (Pet. 13-4), but

he did not submit any affidavits from these proposed witnesses to meet his burden to show that any

of them knew of the alleged abuse, were available to testify, or would have testified.  He submitted

two affidavits from his half-sister Brenda, who testified at trial, but neither states that she would

have been willing to testify to the new information contained in them.  Knox's own memorandum

of her interview with Brenda in August of 2005 states that "[i]t was difficult to set the appointment

with Brenda and have her keep it", and although Brenda spoke extensively about the family history

with some encouragement, she was "very reluctant to talk about any negative information."  (Pet.

Ex. 19, final page).  Even well after petitioner received the death penalty, his sister was reluctant to

speak to anyone about negative events in her family.  Knox's declaration also references

conversations with Brenda's daughter and his brother Juan.  Petitioner also submitted two affidavits

from his sister Maria, and affidavits from his mother's friends Luiz Gonzalez and Margaret Barajas,

and from former day care worker Vicki White.[10]  None of these individuals state that they were

---

[10] Ms. White's affidavit does not provide any information about petitioner's home life, only his behavior and appearance at day care.

available and willing to testify to the information in their affidavits.

In contrast, Busbee submitted an affidavit at the state habeas level that the state court found to be credible. She states that she interviewed petitioner's siblings Brenda and Juan, but neither told her that their father was physically abusive or an alcoholic when asked about possible reasons for petitioner's actions. Neither Juan's letter, referenced by Knox, nor Brenda's affidavits dispute that they spoke to petitioner's attorney, and neither state that they provided this information to counsel. While Maria now contends that she never spoke to any member of the defense team, her state habeas affidavit did not contain this statement. Contrary to her assertions, counsel's records reflect contacts with Maria and Juan and attempts to contact Jose. In addition, three other people, including two neighbors and one former neighbor, testified at trial for petitioner.[11] Petitioner himself denied that he was the victim of any abuse when specifically asked by his attorneys, and he never told Dr. Pearson about abuse either. His own affidavit does not substantiate the claims of abuse. Knox's memorandum about Brenda's reluctance to speak negatively about the family supports the defense team's claim at the state level about difficulties in getting family members to speak to them. Gonzalez worked with petitioner's mother from 1997 through 2000, and Barajas was her neighbor in 1981 and 1982, twenty years before trial. None of the affidavits state that anyone told counsel was about them. In light of the record, the new evidence does not rise to the level of clear and convincing evidence sufficient to overcome the state court's factual findings. Petitioner has not shown that trial counsel's investigation into potential mitigating evidence of abuse was not reasonable.

---

[11] Both of Maria's affidavits state that she was living in the family house with her father at the time of petitioner's trial. (Pet. Ex. #2, #19). Records submitted at the state level reflect that the defense team called the house on numerous occasions. (S.H.Tr.9:2536-41).

The Supreme Court in *Rompilla* made clear that attorneys should not rely solely on what is reported to them by their client and his family members about a client's history where other conflicting evidence is available. There, the trial file contained Rompilla's prison file that included evidence of his history of alcohol abuse and psychological disorders, i.e., "mitigation leads" to a history of physical abuse and evidence of organic brain damage. In *Wiggins*, records from the Department of Social Services that were immediately available to counsel contained evidence of the abuse Wiggins had suffered. These cases held that trial counsel has a duty to investigate further where there are indications from the known evidence that further investigation would be fruitful. Unlike those cases, petitioner has not identified any source of other conflicting evidence about abuse in his family.

Petitioner has identified only family members and friends as a source of the evidence of abuse. It is undisputed that counsel spoke with at least two immediate family members who were apparently concerned about and supportive of petitioner, and who were in a position to know about any mitigating explanations for petitioner's behavior. They provided information about the beating he received at age 11, his brother's influence, and his mother's death, and his substance abuse. The defense team also made efforts to, and did, speak with other family members. Petitioner has not presented clear and convincing evidence to overcome the state court's factual findings that family members did not tell his trial attorneys about any abuse despite be given an opportunity to do so. None of petitioner's affidavits state that the family told defense counsel about Gonzalez and Barajas. Counsel cannot be faulted for failing to present evidence that was not revealed by the witnesses. *Soria v. Johnson*, 207 F.3d 232, 251 (5th Cir. 2000); *see also Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (recognizing that the reasonableness of an attorney's investigation may "critically

depend" on information provided by the defendant and on the defendant's own "strategic decisions" about the representation).  Petitioner has failed to meet his burden to show that counsel's mitigation investigation into physical abuse was deficient.

