**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **LICHO ESCAMILLA,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **vs.** | § | **No: 3:06-CV-2248-O (BH)** |
| | § | |
| **RICK THALER, Director TDCJ** | § | |
| **Institutional Division,** | § | |
| | § | |
| **Respondent.** | § | |

**PETITIONER'S AMENDED MOTION FOR NEW TRIAL
PURSUANT TO FED. R. CIV. P. 59e
AND REQUEST FOR ORAL ARGUMENT**

Comes now, LICHO ESCAMILLA, the Petitioner in this case and through his counsel files this Motion for New Trial pursuant to FED. R. CIV. P. 59e and Request for Oral Argument. For the reasons that follow, Petitioner respectfully requests this Court grant his Motion for New Trial, grant his Request for Oral Argument, and, allow him the opportunity to challenge state habeas counsel's effectiveness pursuant to *Martinez v. Ryan*, 566 U.S. ___ (2012).

Petitioner specifically seeks a New Trial regarding his ineffective assistance of counsel claims relating to trial counsels' failure to investigate Petitioner's family and social history, the family's extensive criminal history; this Court's erroneous conclusion, set forth in a footnote, that no family "abuse actually occurred"; trial counsels' inexcusable failure to timely engage their only possible testifying expert, Dr. Pearson; and, the Court's failure to address Petitioner's objections regarding the Magistrate Judge's Finding on the issue of prejudice.

Petitioner specifically objected to trial counsels' failures to investigate these issues, including the issue of prejudice, thereby preserving his right to receive *de novo* review of these claims.  Despite Petitioner's timely and specific objections, this Court's March 26, 2012, Order

1

did not fully address Petitioner's ineffective assistance of counsel claims or, on the issue of

alcoholism and abusive family environment, only addressed the issue in a cursory footnote that is

inconsistent with the evidence submitted before the state courts and the record before this Court.

Petitioner respectfully asserts that this Court's March 26th Order failed to respond to

Petitioner's numerous, individualized specific objections regarding the issues serving as the basis

for this New Trial Motion, including his demonstration of prejudice.  Petitioner further alleges

that any failure to prove his abusive upbringing in a violent and alcoholic family, failure to prove

with admissible evidence that there were willing and available witnesses, and failure to prove

that psychiatric testimony could have aided Petitioner's case was due to the ineffective assistance

of state habeas counsel.  Following the U.S. Supreme Court's recent decision in *Martinez v.*

*Ryan*, such evidentiary shortcomings do not preclude this Court from considering the extensive

affidavit testimony provided by Petitioner's witnesses verifying that Petitioner's mother was

physically abused by Petitioner's father, that the boys were often subjected to extreme physical

and verbal abuse and that Petitioner's father was a violent alcoholic.

I.      *Martinez v. Ryan*

In March, 2012, the U.S. Supreme Court held that states, such as Texas, that preclude

consideration of the effective assistance of counsel at trial on direct appeal, must ensure that

convicted individuals receive the effective assistance of counsel during their initial tier-one (in

Texas, state habeas petition) review.  *Martinez v. Ryan*, 566 U.S. ____ (2012). The *Martinez*

Court held that habeas claims presented in federal court will not be deemed procedurally

defaulted where the individual received the ineffective assistance of counsel during state habeas

review.  *Id.*  Thus, this Court should entertain Petitioner's challenge that the evidence he

submitted to support his federal habeas petition, evidence that was obviously relevant, easily

obtainable and supports Petitioner's claim of ineffective assistance of trial counsel, should be considered and evaluated under a logical extension of *Martinez. Id.*

Petitioner supported his federal habeas petition with several affidavits, all of which support his claims that Petitioner's trial counsel failed to provide him the Sixth Amendment right to the effective assistance of trial. However, this Court refused to incorporate these items in its assessment, citing *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388 (2011).[1] Further, this Court faults state habeas counsel for failure to properly develop the state record, including failure to properly demonstrate "prevailing professional norms" under ineffective assistance of counsel and failure to show that any of the state habeas affidavit witnesses "were available and willing to testify."[2] These failures prevented Petitioner from receiving a fair trial and from fairly presenting his viable Sixth Amendment claims, the goal of *Strickland* and its progeny.

Petitioner alleges that state habeas counsel fell short of prevailing professional norms when she: (1) failed to reference proper ABA governing standards for trial counsel in 2002;[3] (2) failed to provide evidence of governing local standards for attorneys in 2002;[4] (3) failed to obtain admissible testimony from Dr. Pearson supporting his statements made to the state habeas investigator that he was unaware of his role in this case and believed his involvement was *pro*

---

[1] *See Order Accepting and Modifying Findings, Conclusions* (March 26, 2012).

[2] *Id.* at 11, 14-15, *citing Magistrate Judge's Findings and Recommendations*, at 45-47.

[3] *See Magistrate Judge's Findings and Recommendations*, at 45 ("With regard to the alleged failure to have a social history done of petitioner and his family and to hire a competent mitigation expert, petitioner cites to the 2003 American Bar Association guidelines for counsel in death penalty cases as evidence of counsel's ineffectiveness. . . . Petitioner was tried in 2002, however."). See also *Order Accepting and Modifying Findings, Conclusions*, at 11.

[4] *Order Accepting and Modifying Findings, Conclusions*, at 15 (wherein this Court states that "[t]he ABA Guidelines are helpful only if they 'reflect "prevailing norms of practice"'"). See also, *Order Accepting and Modifying Findings, Conclusions*, at 15 n.2 (faulting Petitioner's federal habeas evidence of "prevailing professional norms" as not being sufficiently local to merit consideration and, further, reminding that Petitioner's federal habeas evidence regarding "prevailing professional norms" "was not presented to the state court and may not be considered in the § 2254(d) analysis").

*forma* as a last ditch effort to cover trial counsels' bases;[5] (4) failed to obtain psychological or psychiatric evidence supporting her claims of ineffective assistance of counsel;[6] (5) failed to ensure that affidavit testimony was admissible and demonstrated not only underlying facts regarding family history, violence and abuse but also a willingness of witnesses to testify; and, (6) failed to ensure that evidence received from family members, such as Petitioner's brother Juan, was presented in admissible form.  These failures fall well short of prevailing professional norms and precluded Petitioner from receiving proper review before this Court.

The evidentiary failures of state habeas counsel, all of which have been held against Petitioner by the Magistrate Judge and this Court,[7] have prejudiced Petitioner's ability to fairly and fully present his ineffective assistance of trial counsel claims.  But for state habeas counsel's failures, this Court would have had available evidence that trial counsel's affidavit testimony is clearly contradicted by numerous members of Petitioner's family and friends thereby demonstrating the unreasonable nature of the state court findings.  Due to the evidentiary shortcomings of state habeas counsel and the bar precluding consideration of evidence beyond the state court record, Petitioner is procedurally defaulted from demonstrating the unreasonableness of the state court findings.  *See Cullen v. Pinholster*, 563 U.S. _____, 131 S. Ct. 1388 (2011).

The issue is not whether evidence exists – in fact, state habeas counsel submitted numerous affidavits and evidence – but simply that the existing evidence was not presented in admissible form.  This lapse by state habeas counsel prejudiced Petitioner because state habeas

---

[5] See *Magistrate Judge's Findings and Recommendations*, at 44 (challenging that "Petitioner has presented no evidence that any other psychologist would have been willing to testify contrary to these findings, or that Dr. Pearson would have testified differently if he had been retained earlier or called to testify").
[6] *Id.*
[7] See *Order Accepting and Modifying Findings, Conclusions*, at 11-12 (March 26, 2012), *Magistrate Judge's Findings and Recommendations*, at 45-47.

counsel's deficient performance precluded full consideration of Petitioner's claims and evidence.[8] Petitioner sustained prejudice because state habeas counsel's failures resulted in a decision that is contrary to the available evidence.[9]  Since ineffective assistance of trial counsel claims can only be brought in state habeas proceedings under Texas practice, Petitioner is permitted to challenge state habeas counsel's performance. *See Martinez v. Ryan*, 566 U.S. ___ (2012). *Martinez* mandates consideration of Petitioner's newly submitted evidence and substantive review of his ineffective assistance of counsel claims by this Court.

As such, Petitioner should be permitted to present his full arsenal of evidence supporting his ineffective assistance of trial counsel claims to this Court without procedural bar or default. Because *Martinez* is extremely new precedent, Petitioner further requests Oral Argument on this issue to ensure full consideration of his claim and his evidence.

Accordingly, for these reasons, Petitioner respectfully asks this Court to GRANT his Rule 59 Motion for New Trial enabling him to benefit from the Supreme Court's recent decision in *Martinez v. Ryan* or, in the alternative, grant his Request for Oral Argument.

II.      Due Process/Equal Protection Violation in Evaluating Admissibility of Testimony

The Magistrate Judge refused to credit the affidavit testimony of Petitioner's witnesses appearing in the state court proceedings purportedly because these affidavits did not contain an explicit statement that the witnesses would be willing to testify to these same facts in court.[10]  Petitioner objected to the Magistrate's crediting trial counsels' affidavit testimony in state court proceedings regarding their version of the events despite no averment that they would

---

[8] *Order Accepting and Modifying Findings, Conclusions*, at 11-16 (March 26, 2012).

[9] *See Order Accepting and Modifying Findings, Conclusions*, at 11-16 (March 26, 2012), *Magistrate Judge's Findings and Recommendations*, at 43 (Maria) 46-47 (indicating that "[n]one of [Petitioner's witnesses] state that they were available and willing to testify to the information in their affidavits").

[10] *Magistrate Judge's Findings and Recommendations*, at 43 (discounting Maria Escamilla's testimony because she "does not state that should would have been willing to testify to this information at trial") 46-47 (indicating that "[n]one of [Petitioner's witnesses] state that they were available and willing to testify to the information in their affidavits").

have testified to these matters if called at the state habeas proceedings.  This Court's adoption of the Magistrate's dual standard for embracing affidavit testimony, and only requiring that Petitioner's witnesses further indicate a willingness to testify to the matters before the state courts runs afoul of both Due Process and Equal Protection.

Further, and equally troubling, is the fact that neither this Court nor the Magistrate Judge considered Petitioner's affidavit testimony in the State Court proceedings to support his allegation that trial counsel failed to conduct a reasonable mitigation investigation.  *Wiggins* explained that "[i]n rejecting petitioner's ineffective assistance claim, [the state court] appears to have assumed that because counsel had *some* information with respect to petitioner's background . . . they were in a position to make a tactical choice not to present a mitigation defense.  In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003).

The affidavit testimony perfunctorily dismissed by the Magistrate Judge and this Court ignores the multiple proofs for the submitted affidavit testimony.  As *Wiggins* demonstrates, Petitioner's claim requires consideration *not only* of witnesses that would be willing or available to testify at trial, but also witnesses that could have provided evidence to trial counsel meriting further investigation.[11]

---

[11] *See e.g., Luis Gonzalez Affidavit* (observing on three to four occasions evidence that Petitioner's mother had been beaten and had a black eye); *Margaret Barajas Affidavit* (confirming evidence of physical abuse in the family, testifying that Petitioner's mother told her Petitioner's father hit her and observing bruises on Petitioner's mother); *Vickie White Affidavit* (averring that she "didn't believe that Licho ever had a chance in life because of the influence of gang members and his brother's involvement with a gang and his influence on Licho.  It [was her] experience that a child growing up in that environment of guns and violence cannot escape without a major intervention"); *Maria Escamilla Affidavit* (testifying that she saw her "father hit my mother with a belt and his hand" and also that her "father would hit us with his belt, switches or whatever he could find); *Brenda Hinojosa Affidavit* (testifying that "I had to watch my mom take physical and verbal abuse from my dad countless times" including pulling her by the hair, dragging her and kicking her.  Brenda also indicated that "even though [my mom] was beaten numerous times, she never went to the hospital or called the police."  Finally, Brenda indicated that she

It is difficult, at best, to understand how this consistent, uncontroverted evidence was dismissed by the Magistrate Judge in reviewing the reasonableness of the state court findings simply because the affidavits failed to confirm that this sworn testimony, admissible in court proceedings, would not be replicated during trial. Petitioner specifically raised Due Process and Equal Protection objections to this issue and renews his objections here.[12]

This Court's sanctioning of a procedural dismissal of testimony is at odds with clearly established federal law that requires consideration of *all* the mitigating testimony presented during the state habeas proceedings – both for evaluation of trial counsel's investigation and for the broader issue of establishing prejudice. *Wiggins v. Smith*, 539 U.S. at 521-26.