Petitioner has also failed to show that counsel were ineffective in their presentation of mitigating evidence.  Based on information from family members, counsel presented a mitigation case that was based on the loss of his mother and subsequent substance abuse.  Although petitioner believes physical abuse within the family would have been more persuasive, he has failed to overcome the presumption of correctness afforded the state court findings that counsel were not informed about this history by petitioner's family, and therefore counsel were not deficient in their strategic presentation of the information they had.  *See Soria v. Johnson*, 207 F.3d 232, 251 (5th Cir. 2000) (recognizing the trial strategy of presenting the defendant's upbringing as a loving and peaceful one and the crime as an aberration).

### c.  *Criminal Histories*

Petitioner further contends that his attorneys were ineffective for failing to investigate and present evidence of his two brothers', his father's, and his extended family's substantial criminal histories.  In particular, petitioner faults his attorney for failing to investigate the "red flag" that he had two brothers in prison and to present evidence of their, his father's and the extended family's criminal histories.  He argues that this evidence would have shown that he was a product of his violent environment rather than the "black sheep" of the family, as the State contended.

Busbee's affidavit states that she was aware of the criminal backgrounds of both of petitioner's brothers and even met with one while he was incarcerated.  Even if she had been aware of petitioner's father's criminal history (two misdemeanor gun possession charges), she would not

49

have presented it at trial because he was a sympathetic figure who had recently lost his wife and now was in danger of losing his son, and who had a great effect on the jury.  If counsel has made an adequate investigation, any conscious and informed decision made based on trial tactics and strategy cannot be the basis for a claim of having received ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753(5th Cir. 2003), *quoting United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).  In addition, evidence of petitioner's father's misdemeanor convictions in 1989 and 1991, his brothers' convictions, and those of other family members, some of whom lived near petitioner, is the type of "double-edged sword" evidence that could also be used to support a claim by the State that petitioner was the worst of a bad bunch and beyond hope or assistance.  *See Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997) (noting that a failure to present evidence at trial does not constitute "deficient performance" under the *Strickland* standard if counsel could have concluded, for tactical reasons, that presenting such evidence would be unwise).  While serious, the criminal histories of his father, brothers, and extended family do not rise to the level of petitioner's execution-style murder of a police officer just weeks after the undisputed commission of a previous murder.  While petitioner believes that a more effective mitigation strategy would have been to present him as a product of his environment, he has not overcome the presumption of correctness of the state court's findings that counsel were not ineffective for failing to present petitioner's two brothers' criminal histories or for failing to investigate and present the criminal backgrounds of his father or other members of the family.

    d.     *Substance Abuse*

Petitioner also contends that his attorneys were ineffective for failing to discover and present

additional evidence of his history of substance abuse.  The trial record reflects that three of his five witnesses spoke about his substance abuse, including Brenda, his father, and a neighbor of the family.  Brenda testified in great detail about petitioner's drinking and drug abuse, her professional experience with chemical dependency in juvenile offenders, and how he was not provided with necessary substance abuse counseling during his past incarceration.  Counsel even described her as an expert in the area.  (R. 39:57.)  The Fifth Circuit has cautioned that a reviewing court should be wary of claims that an attorney failed to present enough evidence of a certain type.  *Smith v. Cockrell*, 311 F.3d 661, 669 (5th Cir. 2002), *citing Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000).  The state court's conclusion that counsel were not deficient in their investigation and presentation of mitigation evidence is not an unreasonable application of the *Strickland* standard.