*Wiggins* requires reviewing federal courts consider all existing evidence in assessing whether trial counsel's cursory investigation was constitutionally reasonable. *See Wiggins v. Smith*, 539 U.S. at 521-23; *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Rompilla v. Beard*, 545 U.S. 374 (2005). *Wiggins* does not suggest, much less sanction, limiting consideration of evidence to that which may ultimately be admissible at trial. *Wiggins*, 539 U.S. at 522. Trial

---

believed the following things made Petitioner become what he is: violence at home, seeing the physical and verbal abuse of his Dad against his Mom; the discipline tactics used on him by his Dad").

[12] Petitioner respectfully objects to the *Magistrate's Findings* because they apply differing standards of review to the affidavit evidence in this case. The *Magistrate's Findings* discount Petitioner's affidavit testimony from family members and neighbors indicating that Petitioner's father physically abused family members, including Petitioner, because the affidavits do not state these individuals would have testified to these matters. Their very testimony via affidavit indicates a willingness to testify to these matters and, regardless of such willingness, would have been relevant to trial counsel's development of mitigation evidence and trial strategy. The *Magistrate's Findings* completely disregard the value, both substantively and strategically, of Petitioner's affidavit testimony. This constitutes error and Petitioner objects.

In contrast, trial counsels' affidavits containing hearsay evidence and testimony regarding their mitigation investigation, which likewise fail to assert they would have been willing to testify to these matters, are accepted by the Court as credible. Such differing standards violate due process. The *Magistrate's Findings* fail to appreciate the broader evidentiary value of Petitioner's witnesses and their affidavit testimony. In reducing the proffered affidavits to a question of whether the witnesses would have actually testified to the abuse, the *Magistrate's Findings* erroneously divorce this testimony from Petitioner's overall claim of ineffectiveness. The very fact that there *was* evidence of abuse in the family, available through multiple sources (family and neighbors) and evidence of extensive criminality among male family members suggests that counsel's failure to find, consider and evaluate this information when constructing their strategy violates clearly established federal law. Accordingly, the *Magistrate's Findings* on this point are objectionable.

counsel cannot simply ignore obvious leads because they fear that witnesses will not comply or testify. And, there is no allegation in *this* case that any of the four witnesses would not have testified to information contained in their affidavits.[13]  Rather, the Magistrate Judge found that as no such explicit guarantee was provided, the federal court can summarily dismiss the evidence as irrelevant. But, as *Wiggins* demonstrates, such finding misses the investigation mark. *Id.*

Petitioner clearly raised the deficiencies of Respondent's affidavit testimony in his federal habeas Petition. These claims have never been address by this Court. As the following confirms, trial counsels' affidavits are incomplete, vague, self-serving, not based on actual knowledge and inconsistent with one other. As Petitioner has argued:

Trial counsels' self-serving affidavits should not salvage an otherwise indefensible case of ineffective assistance of counsel. Mr. Huff's affidavit avers that "some of Escamilla's family met with us at Ms. Busbee's office." Huff Affidavit, p. 1, dated June 29, 2006. However, there is no recitation of which family members came to speak with him. Further, when Mr. Huff testifies that "[n]o one mentioned anything about abuse by Escamilla's father or anyone else," he fails to explain that perhaps that was because Petitioner's father was present during the only interview with counsel. There is no evidence that the family met at any other time with Mr. Huff than this lone example where the oppressive father was present. Mr. Huff's statement that, "I believe at one point during the meeting, we separated them and spoke with them individually" is not credible at all since Petitioner's father does not relate to others in English. Thus, the reliability of this generic affidavit does not justify the wholesale reliance provided by the state habeas court.

---

[13] The federal courts pedantic preclusion of Petitioner's state habeas affidavits simply demonstrates error and prejudice by state habeas counsel meriting consideration of the evidence under *Martinez v. Ryan.*

Likewise, Ms. Busbee's affidavit is lacking in specificity and reliability. Ms. Busbee, like Mr. Huff, speaks generically of Petitioner's family but only names four family members that they attempted to contact: Brenda Hinojosa, Jose Escamilla, Jose Escamilla, Jr. and Juan Escamilla. Nothing at all is said regarding Petitioner's paternal grandmother, his three paternal uncles and their wives and his numerous cousins – all living within a six block radius of Petitioner's family. In providing specifics about the lone meeting with family members, Ms. Busbee – unlike Mr. Huff – clearly indicates that only Brenda (Petitioner's sister) and Jose Escamilla (Petitioner's father) were present during the meeting. Thus, Ms. Busbee's own testimony confirms that trial counsel only met with two family members before trial. And, notably, Ms. Busbee does not agree that these two individuals were separated at any time during the interview – explaining very easily why no information about paternal abuse was forthcoming.

Ms. Busbee also admits that the earliest time at which she met with Petitioner's other sister and Petitioner's niece was during the punishment phase (though Ms. Busbee does not even explain who these individuals are or what their relation to Petitioner is). There is no reasonable explanation for waiting until after your client is convicted to contact the remaining members of the family. And, it is perhaps understandable that these two family members might be "off-putting" and "overly dramatic" after their immediate relative has just been found guilty of capital murder. One can only surmise how these potential witnesses and sources of information might have been perceived in a less threatening environment at a time when their insight could have been used to help develop a mitigation strategy.

These findings unduly minimize the burden imposed upon counsel following *Williams*, *Wiggins* and *Rompilla*. None of these three cases permit upholding a purported mitigation "investigation" relying upon information obtained from family members met for the first time

during the penalty phase of trial.  Rather, these cases underscore the importance of evaluating the mitigation case prior to trial and, one can only surmise, prior to jury selection.  Tellingly, neither Mr. Huff nor Ms. Busbee give any specifics of their respective "investigations" – i.e., how much time was devoted to investigation, when the investigation was conducted, when the investigation was completed or reference to any notes or files in the possession of either attorney.[14]

The state trial court unreasonably credits Ms. Busbee's statement that she met with and interviewed additional family members beyond Petitioner's half-sister Brenda and Petitioner's father. State Court Findings, Finding 88, page 26.  The finding, unreasonably indicates that in her affidavit, "Ms. Busbee specifically identifies Maria Escamilla (applicant's sister) and another young woman *possibly* Rachel Hinojosa (applicant's niece), as two family members . . . that Mr. Jenkins met with during his pretrial investigation."   First, the information contained in Ms. Busbee's affidavit about what Mr. Jenkins purportedly did is not based on personal knowledge and does not suffice as proper evidence regarding the actual scope of the investigation.  In fact, even the phrasing of the affidavit and the state court findings speaks in tentative and speculative terms:  it might have been, possibly, Petitioner's niece – but, one cannot be sure because there is no direct or admissible evidence on this point.

As Petitioner's evidence has been discounted for failing to contain assurances that the witnesses would testify at trial, Respondent's evidence which is not based on personal knowledge and is speculative should be similarly discounted.

In fact, Maria Escamilla's affidavit testimony contradicts Ms. Busbee's statements.[15] Maria avers that she never met with any attorney or investigator prior to meeting with

---

[14] Neither attorney provided either state habeas counsel or federal habeas counsel with any investigative notes or files.  Apparently, neither attorney maintains, or perhaps ever maintained, an investigative file in this case.
[15] *Maria Escamilla Affidavit*, 2008.

Petitioner's state habeas investigator, Toni Knox.[16]  Maria's testimony challenges the credibility

and reliability of Ms. Busbee's state habeas affidavit.  In addition, there are no notes in either

Mr. Huff's file or Ms. Busbee's file confirming that any interview with Maria ever occurred.

Just a vague recollection and a "possible" identification.[17]

Further, Ms. Busbee's self-serving testimony and post-hoc rationalization that she does

not "remember looking for [Petitioner's] father's criminal history.  [But] Even had I found one,

though, I doubt I would have used it," is unreliable, unrealistic and based upon pure

speculation.[18]  While Ms. Busbee might not have used Petitioner's father's criminal history as

evidence during mitigation, the teachings of *Williams*, *Wiggins* and *Rompilla*, explain that she

failed in her duty to her client if she could have used this information to shape the mitigation

strategy.[19]  Thus, the state habeas court findings regarding the sufficiency of investigation based

on Ms. Busbee's affidavit are unreasonable in light of the evidence.

---

[16] *Id.*

[17] This testimony is contradicted directly by Maria's state habeas affidavit testimony.  Ms. Busbee testified that she met with Maria – something Maria denies – and another female family member, "possibly Rachel Hinojosa."  Ms. Busbee clearly does not have any documentary evidence, such as notes or any investigative file to confirm this possible recollection.  Rather, the state court unreasonably credited Ms. Busbee's testimony despite its general and equivocal nature.

[18] *Busbee Affidavit*, p. 4, dated June 28, 2006.

[19]      The court rejected the State's defense of counsel's "tactical" decision
to 'retry guilt,' concluding that for a strategic decision to be reasonable,
it must be "based upon information the attorney has made *after conducting
a reasonable investigation*."  The [state] court found that though counsel
were aware of some aspects of [Petitioner's] background, that knowledge
did not excuse them from their duty to make a "fully informed and
deliberate decision" about whether to present a mitigation case.  In
fact, the [state] court concluded, their knowledge triggered an
obligation to look further.

*Wiggins v. Smith*, 539 U.S. 510 (2003)(criticizing the unreasonable state court findings)(emphasis added).

Under *Williams*, *Wiggins* and *Rompilla*, one cannot, post hoc, justify their mitigation strategy on incomplete information.[20]  The fact that Ms. Busbee might still believe now, as she did then, that her alleged "strategy" was effective does not suffice to counter Petitioner's challenge that Ms. Busbee and Mr. Huff constructed this "strategy" without a complete appreciation for the family history and for the true nature of Petitioner's father's abusive and alcoholic proclivities.  Even a cursory investigation would have revealed that Petitioner – and his brothers – are who they are because of their abusive and violent upbringing.  Further, the *Williams*, *Wiggins*, *Rompilla* trilogy requires counsel to chase down leads that might shed light on potential mitigation strategies . . . such as the knowledge that all the male children in the family have criminal histories of shootings, drugs, assaults and crimes of violence.

The lessons of *Williams*, *Wiggins* and *Rompilla* suggest that counsels' awareness of a checkered criminal past for all the male children in the family required counsel to dig a little deeper and not place such blind reliance on the family's protestations of normalcy.  Having every

---

[20] In describing the "proper application" of the *Strickland* standard in relation to investigation, Justice O'Connor wrote:

> Our opinion in *Williams v. Taylor* is illustrative of the proper application
> of these standards.  In finding Williams' effectiveness claim meritorious,
> we applied *Strickland* and concluded that counsel's failure to uncover and
> present voluminous mitigating evidence at sentencing could not be
> justified as a tactical decision to focus on Williams' voluntary confessions,
> because counsel had not "fulfill[ed] their obligation to conduct a thorough
> investigation of the defendant's background. . . .
> In light of these standards, our principal concern in deciding whether [counsel]
> exercised "reasonable professional judgment[t], it not whether counsel should
> have presented a mitigation case.  Rather, we focus on whether the investigation
> supporting counsel's decision not to introduce mitigating evidence of
> [a Petitioner's] background *was itself reasonable*.  In assessing counsel's
> investigation, we must conduct an objective review of their performance,
> measured for "reasonableness under prevailing professional norms," which
> include a context-dependent consideration of the challenged conduct
> as seen "from counsel's perspective at the time."

*Wiggins v. Smith*, 539 U.S. 510 (2003)(emphasis in original)(internal citations omitted).

male child in a family incarcerated for crimes of violence implies that the familial environment was not as "Leave it to Beaver-ish" as counsel's affidavit would suggest.  Further, had counsel sought actual information about the serious criminal history of Petitioner and his brothers – not to mention Petitioner's father, his father's son from a previous marriage, his uncles and cousins – it is doubtful that she could have credibly maintained that "the Escamillas were a fine family and that Escamilla's father was a good man and father."  Such conclusion could not reasonably have been reached on the data available in the criminal records alone.