3. *Prejudice*

Because petitioner has failed to show that the state court was unreasonable with regard to the deficiency prong of *Strickland*, it is unnecessary to consider the second *Strickland* prong.  *United States v. Kimler*, 167 F.3d 889, 894 (5th Cir. 1999).  Assuming *arguendo* that petitioner had established that his trial counsel were ineffective in their investigation and presentation of mitigation evidence, he has failed to show that the state habeas court's determination that he failed to prove the second prong of the *Strickland* standard is unreasonable.  He has not shown a reasonable probability that he would not have received the death penalty had this type of evidence been presented at trial.[12]

In *Wiggins*, the defense attorney failed to discover and present evidence that the defendant suffered from severe deprivation and abuse by an alcoholic mother, as well as subsequent physical

---

[12] Notably, the affidavit and notes from interviews with two jurors regarding the presentation of additional mitigating evidence state only that the two jurors would have *considered* more family information during the sentencing stage that might have influenced petitioner's development, not that it would have changed their minds. (Pet. Ex. 1, 24).

and sexual abuse during his years in foster care.  Similarly, in *Rompilla*, the attorneys failed to discover and present evidence that both of Rompilla's parents were alcoholics, the children were neglected, Rompilla was frequently physically abused by his father, and Rompilla suffered from brain damage and impaired cognitive function.  Petitioner's proffered evidence does not rise to this level of abuse and neglect.  Although petitioner's new evidence describes his father's alcoholism, brutal discipline and domestic violence, the record also reflects that petitioner came from a close and loyal family, was devoted to his father and mother, and was loved by his siblings and parents. Petitioner has not shown that the state court's determination that no prejudice had been shown for failure to present this evidence was unreasonable, and his first ground for relief should be denied.

## IX.  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Criminal defendants have a constitutional right to effective assistance of counsel in their first appeal.  *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Douglas v. California*, 372 U.S. 353, 356-57 (1963).  "A claim of ineffective assistance based on the failure to argue an issue on appeal is governed by the familiar two-part *Strickland* test."  *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000).

### A.      Definition of Mitigation Evidence

In his eighth ground for relief, petitioner asserts that his appellate counsel was ineffective for failing to argue on appeal that the statutory definition of mitigation provided to the jury in his case is unconstitutionally narrow.  As discussed, this claim (ground seven) lacks merit.  Counsel was not ineffective for failing to raise it as a point of error on appeal.

### B.      The term "probability"

In his tenth ground for relief, petitioner asserts that appellate counsel was ineffective for

failing to argue on direct appeal that the term "probability" in the first special punishment issue, violates petitioner's due process rights because it dilutes the reasonable doubt standard. This claim (ground nine) is also without merit, so counsel was not ineffective for failing to raise it as a point of error on appeal.

## XI. TEXAS DEATH PENALTY SCHEME

In his twelfth, thirteenth, and fifteenth grounds, petitioner argues that the Texas death penalty statute is unconstitutional.

### A.   <u>Burden of Proof for Mitigation Evidence</u>

In his twelfth ground for relief, petitioner argues that his constitutional rights were violated because the State was not required to prove the absence of mitigating factors beyond a reasonable doubt. He cites *Ring v. Arizona*, 536 U.S. 548 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in support of his claim that federal law requires that a Texas capital jury find the absence of factors that mitigate against the death penalty beyond a reasonable doubt before answering the mitigation special issue "no", and before a defendant may be sentenced to death.

The Fifth Circuit has specifically held that there is no constitutional requirement that Texas's mitigation issue be assigned a burden of proof. *See Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2003). Addressing an identical argument based on *Ring* and *Apprendi*, the Fifth Circuit specifically held that a petitioner's Sixth Amendment rights are not violated when state law does not require the prosecution to prove the absence of mitigating factors beyond a reasonable doubt. *See Grandos v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir. 2006). On direct appeal, the Court of Criminal Appeals denied this claim based on its previous case law. *Escamilla*, 143 S.W.3d at 828. This conclusion is not contrary to federal law. This ground for relief is without merit and should be denied.

B.      **"Mixed Signals"**

In his thirteenth ground for relief, petitioner alleges that the mitigation special issue is unconstitutional because it sends "mixed signals" to the jury by allowing it to consider and evaluate evidence in an inconsistent fashion.  (Pet. at 178).  He raised this issue on direct appeal, and the Court of Criminal Appeals overruled it, finding that the issue had been raised and rejected before. *Escamilla*, 143 S.W.3d at 828.  This conclusion is not contrary to clearly established federal law.