Finally, had counsel actually spoken to Maria, as she suggests, even as late as the penalty phase, counsel would have learned that Petitioner's father was physically and verbally abusive toward every member of the family.  It is hard to imagine that trial counsel would have refused or ignored such important information.

Accordingly, because the state habeas court relied upon Ms. Busbee's affidavit to establish a key point in the Sixth Amendment assessment without requiring that Ms. Busbee have personal knowledge of the actual investigation conducted and without assessing the credibility of her testimony in light of the evidence presented during the state habeas proceedings, these findings are unreasonable and not deserving of AEDPA deference.  Petitioner respectfully requests, at a minimum, that he be provided an evidentiary hearing on this issue to permit him to more fully develop the facts regarding the insufficiency of trial counsels' "investigation" and the credibility of trial counsels' respective affidavits.

Petitioner continues to object that holding his state habeas evidence to one standard, the highest possible standard,[21] and requiring that Petitioner's affiants affirmatively testify that they would present their identical sworn affidavit testimony in trial violates Due Process and Equal Protection.  He further objects that this Court credits both trial counsel and their legal assistant

---

[21] Neither this Court nor the Magistrate Judge cite any authority supporting its restrictive consideration of affidavits.

with a heightened level of veracity despite any indication or averment that any of these affidavit witnesses were willing to give this same testimony at trial.  He further objects that the Magistrate Judge and this Court credit trial counsels' respective affidavits despite their generic offering of information (both nearly identically state their investigator looked into Petitioner's background to locate family members, friends and neighbors) contradicted by several of Petitioner's witnesses.  No State affidavit provides actual evidence of who, if anyone, was located by counsel or their investigator or who, if anyone, was contacted, beyond Petitioner's father and one sister.  Tellingly, the investigator, Mr. Cliff Jenkins has never provided an affidavit detailing his "investigation" and neither Mr. Huff nor Ms. Busbee have ever produced an investigatory file to either state habeas or federal habeas counsel.  Petitioner has alleged no such file exists.

Petitioner contends that the Magistrate's Findings violate Due Process and Equal Protection by requiring Petitioner's affiants include averments not required by the State's witnesses.  To embrace the State's witnesses' affidavit testimony without requiring the same rigor or promise of willingness and availability to testify in these proceedings demands more of Petitioner, without reason or cause, than the State.  Further, such heightened approach is at odds with clearly established law set forth in *Wiggins v. Smith*.[22]

Petitioner's state habeas evidence is proof that counsel failed to conduct an investigation.  Thus, his witnesses' willingness to testify is actually beside the point.  The greater problem, however, is the use of differing standards of reviewing the testimony submitted – an inexplicably

---

[22] As *Wiggins* found:

> In light of [governing ABA] standards, our principal concern in deciding whether [trial counsel] exercised "reasonable professional judgment[t], *id.*, at 691, is not whether counsel should have presented a mitigation case.  Rather, we focus on whether *the investigation supporting counsel's decision* not to introduce mitigating evidence of [Petitioner's] background was itself reasonable.  *Wiggins*, 539 U.S. at 522 (emphasis added).

14

demanding one for Petitioner's witnesses and a much less searching one for trial counsel and their legal assistant.  Due Process and Equal Protection preclude such dual standards.

For these reasons, Petitioner respectfully requests that his Motion for New Trial be GRANTED and that his properly submitted, uncontroverted affidavit testimony be considered by this Court as evidence supporting his claims that the State court findings are unreasonable.

III.     Court's Failure to Fully Address Petitioner's Ineffective Assistance Claims

Petitioner urges this Court to address, fully, his individually asserted allegations that trial counsel failed to investigate or develop mitigating evidence on his behalf despite clearly established federal law requiring such investigation and development.  *See Williams v. Taylor*, 529 U.S. 362 (2000), and *Wiggins v. Smith*, 539 U.S. 510 (2003).  Petitioner is required, with specificity, to present his Objections to this Court to secure *de novo* review.  Petitioner did so. The Court's March 26th Order fails, however, to fully respond to Petitioner's individual objections and, thus, merits a New Trial on these issues.

A.     District Court Did Not Provide *De Novo* Review Regarding Expert

Key among the deficiencies relating to investigation and development of mitigating evidence is trial counsels' failure to consult with the lone "mitigation" expert until *after* trial had begun. Because this Court did not rule on this, Petitioner respectfully requests a New Trial.

The ADEPA doubly deferential standard does not preclude relief on this claim.  Rather, not only are counsel's shortcomings in failing to confer with their lone mitigation expert prior to the commencement of trial proceedings unreasonable, they verge on outrageous.

1.  Deficiency

The record demonstrates three important *undisputed* facts regarding the failure to timely engage an expert:  (1)  the first time the expert saw Petitioner was *after* trial proceedings had

begun, the evaluation taking place in a holding cell off the courtroom where trial proceedings were ongoing, thus long after the time for crafting a viable strategy had passed; (2)  the expert did not have accurate information about Petitioner's family history, falsely stating in his report that none of Petitioner's family members had legal trouble, thus failing to incorporate the endemic criminal element of Petitioner's family in his report; and, (3) Petitioner's trial counsel did not receive the expert's report, and thus was without knowledge of its contents, *until one full month after trial and sentencing had been completed*.  Such dilatory engagement of the lone mitigation expert is outrageous under national, local and Constitutional standards.

The record before the state courts and this Court clearly negate trial counsels' claim that they immediately investigated this case.  In contrast to trial counsel, Ms. Brook Busbee's unsupported, indeed – unsupportable, affidavit testimony that trial counsel began an immediate investigation in this case, Petitioner has proven his allegation of failure to investigate with unopposed and undisputed evidence that trial counsel did not engage their mitigation expert until *after* trial proceedings had begun.  *See Glen Pearson Letter*, (Nov. 29, 2002).

Further, the expert's report is based on patently false information, lack of any family criminal history, which if timely communicated to trial counsel would have necessitated correction during the evaluation proceedings.  Had Dr. Pearson learned that Petitioner and his brothers, including his half-brother, all with criminal pasts, had been raised by a father twice arrested for crimes involving gun possession, it might have contextualized why Petitioner's "pow-pow-pow" description of the shooting "as if he were a 10-year-old playing cops and robbers" was a product of Petitioner's environment and not evidence of antisocial personality disorder.[23]  Had Dr. Pearson been aware that Petitioner was raised in a neighborhood where gunshots rang out constantly, that Petitioner's own father used a gun to scare Petitioner's mother by shooting the

---

[23] *See Glen Pearson Letter*, (Nov. 29, 2002).

gun in the air, or that Petitioner's older brother had shot someone for picking on Petitioner, and that the family had blamed Petitioner for older brother's behavior, more context would have been provided for the "pow-pow-pow" description of his crime.  To Petitioner, life was likely reduced to perpetually being a "10 year-old playing cops and robbers."[24]

And, with a complete lack of supervision regarding alcohol, drugs and guns, Dr. Pearson would have learned – had counsel performed even a rudimentary investigation about the family dynamics – that Petitioner's behavior was a predictable response to his upbringing.[25]  Petitioner is a tragic, but natural, product of his environment.

Because trial counsel did not even receive the expert's written report until one month *after* Petitioner had been sentenced to death, counsel was unable to ensure the accuracy or usefulness of this expert.  In direct contravention of trial counsels' testimony that they immediately began their investigation in this case, the documentary evidence admitted before both the state courts and this Court belie such testimony.  And, patently absent from both Mr. Huff's and Ms. Busbee's affidavit is any indication of how much time was spent investigating.  All that is set forth, and credited as accurate, is that an immediate investigation took place.  Such hollow, unsupported assertions do not meet the constitutional threshold.

Much like *Scott v. Harris*, 550 U.S. 372 (2007), this is a case where the competing evidence is not truly competing.  With all due respect, Petitioner has revealed Ms. Busbee's affidavit to be lacking in veracity:  "[Busbee's] . . . version of events (unsurprisingly) differs substantially from [Petitioner's] version."  *Id.* at 378.

---

[24] *See Glen Pearson Letter*, (Nov. 29, 2002).
[25] It is one thing to have someone appear to be a heartless, remorseless killer.  It is another to learn that this façade is a direct result of being raised in an environment where that person was continually beaten, verbally abused, and constantly exposed to crimes of violence and guns without any admonition – tacitly or openly – that such behavior is inappropriate.  The scientific method of analysis requires accurate data to ensure valid test results.  If the conclusion reached is based upon inaccurate data, the conclusions are similarly flawed.  Such basics of logic and appreciation of the scientific method are notably absent in the state court's findings.

There is, however, an added wrinkle in this case:  the existence in the record of [undisputed contrary evidence] capturing the events in question.  There are no allegations that [the Pearson report, dated Nov. 29, 2002 – a full month after Petitioner was sentenced to death] was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened.  The [Pearson report] quite clearly contradicts the version of the story told by . . . [Busbee] and adopted by the [state courts]. . . .

When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. . . . [Reviewing courts] should not have relied on such visible fiction, [they] should have viewed the facts in the light depicted by [Pearson's report].

*Id.* at 378-86.  Respondent has not challenged any component of Dr. Pearson's November 29, 2002, report.  With all due respect, any claim of immediate investigation is a visible fiction.  *Id.*

Dr. Pearson's uncontroverted report reveals that he met with Petitioner for about an hour "in the holding cell adjacent to the courtroom in which his trial was proceeding."  *Id.*  Thus, prior to jury selection, trial counsel had not yet had Petitioner evaluated or his case considered by any mitigation expert.  This failure ran directly afoul of governing prevailing professional norms in Texas in 2002.  Further, the timing of the evaluation confirms Dr. Pearson's testimony to Ms. Toni Knox that he believed this request was done at the eleventh hour simply to allow trial counsel to cover all the bases and was not intended to be a legitimate, helpful evaluation.  Pearson's own affidavit testimony confirms that Petitioner "was already in trial when I saw him."  *Pearson Affidavit.*  Pearson further confirmed he had never testified in a death penalty case and, even so, would never testify that any individual deserved the death penalty.  *Id.*

18

The Magistrate's Findings that trial counsel's eleventh hour resort to Dr. Pearson was "immediate" or constitutionally effective is contrary to clearly established federal law. This Court's *sub silentio* adoption of these Findings is likewise erroneous.[26]

This Court wholly failed to address Petitioner's Objections to the Magistrate's Findings at 44-45. Petitioner has demonstrated by clear and convincing evidence that resort to the lone "mitigation" expert did not occur until after the trial proceedings had begun in this case, in a holding cell directly off the courtroom. Thus, both the State Court Findings and the Magistrate's Findings that an immediate investigation took place are incomplete, if not inaccurate. To the extent that the both the State Court Findings and the Magistrate's Findings suggest that the brief eleventh hour resort to a proposed testifying expert, occurring only after the trial proceedings had begun, is inconsistent with clearly established federal law. Any conclusion that such dilatory and

---

[26] Petitioner's specific objections were as follows:

The *Magistrate's Findings*, at 44 – 45, also err in finding that trial counsel's delayed use of Dr. Pearson does not violate the governing ABA Guidelines relating to experts. First, trial counsel was required to use their investigative efforts to develop a trial and punishment strategy. *See* GUIDELINE 11.7.1 GENERAL TRIAL PREPARATION A. (mandating that "as the investigations mandated by Guideline 11.4.1 produce information, counsel should formulate a defense theory. In doing so, counsel should consider both the guilt/innocence phase and the penalty phase, and seek a theory that will be effective through both phases.") Waiting until *after* trial has begun to have a client evaluated by an expert precludes proper strategic development. Further, failure to provide an expert with accurate information (such as the family's extensive criminal history, including in this case over 38 convictions excluding Petitioner's convictions) prevented the expert from providing useful, if not usable, information. In this regard, the *Magistrate's Findings* are objectionable because they fail to evaluate trial counsel's investigative efforts in light of the governing ABA Guidelines. Petitioner objects to the *Magistrate's Findings* failure to review the state court findings in light of Guideline 11.71.