Petitioner cites *Penry v. Texas*, 532 U.S. 782 (2001) (*Penry II),* and *Smith v. Texas*, 543 U.S. 37 (2004).  In *Penry II,* the defendant presented evidence of both mental retardation and severe childhood abuse, but no mitigation evidence special issue was given to the jury.  Instead, it received a "nullification" instruction that if it believed Penry's mitigation evidence was such that a life sentence was warranted rather than death, it should change one of the answers to the existing two special issues from "yes" to "no."  Because the jurors were expected to answer the existing special issues truthfully, but were instructed to change one of those answers if the mitigation evidence warranted a life sentence, the Supreme Court found that the instruction was an inappropriate and insufficient vehicle for them to consider and give effect to Penry's mitigating evidence.  *See id*. at 797-99.  In *Smith*, the Supreme Court reiterated its holding in *Penry II* that a "nullification" instruction is an insufficient vehicle for considering mitigating evidence, and it further held that defendants did not have to establish a nexus between the mitigation evidence presented and the murder.  The evidence must simply be relevant for mitigation purposes.  *Smith*, 543 U.S. at 44-45.

The mitigation special issue in this case does not present the same nullification concerns as in *Penry II* or *Smith*.  In *Penry II*, the Supreme Court noted with approval the new mitigation special issue that had recently been added to the Texas statute.  *See* 532 U.S. at 803.  This new mitigation

54

special issue approved in *Penry II* was given to the jury in this case. Because the state court's decision to deny this claim is not contrary to well-established federal law, it should be denied.

## C.    **Open-Ended Jury Discretion**

In his fifteenth ground for relief, petitioner argues that the Texas death penalty scheme violates his rights under the Fifth, Eighth, and Fourteenth Amendments because it permits the open-ended jury discretion at the punishment phase condemned by *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*), *Penry II*, and *Furman v. Georgia*, 408 U.S. 238 (1972). Citing the dissent in *Callins v. Collins*, he claims that the death penalty is unconstitutional because it is impossible to simultaneously restrict a jury's discretion to impose the death penalty while also allowing it unfettered discretion to consider all mitigating evidence against the imposition of the death penalty.

Petitioner was indicted and tried for capital murder for knowingly killing a peace officer acting in the lawful discharge of an official duty; this is one of the subsets of murder eligible for the death penalty in Texas. (Tr.:2; TEX. PEN. CODE ANN. § 19.03 (Vernon 1994)). In *Jurek v. Texas*, 428 U.S. 262 (1976), the Supreme Court upheld a version of the Texas death-penalty statute that, like the version of the statute under which petitioner was tried and sentenced, narrowed the class of offenders subject to a death sentence. The Court also noted in *Tuilaepa v. California*, 512 U.S. 967, 974 (1994), that "[i]n providing for individualized sentencing, it must be recognized that the States may adopt capital sentencing processes that rely upon the jury, in its sound judgment, to exercise wide discretion." It specifically found that a sentencer may be given unbridled discretion in determining whether to impose the death penalty once it is determined that the defendant is a member of the class that is eligible to receive the death penalty. *See Tuilaepa*, 512 U.S. at 979-980 (citing *Zant v. Stephens*, 462 U.S. 862, 875 (1983)). These cases illustrate that where the class of

55

murder defendants subject to the death penalty is sufficiently tailored to avoid arbitrariness, and a state provides a sufficient vehicle for consideration of all relevant punishment evidence, both aggravating and mitigating, a state capital sentencing statute will be considered constitutional.

The Supreme Court has also held that the future dangerousness special issue is a constitutionally adequate vehicle for juries to consider aggravating and most mitigating evidence. It approved the Texas future dangerousness issue in *Jurek* and has continued to do so in subsequent cases. *See Pulley v. Harris*, 465 U.S. 37, 50-1 (1984). Although the Supreme Court held in *Penry I*, 429 U.S. at 324-25, that certain mitigating evidence could not be adequately considered within the scope of the future dangerousness issue that petitioner's jury received, he was tried after the Texas legislature amended Article 37.071 to address those concerns. As noted, the Supreme Court has since approved of the new amended mitigation issue, which petitioner's jury received, as an adequate vehicle for the consideration of all mitigating evidence. *See Penry II*, 532 U.S. at 803.