The *Magistrate's Findings*, at 44-45, err by not considering the ABA Guidelines governing sentencing preparation. GUIDELINE 11.8.3 PREPARATION FOR THE SENTENCING PHASE A. (As set out in Guideline 11.4.1, preparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case. Counsel should seek information to present to the sentencing entity or entities in mitigation or explanation of the offense and to rebut the prosecution's sentencing case.)

Petitioner submitted two affidavits proving, and thus establishing by clear and convincing evidence, that trial counsel did not even attempt to utilize their psychological expert until *after* trial had begun. Trial counsel's own affidavit concedes this point. This proves that trial counsel failed to conform to both Guideline 11.4.1 and 11.8.3 by not beginning their expert preparation until after the time for considering and adopting a trial strategy had passed. Petitioner objects to the *Magistrate's Findings* failure to apply 11.4.1. and 11.8.3 in reviewing the state court findings.

incomplete action satisfies the Sixth Amendment standard to investigate fails to accord Petitioner a fair review of the evidence he has submitted.

Petitioner further challenges that the Magistrate's Findings and Recommendation, and this Court's adoption thereof, suggesting that trial counsel undertook an immediate investigation in this case are unreasonable in light of the evidence in the record before the state courts. The documentary evidence Petitioner submitted belies the decisions reached by the reviewing courts.

The undisputed testimony reveals that the lone possible testifying expert did not interview or otherwise evaluate Petitioner until *after* trial proceedings had begun. This interview lasted approximately one hour and did not involve any standard psychological or psychiatric testing. This interview was conducted in a holding cell adjacent to the courtroom where the proceedings were underway. This interview was not based on an accurate family history – the expert falsely believed, and later falsely reports, that there was no family criminal history. This interview was not undertaken with an understanding that this was a death-penalty case. And, most importantly, the expert's report was not prepared until a full month *after* Petitioner had been sentenced to death.

Ms. Busbee's claim of immediate evaluation is clearly and unequivocally contradicted by the record in this case. Any finding that a last minute, minimized one-hour evaluation in a holding cell during trial proceedings is constitutionally acceptable is an unreasonable finding. Any finding that a report prepared one full month after the proceedings had ended and the client had been sentenced to death is constitutionally acceptable is an unreasonable finding. Any finding that a report based on false and incomplete information, information allegedly known by trial counsel to be false, is either reliable or constitutionally acceptable is an unreasonable finding. National ABA, local practice, prevailing professional norms and clearly established

federal law all mandate a finding that is in accord with the existing evidence that the late-hour resort to the expert during trial proceedings occurred too late to be of any benefit. Instead, this Court accepted and sanctioned the unreasonable findings of the state court in light of the evidence presented in the state court record. This was error.

Further, in contravention of Ms. Busbee's testimony that the expert could not have helped, the testimony of the expert himself contradicts this finding. Dr. Pearson has unequivocally indicated he would never recommend a death sentence in any case under any circumstances. Ms. Busbee thus had an expert that had reviewed her client that would have testified his opposition to the very sentence imposed. It is unreasonable to suggest that such testimony in a capital murder case would not have been helpful. Petitioner has established that Dr. Pearson could have provided useful testimony, that a death sentence was not appropriate in this case, meriting habeas relief under clearly established federal law. When the lone testifying expert avers that he would not have recommended a sentence of death, it is difficult to appreciate how that testimony would not have been useful. Under any definition, such testimony would have provided mitigation evidence that would have aided Petitioner.

Petitioner urges this Court to fully address his particular Objections regarding trial counsel's failure to promptly or properly investigate Petitioner's case and to GRANT his Motion for New Trial on this issue because:

1) Counsel failed to contact the lone mitigation expert until *after* trial proceedings had begun, in contravention of prevailing professional norms;
2) Counsel's lone mitigation expert first saw Petitioner *during* trial proceedings on October 2, 2002;
3) Counsel's lone mitigation expert did not provide counsel with his written report in the case until November 29, 2002, thirty-one days *after* the guilt-innocence proceedings had concluded and twenty-nine days *after* the penalty phase proceedings had concluded.

4) Counsel has provided no evidence that they consulted with the expert prior to receiving the written report, despite three affidavits detailing their "investigation" in this case;

5) Petitioner has demonstrated that the report was based on false information, involved a cursory evaluation without the usual standard psychological or psychiatric testing devices being employed or considered;

6) Petitioner has demonstrated that the expert himself believed the consultation was not legitimately pursued but, rather, was an eleventh hour attempt to "cover the bases,"

7) Counsel's dilatory resort to the expert precluded use of the expert for mitigation assistance or strategic preparation during guilt/innocence or punishment;

8) Counsel's failure to educate or inform the expert with independent notes or files confirms Petitioner's allegation that no investigative file ever existed in this case, *see Dr. Glen T. Pearson, M.D., Letter* (November 29, 2002)(indicating that the records provided were "mostly from Dallas County Juvenile Department and the Texas Youth Commission) and no accurate family history was provided in contravention of prevailing professional norms;

9) Counsel's failure to properly inform the expert of her alleged knowledge regarding the family criminal history resulted in a factually flawed and incomplete assessment of Petitioner, *see Dr. Glen T. Pearson, M.D., Letter* (November 29, 2002)(falsely stating that "[n]one of Licho's siblings were involved with illegal activity");

10) Counsel's failure to follow up with the expert once she learned portions of the assessment were based on false information, i.e., inaccurate family criminal history, was constitutionally deficient;

11) Counsel's inability to utilize an expert to craft trial strategy when that expert was not consulted prior to trial proceedings beginning, a finding at odds with clearly established federal law and prevailing professional norms;

12) Counsel's dilatory resort to the expert precluded use of the expert for mitigation assistance or strategic preparation during either the guilt/innocence or punishment phases of trial; and,

13) Petitioner has demonstrated that the expert would have testified that Petitioner did not deserve the death penalty.

The Magistrate Judge's Findings that trial counsel's use of an expert comports with the

Sixth Amendment standards of effective trial counsel are at odds with the law and evidence in

this case and merits a new trial.  Counsel did not use any expert until after trial proceedings had

begun. Exactly like *Wiggins*, "[t]he record of the actual sentencing proceedings underscores the

unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly

resulted from inattention, not reasoned strategic judgment."  *Wiggins v. Smith*, 539 U.S. at 525.

22

Further, counsel did not receive any report about the findings rendered until 31 days after the close of guilt/innocence in this case and 29 days after the penalty proceedings had concluded. There is no possible way that these findings could have been incorporated into any trial or punishment strategy as the entire case had been concluded for a full month before the expert's report was even prepared in contravention of prevailing professional norms. Deficient performance in this case is clear.

2.       Prejudice

Most importantly, these failings prejudiced Petitioner because it precluded him from receiving any viable expert assistance or testimony. Dr. Pearson unequivocally testified that he believes *every* person should receive a life sentence over the death penalty. Counsel's reliance on an inaccurate report prevented Petitioner from accessing expert testimony arguing *against* the very penalty Petitioner received. There is no "double-edged" nature to an expert witness that would testify *against* the death penalty. None. Had a jury heard that a juvenile expert, even one only partially aware of Petitioner's background, opposed a death sentence, there is a reasonable probability that the jury would have sentenced Petitioner to life. Had the jury learned of Petitioner's actual family history, his development in a violent and criminal household, that his inappropriate response to the crime like a "10 year-old playing cops and robbers saying 'pow-pow-pow'" was a natural consequence of his upbringing, fortified by an expert's testimony that the death penalty was not warranted, there is a reasonable probability that Petitioner would have been sentenced to life.

Petitioner presented specific objections to the Magistrate Judge's finding of no prejudice. This Court, however, did not address prejudice in its March 26th Order. Petitioner reasserts and incorporates his Objections to the Magistrate Judge's Findings regarding prejudice. The

Magistrate Judge erred on pages 51-52 by suggesting that because Petitioner's abusive and violent upbringing did not rise to the level of *Wiggins* and *Rompilla* he failed to show prejudice. This is not the proper test for prejudice under clearly established federal law.  Instead, the test is simply whether, in light of the evidence presented in the state trial and state habeas proceedings, there is a reasonable probability that Petitioner would have received a life sentence.  Reviewing courts must balance all the mitigating evidence against the aggravating evidence.  *Williams v. Taylor*, 529 U.S. at 397-98.  The Magistrate Judge failed to do so.  And, by adopting these Findings, this Court likewise applied the wrong standard.

Petitioner has proven that he grew up in a physically violent household.  Petitioner has proven that nearly every male member of his nuclear family has committed violent crimes involving guns and murder.  Petitioner learned, at home, that the way to solve disputes was with guns and violence.  Petitioner's older brother demonstrated this when he shot another person for beating up Petitioner.  Petitioner's brother was incarcerated for this shooting and its relevance is undisputable.  In addition, the state court was clearly advised of the violent nature of Petitioner's family during state habeas proceedings but chose to turn a blind eye to its mitigating relevance.

The state habeas court's finding that "although the State could not have argued that [Petitioner] was the only criminal in the family, they could still have credibly argued that he was the most dangerous member of his family" is unreasonable in light of the evidence submitted to the state court.  State Court Findings, Finding 115, page 34.  Toni Knox, the state habeas investigator, submitted an affidavit listing the following criminal history of the Escamilla family:

<u>Licho and Family Criminal History</u>

Licho (Petitioner herein) and the Escamilla family have a long history of arrests and incarcerations.  Licho's paternal Uncle Natalio was murdered by being shot at age seventeen in Florida.  Licho's father [Jose Escamilla] was arrested in 1989 and 1991 for

public intoxication and both times for carrying an unlawful weapon (gun).  The Dallas, Irving and other local Police Departments have a long history with the Escamilla family.

Jose's  oldest son with Rosa [his previous marriage], Santos Lugo Escamilla (goes by Lugo) was convicted of murder and incarcerated in the Minnesota prison system in 1995.  He is currently incarcerated at the Minnesota Correctional facility in Moose Lake, Minnesota.  His (sic) may be eligible for release by 2009, but his sentence does not expire until 2016.

Licho's brother Juan, was first arrested as an adult by the Dallas PD was (sic) on September 21, 2001 for unauthorized use of a vehicle and evading arrest.  Juan was apparently on probation for four years for a previous juvenile offense and his probation was revoked.  He was sentenced to 240 days in jail.  Juan was incarcerated at Lew Sterrett during the same time that Licho was incarcerated there.  Juan's second arrest was July 27, 2002 by the Irving PD for unlawful carrying of a weapon.  He was incarcerated for 200 days.  Juan's last arrest [at the time of Ms. Knox's declaration – he has since been arrested AGAIN] was on April 10, 2003 was for possession of a controlled substance (cocaine) and unlawful possession of a firearm by a felon.  Juan was sentenced to two years and is currently completing that confinement at the TDCJ Clements Unit in Amarillo, Texas.

Licho's uncle, Juan (his father's brother, not Licho's younger brother), was arrested by the Dallas PD on April 5, 1969 for disorderly conduct and driving while under the influence of liquor and sentenced to 30 days.  He was arrested again August 3, 1973 for driving while under the influence of liquor and sentenced to one year probation.  He was arrested in 1978 for carrying a prohibited weapon and received three years probation.

Licho's cousin, Eliezar Escamilla, son of Jose's brother, Juan, was arrested February 12, 1997 and charged with aggravated assault with a deadly weapon (car), which was later changed to manslaughter.  He was also charged with burglary of a habitation and received a sentence of six years.  He is currently out on parole in Dallas.  He had a series of misdemeanor arrests starting in 1994 and his last arrest was in September of 2004, but he was found not guilty.  Another of Licho's paternal cousins, Julian Escamilla, also has a record of arrests by the Dallas PD.

Licho's older brother, Jose, was incarcerated at Texas Youth Commission as a juvenile in 1995 for shooting a man that had assaulted Licho.  His first adult arrest was May 30, 2001 b the Irving Police Department for evading arrest and he was sentenced to 90 days in jail.  His next arrest was by the DPD on May 19, 2003 and was originally for unlawfully carrying of a weapon (handgun), but the charge was later changed to DWI.  Jose is currently incarcerated on federal drug related charges and is incarcerated in a federal prison near San Antonio.

Declaration of Toni Knox, Second Declaration, page 46-47.

This evidence indicates that Petitioner was raised in a family where gun possession, alcohol use and overuse, physical beatings, shootings and killings were considered normal.  It is a stretch – at best – to suggest that somehow Petitioner is the worst of this group.  Instead, he is simply a product of his environment and began to act in similar ways to his father, his uncle, his brothers and his cousin.  From all objective observations, Licho Escamilla learned to act the way he did at home.  "Pow-pow-pow" was a way of life for the Escamillas.

Had counsel conducted even a cursory review of the family past, they would not have permitted the prosecutor, Mr. Tokoly, to argue the following without objection – as his conclusions are contradicted by the evidence and are patently untrue:

> *This case isn't about events in his life; it's about choices that he's made.  Choices that he's made.  And, please think about this, this isn't a situation that we see so many times and hear about where someone becomes a law breaker because they had either an abusive or no proper upbringing.  Think about it.  That's not the case here.  You listened to his father.  You listened to him testify.  He had loving parents that were role models.*

Mr. Tokoly is correct that Petitioner had role models – *negative* role models.  And, unfortunately, Petitioner emulated those negative role models and began to engage in alcohol abuse and lawless behavior at an early age.  The only plausible reason Petitioner's trial counsel failed to object and sat mute while this false argument was presented, leaving the jury with the impression that Petitioner was the product of a stable and loving environment was because counsel had no idea it was a false argument.  There is no reasonable strategic reason to allow the State to falsely portray your client as individually lawless due to his choices when nearly every male member of his family has a violent, gun-based criminal past.[27]  *See Sears v. Upton*, 130 S.Ct. 3259 (2010).

---

[27]   1.     Petitioner's Uncle Juan had two convictions.  One for unlawful carrying of a weapon and one for prohibited weapon.  (Cases F-7804467, MA-9153353)

2.     Petitioner's Uncle Eliezar had a conviction for burglary of a habitat. (F-9775621)

Counsel was further deficient for not investigating Petitioner's father's alcohol and physical abuse. Had counsel investigated the governing brutality at home – or the extensive familial criminal history – counsel would not have been able to permit the wrongful characterization of Petitioner as a rational actor making choices that were in contradiction to his "proper upbringing." *See id.* Petitioner's resort to drugs and alcohol was learned at home. Petitioner's appreciation that violence and guns are proper dispute resolution techniques was learned at home. Petitioner is a natural product of his violent, abusive and chaotic upbringing. He may have had loving parents. But, the role models he had at home, including a father who carried and used guns to scare others, were uniquely negative.[28] The father that Ms. Busbee

---

3.    Petitioner's father, Jose, Sr., had two convictions. One conviction for unlawful carrying of a weapon and a second for unlawful carrying of a weapon – handgun. (Cases MA-8923384, MA-9140928)

4.    Petitioner's cousin, Eliezar (Juan's son), has a total of ten adult convictions: four for assault, four for assault with a DV, one for aggravated assault with a deadly weapon and one for murder. (Cases F-0454866, F-0454867, F-9746530, F9746550, M-0405601, M-0405559, M-0458028, M-0458029, M-0458032, and M-0458033)

5.    Petitioner's older brother, Jose, Jr., has eight adult convictions: possession of a controlled substance, possession of a prohibited weapon, two for theft in excess of $1,500, DWI, driving while license suspended, unlawful carrying of a weapon – handgun, and assault. (Cases F-0020647, F-9755456, F-9652623, MB0321102, MB0321103, MA0321107, MA0372081, and MB0136632). Jose, Jr., is currently in federal custody serving a 15-18 year sentence.

6.    Petitioner's younger brother, Juan, has nine adult convictions: two for aggravated assault with a deadly weapon, aggravated robbery with a deadly weapon, unauthorized possession of a firearm by a felon, possession of a controlled substance, evading arrest, unauthorized use of a motor vehicle, driving while license suspended and unlawful carrying of weapon – handgun. (Cases F-0773346, F-0773174, F-0757125, F-0334671, F-0334670, F-0157490, F-0157491, M-0688446, and M-0235458). Juan is currently in state custody on new charges.

In addition to this history, Petitioner's father's son from a previous marriage, Alfredo Hinojosa, has an extensive criminal history in Hidalgo County, Texas. Alfredo Hinojosa has six convictions: 2 DWIs, possession of marijuana, criminal mischief, aggravated assault with a deadly weapon and murder (Cases CR-113938-A, CR-106414-A, CR-61285-C, CR-59896-C, CR-543-83-C, and CR-105-87-C). Thus, including Alfredo, all four of Petitioner's sons have extensive criminal history -- two for murder.

[28] The family criminal history is legion. Both Petitioner's father and uncle have 2 convictions each – both gun related. Petitioner's cousin has 10 adult convictions, including murder and the rest for assault and weapon related charges. Petitioner's older brother has 8 adult convictions, including weapon and assault convictions. Petitioner's younger brother has 9 adult convictions, including weapon and assault convictions. And, Petitioner's step-brother

suggests was such a compelling witness has two of his four sons serving time for murder.[29] Excluding Petitioner, Petitioner's father's other three sons have accumulated 23 adult convictions between them – nearly all relating to gun, assault and physical violence, including murder.[30]

In addition, Petitioner was exposed to physical violence on a regular basis. The state habeas court's finding that "the degree and nature of the recently reported abuse was not sufficient to evoke much sympathy from the jury" are unreasonable because they fail to consider the context of weekly beatings – against both mother and children. State Court Findings, Finding 116, page 34. And, the trilogy of *Williams, Wiggins* and *Rompilla* indicate that this is precisely the type of evidence that is relevant and mitigating and must be weighed against the aggravating evidence – something the federal courts have yet to do in this case. *See Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510, 522 (2003); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

The state habeas court unreasonably determined that Petitioner's "abuse evidence is not powerful in quality or quantity. As previously noted [Petitioner] presents no documentary evidence to substantiate the abuse claims. He relies entirely on anecdotal recollections from family and friends." State Court Findings, Finding 117, page 35. This is erroneous: sworn affidavit testimony cannot be characterized as mere anecdotal evidence. Petitioner's state habeas evidence included affidavit testimony from his sisters to substantiate the extensive nature of abuse in the family – much of it directed at Petitioner.[31] In addition, two female friends of

---

(Petitioner's father's son from a previous marriage) has 6 adult convictions, including murder. Thus, three of the five boys in this nuclear family have murder convictions. This hardly makes Petitioner the worst of the worst. Rather, such overwhelming evidence suggests Petitioner is merely a product of his violent upbringing.
[29] *Id.*
[30] *Id.*
[31] *Id.*

Petitioner's mother testified via affidavit that they saw bruises on Petitioner's mother's face on numerous occasions.[32]

Numerous neighbors and family members *did* give *uncontroverted* testimony that Petitioner's father was horribly abusive, both physically and verbally.[33]  Petitioner's younger brother reports that Petitioner's father called his own children "fucken faggots" and would beat the children with his bare hands.[34]  His older sister, Maria, confirms this to be true.[35]  The state habeas court unreasonably reached its ultimate decision that no such abuse occurred based on the father's own self-serving testimony – testimony that has been discredited by two of his daughters and two neighbors.[36]  Of course Petitioner's father did not admit his violent outbursts, his abuse

---

[32] *Luiz Gonzalez Affidavit*, p. 1, dated October 30, 2005 (averring that "I observed three or four occasions that Maria appeared to have been beaten and (sic) a black eye"); *Margaret Barajas Affidavit*, p. 1, dated October 30, 2005 (averring that "Maria told me that her husband would hit her and I saw bruises").

[33] *Id.*

[34] Petitioner's brother Juan advised state habeas counsel that Petitioner's father:

> abused us when we were young also whipped us with his belt, and smacked us around.  When he was really mad he would beat us down with his bare hands punching us.  When we would get in trouble at school he would make us get on our knees and whip us with his belt til he got tired.
> I guess that was the way he thought we would learn to behave. But the way he would talk to us didn't help either.  I mean he would curse us out when we wouldn't do what he wanted us to do.  For example:  If my father asked me to cut the grass and I forget to do it?  My dad would curse me out and say things like "You not worth the fuck.  You never going to amount to shit.  You son of a bitch. You fucken faggot."

*See State Habeas Exhibit 18.*

[35] *Maria Escamilla Affidavit*, 2008.

[36] *See e.g., Luis Gonzalez Affidavit* (observing on three to four occasions evidence that Petitioner's mother had been beaten and had a black eye); *Margaret Barajas Affidavit* (confirming evidence of physical abuse in the family, testifying that Petitioner's mother told her Petitioner's father hit her and observing bruises on Petitioner's mother); *Vickie White Affidavit* (averring that she "didn't believe that Licho ever had a chance in life because of the influence of gang members and his brother's involvement with a gang and his influence on Licho.  It [was her] experience that a child growing up in that environment of guns and violence cannot escape without a major intervention"); *Maria Escamilla Affidavit* (testifying that she saw her "father hit my mother with a belt and his hand" and also that her "father would hit us with his belt, switches or whatever he could find); *Brenda Hinojosa Affidavit* (testifying that "I had to watch my mom take physical and verbal abuse from my dad countless times" including pulling her by the hair, dragging her and kicking her.  Brenda also indicated that "even though [my mom] was beaten numerous times, she never went to the hospital or called the police."  Finally, Brenda indicated that she

of his wife, his beating of his children or his family's legion criminal history – such as his other son's murder conviction.  The father's explanations were false, misleading and could have been easily contradicted had trial counsel bothered to follow-up easily available leads.  *Wiggins v. Smith*, 539 U.S. at 521-23; *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Rompilla v. Beard*, 545 U.S. 374 (2005).

The state habeas court unreasonably found that Petitioner "fails to acknowledge the powerful impact of the mitigation theory his counsel did develop and present at trial."  State Court Findings, Finding 123, page 37.  First, the evidence of juror interviews contradicts that this purported mitigation theory was effective, much less powerful.  Toni Knox, Second Declaration; Toni Knox Affidavit, 2008.  Most jurors did not feel that any mitigation theory was presented.  Thus, the state habeas court findings on this issue are unreasonable in light of the facts and evidence.

And, while Petitioner recognizes that the issue of prejudice must be resolved based on an objective test, the state court findings are in clear contradiction to actual juror testimony.  Contrary to Ms. Busbee's self-serving testimony that her "strategy" was effective, Petitioner's actual jurors did not find the father's testimony effective or powerful.  Thus, the state court findings are unreasonable in light of the evidence presented to the state court because Petitioner's evidence directly refutes Ms. Busbee's "testimony" regarding the effectiveness of Petitioner's father.  These jurors aver that Petitioner's life was not placed in context and that no real mitigation evidence was advanced.  Trial counsel's cursory "investigation" unconstitutionally failed Petitioner in this case.

---

believed the following things made Petitioner become what he is:  violence at home, seeing the physical and verbal abuse of his Dad against his Mom; the discipline tactics used on him by his Dad").

And, while the state court focused on Ms. Busbee's testimony as to why she limited her mitigation evidence solely to the father and one sister, the Constitutional assessment necessarily looks beyond what was actually presented at mitigation. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)  As *Wiggins* explains, the issue that must be resolved on a failure to investigate claim is what was presented in light of what should have been obtained via an adequate investigation.[37] If trial counsel failed to properly conduct a mitigation investigation, then the ultimate "strategy" selected cannot be informed.  Under Strickland and its progeny, trial counsels' un-informed strategy based on an incomplete investigation is constitutionally deficient. *See Williams v.*

---

[37] In writing for the *Wiggins* majority, Justice O'Conner found

> Here, as in *Strickland*, counsel attempt to justify their limited investigation as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead.  In rejecting respondent's claim, we defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

> Our opinion in Williams v. Taylor is illustrative of the proper application of these standards.  In finding Williams' ineffectiveness claim meritorious, we applied Strickland and concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.

*Wiggins v. Smith*, 539 U.S. at 521-522.

*Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510, 522 (2003); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

Two jurors have indicated that had they been presented evidence of the true family dynamics, they both would have entertained the idea of a life sentence.[38]  This evidence was presented to – and ignored by – the state habeas court.  The refusal of the state court to fully consider the evidence presented regarding these two jurors undermined the reliability of the state courts' findings.  Findings 126 and 127 suggest that had the undiscovered mitigation evidence been found and had that same evidence been presented, it would not have made any appreciable difference.  State Court Findings, Findings 126-127, page 38.  Yet, literally two jurors found that it *did* make a difference.  And, the U.S. Supreme Court has reminded that "[t]his evidence might now have made [Petitioner] more likeable to the jury, but it might well have helped the jury understand [Petitioner], and his horrendous acts – especially in light of his purportedly stable upbringing.  *Sears v. Upton*, 130 S.Ct. 3259 (2010).

The objective standard of prejudice cannot turn a blind eye to subjective testimony from jurors in Petitioner's actual trial.  At least two actual jurors testified that they found the mitigation presentation deficient and would have considered the various pieces of evidence that Petitioner presented to the state courts.  It is a legal fiction to thereafter ignore this testimony by, remarkably, finding that Petitioner has not established prejudice.

The state court findings are patently unreasonable as the information regarding these two jurors precisely meets Petitioner's evidentiary burden – proving that had the evidence been evaluated it could have made a difference in the sentencing outcome.  Where two jurors indicate that they could have been willing to grant life over death had they been presented with Petitioner's true familial circumstances, Petitioner has surely demonstrated that there is a

---

[38] *Knox Affidavit*, 2008.

probability that other jurors – objectively reasonable jurors – would have found his evidence equally compelling.[39]

This Court, in adopting the Magistrate Judge's Findings that Petitioner's evidence did not "rise to the level of abuse and neglect" of Wiggins and Rompilla commits legal error.  The trilogy of *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510, 522 (2003); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005), resort back to the seminal case of *Strickland v. Washington*, 466 U.S. 688 (1984).  None of these cases serve as the floor – an example whereby if you fail to prove extreme sexual abuse or maltreatment – you cannot succeed under an ineffective assistance of counsel claim.  Rather, these decisions require that reviewing courts balance the aggregate mitigating evidence, both that adduced at trial and during the state habeas proceedings, against the aggravating factors.

In this case, the federal courts err by resolving the prejudice issue as follows:

---

[39] *See Mitigation Partners, Exhibit 1 (Knox interview with Amis)*; Knox Affidavit, 2008.

Toni Knox testifies most recently as follows:

> Ms. Amis remembered all the previous incidents that were presented against Licho, including him stealing a car and trying to get away, the incident with the principal and other illegal activities.  She said they had quite a bit of information about his previous bad behavior.  I asked her if she might have been able to consider other mitigating factors if they had been presented.  For example, if it had been presented that someone had issues of abuse from childhood; would she have considered that to be mitigating?  She responded that her mother had been abused as a child and she had seen the effects on her mother's life.  She would have considered some mitigation factors if proven and feels it may have swayed her to a life decision.

Knox Affidavit, 2008, p. 2-3 (and attached notes).  Surely if Ms. Amis would have considered the evidence withheld from this jury, other jury reasonable jury members would have also.  And, the abundance of evidence that contextualizes Petitioner's crime, would have certainly impacted reasonable jury members.  Counsel's failure to introduce contextualizing evidence ensured Petitioner's fate – a sentence of death.  It is this failure that requires reviewing courts to answer whether one can have confidence in the outcome of a verdict devoid of any real mitigation evidence.

"Although petitioner's [evidence] describes his father's alcoholism, brutal discipline and domestic violence, the record also reflects that petitioner came from a close and loyal family, was devoted to his father and mother, and was loved by his siblings and parents.  Petitioner has not shown that the state court's determination that no prejudice had been shown for failure to present this evidence was unreasonable . . . ."  *Magistrate Judge's Findings and Recommendations*, at 52.

Petitioner specifically objected to these Findings.  And, this Court did not address Petitioner's objections regarding prejudice.  This Court has not yet undertaken an independent, *de novo*, review of the Magistrate's Findings regarding prejudice.

Petitioner seeks a new trial on this issue because clearly established federal law requires that in assessing prejudice reviewing courts must weigh the mitigating evidence against the aggravating evidence.  That did not occur in this case.  Instead, the Magistrate Judge balanced some, but by no means all, of Petitioner's mitigating evidence against the minimal mitigation evidence presented by trial counsel.  This is error.

The U.S. Supreme Court "certainly [has] never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.  To the contrary, we have consistently explained that the *Strickland* inquiry requires precisely the type of probing and fact-specific analysis that the state trial court failed to undertake below.  In the *Williams* decision, for instance, we categorically rejected the type of truncated prejudice inquiry undertaken by the [] courts in this case."  *Sears v. Upton*, 130 S.Ct. 3259 (2010).

Factually, *Sears* is nearly identical to this case.  Sears' prosecutor told the jury, "[w]e don't have a deprived child from an inner city, a person who[m] society has turned its back on or

34

at an early age.  But, yet, we have a person, privileged in every way, who has rejected every opportunity that was afforded him."  *Id.*  Petitioner's prosecutor similarly misrepresented that he had made a deliberate choice to kill, despite purportedly having "loving parents that were role models."

Similar to *Sears*, "[t]he mitigation evidence that emerged during the state postconviction [proceedings], however, demonstrates that [Petitioner] was far from 'privileged in every way.'" *Id.*  Identical to *Sears*, Petitioner's home life "was anything but tranquil" as his "parents had a physically abusive relationship," his father referred to him and his brothers as fucken faggots, improperly disciplined him with his fists, belts and sticks, and he was raised in a family surrounded by murderers and violent convicts.  *Id.*

Unlike the state court findings and the Magistrate Judge's Findings in this case, *Sears* explains that "the fact that [Petitioner's] brother is a convicted drug dealer and user, and introduced [Petitioner] to a life of crime, actually would have been consistent with a mitigation theory portraying [Petitioner] as an individual with diminished judgment and reasoning skills, who may have desired to follow in the footsteps of an older brother. . . ."  *Id.*  Careful consideration of *Sears* confirms that Petitioner's criminal family background is much more extensive, much more endemic and much more mitigating than the items the U.S. Supreme Court believed merited prejudice assessment.  Yet, this Court did not apply the reasoning or analogy of *Sears*.

The only role modeling that took place at Petitioner's home was the "pow-pow-pow" of guns and violence that trial counsel failed to put into context for its lone expert.  The role modeling that took place included murder, just like Petitioner's cousin and his half-brother.  The

picture drawn up by the prosecutors in this case was as false and misleading as the presentation in *Sears*, a presentation to be found constitutionally deficient. *See id.*

Likewise, this Court did not apply *Porter v. McCollum*, 130 S.Ct. 447 (2009), to Petitioner's case despite the admonition that to properly assess prejudice under ineffective assistance of counsel claims, reviewing courts must "consider 'the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweigh it against the evidence in aggravation." *Id.* at 453-54. "This is not a case in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing judge.' The judge and jury at [Petitioner's] original sentencing heard almost nothing that would humanize [him] or allow them to accurately gauge his moral culpability." *Id.* at 454.

Was the "pow-pow-pow" Petitioner described his father shooting at his mother? Was the "pow-pow-pow" his brother shooting a neighbor for beating up Petitioner? Was the "pow-pow-pow" Petitioner's half brother murdering another individual? Was the "pow-pow-pow" Petitioner's cousin murdering another individual? Was the "pow-pow-pow" the sound of his brothers' 23 adult convictions? Was the "pow-pow-pow" the sound of Petitioner's father's fists against his mother, his sister, his brother or himself? Was the "pow-pow-pow" the sound of guns, gangs and violence all around Petitioner?

As *Rompilla* explains, the missing "evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that *the undiscovered 'mitigating evidence, taken as a whole "might have influenced the jury's appraisal" of [Petitioner's] culpability, and the likelihood of a*

*different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome'*

*actually reached at sentencing.*"  *Rompilla*, 545 U.S. at 393 (emphasis added).  Neither this

Court nor the Magistrate Judge weighed all of the undiscovered mitigating evidence taken as a

whole.  *Id.*  Yet, under clearly established federal law, this is required.  *Id.*

The readily available mitigating evidence that was ignored by trial counsel includes:

a) Evidence of a physically brutal father, one that hit Petitioner, his siblings and his mother with sticks, belts and open fists;[40]
b) Evidence of an alcoholic father;[41]
c)  Evidence of a verbally abusive father;[42]
d) Evidence that a daycare worker from Petitioner's childhood feared that his brother's gang and drug involvement would negatively affect Petitioner;[43]
e) Evidence of an extensive family criminal history, including two other immediate family members with murder convictions;[44]

---

[40] *See e.g., Luis Gonzalez Affidavit* (observing on three to four occasions evidence that Petitioner's mother had been beaten and had a black eye); *Margaret Barajas Affidavit* (confirming evidence of physical abuse in the family, testifying that Petitioner's mother told her Petitioner's father hit her and observing bruises on Petitioner's mother); *Maria Escamilla Affidavit* (testifying that she saw her "father hit my mother with a belt and his hand" and also that her "father would hit us with his belt, switches or whatever he could find); *Brenda Hinojosa Affidavit* (testifying that "I had to watch my mom take physical and verbal abuse from my dad countless times" including pulling her by the hair, dragging her and kicking her.  Brenda also indicated that "even though [my mom] was beaten numerous times, she never went to the hospital or called the police."  Finally, Brenda indicated that she believed the following things made Petitioner become what he is:  violence at home, seeing the physical and verbal abuse of his Dad against his Mom; the discipline tactics used on him by his Dad").

[41] *Id.*

[42] Petitioner's brother Juan advised state habeas counsel that Petitioner's father:

> abused us when we were young also whipped us with his belt,
> and smacked us around.  When he was really mad he would beat
> us down with his bare hands punching us.  When we would get in
> trouble at school he would make us get on our knees and whip us
> with his belt til he got tired.
> I guess that was the way he thought we would learn to behave.
> But the way he would talk to us didn't help either.  I mean he would
> curse us out when we wouldn't do what he wanted us to do.  For
> example:  If my father asked me to cut the grass and I forget to do
> it?  My dad would curse me out and say things like "You not worth
> the fuck.  You never going to amount to shit.  You son of a bitch.
> You fucken faggot."

*See State Habeas Exhibit 18.*

[43] *Vickie White Affidavit* (averring that she "didn't believe that Licho ever had a chance in life because of the influence of gang members and his brother's involvement with a gang and his influence on Licho.  It [was her] experience that a child growing up in that environment of guns and violence cannot escape without a major intervention").

[44] Petitioner's father and uncle have 2 convictions each – both gun related.  Petitioner's cousin has 10 adult convictions, including murder and the rest for assault and weapon related charges.  Petitioner's older brother has 8

f) Evidence of an extensive family criminal history, including 23 adult convictions between Petitioner's father's three other sons;[45]

g) Evidence that the lone possible testifying expert would not have recommended a sentence of death in this case.[46]

In addition to this evidence the reviewing courts must accept the testimony actually adduced at trial on Petitioner's behalf. When the entirety of this evidence is considered, there is a "a reasonable probability that [the jury] would have returned with a different sentence." *Wiggins v. Smith*, 539 U.S. 510 (2003). "Had the judge and jury been able to place [Petitioner's] life history 'on the mitigating side of the scale,' and appropriate reduced the ballast on the aggravating side of the scale, there is clearly a reasonable probability that the [sentencing] . . . 'would have struck a different balance,' and it is unreasonable to conclude otherwise." *Porter*, 130 S.Ct. at 454.

For these reasons, and for the specific reason that no reviewing court has yet weighed the mitigating evidence against the aggravating evidence, Petitioner respectfully moves for a New Trial.

B. District Court Did Not Provide *De Novo* Review For Family Criminal History

Despite Petitioner's preservation and specific objection regarding the Magistrate's failure to properly evaluate trial counsels' ignorance regarding the family criminal history, this Court has not resolved the issue. Trial counsel, Ms. Brooke Busbee, generically testified via affidavit that she "knew" about Petitioner's brothers' criminal history. The use of this word ("knew"), however, is imprecise if not inaccurate. What Ms. Busbee apparently was suggesting was some,

---

adult convictions, including weapon and assault convictions. Petitioner's younger brother has 9 adult convictions, including weapon and assault convictions. And, Petitioner's step-brother (Petitioner's father's son from a previous marriage) has 6 adult convictions, including murder. Thus, three of the five boys in this nuclear family have murder convictions.

[45] *Id.*

[46] *See Glen Pearson Letter*, (Nov. 29, 2002).

very limited awareness that at least one of the brothers had been incarcerated – and, in fact, was incarcerated at the time of Petitioner's trial.

Trial counsel was ineffective, however, because:

(1) Counsel failed to follow up on the obvious lead regarding Petitioner's family's criminal history suggesting Petitioner's lack of candor;

(2) Counsel failed to investigate the full spectrum of any of Petitioner's brother's true criminal history, including the half-brother's murder conviction;

(3) Counsel failed to familiarize herself with Petitioner's father's gun-related criminal history;

(4) Counsel failed to investigate the family's criminal history which was "readily available by 'looking into a file,'" *see District Court's Order Accepting and Modifying Findings, Conclusions and Recommendations*, at 16 (March 26, 2012)(citing *Rompilla v. Beard*, 545 U.S. 374, 389 (2005));

(5) Counsel failed to discover Petitioner's family history of murder and violent crimes, despite this evidence being "readily available by 'looking into a file,'"

(6) Counsel's lack of investigation permitted the prosecution to falsely portray Petitioner as the "black sheep" of his family when, in fact, violent gun-based crimes are endemic in Petitioner's family;

(7) Counsel's lack of investigation permitted the prosecution to falsely portray Petitioner as the product of a loving and stable home with positive role models;

(8) Counsel's lack of investigation permitted the prosecution to falsely portray Petitioner as the product of his own free will and deliberate choices rather than the product of a violent, crime-ridden family; and,

(9) Counsel's lack of investigation cannot be credited *post hoc* as reasonable when any so-called strategy developed would have required evaluation of records contained in state files to ensure that the strategy selected was the product of deliberation, not ignorance.

This Court failed to address Petitioner's claim regarding the family's criminal history in its analysis of Petitioner's objections. *District Court's Order Accepting and Modifying Findings, Conclusions and Recommendations* (March 26, 2012). This Order credits Petitioner with properly objecting to the Magistrate's findings regarding this issue, *id*. at 12 and 14, but wholly fails to address the issue *de novo* as required. While the Court addresses Petitioner's objection that trial counsel failed to properly investigate or develop his abusive upbringing, no analysis is provided regarding trial counsel's numerous deficiencies in relation to the family's criminal

history.  *See id.* at 16-17.  The Court's citation to *Clark v. Thaler*, 2012 WL 688519, is inapplicable to this issue and does not address Petitioner's specific objection.

Rather than restate the extensive evidence set forth above regarding the Escamilla family criminal history, Petitioner incorporates the previous section and all evidence referenced therein to support his claim for New Trial on this issue.  Further, much like the attorney investigation found deficient in *Wiggins* and *Porter*, trial counsel "ignored pertinent avenues for investigation of which [they] should have been aware."  *Porter*, 130 S.Ct. at 453.  Ms. Busbee's awareness/knowledge of Petitioner's brothers' criminal history is undeveloped in her state court affidavit.  She conclusively, without any further explication, indicates that she "knew" about the history.  There is no evidence, however, that she truly knew that each of Petitioner's three brothers, two full and one half, had 23 adult convictions between them, including a conviction for murder.  There is no evidence that trial counsel knew that Petitioner's cousin has also been convicted of murder.

Petitioner objected to the Magistrate's Findings that "[w]hile serious, the criminal histories of [Petitioner's] father, brothers and extended family do not rise to the level of petitioner's execution-style murder of a police officer just weeks after the undisputed commission of a previous murder."  *Magistrate Judge's Findings*, at 50.  Petitioner is entitled to a New Trial on this issue because the Magistrate Judge failed to appreciate the mitigating nature of this evidence under modern U.S. Supreme Court precedent.  *See e.g., Porter v. McCollum*, 130 S.Ct. 447, at 454-55; *Sears v. Upton*, 130 S.Ct. 3259, 3264 (holding trial counsel ineffective, in part, for failing to present mitigating evidence in a 1993 capital murder trial because "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive").

The Magistrate Judge's citation to 5th Circuit authority that predates these cases do not qualify as clearly established federal law under the ADEPA and are, respectfully, inapposite. *See Magistrate Judge's Findings*, at 50 (citing 1997, 2002 and 2003 5th Cir. Opinions). *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510, 522 (2003); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Porter v. McCollum*, 130 S.Ct. 447 (2009); and, *Sears v. Upton*, 130 S.Ct. 3259 (2010), all weigh in favor of Petitioner's claim that trial counsel prematurely abandoned their investigation at a point where the existing evidence – knowledge of both birth brother's violent criminal history, including 17 adult convictions between them – would have merited reasonable counsel to dig deeper and look further. *Rompilla*, 545 U.S. at 395; *Wiggins*, 539 U.S. at 527, 534. Termination of a mitigation investigation is only reasonable in the context of an informed decision – one that has carefully found and eliminated the contours of the existing sources of evidence – after a thorough investigation. *Rompilla*, 545 U.S. at 395; *Wiggins*, 539 U.S. at 527, 534.

The Magistrate Judge's Findings on page 50 unreasonably apply this clearly established federal law and merit reversal of this Court's March 26th Order. Petitioner respectfully incorporates his prejudice section set forth above. In addition, he reiterates the proper standard in assessing prejudice under *Strickland* and its progeny:

Petitioner must demonstrate that there is a reasonable probability that absent trial counsel's errors, he would have been sentenced to life. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. 668 (1984).

> In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. . . The assessment

of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.

The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. . . . When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer - including an appellate court, to the extent it independently reweighs the evidence - would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 694-697.

The commands of *Strickland* do not involve an outcome-determinative test.  This simply requires that Petitioner point out that had the undiscovered evidence been evaluated for consideration prior to the penalty phase, counsel's strategy probably would have reflected this information and there is a reasonable probability that the jury would not have sentenced him to death. "It is unquestioned that under the prevailing professional norms at the time of [Petitioner's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.  The investigation conducted by [Petitioner's] counsel clearly did not satisfy these norms." *Porter*, 130 S.Ct. 452-53.  Here, counsel did not even take the first step of interviewing witnesses or requesting records," despite knowledge or awareness that Petitioner's brothers were incarcerated and had criminal histories.  *Id.* at 453.

Petitioner was undeniably vilified during the penalty phase of his trial as a black sheep that appreciated, if not relished, the unlawful nature of his actions.  This was patently false.  The state courts refused to consider the effect the lack of investigative information contextualizing Petitioner's crime in the middle of a criminally-oriented family had on the jury's assessment of death.  *Sears*, 130 S.Ct. at 3264. Were trial counsel aware of the vast materials regarding Petitioner's family's past, they would have undoubtedly lodged vigorous objections to the prosecution's inaccurate characterization of Petitioner as growing up with good role models. Lacking this information, they sat inert, wholly ignorant that the prosecution's theory about the Escamilla family was factually wrong – terribly wrong.  *Sears*, 130 S.Ct. at 3262.

Had the jury been fully apprised of Petitioner's physically abusive upbringing, his early introduction to drugs and alcohol by family members and his constant exposure to gun-based violent crimes by other family members, including murder, the jury would have been confronted with a very different individual during sentencing.  Had the jury heard that Petitioner's older brother shot an individual for beating up Petitioner, the jury would have had the necessary context to help explain Petitioner's crime.  *Id.* at 3262-64.  *The difference between an incorrigible individual and an individual who has been raised in a criminal cartel is vast and constitutionally significant.*  And, despite the state court's deference, adopted by the federal courts, of trial counsel's alleged strategy to portray the horrible loss execution would impose on Petitioner's father, a nearly identical strategy was found constitutionally unreasonable by the U.S. Supreme Court.  *Id.*

*Sears* confirms that an incomplete mitigation strategy seeking solely to point out to emotional devastation execution would have *on the defendant's family* is constitutionally unreasonable.  *Id.*  Much like Petitioner's case, *Sears* had seven witnesses testify that he came

from a middle-class background, that "his actions shocked and dismayed his relatives; and a death sentence, the jury was told, would devastate the family." *Id.* Petitioner's trial counsel relied on two familial witnesses to portray the same, incomplete picture of devastation that Petitioner's execution might have on his family. But, just like *Sears*, this poorly conceived strategy backfired because the prosecution ultimately used Petitioner's supposed "normal" upbringing against him – despite its factual inaccuracy. *Id.*

In this case, had trial counsel foreclosed the normalcy argument – since Petitioner's upbringing in a criminal cartel is anything but normal – in all reasonable probability that would have meant the difference between a sentence of life and a sentence of death. *Id.* And, the affidavits of two of Petitioner's jury members demonstrate there is a reasonable probability that at least one of the jury members – perhaps two – might have opted for life. If the actual jurors testify to reservations, certainly reasonable jurors would display the same reticence.

An accurate presentation of Petitioner's family history would have undermined the prosecution's entire punishment theory that Petitioner was an inordinately violent individual – completely distinct from his normal, blue-collar law abiding family members. *Id.* But for counsel's unawareness of the obvious flaws in the prosecution's theory, Petitioner would have undoubtedly been presented as a product of his violent, criminal environment. Such presentation would have undoubtedly been more sympathetic than the presentation of a hardened killer who had learned good morals at home under the direction of a loving non-violent father.

Petitioner, when assessed with even a modicum of insight into his upbringing, is a sympathetic figure. *See Sears*, 130 S.Ct. at 3262-64. The state courts erred in not considering the impact the family's criminal history might have had on the outcome of Petitioner's trial. Two jurors have indicated in interviews that the presentation of some reason explaining

Petitioner's behavior might have swayed their opinion. Again, if Petitioner's actual jurors felt this way, surely objectively reasonable jurors would feel the same. This evidence helps meets Petitioner's burden of proof under *Strickland*. All that Petitioner must do is demonstrate by a preponderance of the evidence that there is a reasonable probability a reasonable jury would have voted for life. This is a much lesser burden than clear and convincing evidence or beyond a reasonable doubt. Had evidence of Petitioner's upbringing even been considered or fully evaluated by counsel, a much different portrait of Petitioner would have been presented to the jury. *Id.* The entire tenor of the penalty phase would have been different. *Id.* The jury would have been exposed to the criminal heritage of the Escamilla family and Petitioner's "normal." The jury would have learned that Petitioner was exposed to drugs and alcohol in the family in his pre-teen years. The jury would have learned that Petitioner was severely disciplined in often degrading and cruel fashion. The jury would have learned that Petitioner's father regularly beat Petitioner, his siblings and his mother with sticks, belts and his bare fist. The jury would have been introduced to a very different individual than the one the prosecution presented while trial counsel sat still – never presenting evidence of the truth, never presenting context.

Most importantly, exactly like *Sears*, had trial counsel actually known about – and communicated the criminal history of Petitioner's family to their expert – the lone mitigation expert would have been able to contextualize Petitioner's behavior regarding the "pow-pow-pow" discussion attributed to antisocial behavior as being the product of a criminal environment, one completely detached from reality. *See Sears*, 130 S.Ct. at 3263-64. "In particular, evidence of [Petitioner's] grandiose self-conception and evidence of his magical thinking, were features, in another well-credentialed expert's view, of a 'profound personality' disorder." *Id.* Dr. Pearson's description of Petitioner sounding like a "10 year-old playing cops and robbers"

45

certainly was impacted due to the lack of information he possessed while performing his assessment.  Had counsel been aware of this error, *Sears* underscores that reasonably competent counsel would have brought it to the expert's attention, that failure to do so was deficient, and that keeping such information from the jury, ultimately, could be prejudicial due to the incomplete, if not entirely inaccurate picture, generated by a deficient investigation.  *Id.*

Had the jury been introduced to the real Licho Escamilla, there is a reasonable probability that they would have sparred his life.  In light of Petitioner's sympathetic childhood, the jury would have been given the opportunity to consider this crime in light of Petitioner's own tragic background, including being raised in the equivalent of a criminal cartel.  For these reasons Petitioner requests this Court GRANT his Motion for New Trial.

C.  This Court's Erroneous Analysis Regarding Petitioner's Duty to Aid Investigation

Petitioner respectfully moves for a New Trial because this Court erroneously relies upon Fifth Circuit precedent, since superseded by U.S. Supreme Court authority, in holding that Petitioner's own behavior negates his claims of failure to investigate.  *See Order Adopting and Modifying Findings*, at 16 (citing *Lackey v. Johnson*, 116 F.3d 149 (5th Cir. 1997); *Sonnier v. Quarterman*, 476 F.3d 349 (5th Cir. 2007)).

Further, despite this Court's suggestion otherwise, *Sonnier* actually *supports* Petitioner's ineffective assistance of counsel claim.  The Fifth Circuit explained:

> According to the record . . . the trial attorneys did not talk to [defendant's] family and acquaintances at the length or in the depth required for [mitigation] purposes.  If any of these persons could have presented or directed counsel to highly effective mitigation evidence, it appears unlikely that the truncated investigation of the family and other witnesses by Sonnier's trial attorneys would have uncovered it.  *Sonnier's refusal to consent to their undertaking more extensive and in-depth discussions with his family and acquaintances to determine the nature and extent of the mitigation evidence available was not reasonable grounds for their failure to do so.*

46

*Sonnier*, 476 F.3d at 358 (emphasis added).

As Petitioner asserted in his initial § 2254 filing, the state court findings regarding failure to investigate are an unreasonable application of *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005). Throughout the state court findings, the state habeas court suggests that any deficiency regarding the failure to uncover the extensive criminal background of Petitioner's family or the pervasive level of physical and verbal abuse inflicted by Petitioner's father is the fault of family reluctance to reveal the true character of the family. Yet, in the very first paragraph of *Rompilla*, Justice Souter explains counsels' independent duty to investigate regardless of familial supports as follows:

> We hold that even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial.

*Rompilla v. Beard*, 545 U.S. 374, 376 (2005). This Court's citation to three Fifth Circuit cases, one dating back to 1997, to support a finding that trial counsel is not ineffective for failing to discover evidence the defendant withheld ignores the transcendental nature of *Rompilla*. *Id.* This Court, erroneously Petitioner contends, states that "[t]he evidence of an abusive, alcoholic father was not readily available by 'looking into a file' of a case identified by the prosecution, but was instead withheld from trial counsel by Petitioner, his family and friends, if true." *Order Accepting and Modifying Findings*, at 50.[47] The shortcoming in this sentence, and in the larger

---

[47] The "if true" language at the end of this sentence refers to footnote 4 where, despite ample affidavit testimony by every single family member excepting Petitioner's older brother – who has yet to testify in these proceedings – detailing horrific spousal abuse, including kicking, dragging by the hair and beating of Petitioner's mother and extensive physical abuse against all the children, this Court "does not find that the abuse actually occurred." One can only surmise that this Court refuses to consider the sworn testimony of Brenda Hinojosa, Luis Gonzales, Margaret Barajas, Maria Escamilla and Juan Escamilla without any cross-examination or controverted testimony.

finding placing blame on Petitioner for trial counsel's failed investigation is that *Rompilla* explicitly contradicts the Fifth Circuit authority cited by this Court.

Much like the allegations of lack of cooperation lodged against Petitioner in the current case, "Rompilla's own contributions to any mitigation case were minimal. Counsel found him uninterested in helping, as on their visit to his prison to go over a proposed mitigation strategy, when Rompilla told them he was 'bored being here listening' and returned to his cell." *Id.* "There were even times when Rompilla was even actively obstructive by sending counsel off on false leads." *Id. Rompilla*'s clear language seemingly modifies, if not overturns, *Lackey v. Johnson*, 116 F.3d 149 (5th Cir. 1997).

Likewise, the U.S. Supreme Court in *Porter* found trial counsel's investigation unreasonable despite the defendant's "fatalistic and uncooperative" approach. *Porter*, 130 S.Ct. at 453. The fact that family members were not forthcoming did not prevent him from obtaining other witnesses. *Id.* Thus, Petitioner asserts this Court erred on pages 50-51 of its *Order* by placing an affirmative burden on Petitioner to prove neither he nor any other family members "blocked" trial counsel's investigation. *Rompilla* and *Porter* obviate such burden by requiring counsel to fully perform an independent investigation regardless of familial or client cooperation. *Rompilla*, 545 U.S. at 376; *Porter*, 130 S. Ct. at 453.

In finding defendant's efforts at obstructionism an insufficient reason for limited investigation, *Rompilla* demanded that counsel pursue readily available documents and leads where "plenty of 'red flags' pointed[ed] up a need to [investigate] further." *Id. Counsels' asserted awareness that Petitioner's older brother was in prison at the time of their investigation and that his younger brother was detained in the county jail where Petitioner was confined during trial undoubtedly qualifies as a "red flag" meriting additional investigation. Most*

48

*families do not have all their male children in state custody for criminal behavior.*  Rather, this would be one of the indicators that the *Williams*, *Wiggins*, and *Rompilla* line of cases holds mandates further evaluation.  For counsel to assert awareness of the brothers' criminal history – and then, to disclaim that such awareness required additional investigation, belies any appreciation of the *Williams*, *Wiggins*, and *Rompilla* trilogy.  Thus, the state findings, the Magistrate's Findings and this Court's reference to 1997 Fifth Circuit precedent seemingly sanctioning counsels' failure to follow obvious leads is contrary to clearly established federal law as set forth by the U.S. Supreme Court.

Petitioner asserts that the state habeas court failed to properly apply *Strickland* in light of *Williams*, *Wiggins*, and *Rompilla*.  Each of these three cases underscores the importance of a thorough and diligent investigation – one independent of defendant and his/her family.  Failure to conduct a reasonable investigation exempts subsequent reviewing courts from providing the usual level of deference reserved for tactical decisions.  In 2000, the Supreme Court reminded that capital defendants have an undisputed right – "indeed, a constitutionally protected right – to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer."  *Williams*, 529 U.S. at 396.

State court findings that defer to counsel's inertia based, allegedly, on Petitioner or his family's reluctance to share familial information are contrary to clearly established federal law under *Rompilla* and *Porter*. This Court's Order, in failing to incorporate the *Rompilla* and *Porter* standards for independent investigation merits a New Trial.  Reasons transcending Petitioner's own purported recalcitrance must be proffered by trial counsel to justify their failure to investigate Petitioner's history of abuse, violence and criminal behavior.  *Rompilla*, 545 U.S. at 376; *Porter*, 130 S. Ct. at 453.  This Court's citation to *Lackey v. Johnson* ostensibly misapplies

*Rompilla's* independent investigation requirement.  *Id.*  Further, this Court's citation to *Sonnier v. Quarterman* omits the Fifth Circuit finding in that case that counsel's truncated investigation was deficient performance under *Strickland* and its progeny.  *Sonnier*, 476 F.3d at 357-58.[48]

As such, a New Trial is warranted.

D.  This Court's Erroneous Findings Regarding Prevailing Professional Norms

This Court faults Petitioner's habeas counsel for failing to properly present evidence of prevailing professional norms under *Strickland v. Washington*, 466 U.S. 668 (1984).  Petitioner earlier alleges that this failing provides him with the opportunity before this Court to present evidence of those norms based on ineffective assistance of state habeas counsel.  *Martinez v. Ryan*, 566 U.S. ____ (2012).

At the time of Petitioner's trial, the prevailing professional norms required counsel to conduct a thorough, independent mitigation investigation.  *See Porter*, 130 S.Ct. at 454 ("It is unquestioned that under the prevailing professional norms at the time of Porter's [1988] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'")(quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).  *See also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1 (C), 93 (1989)(investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that

---

[48] The Fifth Circuit explicitly found deficient performance on facts very similar to Petitioner's case:

> [W]e conclude that the trial attorneys stopped short of making a reasonable investigation for purposes of uncovering relevant mitigating evidence that could have been useful in reaching two goals that *it was their duty to pursue*:  (1) fully informing [defendant] of all available mitigating evidence and their opinion of its potential effectiveness based on their professional knowledge and experience; and (2) persuading the sentencing jury that [defendant's] moral culpability was not sufficient to warrant the death penalty.

*Sonnier*, 476 F.3d at 358 (emphasis added).  To the extend the *Sonnier* court found no prejudice, it did so only after weighing all the mitigating evidence against the aggravating evidence in the case – something that has not yet occurred on Petitioner's behalf.  *Id.* at 359-60.

may be introduced by the prosecutor"); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)(citing to 1989 ABA Guidelines to establish prevailing professional norm in 1989 capital trial).  The Texas and national practices reflect "well-defined norms" for mitigation investigation, and thus the floor below which counsel may not descend.  *Wiggins*, 539 U.S. at 524-25; *Rompilla*, 545 U.S. at 380.  In past cases, the U.S. Supreme Court appears to be taking judicial notice of the governing norms.

For these reasons, Petitioner respectfully requests that this Court take judicial notice of the prevailing professional norms in Texas when Petitioner's case was tried.  The governing Texas standard of care is reflected in the ABA Guidelines specifying that counsel should investigate the defendant's full history, including "medical history, . . . family and social history (including physical, sexual or emotional abuse").  1989 Guidelines 11.41.D.2.  Counsel must also interview "witnesses familiar with aspects of the client's history that might affect the . . . possible mitigating reasons for the offense, and/or other mitigating evidence to show why the client should not be sentenced to death."  1989 Guideline 11.4.1.D.3.  Counsel's duty "is not discharged by conducting a limited investigation."  *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007).  Counsel must "seek records, interview family members and friends, and obtain appropriate mental evaluations well in advance of trial."  *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006).

Termination of mitigation investigation is only appropriate in the context of an informed decision, after a thorough investigation.  *Rompilla*, 545 U.S. at 395; *Wiggins*, 539 U.S. at 527-28.  Even if counsel performed some investigation, that does not preclude a finding of deficient performance with respect to further investigation they reasonably should have done under the circumstances.  *Rompilla*, 545 U.S. at 388-89; *Wiggins*, 539 U.S. at 527, 534.  Federal courts,

even under the deferential scheme of the AEDPA, should scrutinize claims of strategy in light of a close reading of the record and a state court finding of strategic purpose for an omission should be disregarded if it cannot withstand such scrutiny.  *Wiggins*, 539 U.S. at 526-27.

The duty to investigate and prepare for the punishment phase also includes rebutting the prosecution's case in aggravation.  Counsel must, at a minimum, secure the information in possession of law enforcement.  *Rompilla*, 545 U.S. at 385-87.  Further, under the circumstances of this case, counsel had an obligation to secure the assistance of experts where it is necessary or appropriate for . . . presentation of mitigation");  *See* David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, Aug. 1986, at 18 ("The use of social workers and psychologists as part of the defense team is a necessity – not a luxury"); *Sears v. Upton*, 130 S.Ct. 3259, 3264 (2010)(holding trial counsel ineffective, in part, for failing to present expert testimony that could have helped the jury better understand defendant in a 1993 capital trial because "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive").

Petitioner respectfully requests that this Court take judicial notice of these prevailing professional norms, or, in the alternative GRANT Petitioner's Motion for New Trial since state habeas counsel failed to properly present and preserve this issue.

E.  Cumulative Error and Prejudice

Petitioner respectfully requests that this Court GRANT his Motion for New Trial to ensure that he receives *de novo* review of all his timely submitted Objections to the Magistrate Judge's Findings.  Such *de novo* review was not fully provided, particularly on the issue of prejudice as it relates to Petitioner's ineffective assistance of counsel for failure to investigate

claims.  Petitioner preserved his right of review and would now ask that full consideration be given to his claims.

For these reasons and all the reasons set forth above, Petitioner respectfully requests this Court GRANT his Motion for New Trial, or, in the alternative set this Motion for Oral Argument.

Respectfully Submitted,

*Mary M. Penrose*
Mary M. Penrose
Texas Wesleyan School of Law
1515 Commerce Street
Fort Worth, TX  76102
(972) 310-8669
mpenrose@law.txwes.edu

## CERTIFICATE OF SERVICE

I, Mary Margaret Penrose, certify that on April 22, 2012, I served Petitioner's Amended Motion for New Trial, including Table of Contents and Authorities on lead counsel for Respondent, Leslie K. Kuykendall, via email at her email address: leslie.kuykendall@oag.state.tx.us.

*Mary M. Penrose*