The Fifth Circuit also has held an identical claim to be without merit. *See Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005). The Fifth Circuit also found that this claim was procedurally barred under *Teague v. Lane*, 489 U.S. 288 (1989), because even if the claim were found to have merit, it would constitute a new constitutional rule of criminal procedure that would not be applicable retroactively to cases on collateral review. *Hughes*, 412 F.3d at 594; *see also Teague*, 489 U.S. at 311-13. At the state level, the Court of Criminal Appeals denied this claim on direct appeal, citing its previous case law. *Escamilla*, 143 S.W.3d at 828. This decision is not contrary to federal law. Petitioner's fifteenth ground for relief should be denied.

## XII. LETHAL INJECTION

In his sixth ground for relief, petitioner asserts that Texas' use of a three-drug protocol to

execute prisoners violates his Eighth Amendment right to be free from cruel and unusual punishment. While he acknowledges that the Supreme Court recently held that Kentucky's similar three-drug protocol does not violate the Eighth Amendment in *Baze v. Rees*, 128 S.Ct. 1520 (2008), he claims that Texas has a history of problems with executing inmates using this protocol, and that further discovery is necessary in order for him to develop the factual basis for this claim.

Citing *Hill v. McDonough*, 547 U.S. 573 (2006), respondent assert that petitioner's claim is not cognizable on federal habeas review and should be brought as an action under 42 U.S.C. § 1983. In *Hill*, an inmate under a sentence of death had brought a § 1983 action against state corrections officials in Florida, asserting that the three-drug sequence lethal injection (like the one used in Texas) constituted cruel and unusual punishment. The district and appellate courts both found that the claim should have, but had not, been brought as a ground for relief in a federal habeas petition. *Id*. at 576. The Supreme Court reversed, holding that the claim could proceed under § 1983 because it challenged the method of execution used in Florida rather than the conviction or sentence. Because Hill challenged only one particular method of execution, a grant of injunctive relief would not bar the State from using an alternative procedure, so the claim was challenge to the circumstances of confinement rather than to the lawfulness of the confinement or sentence. *Id*. at 579-81.

Since *Hill*, the Fifth Circuit has not addressed this issue directly in a published opinion. In *Rachal v Quartermann*, 265 Fed. Appx. 371 (5th Cir. Feb. 14, 2008), *cert. denied*, 129 S.Ct. 396 (2008), however, it found that Rachal was not entitled to a stay and abeyance on his unexhausted challenge to the Texas lethal injection protocol because claims challenging the method of execution do not concern the fact or duration of a sentence and cannot be raised in a habeas proceeding. *Id*.,

slip op. at 377.

As in *Hill,* Petitioner's claim that Texas' three-drug lethal injection protocol constitutes cruel and unusual punishment because it creates a heightened risk that inmates will experience pain and suffering does not attack his conviction or his sentence.  He suggests that there are other methods of execution that would not be cruel and unusual punishment.  Based on *Hill* and *Rachal*, this ground for relief should be dismissed without prejudice so that petitioner may raise it in a § 1983 action. *See also Parr v. Quarterman*, 2007 WL 236290 (S.D. Tex. Aug. 14, 2007) (citing *Hill* in holding that Parr could not bring his lethal injection claim in a habeas case); *Bustamante v. Quarterman*, 2006 WL 3541565 (S.D. Tex. Dec. 6, 2006) (dismissing without prejudice a challenge to the constitutionality of a specific method of execution because it is properly brought in a § 1983 action, not in a habeas corpus petition).

## XIII. STATE CONSIDERATION OF CLAIMS

Petitioner raised most of his claims in either his state writ or on direct appeal.  The Court of Criminal Appeals denied the state writ on its merits and affirmed petitioner's conviction and death sentence on direct appeal.  The state's decisions are consistent with, and involved no unreasonable application of, applicable Supreme Court precedent.  The adjudication of the claims did not result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented to the state court.  Under applicable Supreme Court standards and the AEDPA standards, petitioner is not entitled to habeas relief on the claims raised in his petition.

## XIV.  EVIDENTIARY HEARING

Based on review of the pleadings and the state court proceedings, an evidentiary hearing appears unnecessary.

## XV. RECOMMENDATION

Petitioner's sixth ground for habeas corpus relief under 28 U.S.C. § 2254 should be **DISMISSED** without prejudice, and his remaining grounds should be **DENIED** with prejudice.

**SO RECOMMENDED on this 5th day of August, 2011.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE